# 24-1340

## United States Court of Appeals
### For the
## Second Circuit

MASAHIDE KANAYAMA,

*Appellant*,

v.

SCOTT KOWAL, CHIEF OF U.S. PRE-TRIAL SERVICES SDNY,

*Appellee*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
District Court Case No. 23-cv-03469 (Hon. Colleen McMahon)

## APPENDIX
### (Vol. I of VIII)

**David Dudley, Esq.**
Law Offices of David M. Dudley
3415 South Sepulveda Blvd
Suite 1100
Los Angeles, CA 90034-1509
310-772-8400
Fax: 310-772-8404
Email: fedcrimlaw@hotmail.com

*Counsel for Appellant Masahide Kanayama*

## TABLE OF CONTENTS

### VOLUME I OF VIII

### APPENDIX

| S.D.N.Y Dkt. Ent. | Description | Appx. Page |
|---|---|---|
| | Docket | A0001 |
| 3 | Civil Cover Sheet | A0008 |
| 4 | Petition for Writ Of Habeas Corpus Pursuant to 28 U.S.C. 2241 | A0010 |
| 4-1 | Exhibit Exhibits Part 1 | A0066 |
| 4-2 | Exhibit Exhibits Part 2 | A0097 |
| 4-3 | Exhibit Exhibits Part 3 | A0127 |
| 4-4 | Exhibit Exhibits Part 4 | A0151 |
| 4-5 | Exhibit Exhibits Part 5 | A0168 |
| 4-6 | Exhibit Exhibits Part 6 | A0206 |
| 4-7 | Exhibit Exhibits Part 7 | A0221 |
| 4-8 | Exhibit Exhibits Part 8 | A0248 |
| 4-9 | Exhibit Exhibits Part 9 | A0257 |
| 4-10 | Exhibit Exhibits Part 10 | A0263 |
| 4-11 | Exhibit Exhibits Part 11 | A0270 |

SDNY CM/ECF NextGen Version 1.7

**Query     Reports     Utilities     Help     Log Out**

CLOSED,APPEAL,HABEAS,ECF

# U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:23-cv-03469-CM

Kanayama v. Kowal                                   Date Filed: 04/26/2023
Assigned to: Judge Colleen McMahon               Date Terminated: 04/12/2024
Cause: 28:2241fd Petition for Writ of Habeas Corpus (Federal)   Jury Demand: None
                                                  Nature of Suit: 530 Habeas Corpus
                                                  (General)
                                                  Jurisdiction: Federal Question

**Petitioner**

**Masahide Kanayama**                 represented by   **David Dudley**
                                                    Law Offices of David M. Dudley
                                                    3415 South Sepulveda Blvd
                                                    Suite 1100
                                                    Los Angeles, CA 90034-1509
                                                    310-772-8400
                                                    Fax: 310-772-8404
                                                    Email: fedcrimlaw@hotmail.com
                                                    *ATTORNEY TO BE NOTICED*

V.

**Respondent**

**Scott Kowal**                       represented by   **Tara Marie La Morte**
*Chief of U.S. Pre-Trial Services SDNY*               DOJ-USAO
                                                    Lrm Jones, Lisa
                                                    1 St. Andrews Plaza
                                                    New York, NY 10007
                                                    212-637-1041
                                                    Email: tara.lamorte2@usdoj.gov
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

**Respondent**

**Does 1-10**                         represented by   **Tara Marie La Morte**
                                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/26/2023 | 1 | **FILING ERROR - DEFICIENT PLEADING - FILER ERROR -** PETITION FOR WRIT OF HABEAS CORPUS pursuant to 28 U.S.C. 2241. (Filing Fee $ 5.00, Receipt Number ANYSDC-27655958)Document filed by David Marshall Dudley. (Attachments: # |

A0001

| | | |
|---|---|---|
| | | 1 Exhibit Exhibits Part 1, # 2 Exhibit Exhibits Part 2, # 3 Exhibit Exhibits Part 3, # 4 Exhibit Exhibits Part 4, # 5 Exhibit Exhibits Part 5, # 6 Exhibit Exhibits Part 6, # 7 Exhibit Exhibits Part 7, # 8 Exhibit Exhibits Part 8, # 9 Exhibit Exhibits Part 9, # 10 Exhibit Exhibits Part 10, # 11 Exhibit Exhibits Part 11, # 12 Exhibit Exhibits Part 12, # 13 Exhibit Exhibits Part 13, # 14 Exhibit Exhibits Part 14, # 15 Exhibit Exhibits Part 15, # 16 Exhibit Exhibits Part 16, # 17 Exhibit Exhibits Part 17, # 18 Exhibit Exhibits Part 18, # 19 Exhibit Exhibits Part 19, # 20 Exhibit Exhibits Part 20, # 21 Exhibit Exhibits Part 21, # 22 Exhibit Exhibits Part 22, # 23 Exhibit Exhibits Part 23, # 24 Exhibit Exhibits Part 24, # 25 Exhibit Exhibits Part 25, # 26 Exhibit Exhibits Part 26, # 27 Exhibit Exhibits Part 27, # 28 Exhibit Exhibits Part 28, # 29 Exhibit Exhibits Part 29, # 30 Exhibit Exhibits Part 30, # 31 Exhibit Exhibits Part 31, # 32 Exhibit Exhibits Part 32).(Dudley, David) Modified on 4/27/2023 (vf). (Entered: 04/26/2023) |
| 04/26/2023 | 2 | **FILING ERROR - DEFICIENT DOCKET ENTRY** - MOTION for David Marshall Dudley to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-27655962. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by David Marshall Dudley. (Attachments: # 1 Affidavit Affidavit Declaration of David M. Dudley, # 2 Supplement Certificate of Good Standing David M. Dudley, # 3 Text of Proposed Order Proposed Order).(Dudley, David) Modified on 4/26/2023 (sgz). (Entered: 04/26/2023) |
| 04/26/2023 | | **>>>NOTICE REGARDING DEFICIENT MOTION TO APPEAR PRO HAC VICE. Notice to RE-FILE Document No. 2 MOTION for David Marshall Dudley to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-27655962. Motion and supporting papers to be reviewed by Clerk's Office staff. The filing is deficient for the following reason(s): missing Certificate of Good Standing from Supreme Court of California. Re-file the motion as a Motion to Appear Pro Hac Vice - attach the correct signed PDF - select the correct named filer/filers - attach valid Certificates of Good Standing issued within the past 30 days - attach Proposed Order. (sgz)** (Entered: 04/26/2023) |
| 04/27/2023 | | **\*\*\*NOTICE TO ATTORNEY TO ELECTRONICALLY FILE CIVIL COVER SHEET. Notice to Attorney David Dudley. Attorney must electronically file the Civil Cover Sheet. Use the event type Civil Cover Sheet found under the event list Other Documents. (vf)** (Entered: 04/27/2023) |
| 04/27/2023 | | **\*\*\*NOTICE TO ATTORNEY REGARDING REMOVAL OF PARTY. Notice to attorney David Dudley. The following party/parties has been removed from this case: David Marshall Dudley; Tara La Morte. The party was added to the case in error. (vf)** (Entered: 04/27/2023) |
| 04/27/2023 | | **\*\*\*NOTICE TO ATTORNEY REGARDING DEFICIENT PLEADING. Notice to Attorney David Dudley to RE-FILE Document No. 1 Petition for Writ of Habeas Corpus. The filing is deficient for the following reason(s): the wrong filer/filers were selected for the pleading. Re-file the pleading using the event type Petition for Writ of Habeas Corpus found under the event list Complaints and Other Initiating Documents - attach the correct signed PDF - select the individually named filer/filers - select the individually named party/parties the pleading is against. (vf)** (Entered: 04/27/2023) |
| 04/27/2023 | | **\*\*\*NOTICE TO ATTORNEY REGARDING CIVIL. CASE OPENING STATISTICAL ERROR CORRECTION: Notice to attorney David Dudley. The following case opening statistical information was erroneously selected/entered: Cause of Action code 18:3184 Extradition Procedure; County code Albany; Fee Status code none (no fee required). The following correction(s) have been made to your case entry: the Cause of Action code has been modified to 28:2241fd Petition for** |

A0002

SDNY CM/ECF NextGen Version 1.7

| | | **Writ of Habeas Corpus (Federal); the County code has been modified to New York; the Fee Status code has been modified to pd (paid). (vf)** (Entered: 04/27/2023) |
|---|---|---|
| 04/27/2023 | | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above-entitled action is assigned to Judge Colleen McMahon. Please download and review the Individual Practices of the assigned District Judge, located at https://nysd.uscourts.gov/judges/district-judges. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at https://nysd.uscourts.gov/rules/ecf-related-instructions..(vf) (Entered: 04/27/2023) |
| 04/27/2023 | | Magistrate Judge Jennifer Willis is so designated. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: https://nysd.uscourts.gov/sites/default/files/2018-06/AO-3.pdf. (vf) (Entered: 04/27/2023) |
| 04/27/2023 | | Case Designated ECF. (vf) (Entered: 04/27/2023) |
| 04/28/2023 | 3 | CIVIL COVER SHEET filed..(Dudley, David) (Entered: 04/28/2023) |
| 04/28/2023 | 4 | PETITION FOR WRIT OF HABEAS CORPUS pursuant to 28 U.S.C. 2241. (Filing Fee $ 5.00, Receipt Number ANYSDC-27671870)Document filed by Masahide Kanayama. (Attachments: # 1 Exhibit Exhibits Part 1, # 2 Exhibit Exhibits Part 2, # 3 Exhibit Exhibits Part 3, # 4 Exhibit Exhibits Part 4, # 5 Exhibit Exhibits Part 5, # 6 Exhibit Exhibits Part 6, # 7 Exhibit Exhibits Part 7, # 8 Exhibit Exhibits Part 8, # 9 Exhibit Exhibits Part 9, # 10 Exhibit Exhibits Part 10, # 11 Exhibit Exhibits Part 11, # 12 Exhibit Exhibits Part 12, # 13 Exhibit Exhibits Part 13, # 14 Exhibit Exhibits Part 14, # 15 Exhibit Exhibits Part 15, # 16 Exhibit Exhibits Part 16, # 17 Exhibit Exhibits Part 17, # 18 Exhibit Exhibits Part 18, # 19 Exhibit Exhibits Part 19, # 20 Exhibit Exhibits Part 20, # 21 Exhibit Exhibits Part 21, # 22 Exhibit Exhibits Part 22, # 23 Exhibit Exhibits Part 23, # 24 Exhibit Exhibits Part 24, # 25 Exhibit Exhibits Part 25, # 26 Exhibit Exhibits Part 26, # 27 Exhibit Exhibits Part 27, # 28 Exhibit Exhibits Part 28, # 29 Exhibit Exhibits Part 29, # 30 Exhibit Exhibits Part 30, # 31 Exhibit Exhibits Part 31, # 32 Exhibit Exhibits Part 32).(Dudley, David) (Entered: 04/28/2023) |
| 05/02/2023 | 5 | NOTICE OF APPEARANCE by Tara Marie La Morte on behalf of Does 1-10, Scott Kowal..(La Morte, Tara) (Entered: 05/02/2023) |
| 05/03/2023 | 6 | NOTICE of Consent to Magistrate. Document filed by Masahide Kanayama..(Dudley, David) (Entered: 05/03/2023) |
| 05/08/2023 | 7 | MOTION for David Marshall Dudley to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Masahide Kanayama. (Attachments: # 1 Supplement Certificate of Good Standing CA Supreme Court, # 2 Affidavit Notarized Declaration/Affidavit D. Dudley, # 3 Text of Proposed Order Proposed Order PDF).(Dudley, David) (Entered: 05/08/2023) |
| 05/09/2023 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 7 MOTION for David Marshall Dudley to Appear Pro Hac Vice. Motion and supporting papers to be reviewed by Clerk's Office staff. The document has been reviewed and there are no deficiencies. (va)** (Entered: 05/09/2023) |
| 05/15/2023 | 8 | ORDER TO ANSWER 28 U.S.C. § 2241: A petition for writ of habeas corpus having been filed on April 27, 2023, this Court hereby ORDERS that: The Clerk of Court shall notify the U.S. Attorney's Office for the Southern District of New York that this order has been issued. Within thirty days of the date of this order, the U.S. Attorney's Office shall file an answer or other pleadings in response to the motion. Petitioner shall have thirty days from |

A0003

| | | |
|---|---|---|
| | | the date on which Respondent is served with answer to file a response. Absent further order, the motion will be considered fully submitted as of that date. Scott Kowal answer due on 7/14/2023. (Signed by Judge Colleen McMahon on 5/15/2023) (kv) Transmission to Docket Assistant Clerk for processing. (Entered: 05/16/2023) |
| 05/16/2023 | 9 | ORDER FOR ADMISSION PRO HAC VICE granting 7 Motion for David Marshall Dudley to Appear Pro Hac Vice.. (Signed by Judge Colleen McMahon on 5/16/2023) (kv) (Entered: 05/16/2023) |
| 05/17/2023 | 10 | ORDER SCHEDULING AN INITIAL PRETRIAL CONFERENCE: If the parties fail to agree upon such a plan or fail to submit the plan to the Court within the time provided (at least two business days before the conference date), the parties must participate in a telephone conference on 9/14/2023 at 11 :45 a.m. Parties should dial in at 1(888)363-4749, access code (9054506) to join the conference. Initial Conference set for 9/14/2023 at 11:45 AM before Judge Colleen McMahon. (Signed by Judge Colleen McMahon on 5/17/2023) (ate) (Entered: 05/17/2023) |
| 06/14/2023 | 11 | MEMORANDUM OF LAW in Opposition re: 7 MOTION for David Marshall Dudley to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.** *Respondent's Opposition to Petition for Writ of Habeas Corpus.* Document filed by Scott Kowal. (Attachments: # 1 Exhibit GX-1, # 2 Exhibit GX-2, Tab 1, # 3 Exhibit GX-2, # 4 Exhibit GX-2, Tab 1, # 5 Exhibit GX-2, Tab 2, # 6 Exhibit GX-2, Tab 3, # 7 Exhibit GX-2, Tab 4, # 8 Exhibit GX-2, Tab 5, # 9 Exhibit GX-2, Tab 6, # 10 Exhibit GX-2, Tab 7, # 11 Exhibit GX-2, Tab 8, # 12 Exhibit GX-2, Tab 9, # 13 Exhibit GX-2, Tab 10, # 14 Exhibit GX-2, Tab 11, # 15 Exhibit GX-2, Tab 12, # 16 Exhibit GX-2, Tab 13, # 17 Exhibit GX-2, Tab 14, # 18 Exhibit GX-2, Tab 15, # 19 Exhibit GX-2, Tab 16, # 20 Exhibit GX-2, Tabs 17-18, # 21 Exhibit GX-2, Tab 20, # 22 Exhibit GX-3, # 23 Exhibit GX-3, Tab 1, # 24 Exhibit GX-3, Tab 2, # 25 Exhibit GX-3, Tab 3, # 26 Exhibit GX-3, Tab 4, # 27 Exhibit GX-3, Tab 5, # 28 Exhibit GX-3, Tab 6, # 29 Exhibit GX-3, Tab 7, # 30 Exhibit GX-3, Tab 8, # 31 Exhibit GX-3, Tab 9, # 32 Exhibit GX-3, Tab 10, # 33 Exhibit GX-3, Tab 11, # 34 Exhibit GX-4, # 35 Exhibit GX-5, # 36 Exhibit GX-5, Tab 1).(La Morte, Tara) (Entered: 06/14/2023) |
| 07/13/2023 | 12 | LETTER MOTION for Extension of Time to File Response/Reply *to Opposition Brief* addressed to Judge Colleen McMahon from David M. Dudley on Behalf of Masahide Kanayama dated July 12, 2023. Document filed by Masahide Kanayama..(Dudley, David) (Entered: 07/13/2023) |
| 07/17/2023 | 13 | ORDER granting 12 LETTER MOTION for Extension of Time to File Response/Reply *to Opposition Brief* addressed to Judge Colleen McMahon from David M. Dudley on Behalf of Masahide Kanayama dated July 12, 2023. Fine but your reply brief is limited to ten pages. Replies due by 8/14/2023. (Signed by Judge Colleen McMahon on 7/17/2023) (mml) (Entered: 07/17/2023) |
| 08/11/2023 | 14 | LETTER MOTION for Extension of Time to File Response/Reply *To Respondent's Opposition Brief* addressed to Judge Colleen McMahon from Attorney David M. Dudley dated August 11, 2023. Document filed by Masahide Kanayama..(Dudley, David) (Entered: 08/11/2023) |
| 08/11/2023 | 15 | ORDER granting 14 Letter Motion for Extension of Time to File Response/Reply re 14 LETTER MOTION for Extension of Time to File Response/Reply *To Respondent's Opposition Brief* addressed to Judge Colleen McMahon from Attorney David M. Dudley dated August 11, 2023. Extension granted. (Replies due by 9/14/2023.) (Signed by Judge Colleen McMahon on 8/11/23) (yv) (Entered: 08/11/2023) |
| 09/13/2023 | 16 | AMENDED CALENDAR NOTICE, Please take notice that the above captioned matter has been re-scheduled for a: Rule (16) conference on Thursday, October 5, 2023 at 11:45 |

A0004

|  |  | A.M. before the Honorable Colleen McMahon, United States District Judge. Parties should dial in at 1(888)363-4 749, access code (9054506) to join the conference. So Ordered. ( Initial Conference set for 10/5/2023 at 11:45 AM before Judge Colleen McMahon.) (Signed by Judge Colleen McMahon on 9/13/23) (yv) (Entered: 09/13/2023) |
| 09/14/2023 | 17 | LETTER MOTION for Extension of Time to File Response/Reply *to Opposition Brief* addressed to Judge Colleen McMahon from David M. Dudley on Behalf of Masahide Kanayama dated 09/14/2023. Document filed by Masahide Kanayama..(Dudley, David) (Entered: 09/14/2023) |
| 09/14/2023 | 18 | ORDER granting 17 Letter Motion for Extension of Time to File Response/Reply re 17 LETTER MOTION for Extension of Time to File Response/Reply *to Opposition Brief* addressed to Judge Colleen McMahon from David M. Dudley on Behalf of Masahide Kanayama dated 09/14/2023. OK. ( Replies due by 10/6/2023.) (Signed by Judge Colleen McMahon on 9/14/23) (yv) (Entered: 09/14/2023) |
| 10/03/2023 | 19 | SECOND AMENDED CALENDAR NOTICE, Please take notice that the above captioned matter has been re-scheduled for a: Rule (16) conference to Thursday, November 2, 2023 at 10:45 A.M. before the Honorable Colleen McMahon, United States District Judge in Courtroom 24A, U.S. District Court, 500 Pearl Street, New York, New York 10007. So Ordered. ( Initial Conference set for 11/2/2023 at 10:45 AM in Courtroom 24A, 500 Pearl Street, New York, NY 10007 before Judge Colleen McMahon.) (Signed by Judge Colleen McMahon on 10/3/23) (yv) (Entered: 10/03/2023) |
| 10/06/2023 | 20 | LETTER MOTION for Extension of Time to File Response/Reply *To Respondent's Opposition Brief* addressed to Judge Colleen McMahon from David M. Dudley on behalf of Masahide Kanayama dated 10/06/2023. Document filed by Masahide Kanayama.. (Dudley, David) (Entered: 10/06/2023) |
| 10/10/2023 | 21 | ORDER granting 20 Letter Motion for Extension of Time to File Response/Reply re 20 LETTER MOTION for Extension of Time to File Response/Reply *To Respondent's Opposition Brief* addressed to Judge Colleen McMahon from David M. Dudley on behalf of Masahide Kanayama dated 10/06/2023. Ok. Replies due by 10/26/2023.. (Signed by Judge Colleen McMahon on 10/10/2023) (jca) (Entered: 10/10/2023) |
| 10/26/2023 | 22 | REPLY to Response to Motion re: 20 LETTER MOTION for Extension of Time to File Response/Reply *To Respondent's Opposition Brief* addressed to Judge Colleen McMahon from David M. Dudley on behalf of Masahide Kanayama dated 10/06/2023. . Document filed by Masahide Kanayama. (Attachments: # 1 Exhibit Japanese Extradition Partners, # 2 Exhibit Human Rights Watch Report, # 3 Exhibit United Nations Report, # 4 Exhibit Expert Report - Defrancesco, # 5 Exhibit Export Report - Bosco).(Dudley, David) (Entered: 10/27/2023) |
| 04/11/2024 | 23 | DECISION AND ORDER DENYING WRIT OF HABEAS CORPUS re: 4 Petition for Writ of Habeas Corpus, filed by Masahide Kanayama. Kanayama's petition is denied. To the extent that Kanayama has a right to appeal this Court's denial of his petition, the Court declines to issue a certificate of appealability because there has been no "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); see United States v. Perez, 129 F.3d 255, 260 (2d Cir. 1997). Further, the Court finds, pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from an order denying Kanayama's motion would not be taken in good faith. See Feliz v. United States, No. 01-cv-5544, 2002 WL 1964347, at *7 (S.D.N.Y. Aug. 22, 2002). This constitutes the decision and order of the Court. (Signed by Judge Colleen McMahon on 4/11/2024) (mml) Transmission to Orders and Judgments Clerk for processing. (Entered: 04/11/2024) |
| 04/12/2024 | 24 | CLERK'S JUDGMENT re: 23 Decision & Order. in favor of Does 1-10, Scott Kowal against Masahide Kanayama. It is hereby ORDERED, ADJUDGED AND DECREED: |

A0005

| | | |
|---|---|---|
| | | That for the reasons stated in the Court's Decision & Order dated April 11, 2024, Kanayama's petition is denied. To the extent that Kanayama has a right to appeal this Court's denial of his petition, the Court declines to issue a certificate of appealability because there has been no "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); see United States v. Perez, 129 F.3d 255, 260 (2d Cir. 1997). Further, the Court finds, pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from an order denying Kanayama's motion would not be taken in good faith. See Feliz v. United States, No. 01-cv-5544, 2002 WL 1964347, at *7 (S.D.N.Y. Aug. 22, 2002). (Signed by Clerk of Court Ruby Krajick on 4/12/2024) (Attachments: # 1 Notice of Righ to Appeal) (nd) (Entered: 04/12/2024) |
| 05/08/2024 | 25 | **FILING ERROR - NO ORDER SELECTED FOR APPEAL** - NOTICE OF APPEAL. Document filed by Masahide Kanayama. Filing fee $ 605.00, receipt number ANYSDC-29330520. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(Dudley, David) Modified on 5/9/2024 (nd). (Entered: 05/08/2024) |
| 05/09/2024 | | ***NOTICE TO ATTORNEY REGARDING DEFICIENT APPEAL. Notice to attorney David Dudley to RE-FILE Document No. 25 Notice of Appeal,.. The filing is deficient for the following reason(s): the order/judgment being appealed was not selected. Re-file the appeal using the event type Notice of Appeal found under the event list Appeal Documents - attach the correct signed PDF - select the correct named filer/filers - select the correct order/judgment being appealed. (nd) (Entered: 05/09/2024) |
| 05/09/2024 | 26 | NOTICE OF APPEAL from 24 Clerk's Judgment,,, 23 Order,,,. Document filed by Masahide Kanayama. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(Dudley, David) (Entered: 05/09/2024) |
| 05/09/2024 | | Appeal Fee Paid electronically via Pay.gov: for 26 Notice of Appeal. Filing fee $ 605.00. Pay.gov receipt number ANYSDC-29330520, paid on 5/8/2024. (tp) (Entered: 05/09/2024) |
| 05/09/2024 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 26 Notice of Appeal. (tp) (Entered: 05/09/2024) |
| 05/09/2024 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 26 Notice of Appeal filed by Masahide Kanayama were transmitted to the U.S. Court of Appeals. (tp) (Entered: 05/09/2024) |
| 12/05/2024 | 27 | FIRST MOTION to Stay *Extradition*. Document filed by Masahide Kanayama. (Attachments: # 1 Exhibit Declaration of Attorney David M. Dudley, # 2 Exhibit Letter from Medical Doctor, # 3 Exhibit Media Reports re: custody deaths).(Dudley, David) (Entered: 12/05/2024) |
| 12/16/2024 | 28 | LETTER addressed to Judge Colleen McMahon from Tara M. La Morte dated December 16, 2024 re: Response to Second Circuit Order dated 11-25-2024. Document filed by Scott Kowal, Does 1-10..(La Morte, Tara) (Entered: 12/16/2024) |
| 12/17/2024 | 29 | MEMORANDUM OF LAW in Opposition re: 27 FIRST MOTION to Stay *Extradition*. . Document filed by Scott Kowal, Does 1-10..(La Morte, Tara) (Entered: 12/17/2024) |
| 12/19/2024 | 30 | DECISION AND ORDER DENYING STAY OF EXTRADITION re: 27 FIRST MOTION to Stay *Extradition*. filed by Masahide Kanayama. The motion for a stay pending appeal is denied. The Clerk of Court is directed to remove the motion at Docket #26 from the court's list of open motions, and to re-close this matter. (Signed by Judge Colleen McMahon on 12/19/2024) (jjc) (Entered: 12/19/2024) |
| 02/04/2025 | 31 | LETTER addressed to Judge Colleen McMahon from Tara M. La Morte dated February 4, 2025 re: Status of Extradition. Document filed by Scott Kowal, Does 1-10..(La Morte, |

A0006

| | | Tara) (Entered: 02/04/2025) |
|---|---|---|
| 03/06/2025 | 32 | TRUE COPY ORDER of USCA as to 26 Notice of Appeal filed by Masahide Kanayama USCA Case Number 24-1340. USCA Case Number 24-1340. Appellant moves for a stay of extradition pending appeal. Upon due consideration, it is hereby ORDERED that the motion is DENIED. See Nken v. Holder, 556 U.S. 418, 43435 (2009). Catherine O'Hagan Wolfe, Clerk USCA for the Second Circuit. Certified : 3/6/2025.(km) (Entered: 03/06/2025) |
| 03/06/2025 | | Transmission of USCA Mandate/Order to the District Judge re: 32 USCA Order.(km) (Entered: 03/06/2025) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 03/07/2025 13:20:36 | | |
| **PACER Login:** | ltfl0086 | **Client Code:** | 09995.0000 |
| **Description:** | Docket Report | **Search Criteria:** | 1:23-cv-03469-CM |
| **Billable Pages:** | 7 | **Cost:** | 0.70 |

JS 44C/SDNY
REV.
10/01/2020

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for use of the Clerk of Court for the purpose of initiating the civil docket sheet.

PLAINTIFFS
MASAHIDE KANAYAMA

DEFENDANTS
SCOTT KOWAL, CHIEF OF US PRETRIAL SERVICES SDNY, AND DOES 1-10

ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER
DAVID M. DUDLEY, LAW OFFICE OF DAVID M. DUDLEY
3415 S. SEPULVEDA BLVD., SUITE 1100
LOS ANGELES, CA 90034

ATTORNEYS (IF KNOWN)
TARA LAMORTE,
US ATTORNEY'S OFFICE
SOUTHERN DISTRICT OF NEW YORK

CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE)
(DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. SECTION 2241

Has this action, case, or proceeding, or one essentially the same been previously filed in SDNY at any time? No [ ] Yes [x]   Judge Previously Assigned

If yes, was this case  Vol. [ ]  Invol. [ ]  Dismissed.  No [ ]  Yes [ ]  If yes, give date _____  & Case No. _____

Is this an international arbitration case?     No [ ]     Yes [ ]

(PLACE AN [x] IN ONE BOX ONLY)                    NATURE OF SUIT

TORTS

ACTIONS UNDER STATUTES

| CONTRACT | PERSONAL INJURY | PERSONAL INJURY | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 INSURANCE | [ ] 310 AIRPLANE | [ ] 367 HEALTHCARE/ PHARMACEUTICAL PERSONAL INJURY/PRODUCT LIABILITY | [ ] 625 DRUG RELATED SEIZURE OF PROPERTY 21 USC 881 | [ ] 422 APPEAL 28 USC 158 | [ ] 375 FALSE CLAIMS |
| [ ] 120 MARINE | [ ] 315 AIRPLANE PRODUCT LIABILITY | | | [ ] 423 WITHDRAWAL 28 USC 157 | [ ] 376 QUI TAM |
| [ ] 130 MILLER ACT | [ ] 320 ASSAULT, LIBEL & SLANDER | [ ] 365 PERSONAL INJURY PRODUCT LIABILITY | [ ] 690 OTHER | | [ ] 400 STATE REAPPORTIONMENT |
| [ ] 140 NEGOTIABLE INSTRUMENT | [ ] 330 FEDERAL EMPLOYERS' LIABILITY | [ ] 368 ASBESTOS PERSONAL INJURY PRODUCT LIABILITY | | | [ ] 410 ANTITRUST |
| [ ] 150 RECOVERY OF OVERPAYMENT & ENFORCEMENT OF JUDGMENT | [ ] 340 MARINE | | PROPERTY RIGHTS | | [ ] 430 BANKS & BANKING |
| | [ ] 345 MARINE PRODUCT LIABILITY | PERSONAL PROPERTY | [ ] 820 COPYRIGHTS | [ ] 880 DEFEND TRADE SECRETS ACT | [ ] 450 COMMERCE |
| [ ] 151 MEDICARE ACT | | | [ ] 830 PATENT | | [ ] 460 DEPORTATION |
| [ ] 152 RECOVERY OF DEFAULTED STUDENT LOANS (EXCL VETERANS) | [ ] 350 MOTOR VEHICLE | [ ] 370 OTHER FRAUD | [ ] 835 PATENT-ABBREVIATED NEW DRUG APPLICATION | | [ ] 470 RACKETEER INFLU- ENCED & CORRUPT ORGANIZATION ACT (RICO) |
| | [ ] 355 MOTOR VEHICLE PRODUCT LIABILITY | [ ] 371 TRUTH IN LENDING | [ ] 840 TRADEMARK | | |
| [ ] 153 RECOVERY OF OVERPAYMENT OF VETERAN'S BENEFITS | [ ] 360 OTHER PERSONAL INJURY | | | SOCIAL SECURITY | [ ] 480 CONSUMER CREDIT |
| | | [ ] 380 OTHER PERSONAL PROPERTY DAMAGE | LABOR | [ ] 861 HIA (1395ff) | [ ] 485 TELEPHONE CONSUMER PROTECTION ACT |
| [ ] 160 STOCKHOLDERS SUITS | [ ] 362 PERSONAL INJURY - MED MALPRACTICE | [ ] 385 PROPERTY DAMAGE PRODUCT LIABILITY | [ ] 710 FAIR LABOR STANDARDS ACT | [ ] 862 BLACK LUNG (923) | |
| | | | | [ ] 863 DIWC/DIWW (405(g)) | [ ] 490 CABLE/SATELLITE TV |
| [ ] 190 OTHER CONTRACT | | PRISONER PETITIONS | [ ] 720 LABOR/MGMT RELATIONS | [ ] 864 SSID TITLE XVI | [ ] 850 SECURITIES/ COMMODITIES/ EXCHANGE |
| [ ] 195 CONTRACT PRODUCT LIABILITY | | [ ] 463 ALIEN DETAINEE | [ ] 740 RAILWAY LABOR ACT | [ ] 865 RSI (405(g)) | |
| | ACTIONS UNDER STATUTES | [ ] 510 MOTIONS TO VACATE SENTENCE 28 USC 2255 | [ ] 751 FAMILY MEDICAL LEAVE ACT (FMLA) | FEDERAL TAX SUITS | [ ] 890 OTHER STATUTORY ACTIONS |
| [ ] 196 FRANCHISE | CIVIL RIGHTS | [ ] 530 HABEAS CORPUS | [ ] 790 OTHER LABOR LITIGATION | [ ] 870 TAXES (U.S. Plaintiff or Defendant) | [ ] 891 AGRICULTURAL ACTS |
| | [ ] 440 OTHER CIVIL RIGHTS (Non-Prisoner) | [ ] 535 DEATH PENALTY | [ ] 791 EMPL RET INC SECURITY ACT (ERISA) | [ ] 871 IRS-THIRD PARTY 26 USC 7609 | [ ] 893 ENVIRONMENTAL MATTERS |
| REAL PROPERTY | | [ ] 540 MANDAMUS & OTHER | | | [ ] 895 FREEDOM OF INFORMATION ACT |
| | [ ] 441 VOTING | | | | [ ] 896 ARBITRATION |
| [ ] 210 LAND CONDEMNATION | [ ] 442 EMPLOYMENT | PRISONER CIVIL RIGHTS | IMMIGRATION | | [ ] 899 ADMINISTRATIVE PROCEDURE ACT/REVIEW OR APPEAL OF AGENCY DECISION |
| [ ] 220 FORECLOSURE | [ ] 443 HOUSING/ ACCOMMODATIONS | [ ] 550 CIVIL RIGHTS | [ ] 462 NATURALIZATION APPLICATION | | |
| [ ] 230 RENT LEASE & EJECTMENT | [ ] 445 AMERICANS WITH DISABILITIES - EMPLOYMENT | [ ] 555 PRISON CONDITION | [ ] 465 OTHER IMMIGRATION ACTIONS | | [ ] 950 CONSTITUTIONALITY OF STATE STATUTES |
| [ ] 240 TORTS TO LAND | | [ ] 560 CIVIL DETAINEE CONDITIONS OF CONFINEMENT | | | |
| [ ] 245 TORT PRODUCT LIABILITY | [ ] 446 AMERICANS WITH DISABILITIES -OTHER | | | | |
| [ ] 290 ALL OTHER REAL PROPERTY | [ ] 448 EDUCATION | | | | |

Check if demanded in complaint:

[ ] CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $_____ OTHER_____

Check YES only if demanded in complaint
JURY DEMAND: [ ] YES [x] NO

DO YOU CLAIM THIS CASE IS RELATED TO A CIVIL CASE NOW PENDING IN S.D.N.Y.
AS DEFINED BY LOCAL RULE FOR DIVISION OF BUSINESS 13?
IF SO, STATE:

JUDGE _____  DOCKET NUMBER_____

NOTE: You must also submit at the time of filing the Statement of Relatedness form (Form IH-32).

*(PLACE AN  x  IN ONE BOX ONLY)*                    **ORIGIN**

[x] 1 Original Proceeding   [ ] 2 Removed from State Court   [ ] 3 Remanded from Appellate Court   [ ] 4 Reinstated or Reopened   [ ] 5 Transferred from (Specify District)   [ ] 6 Multidistrict Litigation (Transferred)   [ ] 7 Appeal to District Judge from Magistrate Judge

[ ] a. all parties represented

[ ] b. At least one party is pro se.                    [ ] 8 Multidistrict Litigation (Direct File)

*(PLACE AN  x  IN ONE BOX ONLY)*     **BASIS OF JURISDICTION**          *IF DIVERSITY, INDICATE CITIZENSHIP BELOW.*

[x] 1 U.S. PLAINTIFF   [ ] 2 U.S. DEFENDANT   [x] 3 FEDERAL QUESTION (U.S. NOT A PARTY)   [ ] 4 DIVERSITY

**CITIZENSHIP OF PRINCIPAL PARTIES (FOR DIVERSITY CASES ONLY)**

(Place an [X] in one box for Plaintiff and one box for Defendant)

| | PTF DEF | | PTF DEF | | PTF DEF |
|---|---|---|---|---|---|
| CITIZEN OF THIS STATE | [ ] 1  [ ] 1 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | [ ] 3 [ ] 3 | INCORPORATED and PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE | [ ] 5  [ ] 5 |
| CITIZEN OF ANOTHER STATE | [ ] 2  [ ] 2 | INCORPORATED or PRINCIPAL PLACE OF BUSINESS IN THIS STATE | [ ] 4 [ ] 4 | FOREIGN NATION | [ ] 6  [ ] 6 |

PLAINTIFF(S) ADDRESS(ES) AND COUNTY(IES)

DEFENDANT(S) ADDRESS(ES) AND COUNTY(IES)

DEFENDANT(S) ADDRESS UNKNOWN

REPRESENTATION IS HEREBY MADE THAT, AT THIS TIME, I HAVE BEEN UNABLE, WITH REASONABLE DILIGENCE, TO ASCERTAIN THE RESIDENCE ADDRESSES OF THE FOLLOWING DEFENDANTS:

**COURTHOUSE ASSIGNMENT**

I hereby certify that this case should be assigned to the courthouse indicated below pursuant to Local Rule for Division of Business 18, 20 or 21.

Check one:     THIS ACTION SHOULD BE ASSIGNED TO:     [ ] WHITE PLAINS     [x] MANHATTAN

DATE 4/28/23     _____ SIGNATURE OF ATTORNEY OF RECORD

ADMITTED TO PRACTICE IN THIS DISTRICT
[x] NO
[ ] YES (DATE ADMITTED Mo. _____ Yr. _____)
Attorney Bar Code #

RECEIPT #

Magistrate Judge is to be designated by the Clerk of the Court.

Magistrate Judge _____ is so Designated.

Ruby J. Krajick, Clerk of Court by _____ Deputy Clerk, DATED _____.

UNITED STATES DISTRICT COURT (NEW YORK SOUTHERN)

**Clear Form**          **Save**          **Print**

UNITED STATES DISTRICT
COURT FOR THE SOUTHERN
DISTRICT OF NEW YORK

- -------------------------------------------------------- X

Case No.: 1:23-CV-3469

MASAHIDE KANAYAMA,

    Petitioner,

       v

SCOTT KOWAL, Chief of U.S. Pre-
Trial Services SDNY, and DOES 1-10,

    Respondents.

- -------------------------------------------------------- X

## PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. SECTION 2241

LAW OFFICES OF DAVID M. DUDLEY
3415 South Sepulveda Boulevard,
Suite 1100
Los Angeles, CA 90034
Ph: (310) 772-8400
Fax: (310) 772-8404
*Attorney for Petitioner*
*Masahide Kanayama*

1

## PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. SECTION 2241

### INTRODUCTION

1. Petitioner Masahide Kanayama is a medical doctor who resides in New York City as a permanent United States resident. He is a Japanese citizen who has applied for American citizenship.

2. Dr. Kanayama is a renowned gynecological surgeon who has developed an innovative and immensely successful surgical technique for treating endometriosis, making him one of the pre-eminent surgeons of his kind not only in this country, but in the world. Exhibit 1.

3. The petitioner has no criminal history whatsoever in any nation.

4. The Japanese government is seeking the extradition of the petitioner from the United States as part of an investigation concerning two alleged instances of vandalism which would almost certainly be charged as misdemeanors anywhere in this country, including Manhattan—if they were charged at all.

5. If returned to Japan, Dr. Kanayama would face persecution as a Christian missionary, which he has been for many years, in a largely Buddhist and Shinto nation that has a history of persecuting those of Christian belief. Ex. 1.

6. Recently, a judge in the Southern District of New York granted the United States government's request for certification of the petitioner's extradition.

2

7. As there is no statutory mechanism for appealing the district court's certification order, the only process available to Dr. Kanayama for review of that order is the filing of this Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. section 2241.

## PROCEDURAL HISTORY

8. On April 4, 2015, the police force in Narita, Japan obtained an arrest sheet or warrant for Dr. Kanayama as part of its investigation into two purported events of vandalism—one at a Buddhist temple in the city of Narita, the other at a Shinto shrine in the area of Katori—on the same date in March of that year. The execution of that sheet or warrant would, under Japanese penal law, allow the Narita police to detain the petitioner for interrogation over a 23-day period, which can be extended for a much longer time period.

9. These arrest sheets have been updated in Japan numerous times since the spring of 2015.

10. On December 12, 2016, the Japanese government sent the United States State Department a Diplomatic Note requesting the extradition of Masahide Kanayama. The State Department later referred the matter to the Department of Justice.

11. On May 30, 2017, the DOJ, through the United States Attorney in the Southern District of New York, filed an extradition complaint against Dr.

A0012

Kanayama.  The case number given to that action in the Southern District was 17-Misc.-1.

12.  On June 2, 2017, the United States Marshal's Service arrested the petitioner in New York City.

13.  Several days later, a federal magistrate judge ordered the petitioner's release from custody on certain conditions, pending the resolution of the extradition complaint.

14.  On August 22, 2017, the government filed its memorandum in support to the extradition request.

15.  On October 20, 2017, Dr. Kanayama filed his formal opposition to that request.

16.  On November 17, 2017, the government filed its reply to that opposition.

17.  On January 12, 2018, the petitioner filed a sur-reply to the government's response.

18.  On December 6, 2022, the district court, Judge Ramos presiding, held a formal extradition hearing.

19.  On January 26, 2023, the district court issued a written order certifying the petitioner for extradition.

20.  Dr. Kanayama now files this Petition, naming Scott Kowal, Chief of Pre-Trial Services for the Southern District of New York as the respondent.  The

naming of this respondent is based upon research conduced by the petitioner, but the available authority  on the issue of who should be the proper respondent in this matter is extremely limited.  Therefore, the petitioner has reserved the right to name other possible appropriate respondents by including several DOES in the title of the Petition.

## STATUS OF PETITIONER

21.   The petitioner remains on supervised release conditions, modified since his initial release on bond.  He is not permitted to travel internationally and his passport is in the hands of the United States Pre-Trial Office for the Southern District of New York.

22.   He can travel within the fifty states, but he must receive permission from his pre-trial officer.

23.   He must report to that officer telephonically or in person as directed.

24.   He has posted a secured bond, which includes $1,000,0000 cash and two properties he owns in Manhattan, with the district court.

## BRIEF SUMMARY OF FACTUAL ALLEGATIONS

25.   On March 25, 2015, a man allegedly touched certain pillars at the Narita-san Shinjoji Temple, a Buddhist facility and major tourist attraction in Narita, with a small amount of vegetable-based oil on his fingertip.  Later that same day, a man allegedly touched some pillars, stairs, and an offering box at the

A0014

Katori Jingu Shrine, a Shinto facility and tourist attraction, with a small amount of vegetable-based oil on his fingertip. That man also made a motion with his hand that seemed to be consistent with drizzling some object with a liquid.

26. Based upon a grainy black-and-white video which they never presented to American governmental authorities, the Narita police concluded that the perpetrator of both events was the same man.

27. For reasons discussed below, the police concluded that this man was Dr. Kanayama.

28. Even though the directors of both the Temple and the Shrine had already determined that no repairs were needed to the affected areas at their respective institutions, the police instructed them to get repair estimates for the supposed damages to their structures. The total monetary amount of those two repair estimates was slightly over 20,000 USD.

29. Because the alleged stains on the wooden objects at those structures never resulted in any loss of function or use—or any significant defacement—and because those stains were temporary and dissipated naturally, no repairs at all were ever undertaken at either location.

## APPLICABLE LAW

30.   The parties to this case agree that, in order to lawfully certify an extradition request in this matter, the district court must determine three questions. First, whether a valid extradition treaty exists between Japan and the United States. Second, whether the events underlying the Japanese extradition request meet the requirement of dual criminality—the requirement that the facts alleged by the Narita police would, if proved, represent a felony offense both under Japanese penal law and an applicable criminal statute in America. Third, there must be probable cause, as determined by an American court, to find that such a felony offense had been committed and that the extradition defendant was the culprit.

31.   There has been no dispute that a valid extradition treaty exists between the United States and Japan.

32.   The parties have disagreed as to whether the government has met the dual criminality and probable cause requirements to support certification of extradition.

## THE DISTRICT COURT ORDER

33.   In a brief written opinion, the district court certified the government's extradition request. That opinion is attached to this Petition as Exhibit 14.

34.   In its order, the court concluded that the government had met both the requirements of dual criminality and probable cause.

## THE DISTRICT COURT ERRONEOUSLY FOUND THAT THE GOVERNMENT HAD DEMONSTRATED DUAL CRIMINALITY

35.   Under the doctrine of dual criminality as applied to the Japanese-American extradition treaty, the government must prove that the facts alleged by Japan, the requesting country, would represent a criminal offense—and that such an offense would be a felony in both nations.

36.   Here, the Japanese government claimed that the petitioner's alleged conduct violated Article 260 of the Japanese penal code, a vandalism statute . In its moving papers before the district court, the United States government asked the court to compare Article 260 with New York Statute Articles 145.05 and 145.10, criminal mischief statutes prohibiting certain types of vandalism.

37.   Nevertheless, the conduct attributed to Dr. Kanayama would not represent a criminal offense under those New York statutes for two reasons.

38.   First, the New York statutes require a specific intent to damage the property at issue.  By contrast, Japanese Article 260 mentions no element of intent in its provisions at all.  Therefore, the mens rea applicable to that article is the intent defined by Article 38 of the Japanese penal code, which is one of general intent.  Consequently, as the documents submitted by Japan allege that

Dr. Kanayama applied oil to the objects in question for religious purposes and offer no other narrative of his intent, his supposed actions would not have been a criminal offense of any kind in New York.

39.   Second, the New York statute mandates that the property at issue must suffer actual damage.  And there is a line of New York state cases which conclude that defacement to a property that is only temporary does not represent such actual damage.  Moreover, the New York definition of actual damages focuses on factors such as loss of function or use and, as the Japanese authorities have admitted, no such loss occurred at either the Narita temple or the Katori shrine.

40.   Even if the conduct attributed to the petitioner would somehow represent a crime of some sort in New York, it certainly would not fall into the category of a felony.

41.   Under NYS 145.10, criminal mischief does not rise to the level of a felony unless the actual damages incurred by the victim property exceed $1,500.

42.   In this case, though the Narita Temple and Katori Shrine did obtain repair estimates—as directed by law-enforcement authorities—neither facility actually undertook such repairs, as they were completely unnecessary.  And, as confirmed by the Japanese government, neither place suffered any loss of use or income from the alleged temporary damage.

43. Therefore, the total monetary damage to the Temple and the Shrine was zero USD.  As a result, if the petitioner's purported behavior did violate the provisions of NYS 145.10, it would not be a felony violation.

44. Hence, the district court mistakenly concluded that the government had satisfied the requirements of dual criminality under the applicable extradition treaty.

## THE DISTRICT COURT ERRONEOUSLY FOUND THAT PROBABLE CAUSE EXISTED TO SUPPORT THE EXTRADITION OF THE PETITIONER

45. Even if the government had met the mandate of double criminality, it did not demonstrate that probable cause existed to prove that the American dual crime of criminal mischief had been committed—and that the petitioner had been the perpetrator of that offense.

46. In its documentation as presented by the American Justice Department, the Japanese government submitted no evidence whatsoever that the perpetrator of the alleged offenses at Narita and Katori committed his actions with an intent to damage those structures.  In fact, the Narita police stated almost the exact opposite—that the offender intended to anoint the facilities with oil for religious purposes. Because no evidence of specific intent was before the district court, it erroneously found that the government had established

probable cause to believe that a criminal offense had occurred to support certification of extradition.

47.    As discussed above, under New York law, neither the Temple nor the Shrine sustained any actual damages as a result of the alleged March 2015 events. Thus, for a secondary reason, the district court mistakenly decided that the government had demonstrated that probable cause existed to justify the extradition of Dr. Kanayama.

48.    Furthermore, the government failed to establish, with competent evidence, that Dr. Kanayama was the perpetrator of either the actions at Narita or Katori.

49.    The government's case as to the petitioner's involvement in either supposed crime was threefold.  First, a dental professor in Japan opined that the man seen in the vague still photos from the Narita security video was the same person observed in photos from the Katori security video—and that individual somehow matched the passport photograph of Dr. Kanayama taken sometime in the past.  Second, a car rented by the petitioner had used tollway exits close to the Temple and the Shrine on the date of the purported offenses.  Third, Dr. Kanayama in 2012 had made YouTube videos in which he had referenced prior instances of anointing—which the Japanese government interpreted as "pouring oil"— Buddhist temples and Shinto shrines.

50.  As the petitioner attempted to prove at his initial extradition proceedings in district court through independent expert testimony—an attempt that the court ultimately blocked—the Japanese dental professor had no credentials whatsoever to engage in any type of facial recognition expert testimony.  If this Court accepts the testimony of that independent facial recognition expert, which is attached as Exhibit 30 to this petition and discussed in the accompanying Memorandum, the dental professor's report was totally worthless and unsupportive of probable cause in this case.

51.  Furthermore, as Dr. Kanayama attempted to prove at his initial extradition proceedings through independent expert testimony, which the district court ultimately appeared to have also blocked, the Japanese government mistranslated the petitioner's videos in terms of its reference to "anointment." According to the petitioner's expert, as Japan has no Judeo-Christian tradition, there is no equivalent word in Japanese for "anointment." Ex. 31.  Yet Japan interpreted "anointment" as "pouring oil".  This translation was inaccurate.  A more accurate interpretation would have been "blessing"—or sanctifying with a small amount of oil.

52.  Therefore, the Japanese government's interpretation of the doctor's YouTube videos does not support in any way probable cause that he committed the alleged offenses at issue in this litigation.

53. If the YouTube videos and the dentist's baseless conclusions are excluded from the probable cause analysis regarding the offender in question, the only evidence supporting the allegation that the petitioner is that offender is the rental car/tollgate documentation. And that documentation, standing alone—and especially in light of defense evidence to which district court gave minimal weight or did not consider at all—does not support the necessary probable cause finding.

54. Consequently, the district court mistakenly determined that the government had proved that probable cause existed to support the accusation that Dr. Kanayama was the perpetrator of the Narita and Katori touchings.

## EXHAUSTION OF OTHER REMEDIES

55. Federal statutory law provides for no direct appeal of a district court's certification of a governmental request for international extradition.

56. Therefore, the only avenue for judicial review of such a certification is the filing of a petition for writ of habeas corpus.

57. The government agrees that such a petition, filed under 28 U.S.C. section 2241, is the appropriate means through which an extradition defendant should seek judicial review.

58.  This petition does not challenge the validity of a conviction or sentence.

59.  This petition does not directly involve any immigration proceedings.

60.  No other petition, appeal, motion, or other action has been filed under any jurisdiction to address the district order subject to relief from the potential granting of this petition.

## CONCLUSION

61.  This Court should grant this petition and set aside the original court's certification of the government's request for extradition in this matter.

Respectfully submitted,

DATED:  April 25, 2023              /s/ David M. Dudley

_____

David M. Dudley
Attorney for Petitioner
MASAHIDE KANAYAMA


/s/ Michael Greene

_____

Michael Greene
Local Counsel for Petitioner
MASAHIDE KANAYAMA

### VERIFICATION OF DAVID M. DUDLEY

I, David M. Dudley, declare as follows:

1.     I am the attorney of record for Petitioner Masahide Kanayama in the matter of his Petition for Writ of Habeas Corpus under 28 U.S.C. section 2241, which is being filed in the United States District Court for the Southern District of New York.

2.     I have read the foregoing Petition and know its contents.  The facts alleged in the Petition are known by me to be true based on my personal knowledge and review of the documents filed in the underlying case.  Because of my familiarity with the testimony and other documents relating to the relevant proceedings in that underlying case, I, rather than the petitioner, am verifying this Petition.

I declare under penalty of perjury that the foregoing is true and correct. Executed at Los Angeles, California on April 25, 2023.

_____
David M. Dudley

A0024

## MEMORANDUM IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. SECTION 2241

### I.

### INTRODUCTION

Petitioner Masahide Kanayama is a world-renowned surgeon with a practice in New York City.  That practice specializes in the treatment of endometriosis, a debilitating disease for women in which tissue that normally lines the inside of the uterus, known as endometrium, grows outside the uterus, causing pain, scar tissue, adhesions, and infertility.  *See* Exhibit "1", Social Profile of Dr. Masahide Kanayama at page 8.

Dr. Kanayama has pioneered innovative surgical techniques that make him uniquely capable of reversing the effects of advanced-stage endometriosis.  As one of the top practitioners globally in this field, he is frequently called upon to make presentations at medical conferences focusing on endometriosis. Women from across the country and throughout the world travel to New York for consultation with, and often surgery from,  Dr. Kanayama.  The doctor's surgical expertise is unparalleled and he has made vast contributions to the general medical understanding and treatment of endometriosis. Ex. 1 at 3.

As a committed Christian, the petitioner is also the founder and director of International Marketplace Ministry ("IMM"), a respected non-profit organization he

A0025

established in 2013 for the promotion of Christian beliefs and practices in Japan. IMM specifically encourages Christians to establish personal relationships with God and, through those "fellowship[s] with the Lord", to "be awakened" and find their own purposes and callings in life. Ex. 1 at 4.

Age 60, Dr. Kanayama is a lawful permanent resident of the United States. He has no criminal history whatsoever here, in Japan, or anywhere else in the world. Ex. 1 at 1.

Japan presently seeks his extradition for two alleged instances of vandalism that occurred on the same day, March 25, 2015, at a Buddhist temple in Narita and a Shinto shrine near Katori. The purported offenses more particularly involved the placement of a vegetable-based oil with a fingertip on certain objects at those facilities. Those objects supposedly were stained by such oil but no repairs were ever needed as the stains were temporary and faded away naturally. Ex 5.

While there is a valid extradition treaty between the United States and Japan, that treaty mandates the conduct underlying a request for extradition by either party be a felony offense in both countries. Contrary to what the Japanese government has claimed through its representative in this case, the United States Justice Department, the actions attributed to the petitioner would not be a crime—let alone a felony—in this country.

The treaty also requires that an appropriate court in the nation from which extradition is requested make a formal determination that there exists probable cause, based upon competent evidence, that an actual crime was committed—and that the individual sought for removal perpetrated that crime. Here, Japan has presented insufficient evidence to support such a judicial finding of probable cause.

For these reasons, through this Petition, Dr. Kanayama seeks review of the district court order which certified the Justice Department's extradition request. Because there is no statutory basis for a direct appeal of that order, a petition filed under 28 U.S.C. section 2241 is the appropriate mechanism for obtaining such review.

Should the petitioner be extradited to Japan, he will be facing detention for at least 23 days—and potentially for many more days or even years—unless he confesses to the two crimes which are under investigation. *See* the Declaration of Dr. Eric Feldman, attached to this Petition as Exhibit "2" at page 1. (Though an arrest warrant, or sheet, as it is called in Japan, has been issued, no formal criminal charges have yet been filed against him in that country.). There is little chance that a Japanese court will exonerate him—no matter how weak the evidence; no matter how strong his protestations of innocence—as the conviction rate in Japan is over 99%. Ex. 2

Moreover, because Dr. Kanayama has acted for decades as a Christian missionary in his nation of origin, he faces likely persecution upon his return to Japan. The Japanese government and society have a history of persecuting Christians. Ex. 1 at 16. And the petitioner himself has been the subject of anti-Christian vitriol in recent years. Ex. 1 at 19.

Because the petitioner is from a family of mixed ethnicity—his father Japanese, his mother Korean—he faces an additional level of persecution if he is extradited to Japan, which also has a history of persecuting Koreans, including those who also have some Japanese familial roots. Ex. 6 Those individuals of multiple ancestries are known in Japan as "hafu" and they have been systematically mistreated at times. Ex. 7. Dr. Kanayama personally experienced physical and psychological abuse as a "hafu" growing up in that country. Ex. 1 at 5.

There is an insufficient legal basis to support the district court's certification of extradition in this case. And it would be a genuinely tragic loss to the United States for  Dr. Kanayama to be removed from this country, where he has been an indispensable asset, directly and indirectly, to thousands of women suffering from endometriosis—into a Japanese jail, where he will be confined indefinitely unless he confesses, against his will as stated in this Petition, for undertaking actions which were undertaken with benign intent and would neither be felonious, nor even criminal, in America.

II.

STATEMENT OF PROCEEDINGS

On April 4, 2015, the police force in Narita, Japan obtained an arrest sheet or warrant for Dr. Kanayama as part of its investigation into two purported events of vandalism—one at a Buddhist temple in the city of Narita, the other at a Shinto shrine in the area of Katori—on the same date, March 25th of that year. These arrest sheets have been updated in Japan numerous times since the spring of 2015,

On December 12, 2016, the Japanese government sent the U.S. government a Diplomatic Note requesting the extradition of Masahide Kanayama. The State Department later referred the matter to the Department of Justice.

On May 30, 2017, the DOJ, through the United States Attorney in the Southern District of New York, filed an extradition complaint against Dr. Kanayama. *See* the Extradition Complaint, attached to this Petition as Exhibit "8". The case number given to that action in the Southern District was 17-Misc.-1. An arrest warrant was issued for the petitioner pursuant to that complaint.

On June 2, 2017, the United States Marshal's Service executed the warrant by arresting Dr. Kanayama in New York City. Several days later, a federal magistrate judge ordered the petitioner's release from custody on certain conditions, pending the resolution of the extradition matter.

A0029

On August 22, 2017, the government filed its memorandum in support to the extradition request. *See* Exhibit "9". On October 20, 2017, Petitioner Kanayama filed his formal opposition to that request. *See* Exhibit "10". On November 17, 2017, the government filed a reply to that opposition. *See* Exhibit "11". On January 12, 2018, the petitioner filed a sur-reply to that response. *See* Exhibit "12".

On December 6, 2022, District Court Judge Ramos of the Southern District of New York held an extradition hearing on this matter. *See* the transcript of this hearing, attached to this motion as Exhibit "13". The district court then granted the government's request for certification of the petitioner's extradition on January 26, 2023 by written opinion and order. *See* the district court's opinion and order, attached to this Petition as Exhibit "14".

Dr. Kanayama now seeks judicial review of that order. Because there is no statute which allows a direct appeal of that ruling, the appropriate mechanism for pursuing such judicial review is the filing of a Petition for Writ of Habeas Corpus under 28 U.S.C. section 2241. *Skaftouros v. United States*, 667 F.3d 144, 157 (2d Cir.2011); *Oen Yin-Choy v. Robinson*, 858 F.2d 1400, 1402 (9th Cir. 1988); *see also* 17 FAM 1623.3.

Pending that review, the petitioner remains at liberty under supervision of the Pre-Trial Services Office for the Southern District of New York with his travel restricted to the United States and his passport in possession of that office. He must

A0030

also obtain pre-approval from his pre-trial officer for any trips he makes within this country.  His initial bond of $1,000,000 cash, and the additional security of two properties owned by him, remains in effect.

<div align="center">III.</div>

<div align="center">STATEMENT OF ALLEGED FACTS</div>

According to the Japanese government, On March 25, 2015, a man allegedly touched certain pillars at the Narita-san Shinjoji Temple, a Buddhist facility and major tourist attraction in Narita, with a small amount of vegetable-based oil on his fingertip.  Later that same day, a man allegedly touched some pillars, stairs, and an offering box at the Katori Jingu Shrine, a Shinto facility and tourist attraction, with a small amount of vegetable-based oil on his fingertip.  That man also made a motion with his hand that seemed to be consistent with drizzling some object with a liquid. Ex. 15 at 4.

On April 9, 2015,  the Narita Police Department opened an investigation into what had supposedly occurred at the Shrine and Temple on March 25.  Ex. 16 at 1. At that time, police officers observed small stains on pillars at the Narita facility and on pillars, stairs, and an offering box at Katori.  Ex. 15 at 6.

Even though the directors of both the Temple and the Shrine had already determined that no repairs were needed to the affected areas at their respective institutions, the police instructed them to get repair estimates for the supposed

damages to their structures. Ex.17 at 2. The total monetary amount of those two repair estimates was slightly over 20,000 USD. Ex. 21.

The stains on the objects at the two locations disappeared naturally over the course of time Ex. 17 at 3 . (There is some question about when the stains actually became no longer visible and the petitioner has developed a timeline which identifies the multiple answers to that question. *See* Exhibit 18.). Of course, as mentioned above, the Temple and Shrine directors had already determined that repairs were unnecessary even before the Narita police asked them to obtain repair estimates. Ex. 17 at 3.

Neither the Buddhist nor the  Shinto facility suffered any loss of use due to the staining, and neither institution suffered any financial damage as a result of the alleged incident. Ex.16 at 3.

Based upon grainy still photos from security videos at Narita and Katori, the police decided that the same individual conducted both touchings on March 25, 2015. *See* those photos at Ex.19, 20.  Law-enforcement officers subsequently concluded that Petitioner Masahide Kanayama was that individual, even though they had no eyewitnesses to the alleged staining event.

The officers based that conclusion on three factors.  First, they provided the grainy stills and a copy of Dr. Kanayama's passport photograph to a dental professor named Matsasugu Hashimoto at the Tokyo Dental College, in Tokyo, Japan. Ex.15

A0032

at 8. Hashimoto then produced a brief report offering his personal opinion that "there was a very high possibility" the man pictured in the security photos and the person portrayed in the passport photo were one and the same. *See* that report, attached as Ex. 22.

Second, the officers reviewed some missionary YouTube videos that Dr. Kanayama had made in 2012 in which he claimed to have previously anointed several structures in Japan. Ex. 23. The Japanese government interpreted the petitioner's use of the word anointment as "pouring oil."

Third, through the examination of tollway and rental car records, the officers determined that Dr. Kanayama had rented a gray Toyota Prius at the Narita International Airport around 2:30 p.m. on March 25, 2015 and returned it to the same location on March 26, 2015 about 9:30 a.m. Ex.16. On March 25 at about 4:30 p.m., the petitioner's rental vehicle was driven through a tollway entrance close to the Narita Temple and, on the same date at approximately 4:41 p.m., it passed through a tollway exit near the Katori Shrine. Ex.16. From those records, based upon that timing, the police surmised that Dr. Kanayama could have been the perpetrator depicted in the security still photos. Ex.16.

IV.

APPLICABLE INTERNATIONAL EXTRADITION LAW

Under 18 U.S.C. § 3184–the federal international extradition statute—the Department of Justice commences extradition proceedings against a purported fugitive from another nation by filing a complaint in a United States District Court, or any other court of the United States, which has personal jurisdiction over that individual. That court then must eventually decide whether to certify extradition to the foreign government requesting extradition—or to deny such certification. *See Skaftouros v. United States, supra,* 667 F.3d 144 at 154. The role of the judicial officer is limited to determining whether to certify to the Secretary of State that the accused person is extraditable. 18 U.S.C. § 3184.

That judicial officer must certify extraditability if he or she finds the following to be true: (1) a valid treaty exists; (2) the crime charged is covered by the relevant treaty; and (3) the evidence marshaled in support of the complaint for extradition is sufficient to sustain the charge. *Id.; see also Cheung v. United States,* 213 F.3d 82, 88 (2d Cir. 2000). Such certification, or denial of certification, takes place after a "hearing" on these issues where "testimony [is] taken before [the court]."

In the present case, both parties have agreed that a valid extradition treaty exists between the United States and Japan. They have not agreed, however, that

the crimes charged in Japan are covered by the that treaty or that the complainant has submitted sufficient evidence to sustain that charge.

The first of these two contested issues is typically referred to as the requirement of dual criminality. The second is generally characterized as the requirement of probable cause.

<div align="center">

V.

THE DISTRICT COURT ORDER

</div>

In a relatively brief opinion, the district court granted the government's request for the certification of Dr. Kanayama's extradition to Japan. Ex. 14. The court first specifically found that the government had met the requirement of dual criminality—which in the case of the U.S-Japan extradition treaty means that the conduct under investigation by the Narita Police would represent a crime in the United States and also rise to the level of a felony offense. Ex. 14 at 8-10. The court second specifically found that the government had met the requirement of probable cause—that it had submitted sufficient competent evidence to support the belief that felony offenses had been committed and that the petitioner was the perpetrator of those offenses. Ex. 14 at 10-12.

VI.

ARGUMENT

### A. CONTRARY TO THE DISTRICT COURT'S OPINION, THE GOVERNMENT'S EXTRADITION COMPLAINT DOES NOT MEET THE REQUIREMENT OF DUAL CRIMINALITY.

1.  Dual Criminality in the Context of the U.S.-Japan Extradition Treaty.

To be covered by the U.S-Japan Extradition Treaty, the conduct underlying an extradition request must in both nations (1) constitute a criminal offense and (2) be serious enough to rise to the level of a felony. *See* U.S-Japan Extradition Treaty Article II, paragraph 1. In analyzing this issue of dual criminality, the district court should determine whether the alleged underlying conduct would represent a felony criminal offense under federal law, under the law of the state in which the extradition proceeding is held, or under the law of the preponderance of American states. *See Hu Yau-Leung v. Soscia,* 649 F.2d 914, 918 n.4 (2d Cir. 1981).

In the present matter, the Narita police have issued a warrant for the arrest of Dr. Kanayama as part of an investigation into his alleged violations of Article 260 of the Japanese Penal Code at the Narita Temple and the Katori Shrine. Article 260 addresses "Damage to Buildings" and, as translated into English, states in relevant part that "a person who damages a building or vessel of another person is punished by imprisonment for not more than 5 years…".

At the extradition proceeding in the district court, the judge considered New York Penal Law section 145.05 as the comparable crime for the purposes of dual criminality analysis. Under section 145.05, "[a] person is guilty of criminal mischief in the third degree when, with intent to damage property of another person, and having no right to do so nor any reasonable ground to believe that he or she has such right, he or she…damages property of another person in an amount exceeding two hundred fifty dollars."

Thus, "the proper 'double criminality' inquiry" here would be "if [the petitioner] had committed the same [alleged] acts in the United States, would a crime have been committed and would it have been a felony?" *Hu Ya-Leung v. Soscia, Supra,* 649 F. 2d at 918. Examining the facts set forth in the Japanese request for extradition, as related by the DOJ during the underlying district court proceedings, and considering them in light of some additional, incontrovertible evidence, the appropriate answer to both questions actually is "no".

2. A Brief Summary of Evidence Presented by the Japanese Government or, Alternatively, Is Incontrovertible.

To conduct a dual criminality analysis, we need to understand what essential, specific factual allegations against the petitioner that the Japanese government has made or are essentially indisputable. Otherwise, it would be impossible to determine whether his purported conduct would have violated NYPL section 145.05. Based

upon the government's filings and defense documents, which Japan either does not or cannot deny, there are seven circumstances relevant to such an analysis.

First, the perpetrator of the Article 260 violations at the Narita Temple and the Katori Shrine used a finger to place a vegetable-based oil on certain poles at the Temple and the Shrine on March 25, 2015—and used a spraying motion in the direction of some stairs and an offertory box at the Shrine on that same date. Ex. 9 at 2-4. Second, the Japanese government believed that Dr. Kanayama was the culprit and applied the vegetable oil in question, per his own supposed admissions regarding prior incidents, for religious purposes. Ex. 9 at 5. Third, that shortly after the events of March 25, some stains were observed on a few pillars at Narita—and poles, stairs, and an offertory box at Katori. Ex. 9 at 3. Fourth, those stains all disappeared naturally with no human intervention as early by as early as July 11, 2015, Ex.25 at 16 and definitely no later than December 2017. Exs. 17, 26, 27, 28, 29.

Fifth, prior to the police intervention, the directors of the Temple and the Shrine had independently concluded that no repairs at their respective facilities were necessary. Ex. 17 at 11-13. Nevertheless, the police asked them to obtain such repair estimates. Ex. at 17 at 9,13. Those estimates totaled over 20,000 USD.

Sixth, no repairs were ever conducted at either facility. Ex. 17 at 9, 11, 13. Seventh, neither the Temple nor the Shrine suffered any loss of function, use, or income as a result of the temporary oil staining. Ex.17 at 12.

### 3. Petitioner Kanayama's Alleged Conduct in Japan Would Not Have Violated NYPL Section 145.05.

*a. Section 145.05 Is a Specific Intent Crime and the Japanese Government Has Presented No Evidence of Such Intent.*

New York Criminal Mischief in the Third Degree, as defined by section 145.05, requires a specific "intent to damage property of another person." In other words, even if the petitioner intended to engage in the act of placing vegetable oil on the objects in question, those supposed actions would not have subjected him to criminal prosecution in New York, absent greater proof of mens era.

The New York statute mandates that, to be guilty of criminal mischief, a defendant must have the "conscious objective" of damaging property belonging to another individual. *See People v. Summer,* 64 A.D.2d 658, 659, 407 N.Y.S.2d 53 (2nd Dept. 1978). This specific intent is a necessary element of criminal mischief and the failure of a prosecutor to demonstrate the willfulness of the defendant to damage property will lead to the dismissal of the charge. *See, e.g., People v. Callahan,* 19 A.D.2d 889, 890, 244 N.Y.S.2d 766 (2nd Dept. 1963) ("mischief conviction could not stand in absence of evidence that injury to property was willful").

Japanese Penal Code Article 260 has no such requirement of specific intent. In fact, on its face, that article has no intent requirement whatsoever. Nevertheless, under Japanese penal law, intent is required for proof of all offenses pursuant to

A0039

Article 38.  Article 38 of that code addresses such intent and states, in relevant part, that " (1) [a]n act performed without the intent to commit a crime is not punishable; provided, however, that the same does not apply unless otherwise specially provided for by law. (2) When a person who commits a crime was not aware of the fact that the crime constituted a greater crime, the person is not be punished for the greater crime. (3) A person lacking knowledge of law does not mean a lack of intention to commit a crime; provided, however, the punishment may be reduced in light of the circumstances."

In the United States, a general intent crime compels the prosecution to prove only that "the defendant intended to do the act in question."  On the other hand, a specific intent crime "requires the prosecution to prove that the defendant intended to bring about a specific consequence through his or her actions, or that he or she perform[ed] the action[s] with a wrongful purpose."  *Cornell Legal Information Institute,* Wex Definitions Team, Definition of "Intent" (2020).

As Article 38 of the Japanese Penal Code states only that an act must be committed with the intent to commit a crime—but not with the objective of bringing about a specific consequence or achieving a wrongful purpose—it unambiguously sets forth a scienter requirement of general intent.  And that general intent requirement applies to all offenses in that code, "unless otherwise specially provided for by law," including the crime of vandalism prohibited by Article 260.

Thus, the intent necessary to violate NYPL section 145.05 is specific, while the intent necessary to violate Japanese Article 260 is general. Consequently, Article 260 and section 145.05 define substantially different crimes. A defendant committing the same acts toward a property—but without an intent to damage it—would be guilty of 260 but not of 145.05.

Here, through the American government, Japan has presented no evidence that Dr. Kanayama, if he actually performed the alleged conduct at the Temple and the Shrine, did so with the intent of damaging either property. To the contrary, the Japanese assertion that the petitioner used a fingertip, and in one instance a drizzling motion with his hand, to place a vegetable-based oil on some objects at Narita and Katori provides strong circumstantial evidence that he had no desire to damage such property in any way. Ex. 9 at 2-4. If he had harbored such a desire, he would certainly have used petroleum oil, paint, acid, a corrosive chemical, a lighter, a nail, a hammer, a screwdriver, or some other object or substance that would have definitely caused grave harm to the affected pillars, stairs, or offering boxes.

Furthermore, the government's memorandum in support of extradition, as part of its effort to prove that the petitioner was in fact the perpetrator never identified by an eyewitness, quotes the doctor from his 2012 YouTube videos as admitting that he had previously "poured oil onto various shrines for religious purposes." Ex. 9 at 5. This is the only reference in the documentation provided by Japan of what the

petitioner's intent might have been. And "pouring oil"—or, more accurately, in the security photos presented by the Narita police, "dabbing oil with a fingertip"—*for religious purposes* demonstrates an objective exactly the opposite of an intent to destroy.

Additionally, as will be discussed further in the context of probable cause, "pouring oil for religious purposes" was the Japanese government's translation of the English word "anointment". As defined by the Holman Bible Dictionary, anointment "describes the procedure of rubbing or smearing a person or thing, usually with oil, for the purpose of healing, setting apart, or embalming. A person can anoint himself, be anointed, or anoint another person or thing." *Holman Bible Dictionary,* Broadman & Holman (1991). Consequently, if the petitioner, who is a Christian missionary, did actually effect the oil placement at Narita and Katori— which he denies—he would have done so for the objective of healing or setting apart (in a religious manner) portions of those properties, as opposed to damaging them.

Therefore, Petitioner Kanayama's supposed behavior at the Temple and the Shrine would not have violated NYPL section 145.05 or any other possible applicable New York statute. The district court erred in finding that the government had met the requirement of dual criminality in this case because it failed to recognize that the comparable American law requires a prosecutorial demonstration of specific intent.

*b. Section 145.05 Requires Actual Damages to the Property at Issue As an Essential Element and the Petitioner's Alleged Conduct Did Not Cause any Such Damage.*

The final essential element of NYPL section 145.05 requires that a defendant has caused "actual damage" to a particular property, not just some sort of speculative damage. *People v. Hills,* 95 N.Y.2d 947, 948 (2000). "While no statutory definition of [actual] 'damages' is provided [in New York penal law], it is commonly recognized that the term contemplates 'injury or harm to property that lowers its value or involves loss of efficiency' and that only 'slight' damage must be proved." *People v. Collins,* 288 A.D. 2d 756, 758 (2001) [internal citations omitted].

"In a criminal mischief case, the damage to property is generally established by evidence of the reasonable cost of repairing the property. Where the property is not repairable, however, the replacement cost is an appropriate measure of the damage." *People v. Shannon,* 57 A.D.3d 1016, 1016, 868 N.Y.S.2d 377 (3rd Dept. 2008).

As defined by New York courts interpreting the damage element of NYPL section 145.05, even if Petitioner Kanayama was the perpetrator of the March 25, 2015 events at the Narita Temple and Katori Shrine, he did not effect any actual damage at those properties. Therefore, he could not have committed the crime of criminal mischief under New York law.

In its extradition request, Japan has presented no evidence whatsoever that the oil-application events at the Temple and the Shrine "lower[ed] the value" of—or

"involve[d] a loss of efficiency at—either facility. Ex.15. Further, the Narita police have presented zero evidence that the stainings caused any closures—or any monetary loss—at the Temple or the Shrine. Ex.16, 24. The petitioner's own investigation, based upon interviews of authorities at those institutions, has confirmed that, as a result of the events of March 2015, neither facility closed fully or temporarily, suffered any loss of function or efficiency, faced any loss of revenue, or endured any financial cost at all. Ex. 17, 25.

Given the lack of functional and financial detriment brought about by those events—and given that the stains were minimal and started to fade naturally right away—the Temple and Shrine directors decided as early as Spring 2015 not to repair any of the affected areas. Ex.17, 25. Nevertheless, in April of that year, the Narita police requested that those directors obtain repair estimates for their respective structures. Ex.16, 17. Obediently, the directors abided by that request and obtained repair estimates. Ex.21. Nevertheless, as the government conceded in its October 2017 reply brief, neither facility conducted any actual repairs. Ex. 11. No repairs were undertaken because they were completely unnecessary. *See* photographs and video included in Ex 5.

In its briefs before the district court, Ex.9, 11, the government claimed that New York case authority, specifically *People v. Fancher,* 116 AD 3d 1084 (2014), had decided that, in situations where repairs had not been conducted, repair estimates

can be used to calculate the damages caused by a criminal mischief defendant. But an analysis of the *Fancher* opinion, and the one case cited as authority in that document, indisputably leads to the conclusion that the use of such estimates under circumstances of non-repair only applies to instances where demonstrable actual damage—as defined by New York law—occurred.

In *Fancher,* the appellate division of the New York Supreme Court decided that even though one of the appellant's claims had not been preserved for appeal—namely the lack of proof to support the amount of damage he had caused to a vandalized vehicle—it "would have found that an auto body shop owner's estimate of the cost of repairing a vandalized pickup truck provided legally sufficient evidence that the damage exceeded $250, even though the repairs were never performed." *Id.* at 1088. To support its decision, the *Fancher* court cited only one case, *People v. Agron,* 106 AD 3d 126, 128, (2013) *lv denied,*21 NY 3d. 1019 (2013).

Because the appellant in *Fancher* had not preserved the issue in question for appellate review, we cannot tell what happened to the "vandalized pickup truck" from the opinion itself. Fortunately, this matter was a relatively high-publicity case in the community where it took place. Thus, from a newspaper account, we can learn that Defendant Fancher "lit a fire in [that] 1988 Chevrolet pickup truck owned

by Delaware Bulldozing." "Man Pleads Guilty in Church Arson, Other Blazes," *The Daily Star,* by Patricia Breakey (October 5, 2010).

Contrary to its citation in *Fancher,* the *Agron* court did not address a situation in which a repair estimate had been obtained by a criminal mischief victim but the repairs at issue had never been conducted. Instead, *Agron* was a case where the victim argued that the defendant's conduct had left the door to an apartment "no longer capable of being locked" because the "'whole frame [had been] jilted." *Id.* at 1129. Therefore, the *Agron* decision essentially approved of the trial court's decision to admit a contractor's estimate for the replacement cost of that door. *Id.* Nothing in the record of that case suggests that the door to that apartment was never replaced—that the residence was permanently left without a door.

Though there is no present way of determining exactly how extensive the arson damage to the pickup truck in *Fancher* was, we can safely assume that such damage reduced its value substantially or resulted in a significant loss of efficiency or function. Of course, in *Agron,* aside from the fact that it does not serve as proper authority for that aspect of the *Fancher* opinion at issue here, the vandalism damage to the door was catastrophic, at least in the sense that the door had to be replaced. Therefore, the government's contention that a repair estimate should be considered an appropriate quantification of actual damage is inapposite—absent separate proof of such actual damage. In other words, the repair estimates obtained by the Temple

and the Shrine—but not acted upon by either of them—do not prove in any way that the petitioner's supposed conduct created actual damage as necessitated by NYPL 145.05. Despite those estimates, to satisfy dual criminality, the government must still prove that the alleged staining reduced the value of the premises in Narita or Katori— or resulted in a loss of efficiency at those locations.

Of additional importance, interpreting New York state criminal mischief and other statutes in light of a case before it, the United States District Court for the Northern District of New York has recognized a distinction between "defacement" and "actual damage" as defined under applicable state law. In *U.S. v. Murtari,* Northern District of New York case number 5:07-CR-387, the district court issued an opinion and order addressing a case in which the defendant on multiple occasions wrote messages in chalk on a federal plaza in Syracuse, New York. As a result of these applications of chalk to public areas, law-enforcement authorities charged that individual with several violations of federal law.

To facilitate review of the defendant's conviction, the district court felt that it was useful to address New York State criminal mischief and graffiti statutes. *Id.* In so doing, the court noted that "'[t]he New York Criminal Practice Commentaries state that the damage inflicted should have some degree of *permanency*." (*Id.,* citing N.Y. Crim. Practice Commentaries 6-62, § 62.03(2) [emphasis added].) The court's

further analysis of cases from that state led it to conclude that there was a determinative legal difference between "defacement" and "damage":

> "Based on a comparison to New York Law, this court finds that the proof did not show that defendant's actions in this case 'damaged' the property, even though the plaza was 'defaced' by the use of chalk. As stated above, the regulation does not prevent 'defacing' property, and it has been held in various cases that defacing and damaging are not necessarily the same. It is clear that although defendant intended to write in chalk on the plaza, he did not intend to 'damage' the surface."

Based upon this analysis, the district court acquitted the defendant of two counts filed against him.

Likewise, in the *Matter of H.,* 32 A.D. 2d 932 (1969), the appellate division of the New York Supreme Court held that "there was no evidence of actual damage to petitioner's driveway within the meaning of section 145.00 of the Penal Law", where the appellant juveniles had defaced it with chalk.

In further support of this distinction between defacement and actual damage, *People v. Stockwell,* 2008 NY Slip Op 50444 (U) [18 Misc. 3d 1145(A)] considered a case in which the defendant had painted a fence adjoining his property with that of a neighbor, without the permission of that neighbor. The *Stockwell* court found that, under New York law, such painting did not represent actual damage, a necessary element of criminal mischief. *Id.* The precise ruling of that court is instructive in this case because it focuses on the inadequacy of the charging document in that

case—a document that is similar to the Japanese government's extradition request

in this one;

> "The Court finds that the accusatory instrument viewed either as a complaint
> or information is not facially sufficient…because the allegations in the factual
> part of the accusatory instrument along with the supporting depositions/police
> report fail to provide reasonable cause to believe a violation of PL 145.00(1)
> occurred due to the conduct of the defendant as there is no allegation of
> damage to the fence caused by painting it that is damages meaning 'injury or
> harm to property which reduces its value'."

*Id.*

Here, the government's "accusatory instrument", the Extradition Complaint

filed on May 30, 2017, Ex. 8, is also "not facially sufficient" in that it fails to allege

that "actual damage" to the Narita Temple and Katori Shrine occurred, as defined

by the American law to which the government asked the district judge conduct a

comparison for dual criminality purposes.   And, even if we assume that the

petitioner's alleged conduct defaced the Temple and the Shrine temporarily, for

whatever time period, such defacement would not itself constituted actual damage

under applicable law.   Therefore, the district court erred in finding that the

government had met its burden to prove dual criminality because the court failed to

recognize that the comparable New York statute mandates proof of actual damages.

*B. CONTRARY TO THE DISTRICT COURT'S OPINION, THE GOVERNMENT'S EXTRADITION COMPLAINT DOES NOT MEET THE REQUIREMENT OF PROBABLE CAUSE.*

1.  Probable Cause in the Context of International Extradition

According to the bilateral extradition treaty between the United States and Japan, "[e]xtradition shall be granted only if there is sufficient evidence to prove…that there is probable cause to suspect, *according to the laws of the requested party*…that the person sought has committed the offense for which extradition is requested ....". *U.S-Japan Extradition Treaty,* Article III [emphasis added].    There are two facets to this necessary probable cause inquiry.  First, under the laws of the requested party—here the United States—there must be probable cause to demonstrate that a real crime was committed.  Second, there must be such cause to prove that the alleged fugitive committed that crime.

Pursuant to 18 U.S.C. § 3184, "the decision to extradite ... must be based on *competent* evidence that would suffice under United States law to hold a defendant for trial, that is, establishing probable cause to believe that the accused committed the crime charged."  *Matter of Extradition of Platko*, 213 F.Supp.2d 1229, 1238 (S.D. Cal. 2002) [citations omitted] [emphasis added].  The probable cause standard used for extradition hearings is "identical to that used by courts in federal criminal preliminary hearings," and the burden remains on the party requesting extradition to produce evidence sufficient to give the magistrate "reasonable ground to believe the

accused [is] guilty" of the charged offense. *Barapind v, Enomoto,* 360 F.3d 1063 at

1069 (9th Cir. 2004); *see also United States v. Howard,* 489 F.3d 484, 491 (2d Cir.

2007). Further, because the Federal Rules of Evidence and Federal Rules of Criminal

Procedure do not apply to extradition proceedings—and therefore, hearsay evidence

may be admitted— "court[s] must 'closely examine the requesting country's

submissions to ensure that any hearsay bears sufficient indicia of reliability to

establish probable cause.'" *Skaftouros, supra,* 643 F. Supp.2d at 543 [citations

omitted].

2.  Admissibility of Defense Evidence at an Extradition Hearing

At an extradition hearing, the accused "does not have the right to introduce

evidence in defense…". *Santos v. Thomas,* 830 F. 3d 987, 992 (9th Cir. 2016).

Nonetheless, a court presiding over such a hearing may discretionarily allow the

alleged fugitive to present certain testimony and exhibits at the hearing. *Id.* Such

evidence is limited to that which "'explains matters referred to by the witnesses for

the government.'" *Id.* [citation omitted].  Evidence "'that merely "contradict[s] the

testimony for the prosecution' may be excluded." *Id.* [citation omitted].

"The difference between 'explanatory' and 'contradictory' evidence is easier

stated than applied" and "federal courts have struggled to distinguish between the

two." *Id.*  Nevertheless, courts seem to have settled on the still rather vague principle

that explanatory evidence is that "explains away or completely obliterates probable

cause," whereas contradictory evidence is that which "merely controverts the existence of probable cause, or raises a defense." *Mainero*, 164 F.3d 1199 at 1207 n.7 (9th Cir. 1999).

### 3.  Assuming for Some Reason that the Government Had Met the Requirement of Dual Criminality at the Extradition Proceeding, it Still Failed to Demonstrate Probable Cause that a Violation of NYPL 145.05 Had Occurred.

Assuming for purposes of argument that the government had met the requirement of dual criminality in some manner, it still did not present sufficient evidence to establish probable cause that a violation of NYPL 145.05 had even occurred in this case.  Here, this probable cause determination must be made under the laws of the United States.  *U.S.-Japan Extradition Treaty,* Article III.

As discussed previously, in its extradition complaint, and at the extradition hearing, the government produced no evidence from Japan that the perpetrator of the March 2015 incidents undertook his actions with the specific intent to damage the Narita Temple or the Katori Shrine as necessitated by 145.05.  Moreover, it produced no evidence that any actual damage, as defined by New York law, occurred at either facility.  Given that there was no testimony or documentation before the district court demonstrating that the two most essential elements of the New York criminal mischief statutes had been satisfied, the court erroneously concluded that the requesting nation had met its burden of establishing probable cause that a crime had even occurred on March 25, 2015.

4.  If Explanatory Defense Evidence is Taken Into Consideration, There Was No Probable Cause to Support the Identification of Petitioner Masahide Kanayama as the Perpetrator of the Alleged Vandalism at Narita and Katori.

The Narita police were unable to produce any eyewitnesses to the events of March 25, 2015.  They also collected no forensic proof, such as fingerprints or DNA, to determine the culprit.  Consequently, they relied upon three items of opinion and circumstantial evidence to support their claim that Petitioner Kanayama perpetrated the supposed crimes at the Narita Temple and the Katori Shrine.

First, the Narita police presented grainy black-and-white still photos from security cameras at the Temple and the Shrine to a dental professor in Tokyo who compared those photos to a passport picture taken of Dr. Kanayama at some time in the past.  Based upon a comparison of the photos, the dentist opined that the individual seen at Narita and Katori was the petitioner.  Ex 22 at 10. Second, the police gathered YouTube videos from 2012 and concluded that Petitioner Kanayama had admitted "pouring oil" on certain objects in Japan prior to the making of those videos.  Ex 23. Third, they used tollgate and rental records to place the doctor in the vicinity of Narita and Katori on the March date in question.  Ex 22 at 10.

With the help of extrinsic evidence which explains or obliterates each of these evidentiary claims, we can ascertain without hesitation that no probable cause, as defined in the federal and state courts of America, exists to conclude that the petitioner was the man observed on security cameras at the two facilities.  This

A0053

extrinsic evidence was presented to the district court over the course of the extradition proceedings—and the court either minimized such defense testimony and documentation or refused to consider it all. Ex. 11.

*a. Given that the Japanese Dental Professor Had No Experience or Expertise in Facial Recognition, and Given that an Actual Expert Has Concluded that the Professor's Conclusions Were Fundamentally Flawed, the Petitioner Has Obliterated the Most Important Aspect of the Government's Probable Cause Presentation.*

The Japanese government's primary proof that Petitioner Kanayama was the perpetrator of the March 2015 events was a "facial recognition" report from a dental professor named Masatsugu Hashimoto. Ex. 22. Japan has presented no evidence that Professor Hashimoto had any experience or expertise in facial recognition. To obtain this report, the Narita police provided him with some grainy black-and-white still photos isolated from security camera videos at the Temple and the Shrine. (To the best of the petitioner's knowledge, the police have never produced the entire video to anyone, including the DOJ and Dr. Kanayama.)

The Narita authorities then asked Hashimoto to compare those fuzzy photos with a passport picture taken of Dr. Kanayama at some unknown time in the past. Relying on those photos, the dental professor concluded that the individuals observed from the security camera at Narita and Katori were the same person—and that there was a "very high possibility"—not probability—that the petitioner was that person, Ex. 22. The professor based that "possibility" primarily on a correlation

of hairlines between the security photo subject and the petitioner's passport photo, even though he clearly had no information about whether Dr. Kanayama's hairline or hairstyle had changed over the course of relevant time. Ex. 22.

Because Hashimoto had no apparent expertise in facial recognition, his testimony should have been disregarded completely on that basis—and on the basis that the security stills were of such a poor resolution that no human being could have conducted an accurate facial comparison based upon them. Nonetheless, the district court cited the professor's opinion in support of its determination that probable cause existed to identify Kanayama as the culprit. Ex. 14 at 11. To reach that conclusion, the court was compelled to exclude the opinion report and preferred testimony of a true facial recognition expert produced by the defense—a report that totally undermined Hashimoto's opinion and obliterated to the point of a nuclear wasteland that, most important, component of the government's probable cause identification of the petitioner. Ex. 14 at 11.

According to Dr. Benjamin Bavarian, one of the world's foremost experts on biometric technology and facial recognition, Hashimoto's identification was "fundamentally flawed" and the professor's report was "biased towards [its] conclusions and would fail any *Daubert* inquiry." Ex. 30 at 2. Specifically, upon reviewing Professor Hashimoto's report, Dr. Bavarian came to the following pertinent conclusions: i) "the [so-called] expert opinion has been biased toward the

conclusions .... us[ing] circumstantial information" concerning the suspect; ii) the expert failed to "consider[] the multitude of variables and uncertainties inherent to surveillance video [of] such low resolution"; iii) "the features used by [Professor Hashimoto] are not accepted as reliable landmarks as defined in the Biometrics Data International Standards"; and iv) the expert opinion does not meet the standards of *Daubert* and the "best acceptable conclusion is that based on the data presented the result is inconclusive." *Id*. [emphasis added].

Dr. Bavarian finished his presentation by stating that "the data provided in the submitted report is practically useless for the purpose [of] any observational []or analytical study." *Id*. Therefore, the Hashimoto opinion is actually worthless in terms of determining whether the petitioner was at the purported Japanese crime scenes on March 25, 2015.

Bavarian's report completely and indisputably *obliterated* the most critical part of the government's probable cause/identification demonstration during the extradition proceedings. Thus, the district court erred in excluding it from its analysis of probable cause.

And the photographs submitted by Japan are of such poor quality, based upon a comparison of them, no reasonable lay person could have concluded that it was fairly probable Dr. Kanayama was the pictured individual. As a result, the Hashimoto report and accompanying still photos provide no cause whatsoever, let

alone probable cause, to believe that the petitioner perpetrated the touching events in question.

*b. Given that Dr. Kanayama's YouTube Missionary Videos Were Produced Almost Three Years Before the Events at Issue, Given Those Videos Discussed "Pouring Oil", and Given Some Mistranslations of the Videos by the Japanese Government, the YouTube Footage In No Way Supports the Identification of the Petitioner as the Culprit at the Temple or the Shrine.*

As presented by the Japanese government, Dr. Kanayama produced two YouTube videos on November 3 and December 31, 2012, respectively, in which he described his experiences of anointing at least two shrines, two mountains, and three snakes.   Ex. 23 at 15 and May 19, 2015 Narita Police Report [included as the seventeenth exhibit to the government memorandum at page 2.]  Because there is no word for "anoint" in Japanese since the culture of that country has no Judeo-Christian tradition, the Narita authorities translated the words used by the petitioner in his native language, "abura sosogi", very literally as "pouring oil,". Ex. 1 at 17. According to the government's extradition submissions, these statements by the petitioner represented additional evidence that he was the lawbreaker at the Temple and the Shrine.  The district court accepted that argument and referenced the videos in its finding that probable cause to identify the extradition defendant had been established. Ex. 14 at 11.

There are at least three critical problems with the government's usage of those statements to identify the doctor as the perpetrator of the March 2015 events.  First,

as the videos were made and released over two years before the events at issue, they clearly do not represent admissions that he was responsible for the incidents at Narita and Katori. Moreover, in those videos, the petitioner does not state that he was planning to anoint—or, as translated by Japanese officials, "to pour oil on"—any other structures, areas, or snakes in the near or distant future. Further, from just two videos, one cannot accurately assume that anointing buildings or other objects was a typical or integral part of his Christian missionary practice in Japan. Any relationship between Dr. Kanayama's videotaped statements in late 2012 and the events of March 2015 is purely speculative.

Second, given the translation of "anointment" as "pouring oil" provided by Japanese authorities, it would be useful to examine the exact meaning of the verb "to pour" in English. According to the Cambridge English Dictionary, that verb means "to make a substance flow from a container, especially into another container, by raising just one side of the container that the substance is in" or alternatively "to (cause to) flow quickly and in large amounts." *Cambridge Advanced Learner's Dictionary and Thesaurus,* Cambridge University Press (2007). Thus, under the Japanese government's literal interpretation, in the 2012 videos, the doctor was describing several prior instances during which he either released oil from a container onto objects or caused oil to flow quickly and in large quantities.

In the present case, however, there was absolutely no example of such pouring, correctly defined. The security photos show a man touching some pillars at the Temple and perhaps the same man touching some objects, and raising his hand in a sprinkling motion, at the Shrine. Ex. 22. There is no portrayal in those photos of an individual making oil flow from a container or in large amounts. As a result, the petitioner's YouTube claims about "pouring oil" are factually inapposite to the events at issue in this case.

Third, as noted earlier in this memorandum, the Japanese government's translation of "anointment" is not entirely accurate. The *Holman Bible Dictionary* states that this term "describes the procedure of rubbing or smearing a person or thing, usually with oil, for the purpose of healing, setting apart, or embalming. A person can anoint himself, be anointed, or anoint another person or thing." *Holman Bible Dictionary,* Broadman & Holman (1991).

Most important, the oil used in the process of anointment is often called the "chrism". "Inside a Catholic Church", Thomas Richstatter, O.F.M., *Youth Update,* Cincinnati: St. Anthony's Messenger Press (1994) at 2. And chrism can be used *metaphorically*: "In the N.T. [New Testament] the word is used metaphorically for the grace of the [Holy] Spirit…". *The Cyclopedia of Biblical, Theological, and Ecclesiastical Literature.* James Strong and John McClintock; Haper and Brothers; NY (1880).

The petitioner's YouTube stories of anointment can be viewed as metaphors for projecting the Christian Holy Spirit onto buildings, physical objects, and even animals. At least one of Dr. Kanayama's videotaped comments as cited in the May 2015 Narita Report, when correctly translated, make clear that he was likely using "anointment" and "chrism" metaphorically in the video.

In that comment, which the Narita police translate essentially as disabling snakes by "pouring oil over them," Ex. 23 at 1-3 and May 19, 2015 Narita Police Report, the petitioner actually said "[t]hen the Holy Spirit spoke to me again and told me there were three white snakes on the mountain. I really thought that this was a spiritual metaphor, but I came across three white snakes during my climb and anointed, rendering them impotent." Independent Translation of November 3, 2012 video, Ex. 23 at 1-3. Unless the doctor truly poured vegetable oil on the snakes or, even more unlikely, dabbed each of them with oil using his fingers, he was using in this example "anoint" as a metaphor.

Of course, the entire story—and perhaps the entire video—might have been metaphorical—and that possibility showcases the danger of using spiritual narratives, or poems, or rap music lyrics, or any form of personal expression as proof of certain historical facts. Given that the petitioner's YouTube commentary was at least partially metaphorical, it has absolutely no relation to the events in question.

Because the 2012 YouTube videos were produced over two years prior to the incidents at Narita and Katori, because those incidents had nothing to do with "pouring oil" correctly defined, and because the videotaped statements of Dr. Kanayama were at least partly, and perhaps entirely, metaphorical, they provide zero factual basis for identifying him as the perpetrator of the incidents. Like the Hashimoto report, this second portion of the government's identification argument fails to establish the necessary probable cause in any way.

*c. Given that the Petitioner Had to Use Certain Tollgates to Travel to and From His Hotel and the Narita Airport, and Given that Almost 10,000 People Visit the Narita Temple Everyday, the Rental Car and Tollway Records Do Not Prove in any Substantial Manner that Dr. Kanayama was the Offender.*

In its initial memorandum, the government also urged the district court to find the existence of probable cause as to the petitioner based on an analysis of records from tollgates through which a Toyota Prius rented by him traveled on March 25, 2015. Ex. 16 at 14. That Dr. Kanayama was in Japan on that date is indisputable. It is equally indisputable that he had rented the Prius and drove along the tollway in question, the Higashikanto Expressway   And the government correctly noted that he picked up the car at the Narita Airport and stayed at a hotel in the Chiba prefecture on the night of March 25, specifically a spa resort in the area of Inubosaki, which is located on the Pacific Ocean in Choshi City, which is known for its hot springs.

Nonetheless, a simple explanation, predicated upon minimal and incontrovertible extrinsic defense evidence, undercuts this third part of the

government's probable cause argument:  to travel between the Narita Airport and his hotel in Chosi City most expeditiously, the doctor would have needed to use that expressway  and, more significantly, the tollgate nearest to the Temple on one end of the journey—and the tollgate nearest to the Shrine on the other. *See* Map of Dr. Kanayama's March 25, 2015 Travel, Ex. 32.  More particularly,  a review of that map—which depicts the locations relevant to the present discussion—demonstrates that to access the Expressway from Narita Airport, one has to use the Narita tollgate, the same gate used for travel to the Narita Temple.  And to exit the Expressway in route to the Inubidaki resort, one has to drive through the Sawara-Katori tollgate— the same gate used for travel the Katori Shrine. *Id.*

The fastest route from the airport to the Inubosaki spa involves the use of both the Expressway and the two tollgates at issue.  The tollway analysis presented by the Japanese authorities, therefore, is completely consistent with innocent travel between Narita Airport and the Inubosaki hotel.  The petitioner's use of that route on March 25, 2015 in no way implicates him as the perpetrator of the Japanese penal offenses at the Temple or the Shrine on that date.

Furthermore, every year, over three million people visit the Narita Temple. Ex. 33.  And  in  2015,  Narita Airport  handled 37.33 million travelers.  Ex. 34. Even if we exclude all other reasons for trips to and from the Narita area, plus transit passengers  who  traveled  though  the  airport  terminals,  upwards  of  100,000

individuals use the Narita tollgate each day.   That Dr. Kanayama was one of approximately 100,000 persons who traveled through that gate on March 25, 2015, even if we narrow that number down to drivers who used both the Narita and Katori gates on that date, hardly supports a factual basis to support the identification of him as the offender.

Because the numbers of daily Narita tollgate users is so high, and because there is an innocent explanation for Dr. Kanayama's road trip that day—an explanation corroborated by the government's own factual presentation—tollway and rental car analysis supports only in the most minimal manner the Narita authorities' identification of the petitioner.   Yet the district court relied on that analysis to find probable cause.  Ex. 14 at 11.   Such reliance was misplaced as the evidentiary value of the analysis was very low.

*d. Considered in Combination, the Three Portions of the Government's Probable Cause Presentation Provide Insufficient Evidence to Support the Identification of Dr. Kanayama*

While tollgate and rental car records may minimally support the district court's probable cause determination—even though there is an incontrovertible innocent explanation for the petitioner's  tollway trip on March 25, 2015—nothing else does.  Dr. Kanayama's YouTube statements from 2012 are irrelevant to the identification of who committed the 2015 acts at the Temple and the Shrine.  And the dental professor's opinion, based upon still photographs of extremely poor

resolution, is worthless from a forensic standpoint. Therefore, the district court erred by finding that the government had met the probable cause requirement of identifying the petitioner as the culprit.

## VII.

## CONCLUSION

Because the government's extradition complaint and subsequent memoranda failed to meet the requirements of dual criminality and probable cause, the district court decided erroneously, as a matter of law, that Petitioner Masahide Kanayama was certifiable for extradition to Japan. For those reasons, this Court should grant the Petition for Writ of Habeas Corpus by setting aside the judgment certifying such extradition and allowing any other relief necessary to prevent the petitioner's involuntary and unlawful removal from the United States.

Respectfully submitted,

/s/ David M. Dudley

DATED:  April 25, 2023

David M. Dudley
Attorney for Petitioner
Masahide Kanayama

A0064

PROOF OF SERVICE

I declare that I am over the age of 18 and not a party to the within cause.  I currently reside in the county of Riverside in the State of California.  A true copy of the attached was emailed to the following:


Scott Kowal,
Chief Pretrial Services Officer
Pretrial Services, Southern District of New York
Scott_kowal@nyspt.uscourts.gov

Tara M. La Morte
Co-Chief, Money Laundering & Transnational Criminal Enterprises Unit
Asset Forfeiture Coordinator
U.S. Attorney's Office
Southern District of New York
TLaMorte@usa.doj.gov


I declare under penalty of perjury that the foregoing is true and correct.  Executed on April 25, 2023.



Margarita J. Mejia

A0065

# Exhibits

| Exhibit | Description |
|---------|-------------|
| 1 | Social history of Dr. Masahide Kanayama |
| 2 | Declaration of Expert Witness Dr. Eric Feldman |
| 3 | Curriculum Vitae and Patient Testimonials – Dr. Masahide Kanayama |
| 4 | Video Exhibit Showing No Permanent Damage to Structures |
| 5 | Photo Exhibits of Alleged Defacement |
| 6 | Persecution of Koreans in Japan |
| 7 | Article describing persecution of "hafu" |
| 8 | Extradition Complaint |
| 9 | Government Memorandum in support of extradition |
| 10 | Defense Opposition Memorandum |
| 11 | Government reply |
| 12 | Defense Sur-Reply |
| 13 | Transcript of Extradition hearing |
| 14 | District Court Order |
| 15 | Japanese Government Extradition Request |
| 16 | Narita Police Investigative Reports 2015-2016 |
| 17 | Declaration of Takeasu |
| 18 | Timeline of Stains appearing and disappearing. |
| 19 | Japanese Police Photos of Narita San |
| 20 | Japanese Police Photos of Katori |
| 21 | Japanese Police Victim Reports, Repair Estimates |
| 22 | Hashimoto Facial Recognition Report |
| 23 | Japanese Police Reports IMM |
| 24 | Japanese Supplemental Reports 2017 |
| 25 | Expert Opinion Takaesu |
| 26 | Declaration of Hisao |
| 27 | Declaration of Dudley |
| 28 | Declaration of Schoenbach |
| 29 | Opinion Michizuki |
| 30 | Benjamin Bavarian Facial Recognition Report |
| 31 | Translation of Anointment |
| 32 | Map of Tollway near Narita and Katori |
| 33 | Visitors to Narita Temple and Katori Shrine |
| 34 | Japanese Penal Code 260 and 38 |

A0066

# Exhibit 1

**JOHN BROWN & ASSOCIATES**
COURT CONSULTANTS

3302 SOUTH GRAND AVENUE
LOS ANGELES, CALIFORNIA 90007
TELEPHONE (213) 628-9218
FAX (213) 628-9718
JBLA@SBCGLOBAL.NET

April 17, 2023

United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

    **Re:   Masahide Kanayama**
           **Writ of Habeas Corpus**

Your Honor

    This office has been asked by Masahide Kanayama's attorney, David Dudley, to compile a report assessing the personal history and characteristics of Dr. Masahide Kanayama; his professional accomplishments, and to analyze and report on other contextual factors that are relevant to the Court's consideration. The information which follows is based on a series of interviews with Dr. Kanayama and his associates, as well as a review of hundreds of patient testimonials, case file documents, and other relevant materials.

*Introduction and Overview*

    Masahide Kanayama, M.D., age 59, a legal permanent resident of the United States with a highly respected surgical practice in New York, is the subject of an extradition request by the Government of Japan pursuant to the Treaty on Extradition Between the United States and Japan dated Mar. 26, 1980, 18 U.S.T. 892.   Dr. Kanayama has no criminal history in the US, Japan, or any other jurisdiction. Dr. Kanayama is charged by Japanese authorities with two counts of damaging religious and historical shrines, in violation of Article 260 of the Japanese Criminal Code, for allegedly "pouring" an oily liquid on two shrines in Japan. According to prosecution materials, the operators of the shrines do not

Re:   Masahide Kanayama
April 17, 2023
Page  2

appear to have noted note any "defacement" at the time and only became aware of the matter when approached by police at a later date. Prosecution materials also confirm that no repairs were carried out nor were any costs incurred by the shrine operators. Nevertheless the Japanese government charges that Dr. Kanayama is responsible for $21,300 in damages based on estimates received for repair to damages which they allege were a result of Dr. Kanayama's actions.

For extradition to apply, the alleged crimes must rise to the level of a felony in the United States.   In its filing, the US Attorney states "these crimes correspond to violations of various United States statutes, including, for example, New York Penal Law section 145.10 (criminal mischief in the second degree) and section 145.05 (criminal mischief in the third degree), both felony crimes." (Page 1, lines 15-18.) The elements of the crime in both cases would require that the prosecution establish specific criminal intent and present evidence of damage in excess of $250.   Even if Dr. Kanayama did this, he had no criminal intent and in fact his intent as a practicing Christian was to "anoint" and thereby sanctify, purify, and protect the structure by placing a small amount of vegetable based oil on his fingertips and touching the structure.

Dr. Kanayama is a surgeon with an impeccable record who pioneered innovative surgical techniques to neutralize and reverse the effects of advanced stage endometriosis, a disease in which tissue that normally lines the inside of the uterus-the endometrium—grows outside the uterus, causing pain, scar tissue, adhesions, and leading to infertility and other complications. Dr. Kanayama's level of expertise in treating endometriosis is unparalleled; he is one of the world's leading experts. In this report and its attachments the Court will find ample evidence of Dr. Kanayama's stature and his unique societal contribution as a leader in the fight against this disease.

Dr. Kanayama is also a committed Christian and the founder and director of International Marketplace Ministry ("IMM"), a respected non-profit organization he established in Japan in 2013. IMM encourages Christians to establish a personal relationship with God and, through their personal "walk and fellowship with the Lord," to "be awakened by The Lord to discover your personal calling."

Re:   Masahide Kanayama
April 17, 2023
Page  3


*Family Background*

    Masahide Kanayama was born on September 8, 1962.    His father was
Chogen Kanayama and his mother was Toyo Kanayama. Chogen Kanayama was
born in Korea in 1930, when Korea was part of Japan, then moved to Japan as a
boy. He was an inventor who held the Japanese patent for the electric blanket,
which he invented during World War II, as well as patents for other inventions,
particularly medical devices. He owned Diamond Electric Company, a small
manufacturer of electric blankets and a device used by gynecologists to
automatically clean instruments.

    Masahide's mother, Toyo, traced her lineage to Korean royalty. Her branch
of the family converted to Christianity and lived in Kyoto, Toyo grew up as part of
the one percent of the Japanese population who was Christian. Toyo's mother was
famous missionary and charity work, and Toyo continued the tradition. She was
active in humanitarian work for the homeless; for lepers; and for others in need.
During Masahide's childhood she frequently traveled to different parts of Japan in
times of need to provide aid. She also studied under the famous Japanese Christian
pastor Reiji Oyama, the founder of "KGK", the Christian Student Association of
Japan.    Pastor Oyama was also a famous radio evangelist in Japan and founder of
the Tokyo Graduate School of Theology. He remained a close advisor to Toyo and
friend of the family, and gave the eulogy at Toyo's funeral in 2007.


*Early Childhood, Schooling and a Christian Upbringing*

    Soon after birth, Masahide was sent to live with relatives in Uraway City
while his parents worked to stabilize their manufacturing business in Tokyo, which
was struggling. He stayed there until he was six. During this time he saw his
parents once a month.

    In Tokyo, Masahide grew up in family circumstances which he describes as
"middle class…not wealthy, somewhat modest." They lived in small house. The

A0070

Re:   Masahide Kanayama
April 17, 2023
Page  4

factory producing the devices invented by his father was adjacent to the family home, and employed five workers, plus his parents.

Masahide describes his father as "disciplinarian type" who was very "righteous" and had firm, clear notions of what was right, and what was wrong. He did not easily show affection. Masahide recalls his father taking the children on outings to the beach and mountains. He was also an animal lover who adopted as many as ten dogs and a dozen cats, as well as a baby bear. He considers the most distinctive aspect of his father's character to be that "his thinking is different form most people." He also describes his father as very healthy, never drinking alcohol, and always insisting that the family eat healthy food and live a healthy lifestyle. He also stated that his father "did not force his way – he believed in freedom, and that I need to shape my life by myself."   Masahide had great respect for his father, whom he viewed as a dreamer and "a genius, always ahead of the ages."

Masahide recalls his mother as a "caring, loving, wonderful mother" who respected her husband, and nurtured and cared for her children with diligence and compassion.   Aside from Masahide, the children included Rika, a daughter who was six years older, and a, Narihidea, a son, four years younger than Masahhide.

He attended Kindergarten in Urawa City then, after completing Kindergarten, he returned to live with his parents in Tokyo. From age six to twelve, he attended Shirakawa Elementary School in Tokyo. He excelled academically, immersed in a rigorous routine that included regular classes from 8:00 AM to 3:00 PM, following by special evening study classes at Keio Kai Preparatory School from 5:00 PM to 9:00 PM designed to ensure he made good grades and prepare him for the entrance exams that would determine which high school he could attend. He recalls there being no time for sports or recreational activities – only study, which he embraced. He graduated from Shirakawa ranked Number 1 out of 200 graduates.   His favorite subjects were math and science; he also enjoyed history, geography, and social science. He never felt pushed by his parents; in fact his father was believed that going through "lots of trials to build character" was more important than schooling. His mother, however, was firm in her desire to ensure that he had a good education.

Re:   Masahide Kanayama
April 17, 2023
Page  5


As a result of his status as first in his class, and his strong performance on the standardized entrance examination, he was accepted into Komaba Toho, generally recognized the most elite advanced curriculum Junior and Senior High School in Greater Tokyo. He commuted one hour per day by subway, and unlike in elementary school, still found time for extracurricular activities that included soccer and competitive table tennis. He maintained exemplary grades and by the time he graduated had completed not only high school course, but had completed many college level courses in chemistry and physics.

### _Christian Upbringing and Personal Religious Awakening_

Approximately one million Japanese, representing one percent of the population, are Christian. The religion reached Japan in the mid-16[th] Century via Roman Catholic Missionaries, then was banned in 1587. Those who continued to practice Christianity, called "kakure kirishitans" meaning "hidden Christians", were persecuted if exposed, even crucified.   Christianity was not officially allowed again until after Japan reopened to world trade in 1853. Christians were again oppressed during World War II, when the Emperor was considered a living god, then the religion re-emerged after the war, when it was spread by missionaries and American soldiers.

Masahide was born into a family in which his mother was a devout Christian, and his father was generally noncommittal and not actively involved in religion. Masahide's mother took the children to attend a Baptist Church located across the street from his home. Later they transferred to a missionary church, reflecting his mother's missionary, evangelical orientation.   Masahide notes of his mother: "She was very passionate about bringing people to Christ."

During his childhood, Masahide experienced incidents of discrimination and persecution due to his status as a minority Christian. On three separate occasions he was taunted and beaten by classmates. The school did not intervene or support him. He also experienced discrimination due to his father having been born in Korea.

Re:  Masahide Kanayama
April 17, 2023
Page  6

Until he was seventeen, Masahide attended the Baptist church as what he describes as a "social ritual." He did not experience any personal religious experience during this period. He recalls: "I was not a dedicated Christian – it was more like a cultural and family duty, mostly to make my mother happy." He realized that his mother considered him her favorite child, and that she had been praying for him, and even during his early childhood, she believed that there was a calling from God for him to eventually become a doctor.

When Masahide was seventeen, he experienced a wholly unexpected and transformative personal religious awakening. The awakening occurred when his mother took him to an evangelical missionary church for the first time. He describes this experience as follows:

> My mother took me to the Korean missionary church. There were only a few people in the church. It was my first time there. It happened as soon as I entered the church. Jesus appeared to me in person. He spoke to me. He called my name. He was tall, wearing a white cap, with a shining face. I knew he was and he said 'I have been waiting for you. Welcome to my kingdom, I have much work for you to do in the future.' I almost fell on the ground. I was totally speechless. Before I met him, I didn't understand Christianity at all. It was all culture. But as soon as I met him, it was so real, so tangible, and he called me by my name, and he had a plan for my future. Then I was willed with the holy spirit, the holy spirit filled me. It was profound. I felt that my whole life was given direction by this experience. The Lord guided me. He let me know to go to University, to study medicine in America. He said: "I will show my healing power through your hands."

Re:   Masahide Kanayama
April 17, 2023
Page  7

*Higher Education and a Call to Medicine*

Acting in accordance with the direction his newfound faith had produced, Masahide learned English, graduated, and enrolled in Crieighton University in Omaha Nebraska in 1981, where he studied chemistry and participated in an interdisciplinary honors program in literature, history, and humanities. He graduated magna cum laude from Creighton in 1984, then went to The Medical College of Wisconsin in Milwaukee, where he spent six years, receiving his MD in 1991. During this time he also obtained a research fellowship involving collaboration with National Cancer Institute in Tokyo and Johns Hopkins, under which he published papers on groundbreaking research in HIV and the Human Papilloma virus.

After receiving his MD, Masahide under took his residency in obstetrics-gynecology at the Mayo Clinic, where he received Teacher of the Year Award for two years running.    After graduating from the Mayo Clinic in 1995, he joined a group practice in Minneapolis.   Then in 1996 he received a call from a physician recruiter in New York from Mount Sinai hospital, looking for a Japanese – speaking ob-gyn specialist. He accepted the position, joining the faculty staff at Mount Sinai for three years.

In describing the process by which he navigated the various decisions that he was presented with, Dr. Kanayama places his development as a physician within what he viewed as the larger, more important spiritual development that was a daily part of his life after his awakening at age seventeen:

> My studies and then entry into medicine was the
> beginning of my Christian role. I prayed. Sometimes I
> prayed all night. At Mayo Clinic He guided me to learn
> very difficult and specialized gynecological surgery.
> When the recruiter from New York called for a Japanese
> speaking gynecologist, I prayed, and the Holy Spirit was
> talking to me, and I knew I have to take it, Then after
> three years, I was guided, this was the time to establish
> my own practice, and to begin my specialization in

A0074

Re:   Masahide Kanayama
April 17, 2023
Page 8

endometriosis.

In 1999, Dr. Kanayama established his own practice in Manhattan, and in 2001 changed the name of the practice to New York Endometriosis Center.   He has continued that practice to the present day

*Breakthrough Surgical Approach To Endometriosis*

While he was at the Mayo Clinic, Dr. Kanayama underwent advanced laparoscopic surgery and gynecologic oncology training under three of the world's top specialists – Dr. Karl Podratz, Dr. Raymond Lee, and Dr. Maurice Webb. Then later, at Mt. Sinai, Dr. Kanayama found that there was a high incidence of endometriosis in his Japanese patients – a much misunderstood condition which causes pain and is associated with infertility. The Mayo Clinic describes endometriosis as follows:

> Endometriosis is an often painful disorder in which tissue that normally lines the inside of your uterus—the endometrium—grows outside your uterus. Endometrisis most commonly involves your ovaries, fallopian tubes, and the tissue lining your pelvis. Rarely, endometrial tissue may spread beyond pelvic organs. With endometriosis, displaced endometrial tissue continues to act as it normally would—it thickens, breaks down, and bleeds with each menstrual cycle. Becausde this displaced tissue has no way to exit your body, it becomes trapped….surrounding tissue can become irritated, eventually developing scar tissue and adhesions….

Dr. Kanayama in interviews for this report recalls his initial involvement with endometriosis as follows:

> In the beginning, I was not thinking about endometriosis, but every day I was seeing Japanese patients. Almost every patient I saw seemed to have it. That was the

Re:   Masahide Kanayama
April 17, 2023
Page  9

> beginning of my specialization . . . doctors didn't know
> how to deal with this disease. Many are using laser, just
> cauterizing, burning, and it comes back quickly. The
> nodule reaches much deeper inside. So from praying, the
> Holy Spirit gave me the idea of how to attack this
> disease. I give credit to God, it wasn't really coming
> from my brain. I made a new technique, using
> laparascopy, no laser, just scissors. Technically it is very
> challenging, cannot easily be taught. You have to have a
> certain type of skill. I believe God guided me to have this
> skill. My practice became like a healing ministry – it is
> God's commission to me to heal these patients, he gave
> me the area of endometriosis and I use it to help and
> touch as many people as possible and change their life.

Describing in more detail his unique approach, Dr. Kanayama stated:

> The major issue in the US and globally is that 95% of
> endometriosis surgeons use the Da Vinci robot. For
> surgery done this way, the surgeon is not touching your
> body -- he is watching a 3d video—yet many if not most
> of the clues can only be felt, not seen. So it's really the
> machine that is operating. The problem is the surgeon
> can't feel anything.    There is no tactile sense or haptic
> sense. No pressure, feeling, texture, and the depth —
> these are all things you can only feel by touching.
> After Da Vinci came — endometriosis surgery quality
> became really bad.    Haptic means you can feel the
> texture of the endometriosis tissue and adenomyosis.
> The Da Vinci robot cuts the wrong way, uses a burning
> scissors. I use cold cut. I feel every every texture of endo
> tissues by haptic skill. I only remove the injured tissue.

An indication of the unique success of Dr. Kanayama's laparoscopic surgical
technique is that with standard laser treatment, 99% of Stage IV patients (the most

Re:  Masahide Kanayama
April 17, 2023
Page  10

advanced stage) have a recurrence that requires further treatment within five years. Dr. Kanayama's Stage IV patients have a five year recurrence rate of 18%. In the 30 years of his practice, he has treated more than 7,000 patients and is regarded as one of the world's premiere surgical specialists treating endometriosis.

Dr. Kanayama's work is widely recognized in the medical field. He is a frequent guest speaker at various medical gatherings, and he has been awarded the "Compassionate Doctor Lifetime Achievement Award" for the last seven years by for the past seven years by Vitals Consumer Services, LLC, an online health care resource that offers reviews of physicians and helps patients find appropriate care. He is Board Certified by the American Board of Ob-Gyn; he is a clinical assistant professor in the Department of Ob-Gyn and Reproductive Sciences at Mount Sinai School of Medicine; and he is a visiting scientist and investigator in the Department of Cancer Immunology and Gynecologic Pathology at The Johns Hopkins University School of Medicine.

Dr. Kanayama's medical licenses include:
- National Board of Medical Examiner Certification
- State of Minnesota Medical License
- State of New York Medical License
- State of Connecticut Medical License

His professional affiliations include:
- American Association of Gynecologic Laparoscopists
- American College of Obstetricians and Gynecologists
- Society of Laparoscopic Surgeons
- International Society of Gynecologic Endoscopists
- Eureopean Society of Human Reproduction and Embryology
- American Medical Association
- Minnesota Ob-Gyn Association, Minnesota Medical Society
- Mayo Alumni Association
- Doctors Mayo Society
- Japanese Medical Society (USA Chapter, New York section)

Re:   Masahide Kanayama
April 17, 2023
Page  11

Dr. Kanayama is the recipient of numerous awards, a sampling of which are appended, along with his Curriculum Vitae, as Exhibit A.

## *Physician Recommendations*

Dr. Kanayama's stature as an endometriosis surgeon is addressed by fellow physician Dr. Alfonso Tagliavia in a letter to the court:

> I have known Masahide for over 19 years . . .Over the years, Masahide has developed a specialized practice focusing on the diagnosis and treatment of endometriosis. . .   Masahide's patients literally come from all over the world; Europe, Asia, South America and Australia. The reason for his success and popularity in the endometriosis world is because he takes the time to educate his patients. He also takes the time to skillfully excise the endometriosis instead of just cauterizing it or placing the patient on hormone therapy like most other gynecologic surgeons I work with often do. On a personal level, I have trusted Masahide with my own daughter who, at the age of 19, already had stage 3 endometriosis. . . I see Dr. Kanayama as one of the pre-eminent endometriosis surgeons in the United States. There is no one else I would send a friend or loved one.

Another physician, Dr. Perry Lerner, writes of his personal experience with Dr. Kanayama, and also addresses the fact that endometriosis, though widespread, receives inadequate attention from the medical community, and that there exists a shortage of physicians who specialize in effective treatment of this widespread disease:

> [M]y daughter has been afflicted with this dreadful condition and has been suffering daily for months. We had seen numerous Gynecologists and other so called

A0078

Re:   Masahide Kanayama
April 17, 2023
Page  12

> specialists. . . She was living with severe pain and we
> decided to seek a surgical remedy. We thought we hd
> gone to a surgeon with experience . . . Post Op she had
> told me this was way beyond her area of expertise. After
> much research we came to Dr. Kanayama. . . . My wife
> and daughter arranged a consultation with Dr.
> Kanayama and came away feeling very well educated
> and optimistic that he could offer hope of living a
> normal life pain free and most importantly being able to
> become pregnant in the future. . . Unfortunately this is a
> condition that appears to be on the back burner and is
> not recognized by the medical community. We need
> more dedicated physicians like Dr. Kanayama who
> deserves many accolades fo the valuable work he does
> in treating endometriosis.

Please refer to Exhibit B, for the complete letters from fellow physicians.

*Patient Testimonials*

Dr. Kanayama is the recipient of well over 1000 patient testimonials.    His
Instagram site (https://www.instagram.com/newyorkendometriosis) has over
86,000 followers, and significantly, this is up from 14,000, which was the number
of followers he had in 2016—a growth that illustrates his ongoing contribution in
his field.    The Court is urged to consider both the volume of patient testimonials,
and the glowing nature of the comments.    A full presentation of these testimonials
is appended to Dr. Kanayama's Petition and Memorandum of Law as Exhibit 4.
Meanwhile, following are a few samples of the testimonials.

Patient Jennifer Tinsen, a medical doctor herself, writes:

> After many years of unsuccessful fertility treatments
> including IVF, and over a year of abnormal bleeding and
> severe pain, I was left on my own to figure out what was
> wrong with me. My physicians told me it was "normal,"

Re:   Masahide Kanayama
April 17, 2023
Page  13

caused by "stress" and "in my head."... Dr Kanayama
found that many of my internal organs were displaced
and confirmed my suspicion of endometriosis,,, 1 month
after my surgery date we conceived our first child
naturally....Dr. Kanayama gave me my life back. I can
honestly say that Dr Kanayama is an amazing, caring,
knowledgeable, meticulous physician and surgeon. He's
truly ONE OF A KIND! I would never use another
physician and would recommend any friend or family
member to him.

Another patient, Jolene, writes in her testimonial:
I had my surgery on Friday and have to say its been
nothing short of miraculous! Every positive thing that
has been said about Dr. K is true. The staff at the
hospital told me that women come from all over the
world to see him and now I know why. It is almost
difficult to figure out what to do with yourself when the
areas that you've had chronic pain for years are just pain
free! The pain is GONE!

Patient July Lopez writes:

Around 4 years ago I stared having pain in my lower
abdomen and lower back. The days were passing and the
pain was getting worse. .... gynecology did not find
anything wrong. The pain I felt would not allow me to
sit comfortably or sleep....I went to emergency room
where they preformed an ultrasound and some blood test
they found nothing an assumed that it was an infection.
The pain would come and go for the next 3 ... new
doctors said that the pain was normal and it was caused
by my menstrual cycle.

When I saw Dr Kanayama he was able to immediately

A0080

Re:   Masahide Kanayama
April 17, 2023
Page  14

run some test and give me a diagnosis. He explained in
detail the condition of my uterus, ovaries and
endometriosis. My uterus had sifted over time because
of the chocolate cyst that has been growing in my right
ovary and endometriosis growing in my reproductive
organs. He mentioned that surgery would be the best
way to diagnose and treat endometriosis….The surgery
was performed at Greenwich hospital Connecticut….On
my post op visit with the Dr he informed me that I had
endometriosis (stage 4) growing on my pelvis, bladder,
intestines fallopian tubes and that I had a polyps in
uterus also the cysts was growing over my ovary. For
this to have grown so large the Dr said that I might have
had this affecting me for the last 10 years. A month has
gone by and I feel a million times better THANK YOU
Dr Kanayama God bless you.

Patient Fran Vandewater writes that she was forty-four and had been
suffering from endometriosis since she was seventeen when she found Dr.
Kanamyama. Her endometriosis had traveled all the way to her stomach lining and
her gynecologist had told her it was not surgically correctible, but could only be
managed with medications. She sought out Dr. Kanayama after reading about him
on the internet, and after surgery she wrote:

Earlier I inquired as to whether or not Dr. Kanayama
could really help. Well, now I know for certain... Dr.
Kanayama has cured my Stage 3 of 4
endometriosis…..While speaking with Dr. Kanayama at
my first post-operative appointment, I told him that I
now refer to him as "Dr. God." He graciously smiled and
said, "I am not God, I am one of God's instruments…."
There is no need to suffer any longer ladies. Dr.
Kanayama can give you high-quality care that you so
deserve. Dr. Kanayama's expertise in laparoscopic
endometrial surgery has contributed immeasurably to

A0081

Re:   Masahide Kanayama
April 17, 2023
Page  15

the wellness of my health today.

### *Spiritual Ministry Through International Marketplace Ministries (IMM)*

In 2013 Dr. Kanayama created International Marketplace Ministries (IMM), a Christian not-for-profit enterprise. The core principle of IMM is that individual Christians have the ability to experience, as Dr. Kanayama has, "a walk and fellowship with the Lord" without needing to rely on a pastor, church, or other mediating entity. Dr. Kanayama describes his motivation in creating IMM as follows:

> I had no plan or desire to do IMM – I was so busy as a doctor. But in prayer the Lord asked me to create it. I'm not a pastor, I've never been to bible college or seminary. This means I am not beholden to anyone. I am a businessman. My business is medicine, as a doctor. That's "marketplace." I started by just showing regular people how to pray, how to develop a personal relationship with God. That is the idea – personal relationship with God, not through a pastor or anyone. Not through me. Through that relationship, you learn that God has a wonderful plan, a higher plan for you to achieve.   Outside of church, through your daily work, your family, your friends, you will contribute to your community and a society and as a Christian.

Dr. Kanayama recognized from the outset that his encouragement of Christians to engage in and develop a personal relationship with God would meet resistance from the established Christian church in Japan.

He explains:

> I knew it would be very difficult for Japanese pastors. They see IMM as giving the people more control, they see church pastors losing control. I cannot help it, it is not

A0082

Re:   Masahide Kanayama
April 17, 2023
Page  16

        my idea, but the Holy Spirit gave it to me. IMM
        encourages people to have a personal prayer relationship
        with God and people start to discover their own callings
        from God in marketplace.

    Beyond acting as a catalyst in the spiritual awakening of its
members, IMM actively engages in charity work and charitable
giving, and in all respects acts as a responsible participant in the
global non-profit community.

*Key Background Contextual Factors*

    In addition to Dr. Kanayama's personal history and accomplishments, the
Court is respectfully asked to consider the following background contextual factors
which are essential to an evaluation of Dr. Kanayama's position as the target of
extradition proceedings initiated by the Japanese government:

    *The Christian Minority in Japan Has Suffered Historical Persecution*

    In Japan, there is a long history of persecution and discrimination
against Christians, who are a one percent minority in the country.   After
first being brought to Japan in 1547, Christianity was subsequently banded
for hundreds of years from 1583 until 1853, forcing Christians to go
underground as *Kakure Kirishitan,* or "hidden Christians." Officially
sanctioned animus towards Christians was substantial as recently as World
War II when state sponsored Shintoism elevated the Emperor to the status of
a God and insisted that the Japanese were a divine race, the *Yamato*; with all
other races and cultures considered inferior.   In present day Japan, the
government is strongly influenced by Nippon Kaigi, (Japan Conference), a
conservative Shinto cult-like organization whose adherents include Prime
Minister Abe and many of his cabinet members, and who are widely
regarded to be pursuing a policy to gut Japan's post-war pacifist
constitution, end sexual equality, get rid of foreigners, void pesky "human
rights" laws, and return Japan to its Imperial Glory. (See Exhibit D)

Re:   Masahide Kanayama
April 17, 2023
Page  17

### *IMM is Seen as a Threat by Traditional Christian Denominations*

IMM, with its emphasis on members seeking and finding a personal relationship with god in the "marketplace" (meaning within their ordinary secular existence, rather than only in Church or a place of traditional worship) is perceived with hostility by traditional Christian denominations because it largely eliminates the role of pastor as the mediator and enabler. IMM teaches that an individual has the power himself or herself to engage in a direct relationship with God, without mediation by anyone. IMM is thus the antithesis of a "cult" because it empowers the individual and de-emphasizes organized leadership – a position which antagonizes many Japanese pastors. This rivalry and antipathy toward IMM by organized Christian religions in Japan is relevant to any consideration of the case because it is apparent that the government only became aware of the alleged defacement years some three years after the YouTube videos posted, apparently when rival Christian practitioners who disapprove of IMM report ed them toauthorities, thus initiating the investigation into alleged defacement by "pouring oil" and ultimately spurring the extradition case now under review.

### *Mistranslation and Misunderstanding of "Anointment"*

The case against Dr. Kanayama turns on what the word "anoint" and what actions it signifies. The word has multiple meanings and a full understanding of the Christian and secular use of the word, and its translation and mistranslation into Japanese, is essential to any objective reading of the complaint against Dr. Kanayama.

In Christian practice, "anointing" refers first of all to the sanctifying presence of the Holy Spirit in a person or place. Jesus Christ is, literally, "Jesus, the Anointed One." This "anointing" of the Holy Spirit" refers to the power and protection given by the Holy Spirit itself upon the individual or object on which and within which the Holy Spirit is present. There is no physical aspect to this – it is a wholly spiritual "anointing." (See for example Acts 10:38. "how God anointed Jesus of Nazareth with the Holy Spirit and

Re:   Masahide Kanayama
April 17, 2023
Page  18

power.." or the established concept that Christians have the Spirit who leads
to   truth and "anoints" continually with His grace and comfort. "But you
have an anointing from the Holy One, and all of you know the truth" (1 John
2:20).

In Christian practice "anoint" is sometimes used to describe a ritual
use of oil as a symbol or metaphor for the presence of the Holy Spirit. When
this is done the "anointing" is typically accomplished by placing a very
small quantity of scented olive oil on the fingertips and dabbing the
fingertips on the person or object to be ritually sanctified. The quantity used
is no more than a few drops, representing a tiny fraction of a fluid ounce
(typically no more than five drops or .02 oz) in any given application. There
is nothing in this practice that would rise to the level of defacement of any
property; indeed, those who practice such "anointment" typically do so in
their own homes and places of business, dabbing oil in miniscule quantities.

There is no native Japanese word for "anoint" and so the concept is
conveyed using the words "abura sosogi" using the Japanese characters
油注ぎ) which literally mean "pour oil."    Abura sosogi, then, is used to
describe all of the following:    a) the metaphorical anointing, without any
use of oil, by the Holy Spirit b) the Christian ritualistic anointing using a
small quantity of oil dabbed, smeared, or sprinkled; and c) the secular act of,
literally, "pouring oil" as to pour oil into cooking pot. In the Youtube videos
that are presented by the prosecution as the primary evidence of Dr.
Kanayama "defacing" property, Dr. Kanayama says "abura sosogi" in
Japanese to convey the Christian metaphorical and/or ritualistic concept of
"anoint" (a or b), whereas in its translations the government consistently
mistranslates this as the literal secular translation, and translates using the
English words "pour oil" (c). The translation by the prosecution
misrepresent the situation by literally referring to a physical act of "pouring
oil" when in fact the words themselves as used by Dr. Kanayama refer either
to the metaphorical meaning of "anointing" by the Holy Spirit, or to the
Christian ritualistic meaning, whereby a few drops are dabbed onto the
person or object being anointed. It is obvious to anyone familiar with the
Christian usage and practice, that Dr. Kanayama is in no way whatsoever

Re:   Masahide Kanayama
April 17, 2023
Page  19

referring to "pouring oil" in quantity on anything – yet the Japanese government translations repeatedly refer to it this way.

And understanding of the typical Christian method of ritualistic anointment, using a few drops of oil on the fingertips, is also relevant to an understanding of the other key piece of prosecution evidence, the security video from the two shrines in question.   According to the government, this video footage depicts a man alleged to be Dr. Kanayama, an allegation which is disputed by Dr. Kanayama. But even if the person in question is, Dr. Kanayama, the actions described are inconsistent the claim of  "pouring oil"  representing thousands of dollars of alleged damage, and are in fact wholly consistent with the typical Christian ritualistic practice of "anointment" with a few drops of harmless oil:

> Video footage obtained from the Narita-san Shinsho-ji Temple revealed that on March 25, 2015, a man wearing a black longsleeved and streaked windbreaker with a hood, a grey jacket, a whitish collared shirt, dark-blue jeans, and black shoes, carrying a camera, and with black thinning hair, was roaming around the Narita-san Shinsho-ji Temple, and between 3:37 p.m. and 4:06 p.m., aroundNio-mon (gate), Komyo-do (hall), Okuno-in (inner sanctuary), and Soman (main gate), was ***touching poles***. (Rec.Ex. 5; see also id. Bxs. 12, 16 (containing still shots)). These were among the locations that were the subject of the complaint to the Japanese police. (Rec. Ex. 11; see also id. Ex. 12). A review of photographs taken of the Soman by a tourist and an employee of the shrine at approximately 2:24 p.m. and 4:07 p.m., respectively, showed that the oil defacement occurred between 3:30 p.m. and 4:07 p.m. (see Rec. Ex. 6), and the videofootage showed the man, now suspect ***touching the poles*** on the east side of Soman at around 4:06 p.m (see id.)." (Memorandum, Page 2, line 15 through Page 3, Line 6.  ***Emphasis added.***)

Re:   Masahide Kanayama
April 17, 2023
Page  20


Thus while the prosecution repeatedly mistranslates "abura sosogi" in the YouTube videos as "pouring oil" – the security video evidence submitted shows no one "pouring oil" but rather shows an individual "touching poles" – an act that is wholly inconsistent with the defacement claimed, and wholly consistent with the benign ritual act of anointment as practiced by Christians worldwide.

*Conclusion and Recommendation*

Dr. Masahide Kanayama is a gifted, dedicated physician and responsible, contributing legal resident of the United States of America. He has dedicated his professional life to the study and surgical cure of endometriosis, an extremely widespread yet poorly understood and under-served sector of the medical profession. He is uniquely able to provide a solution to a medical problem that is not readily available from other surgeons. The hundreds of letters from patients expressing joy and appreciation for the life-altering surgery of Dr. Kanayama's unique technique speak eloquently to the positive value he represents in America. His presence in America is a distinct and quantifiable benefit to the United States.

Aside from his professional qualifications and skill, Dr. Kanayama is, by any objective measure, a "good man" in the fullest sense of that expression. In an interview for this report, Dr. Kanayama's longtime assistant Sabrina Kucevic put this in perspective:

> He does not advertise. Everything is word of mouth. I have watched patients find him and fly in from all over the world. He is very humble. He listens. He is there to help you. He doesn't push anyone to have surgery with him. But afterwards they say things like: "You're like a miracle." One even called him "Dr. God." He always replies the same way: "Don't thank me, thank God." This is New York and that kind of humility doesn't exist here. He is humble not just as a physician, but in all aspects of his life. He doesn't even drive a car. He takes the subway, he walks places, he is very simple. It makes no

Re:  Masahide Kanayama
April 17, 2023
Page  21

        sense, because of how successful he is, but he goes
        around like a college student. He doesn't show off. He
        gives people discounts, sometimes he gives free
        treatment. I'm New Yorker, I know good, and I now bad.
        Dr. Kanayama is good, a very good man.

      The alleged "crime" for which it is proposed that he be deported went
entirely unnoticed by the caretakers of the shrines in question, and by Japanese
authorities, for years. No defacement was noted. No repairs were undertaken.

      The Court is respectfully urged in its evaluation of the deportation request to
consider the strong personal history and admirable, responsible personal
characteristics of Dr. Kanayama, his many contributions to the medical profession
and his successful treatment of thousands of patients. The Court is also respectfully
asked to consider the questionable context of the alleged "crime" which, at worst,
was a benign, harmless act of spiritual expression which caused no damage and
was undertaken with no criminal intent whatsoever.

Michael Sellers        John Brown

MS/JB:lt

enclosures

0001

# *APPENDIX*

| Exhibit | Description | Page |
|---------|-------------|------|
| A | Dr. Masahide Kanayama Curriculm Vitae and Awards | 001 |
| B | Letters of Support from Physicians | 008 |
| C | Patient Testimonials including Handwritten Letters; Testimonials on Dr. Kanayama's Website, Testimonials on Dr. Kanayama's Instagram Site, and Testimonials on Third Party Rating Sites includine Yelp, WebMD, and Others | 011 |
| D | Website Visitors by Country of Origin | 068 |
| E | News Articles About Dr. Masahide Kanayama | 070 |
| F | Articles and Information About Christian "Anointment" | 074 |
| G | Photographic Examples of Commercially Available Anointing Oil as Typically Sold in Small Bottles from 0.25 oz to 0.34 oz | 107 |
| H | "Abura Sosogi" = "Anointment" Translation | 109 |
| I | Additional Background  on the "Hidden Christians" and "Nippon Kaigi " | 113 |

A0089

0003

# EXHIBIT A

To the Social History Report

# Masahide Kanayama, MD
## Curriculum Vitae

### CURRENT POSITION

Director
  The New York Endometriosis Center
  Advanced laparoscopy and endometriosis treatment New
  York, NY

2. American board of Ob-Gyn certified specialist
3. Clinical assistant professor
   Department of Ob-Gyn and Reproductive Sciences Mount
   Sinai School of Medicine, New York, NY
4. Visiting scientist and investigator
   Department of Cancer immunology and Gynecologic Pathology The
   Johns Hopkins University School of Medicine
   Baltimore, MO.

Office address: 150 East 55th street, 5th floor, New York, NY 10022 Telephone:

1-212-421-1016,  Fax: 1-212-421-1019

E. mail: masahide.kanayama@gmail.com

Web site: www.Gynecosurgery.com

Citizenship: Japan, permanent residence holder in the United States

### EXPERIENCES

1. 1999 to current
   Director, New York Endometriosis Center New
   York, NY
2. 1997-1999
   Mount Sinai School of Medicine, Assistant professor of Obstetrics and Gynecology
   Mount Sinai Medical Associates, Assistant attending
   New York, NY

A0091

## EDUCATION, RESEARCH, AND TRAINING

I.  Residency and postgraduate clinical training
    1991-1995    Mayo Graduate School of Medicine
                 Mayo Clinic
                 Rochester, Minnesota, USA.



    Advanced laparoscopic surgery and gynecologic oncology trainings
    Under Dr. Karl Podratz, Dr. Raymond Lee, and Dr. Maurice Webb.

    Recognized as the teacher of the year in 1993 and 1994 by Mayo Medical
    School.

II.  Medical School
     Medical College of Wisconsin, Milwaukee, WI MD
     conferred in 1991.

III. Research fellowship
     1988-1989 the National Cancer Center Research Institute Tokyo,
     Japan
     Division of molecular genetics, Lab of Masaaki Terada MD.

IV.  Undergraduate education
     1981-1985 Creighton University College of Arts and Sciences
                 Omaha, NE, USA
                 BS degree in chemistry and Honors program "magna
                 cum laude" graduate, May 1985.

V.   High school education
     1978-1981 Komaba Toho High School Tokyo,
                 Japan
                 High school diploma, March 1981

VI.  Research collaborations (Dr Robert Kurman and Dr TC. Wu's labs)
     Department of Gynecologic pathology and cellular immunology, The
     Johns Hopkins University School of Medicine, Baltimore, MD.

A0092

**BOARD CERTIFICATION**

Diplomat, American Board of Obstetrics and Gynecolgy (ABOG)

**MEDICAL LICENSURES**

1. The National Board of Medical Examiner Certification
2. The State of Minnesota medical license
3. The State of New York medical license
4. The State of Connecticut medical license

Professional Affiliations:

1. American Associations of Gynecologic Laparoscopists
2. American college of Obstetricians and Gynecologists
3. Society of Laparoscopic Surgeons
4. International Society of Gynecologic Endoscopists
5. European Society of Human Reproduction and Embryology, A panel section on endometriosis and endometrium
6. American Medical Association
7. Minnesota Ob-Gyn association, Minnesota Medical Society
8. Mayo Alumini Association
9. Doctors Mayo Socirety
10. Japanese Medical Society (USA chapter, New York section).

**RESEARCH, PUBLICATIONS, ARTICLES, ABSTRACTS, AND PRESENTATIIONS**

1. "Rat Luteal Angiogenesis: primary characterization."
   J. Rone, MD.Kanayama, AL.Goodman
   Abstract and oral presentation in 1998 Annual International Endocrine Society
   Atlanta, GA, USA.

2. "Detection of a neuron-specific 9.0 kb transcript which shares homology with the antisense GAG genome of HIV-1 from both normal and AIDS individuals." TC.Wu, MD.Kanayama, R. Hruben, W. Whitehead, B. Raj

A0093

Am. J. Pathol.  1993, Jan. 142(1);25-31.
Presentation at 1992 US and Canadian Academy of Pathology meeting.

3. "In situ hybridization of HIV-1 by a riboprobe generated from the GAG gene of HIV- 1"
MD.Kanayama, TC.Wu, W.Whitehead, B.Raj Modern
Pathol. 1992, Jan 5(1);109
Oral presentation at 1993 Annual Minnsota Ob-Gyn Society Meeting

4. "Virus-associated RNAs (VA-1 and VA-II): an efficient target to detect adenovirus
infection by in situ hybridization."
TC.Wu, MD.Kanayama, R.Hruben, W-C Au, FB.Askins, GM.Hutchins Am. J.
Pathol.  1992. April 140 (4); 991-998

5. "Detection of adenovirus VA-I and VA-II in adenovirus-associated
meningoencephalitis, enteritis, cystitis, hepatitis, pneumonia by RNA in situ
hybridization."


TC.Wu, W.Chou, MD.Kanayama, W.Fork, R.Hruben, GM.Hutchin Modern
Pathol. 1994, Jan 7 (1); 128
Presentation at 1994 US and Canadian Academy of Pathology Meeting
Montreal Canada

6. "Localization of Epstein-Barr Virus encoded small RNAs (EBER-1) by in situ reverse
transcription: first successful generation of cDNA in the tissue section." TC.Wu,
Y.Ling,  MD.Kanayama, P.Charache, RJ.Kurman
J. Biomed. Sci.  1995 Feb (2); 249-255.
Oral presentation at 1995 US and Canadian Academy of Pathology Meeting. Berlin,
Germany

7. "Preventive and Therapeutic Vaccines for Human Papilloma-virus-associated
cervical cancers."
M. Ling, MD.Kanayama, R.Roden, TC.Wu
J. Biomed. Sci,  2001  7(5); 341-356.

8. "Detection of low copy HPV in basal cells of cervical lesions by a novel in situ
hybridization."
MD.Kanayama, CC.Huang, ML.Kashima, TC.Wu

A0094

Presentation in the First International Congress of Human Paillomavirus infections and cervical cancer, Quebec, Canada.

9.  "Cardiac myocytes do not undergo programmed cell death in heart allograft rejection: failure to identify apoptotic cells by in situ end labeling of nuclear DNA fragments."
    TC.Wu, MD.Kanayama, R.Hruben, GM.Hutchin, RJ.Kurman
    Modern. Pathol. 1994 Jan, 7(1):32.
    Presentation in 1994 US and Canadian Academy of Pathology Meeting
    Monteal, Canada.

10. "Constriction of the umbilical cord by an amniotic band, with fetal compromise illustrated by reverse diastolic flow in the umbilical artery; successful intervention."
    MD. Kanayama, TA.Gaffey, PL.Ogburn, Jr.
    J. Reprod. Med.  1996 Jan. 40(1); 71-73.

11. "Free fatty acids levels in normal pregnancy: prospective studies"
    MD.Kanayama , J. VanWinter, PL. Ogburn, Jr.
    Am. J. Obstet. Gynecol.  1996, June 174(2);375.
    Presentation at the 1996 Annual Society of Perinatal Obstetricians Meeting,
    Kona, Hawaii.

12. "Deficiency of n3 and n6 fatty acids in pregnancy:time courses and effect of antioxidant nutrients."
    KB.Schwarz,  J.Cox, S.Sharma, TH.Risby, PL.Ogburn, J.VanWinter,
    MD.Kanayama,D.Bibs,  RT.Holman.
    J. Nutr. Envir. Med.  1999, (8); 335-344.

13. "Rapid identification of HPV DNA subtypes by application of the reverse dot blot hybridization"
    MD.Kanayama, JT.Chen, GS. Hsue, MJ. Borowitz, RJ.Kurman, TC.Wu Abstract
    presentation  at  2000  InternationalPapillomavirusMeeting San Francisco, CA.

14. "Advanced laparoscopic treatment of DIE (deep infiltrating endometriosis) for chronic pelvic pain and infertility by novel reverse excision technique: primary report. Of 262 cases"
    MD. Kanayama
    Oral and abstract presentation at 2010 EPS international Obstetrics and Gynecology
    Summit, Nanjing, China

A0095

0009






0010

# EXHIBIT B

To the Social History Report

**Greenwich Ear Nose & Throat**
**Head & Neck Surgery**
*49 Lake Avenue, Suite 103*
*Greenwich, CT 06830*
*Phone: (203) 869-2030*
*Fax: (203) 869-9262*

**Stamford Ear, Nose & Throat**
**Head & Neck Surgery**
*125 Strawberry Hill Avenue, Suite 103*
*Stamford, CT 06902*
*Phone: (203) 348-7797*
*Fax: (203) 964-3140*

To Whom It May Concern,

I am writing this letter on behalf of Dr. Kanayama. A brief history, my daughter has been afflicted with this dreadful condition and has been suffering daily for months. We had seen numerous Gynecologists and other so called specialists for a diagnosis of this condition. She was living with severe pain and we decided to seek a surgical remedy. We thought we had gone to a surgeon with experience and who would be able to remedy this condition, however, she was unable to do much. Post Op she had told me this was way beyond her area of expertise and we should seek out another surgeon with more experience treating endometriosis. Through much research we came upon Dr. Kanayama.

This time I did my homework. We read numerous scholarly articles written by Dr. Kanayama and I became more confident that we had finally found the right person! My wife and daughter arranged a consultation with Dr. Kanayama and came away feeling very well educated and optimistic that he could offer hope of living a normal life pain free and most importantly being able to become pregnant in the future. Dr. Kanayama offers women a chance to live a normal pain free life through his many years of research and dedication to this condition that effects thousands of women all across the globe.

Unfortunately, this is a condition that appears to be on the back burner and is not recognized by the medical community. We need more dedicated physicians like Dr. Kanayama who deserves many accolades for the valuable work he does in treating endometriosis.

Sincerely,

Dr. Perry H. Lerner

A0098

0012

## GREENWICH ANESTHESIOLOGY ASSOCIATES, P.C.
**P. O. BOX 772**
**GREENWICH, CONN. 06836**
**TELEPHONE (203) 863-3364**
**FAX (203) 863-3391**

8/30/17

To Whom it may concern,

I am writing this letter in support of Dr. Masahide Kanayama. I have known Masahide for over 19 years and we have been working together since then. Over the years, Masahide has developed a specialized practice focusing on the diagnosis and treatment of endometriosis. As an anesthesiologist myself, he has taught me many of the finer points in treating endometriosis.

Masahide's patients literally come from all over the world; Europe, Asia, South America and Australia. The reason for his success and popularity in the endometriosis world is because he takes the time to educate his patients. He also takes the time to skillfully excise the endometriosis instead of just cauterizing it or placing the patient on hormone therapy like most other gynecologic surgeons I work with often do.

On a personal level, I have trusted Masahide with my own daughter who, at the age of 19, already had stage 3 endometriosis. Needless to say, even my daughter sings his praises. "Dr. K is great!", she told me as we were driving home from her surgery!

In conclusion, I see Dr. Kanayama as one of the pre-eminent endometriosis surgeons in the United States. There is no one else I would send a friend or loved one, and coming from an anesthesiologist, that speaks volumes.

Should you have any questions, please feel free to contact me.

Respectfully,

Alfonso Tagliavia MD
President
Greenwich Anesthesiology Associates P.C.

A0099

0013

# EXHIBIT C

To the Social History Report

For Exhibit C "Testimonals", please refer to the main exhibits for Dr. Kanyama's Petition and Memorandum of Law, Exhibit 4.

0070

# EXHIBIT D

To the Social History Report

0071

**Dr. Masahide Kanayama on Website Visitors by Geographic Location**

# EXHIBIT E

To the Social HIstory Report

0073



**NEWSMAX ARTICLE**
giving Dr. Kanayama's New York Endometriosis Center a ranking of #1 in the"Top Ten Treatment Centers of Endometriosis:

**"1. The New York Endometriosis Center, which is one of the leading endometriosis treatment and gynecologic surger centers in the world with offices in New York and Greenwich."**

http://www.newsmax.com/t/newsmax/article/388052

A0104

**JAPANESE NEWSPAPER ARTICLE**
**Profiling Dr.Kanayama as one of the world's leading endometriosis specialists**





0076

# EXHIBIT F

To the Social History Report

0077

# Anoint

Dictionaries - Baker's Evangelical Dictionary of Biblical Theology - Anoint

## Anoint [E]

To smear or rub with oil or perfume for either private or religious purposes. The Hebrew term for "anoint, " masah [מָשַׁח], has secular connotations, such as rubbing a shield with oil ( Isa 21:5 ), smearing paint on a house ( Jer 22:14 ), or anointing the body with oil ( Am 6:6 ). The theological meaning of masah [מָשַׁח] is fourfold. First, an individual or object set apart for divine use is said to be "anointed." Solomon was anointed ruler over Israel ( 1 Ch 29:22 ); this anointing made him both responsible for and accountable to the people. Anointed kings sometimes failed in their tasks, and were reminded of their accountability ( 1 Sam 15:17 ; 2 Sam 12:7 ). Second, when people were anointed, God empowered them to accomplish his tasks ( 1 Sam 10:6 ; 16:13 ). Third, no one was allowed to harm God's anointed ( 1 Sam 24:10 ; 26:9 ). Finally, the term mashiyach [מָשִׁיּם] derived from masah [מָשַׁח], refers to Israel's Messiah who was to come from the house of David ( Psalm 84:9 ; Psalms 89:38 Psalms 89:51 ). In the New Testament, Christ is portrayed as the Messiah. Jesus is the promised deliverer ( John 1:41 ; 4:25 ), anointed with the Holy Spirit and with power ( Ac 10:38 ).

Louis Goldberg

See also Jesus Christ, Name and Titles of; Messiah

Bibliography. H. L. Ellison, The Centrality of the Messianic Idea for the Old Testament; V. P. Hamilton, TWOT, 1:1255-56; J. B. Payne, Theology of the Older Testament.

Baker's Evangelical Dictionary of Biblical Theology. Edited by Walter A. Elwell.

Copyright © 1996 by Walter A. Elwell. Published by Baker Books, a division of

Baker Book House Company, Grand Rapids, Michigan USA.

All rights reserved. Used by permission.

For usage information, please read the Baker Book House Copyright Statement.

[E] indicates this entry was also found in Easton's Bible Dictionary

### Bibliography Information
Elwell, Walter A. "Entry for 'Anoint'". "Evangelical Dictionary of Theology". . 1997.

Dictionaries - Easton's Bible Dictionary - Anoint

## Anoint [B]

The practice of anointing with perfumed oil was common among the Hebrews.

• The act of anointing was significant of consecration to a holy or sacred use; hence the anointing of the high priest ( Exodus 29:29 ; Leviticus 4:3 ) and of the sacred vessels ( Exodus 30:26 ). The high priest and the king are thus called "the anointed" ( Leviticus 4:3 Leviticus 4:5 Leviticus 4:16 ; 6:20 ; Psalms 132:10 ). Anointing a king was equivalent to crowning him ( 1 Samuel 16:13 ; 2 Sam 2:4 , etc.). Prophets were also anointed ( 1 Kings 19:16 ; 1 Chronicles 16:22 ; Psalms 105:15 ). The expression, "anoint the shield" ( Isaiah 21:5 ), refers to the custom of rubbing oil on the leather of the shield so as to make it supple and fit for use in war.

• Anointing was also an act of hospitality ( Luke 7:38 Luke 7:46 ). It was the custom of the Jews in like manner to anoint themselves with oil, as a means of refreshing or invigorating their bodies ( Deuteronomy 28:40 ; Ruth 3:3 ; 2 Sam 14:2 ; Psalms

0078

104:15 , etc.). This custom is continued among the Arabians to the present day.

- Oil was used also for medicinal purposes. It was applied to the sick, and also to wounds ( Psalms 109:18 ; Isaiah 1:6 ; Mark 6:13 ; James 5:14 ).

- The bodies of the dead were sometimes anointed ( Mark 14:8 ; Luke 23:56 ).

- The promised Deliverer is twice called the "Anointed" or Messiah ( Psalms 2:2 ; Daniel 9:25 Daniel 9:26 ), because he was anointed with the Holy Ghost ( Isaiah 61:1 ), figuratively styled the "oil of gladness" ( Psalms 45:7 ; Hebrews 1:9 ). Jesus of Nazareth is this anointed One ( John 1:41 ; Acts 9:22 ; Acts 17:2 Acts 17:3 ; Acts 18:5 Acts 18:28 ), the Messiah of the Old Testament.

These dictionary topics are from

M.G. Easton M.A., D.D., Illustrated Bible Dictionary, Third Edition,

published by Thomas Nelson, 1897. Public Domain, copy freely.

[B] indicates this entry was also found in Baker's Evangelical Dictionary

**Bibliography Information**

Easton, Matthew George. "Entry for Anoint". "Easton's Bible Dictionary". .

Dictionaries - King James Dictionary - Anoint

## Anoint

To rub in; rub on.

Because thou sayest, I am rich, and increased with goods, and have need of nothing; and knowest not that thou art wretched, and miserable, and poor, and blind, and naked: I counsel thee to buy of me gold tried in the fire, that thou mayest be rich; and white raiment, that thou mayest be clothed, and that the shame of thy nakedness do not appear; and **ANOINT** thine eyes with eyesalve, that thou mayest see. ( Revelation 3:17-18 )

Source: A King James Dictionary. (Used with permission. Copyright © Philip P. Kapusta)

**Bibliography Information**

"Entry for 'Anoint'". A King James Dictionary.

Copyright © 2017, Bible Study Tools. All rights reserved. Article Images Copyright © 2017 JupiterImages Corporation.

A0109

0079

**GOD**.net

# (https://god.net/)    ≡

## The Anointing of the Holy Spirit

🏠 (HTTPS://GOD.NET)  ›  GOD (HTTPS://GOD.NET/GOD/)  ›  ARCHIVES (HTTPS://GOD.NET/GOD/ARTICLES/)  ›  THE ANOINTING OF THE HOLY SPIRIT

# The Anointing of the Holy Spirit

You have the anointing of God flowing through you when God's heart touches another person's heart through your heart. The anointing of God is the Holy Spirit. He flows as a river of love, from the throne of grace, through the hearts of believers, bringing life to all that receive His touch.

God anoints people that love Him more than they love their own lives, and that love others as themselves. As we open our hearts to love others God's anointing flows through us. When we close our hearts to others and grieve the Holy Spirit the flow stops.

(1 John 3:17 NKJV) But whoever has this world's goods, and sees his brother in need, and shuts up his heart from him, how does the love of God abide in him?

(Proverbs 4:23 NKJV) Keep your heart with all diligence, For out of it spring the issues of life.

The anointing of the Holy Spirit is given through people to demonstrate God's love and power. Christ means the "Anointed One". Because Christ is in us the same anointing that He had on earth we

A0110

(Luke 4:18-19 NKJV) "The Spirit of the LORD is upon Me, Because He has anointed Me To preach the Gospel to the poor; He has sent Me to heal the brokenhearted, To proclaim liberty to the captives And recovery of sight to the blind, To set at liberty those who are oppressed; {19} To proclaim the acceptable year of the LORD."

1. The anointing is given to preach the Gospel to the poor
   2. The anointing is given to heal and restore people
   3. The anointing is given to proclaim freedom to the captives
   4. The anointing is given to open blind eyes
   5. The anointing is given to set people free
   6. The anointing flows in God's timing and proclaims God's timing
2. The anointing is given to preach the Gospel to the poor, to bring the revelation of God's love to those who are seeking.

God's anointing flows to those who are hungry for a touch from His Holy Spirit. The anointing has less to do with the person that it flows through than it does with the person who receives it, and the One who sent it, God Almighty.

(Luke 6:19-20 NKJV) And the whole multitude sought to touch Him, for power went out from Him and healed them all. {20} Then He lifted up His eyes toward His disciples, and said: "Blessed are you poor, For yours is the kingdom of God.

(Matthew 5:3 NKJV) "Blessed are the poor in spirit, For theirs is the kingdom of heaven. *The term poor here is the Greek word, ptochos which carries the implication of being a beggar, in this case a spiritual beggar hungry for the Spirit of God.*

- The anointing can be stifled if the people refuse to receive it from the person that God is sending it through. Things such as pride, envy, bitterness, and unforgiveness against an anointed person can prevent the receiver from accepting it. The anointed person must go to people that can receive it.

(Matthew 13:57-58 NKJV) So they were offended at Him. But Jesus said to them, "A prophet is not without honor except in his own country and in his own house." {58} Now He did not do many mighty works there because of their unbelief.

(Matthew 10:13-14 NKJV) "If the household is worthy, let your peace come upon it. But if it is not worthy, let your peace return to you. {14} "And whoever will not receive you nor hear your words, when you depart from that house or city, shake off the dust from your feet.

2. <u>The anointing is given to heal and restore people</u>

(Acts 10:36-38 NKJV) "The word which God sent to the children of Israel, preaching peace through Jesus Christ; He is Lord of all; {37} "that word you know, which was proclaimed throughout all Judea, and began from Galilee after the baptism which John preached: {38} "how God anointed Jesus of Nazareth with the Holy Spirit and with power, who went about doing good and healing all who were oppressed by the devil, for God was with Him.

3. <u>The anointing is given to proclaim freedom to the captives</u>

(2 Timothy 2:24-26 NKJV) And a servant of the Lord must not quarrel but be gentle to all, able to teach, patient, {25} in humility correcting those who are in opposition, if God perhaps will grant them repentance, so that they may know the truth, {26} and that they may come to their senses and escape the snare of the devil, having been taken captive by him to do his will.

4. <u>The anointing is given to open blind eyes</u>

(2 Corinthians 4:3-4 NKJV) But even if our Gospel is veiled, it is veiled to those who are perishing, {4} whose minds the god of this age has blinded, who do not believe, lest the light of the Gospel of the glory of Christ, who is the image of God, should shine on them.

(Revelation 3:18 NKJV) "I counsel you to buy from Me gold refined in the fire, that you may be rich; and white garments, that you may be clothed, that the shame of your nakedness may not be revealed; and anoint your eyes with eye salve, that you may see.

5. <u>The anointing is given to set people free</u>

(Isaiah 10:27 NKJV) It shall come to pass in that day That his burden will be taken away from your shoulder, And his yoke from your neck, And the yoke will be destroyed because of the anointing oil.

(John 8:36 NKJV) "Therefore if the Son makes you free, you shall be free indeed.

6. <u>The anointing flows in God's timing, and also proclaims God's timing</u>

A0112

(Ephesians 2:10 NKJV) For we are His workmanship, created in Christ Jesus for good works, which God prepared beforehand that we should walk in them. As we walk in the anointing of God we go where God wills, do what God wills, and say what God wills.

(John 8:28-29 NKJV) Then Jesus said to them, "When you lift up the Son of Man, then you will know that I am He, and that I do nothing of Myself; but as My Father taught Me, I speak these things. {29} "And He who sent Me is with Me. The Father has not left Me alone, for I always do those things that please Him."

- **The anointing of the Holy Spirit is a gift from God**

(John 4:10 NKJV) Jesus answered and said to her, "If you knew the gift of God, and who it is who says to you, 'Give Me a drink,' you would have asked Him, and He would have given you living water."

(John 4:13-14 NKJV) Jesus answered and said to her, "Whoever drinks of this water will thirst again, {14} "but whoever drinks of the water that I shall give him will never thirst. But the water that I shall give him will become in him a fountain of water springing up into everlasting life."

(John 7:37-39 NKJV) On the last day, that great day of the feast, Jesus stood and cried out, saying, "If anyone thirsts, let him come to Me and drink. {38} "He who believes in Me, as the Scripture has said, out of his heart will flow rivers of living water." {39} But this He spoke concerning the Spirit, whom those believing in Him would receive; for the Holy Spirit was not yet given, because Jesus was not yet glorified.

(2 Corinthians 1:20-22 NKJV) For all the promises of God in Him are Yes, and in Him Amen, to the glory of God through us. {21} Now He who establishes us with you in Christ and has anointed us is God, {22} who also has sealed us and given us the Spirit in our hearts as a guarantee.

- **The anointing gives wisdom**

(1 John 2:20 NKJV) But you have an anointing from the Holy One, and you know all things.

(1 John 2:27 NKJV) But the anointing which you have received from Him abides in you, and you do not need that anyone teach you; but as the same anointing teaches you concerning all things, and is true, and is not a lie, and just as it has taught you, you will abide in Him.

0083

(Isaiah 11:2 NKJV) The Spirit of the LORD shall rest upon Him, The Spirit of wisdom and understanding, The Spirit of counsel and might, The Spirit of knowledge and of the fear of the LORD.

(Daniel 12:3 NKJV) Those who are wise shall shine Like the brightness of the firmament, And those who turn many to righteousness Like the stars forever and ever.

(Proverbs 11:30 NKJV) The fruit of the righteous is a tree of life, And he who wins souls is wise.

(Psalms 90:12 NKJV) So teach us to number our days, That we may gain a heart of wisdom.

- The anointing is the river of life that flows from the throne through your heart and penetrates other people's hearts

(Psalms 36:7-9 NKJV) How precious is Your lovingkindness, O God! Therefore the children of men put their trust under the shadow of Your wings. {8} They are abundantly satisfied with the fullness of Your house, And You give them drink from the river of Your pleasures. {9} For with You is the fountain of life; In Your light we see light.

(Psalms 46:4 NKJV) There is a river whose streams shall make glad the city of God, The holy place of the tabernacle of the Most High.

(Revelation 21:6 NKJV) And He said to me, "It is done! I am the Alpha and the Omega, the Beginning and the End. I will give of the fountain of the water of life freely to him who thirsts.

(Revelation 22:1-2 NKJV) And he showed me a pure river of water of life, clear as crystal, proceeding from the throne of God and of the Lamb. {2} In the middle of its street, and on either side of the river, was the tree of life, which bore twelve fruits, each tree yielding its fruit every month. The leaves of the tree were for the healing of the nations.

(Revelation 22:17 NKJV) And the Spirit and the bride say, "Come!" And let him who hears say, "Come!" And let him who thirsts come. Whoever desires, let him take the water of life freely.

- As we continue in the river of God's anointing it intensifies until we are carried by it.

(Ezekiel 47:1-10 NKJV) Then he brought me back to the door of the temple; and there was water, flowing from under the threshold of the temple toward the east, for the front of the temple faced east; the water was flowing from under the right side of the temple, south of the altar. {2} He

A0114

brought me out by way of the north gate, and led me around on the outside to the outer gateway that faces east; and there was water, running out on the right side. {3} And when the man went out to the east with the line in his hand, he measured one thousand cubits, and he brought me through the waters; the water came up to my ankles. {4} Again he measured one thousand and brought me through the waters; the water came up to my knees. Again he measured one thousand and brought me through; the water came up to my waist. {5} Again he measured one thousand, and it was a river that I could not cross; for the water was too deep, water in which one must swim, a river that could not be crossed. {6} He said to me, "Son of man, have you seen this?" Then he brought me and returned me to the bank of the river. {7} When I returned, there, along the bank of the river, were very many trees on one side and the other. {8} Then he said to me: "This water flows toward the eastern region, goes down into the valley, and enters the sea. When it reaches the sea, its waters are healed. {9} "And it shall be that every living thing that moves, wherever the rivers go, will live. There will be a very great multitude of fish, because these waters go there; for they will be healed, and everything will live wherever the river goes. {10} "It shall be that fishermen will stand by it from En Gedi to En Eglaim; they will be places for spreading their nets. Their fish will be of the same kinds as the fish of the Great Sea, exceedingly many. *Wherever the river goes it brings life. The fish in the above passage represent lost souls; the sea represents the sea of humanity, peoples and nations that need the Gospel message to come through God's anointed people.*

- **The anointing is given to intercede for people**

(Isaiah 59:16-21 NKJV) He saw that there was no man, And wondered that there was no intercessor; Therefore His own arm brought salvation for Him; And His own righteousness, it sustained Him. {17} For He put on righteousness as a breastplate, And a helmet of salvation on His head; He put on the garments of vengeance for clothing, And was clad with zeal as a cloak. {18} According to their deeds, accordingly He will repay, Fury to His adversaries, Recompense to His enemies; The coastlands He will fully repay. {19} So shall they fear The name of the LORD from the west, And His glory from the rising of the sun; When the enemy comes in like a flood, The Spirit of the LORD will lift up a standard against him. {20} "The Redeemer will come to Zion, And to those who turn from transgression in Jacob," Says the LORD. {21} "As for Me," says the LORD, "this is My covenant with them: My Spirit who is upon you, and My words which I have put in your mouth, shall not depart from your mouth, nor from the mouth of your descendants, nor from the mouth of your descendants' descendants," says the LORD, "from this time and forevermore." (Isaiah 60:1-2 NKJV) Arise, shine; For your light has come! And the glory of the LORD is risen upon you. {2} For behold, the darkness shall cover the earth, And deep darkness the people; But the LORD will arise over you, And His glory will be seen upon you.

- **The free flowing anointing of God's love brings joy to God and that joy is felt by the person He flows through. Love is the joy we get from God when we put His benefit and the benefit of another person before our own.**

**(Psalms 45:3-7 NKJV) Gird Your sword upon Your thigh, O Mighty One, With Your glory and Your majesty. {4} And in Your majesty ride prosperously because of truth, humility, and righteousness; And Your right hand shall teach You awesome things. {5} Your arrows are sharp in the heart of the King's enemies; The peoples fall under You. {6} Your throne, O God, is forever and ever; A scepter of righteousness is the scepter of Your kingdom. {7} You love righteousness and hate wickedness; Therefore God, Your God, has anointed You With the oil of gladness more than Your companions.**

**(Isaiah 58:6-12 NKJV) "Is this not the fast that I have chosen: To loose the bonds of wickedness, To undo the heavy burdens, And to let the oppressed go free, And that you break every yoke? {7} Is it not to share your bread with the hungry, And that you bring to your house the poor who are cast out; When you see the naked, that you cover him, And not hide yourself from your own flesh? {8} Then your light shall break forth like the morning, Your healing shall spring forth speedily, And your righteousness shall go before you; The glory of the LORD shall be your rear guard. {9} Then you shall call, and the LORD will answer; You shall cry, and He will say, 'Here I am.' "If you take away the yoke from your midst, The pointing of the finger, and speaking wickedness, {10} If you extend your soul to the hungry And satisfy the afflicted soul, Then your light shall dawn in the darkness, And your darkness shall be as the noonday. {11} The LORD will guide you continually, And satisfy your soul in drought, And strengthen your bones; You shall be like a watered garden, And like a spring of water, whose waters do not fail. {12} Those from among you Shall build the old waste places; You shall raise up the foundations of many generations; And you shall be called the Repairer of the Breach, The Restorer of Streets to Dwell In.**

- **Although there is great pleasure and joy in the anointing, because it is the presence of God, we are not to seek the joy, we are to seek God, and the benefit of others, the joy is a natural result of these things. The anointing is not given for the vessel it flows through; it is given for the one it flows to.**

**(Psalms 16:11 NKJV) You will show me the path of life; In Your presence is fullness of joy; At Your right hand are pleasures forevermore.**

**(James 4:3 NKJV) You ask and do not receive, because you ask amiss, that you may spend it on your pleasures.**

- Everyone in the body of Christ is anointed with the Holy Spirit, and we all need to give from God's anointing to each other, and we all need to be able to receive the anointing that comes through other Christians.

(1 Corinthians 12:4-12 NKJV) There are diversities of gifts, but the same Spirit. {5} There are differences of ministries, but the same Lord. {6} And there are diversities of activities, but it is the same God who works all in all. {7} But the manifestation of the Spirit is given to each one for the profit of all: {8} for to one is given the word of wisdom through the Spirit, to another the word of knowledge through the same Spirit, {9} to another faith by the same Spirit, to another gifts of healings by the same Spirit, {10} to another the working of miracles, to another prophecy, to another discerning of spirits, to another different kinds of tongues, to another the interpretation of tongues. {11} But one and the same Spirit works all these things, distributing to each one individually as He wills. {12} For as the body is one and has many members, but all the members of that one body, being many, are one body, so also is Christ.

(Ephesians 4:11-16 NKJV) And He Himself gave some to be apostles, some prophets, some evangelists, and some pastors and teachers, {12} for the equipping of the saints for the work of ministry, for the edifying of the body of Christ, {13} till we all come to the unity of the faith and of the knowledge of the Son of God, to a perfect man, to the measure of the stature of the fullness of Christ; {14} that we should no longer be children, tossed to and fro and carried about with every wind of doctrine, by the trickery of men, in the cunning craftiness of deceitful plotting, {15} but, speaking the truth in love, may grow up in all things into Him who is the head; Christ; {16} from whom the whole body, joined and knit together by what every joint supplies, according to the effective working by which every part does its share, causes growth of the body for the edifying of itself in love.

- The anointing is sacred, the anointing is the Holy Spirit, and all believers in Christ have the anointing of the Holy Spirit. We must be careful what we say about our brothers and sisters in Christ.

(Matthew 12:31 NKJV) "Therefore I say to you, every sin and blasphemy will be forgiven men, but the blasphemy against the Spirit will not be forgiven men.

(1 Chronicles 16:22-24 NKJV) Saying, "Do not touch My anointed ones, And do My prophets no harm." {23} Sing to the LORD, all the earth; Proclaim the good news of His salvation from day to day. {24} Declare His glory among the nations, His wonders among all peoples.

A0117

Q  Search

# Bible Quote

*"They answered and said to Him, "Abraham is our father." Jesus said to them, "If you were Abraham's children, you would do the works of Abraham. But now you seek to kill Me, a Man who has told you the truth which I heard from God. Abraham did not do this."  "*

*Source: Holy Bible (John 8:39-40 NKJV)*

# Subscribe

**Subscribe to be informed about new articles and important updates**

**\* indicates required**

**Email Address \***

**First Name**

**Last Name**

Subscribe

# Recent Articles

A0118

**Your Ultimate Purpose 3 – The New You (https://god.net/articles/your-ultimate-purpose-3-the-new-you/)**

**Your Ultimate Purpose 2 – Receiving from God (https://god.net/articles/your-ultimate-purpose-2-receiving-from-god/)**

**Your Ultimate Purpose 1 – To be One with God (https://god.net/articles/your-ultimate-purpose-1-to-be-one-with-god/)**



(https://www.facebook.com/Seek-God-160768

HOME (HTTPS://GOD.NET)  /  GOD (HTTPS://GOD.NET/GOD/)  /  ARTICLES (HTTPS://GOD.NET/ARTICLES/)  /  BIBLE TOPICS (HTTPS://GOD.NET/GOD/BIBLE-TOPICS/)  /  ARCHIVES (HTTPS://GOD.NET/GOD/ARTICLES/)  /  ABOUT – (HTTPS://GOD.NET/ABOUT-GOD-DOT-NET/)

*The glory of God is the manifestation and revelation of His holy love*

© Copyright 2017 SEEK GOD MINISTRIES, All Rights Reserved

A0119

"Anointing with Oil – in the Bible and Today" - taken from www.helpforchristians.co.uk
Copyright: John Richards/Renewal Servicing 2002, but waived for users of the above web-site.

# ANOINTING with Oil – in the Bible and Today

**Outline –**

**I. Introduction**
**II. Oil & Anointing in Scripture**
    1) Oil – its Everyday Uses
    2) Oil – for Life!
    3) Oil – its Special Uses
    4) Anointing the King
    5) God's Anointed One
    6) God's Anointed People
    7) God's Anointing Spirit
    8) Anointing the Sick
**III.  Ministering & Receiving Anointing Today**
    1) Background
    2) The Context
    3) Essential meaning
    4) The Church
    5) The Ministers
    6) The Sick
    7) The Situations
    8) The Forms
    9) The Oil
    10) The Anointing
    11) The Prayers
    12) The Outcomes
**IV.  Conclusion**

1

A0120

"Anointing with Oil – in the Bible and Today" - taken from **www.helpforchristians.co.uk**
Copyright: John Richards/Renewal Servicing 2002, but waived for users of the above **web-site**.

## Part I – Introduction

There are two main sorts of 'anointing':
- spiritual anointing with God's Spirit and
- physical anointing with oil.

I shall deal with them together because they often go together, and each throws light on the other.  Both are of increasing interest among Christians today, especially among those who are rediscovering the importance of the Holy Spirit and/or those who want to deepen and enrich their expressions of the Church's Healing Ministry on Biblical principles.

Don't jump ahead to find out what to do, because what Christian anointing means comes first. In other words the **'What?'** comes before the **'How?'**.  We need first to outline the uses of oil in the Bible and the meaning of anointing.

2

"Anointing with Oil – in the Bible and Today" - taken from **www.helpforchristians.co.uk**
Copyright: John Richards/Renewal Servicing 2002, but waived for users of the above **web-site**.

## Part II - Oil & Anointing in Scripture

### 1) Oil  – Its everyday uses in Scripture

Although society is nowadays very dependent on oil, we don't come across it in a very personal way.

In Bible times it was quite different. Canaan was the **land of olives** and oils flowed richly in the lives of those who lived there. Jesus's parable of the steward has a man who owed a hundred jugs of it! [Luke 16:6] In everyday life it was used for the following five things –

- Washing

 A well known example is Jesus's teaching that we should not let others know when we are fasting. **'But when you fast put oil on your head and wash your face, so that your fasting may be seen not by others…'**

[Matthew 6:17-18.

When Jesus was being hosted by Simon the Pharisee, a woman anointed his feet.  He turned to Simon and mentioned three things that he had omitted to do for him – his honoured guest: no water, no kiss, no anointing.  So Luke 7:46 reads **'You did not anoint my head with oil, but she has anointed my feet with ointment.'**

The context suggests that it was a kind act of refreshment in a sunny climate where skin dried quickly.  Perhaps today's equivalent is the Eau de Cologne impregnated 'hot towel' that airlines use to pamper their First Class passengers!

See also Psalm 104:15.]

- Medicine

A familiar example comes in Jesus's parable of the Good Samaritan. **'He went to him and bandaged his wounds, having poured oil and wine on them'.** The oil was for softening the wound and wine was used as an antiseptic.

[Luke 10:34.

When the Psalmist sings (23:5): **you anoint my head with oil**, its literal basis lies in a shepherd's use of oil for his injured sheep.]

- Cooking

The widow of Zarephath admits to Elijah: **'I have nothing baked, only a handful of meal in a jar, and a little oil in a jug.  I am now gathering a couple of sticks, so that I may go home and prepare it for my son, that we may eat it…'**

[I Kings 17:12.  See also Ezekiel 16:13.

The Lord promised that the **jug of oil would not fail** until he sent rain years later (17:14). This prefigured the new life by which God would raise her son. This Old Testament incident compares interestingly with Jesus's miracle at Cana (John 2:1-11), where wine is a symbol of new life.]

3

A0122

"Anointing with Oil – in the Bible and Today" - taken from **www.helpforchristians.co.uk** 0092
Copyright: John Richards/Renewal Servicing 2002, but waived for users of the above web-site.

- Lighting

Jesus's parable of the wise and foolish bridesmaids is based on oil.

**'When the foolish took their lamps, they took no oil with them; but the wise took flasks of oil…'**

> [Matthew 25:3-4 See also Exodus 25:6]

- Trade

Hosea complains about the tribe of Ephraim –

**'…they make a treaty with Assyria, and oil is carried to Egypt.'**

> [Hosea 12:1. See also 1 Kings 5:10-11]

## 2) Oil in Scripture – for Life!

Oil was valued so much for its positive contribution to life that it became a symbol of the good life, not of sadness, but of gladness! So in Isaiah we read -

The spirit of the Lord God is upon me,

because the Lord has anointed me;

he has sent me…

…to comfort those who mourn in Zion –

to give them a garland instead of ashes,

the oil of gladness instead of mourning,

the mantle of praise instead of a faint spirit.

> [Isaiah 61:1-3 (Verses 1 and 2 were read by Our Lord in the Synagogue, see section e). Luke 4:18-19)]

Oil was frequently linked with wine in Scripture, that other symbol of joy and life. **Wine and oil** become synonymous with pleasure.

> [e.g. **Whoever loves pleasure will suffer want;**
> **whoever loves wine and oil will not be rich.** Proverbs 21:17
> Note that in Hebrew poetry the second line is often parallel in thought to the first, so in these two lines, **'pleasure'** and **'wine and oil'** are, in fact, equated.]

**The important thing to grasp is that oil is, essentially, not about sickness or death, but about blessing and LIFE!**

The Jews did not anoint mourners: oil was not for funerals, but parties!  It is hardly surprising that something so basic to life joined such things as water, bread and wine, as a rich and ready symbol.

The use of oil is mentioned over 200 times in Scripture, but half of the references concern its special usages.

4

"Anointing with Oil – in the Bible and Today" - taken from **www.helpforchristians.co.uk**
0093
Copyright: John Richards/Renewal Servicing 2002, but waived for users of the above **web-site**.

### 3) Oil in Scripture - its Special Uses

The special use of oil was to indicate that he/she/it was **God's choice**. It indicated primarily that God was consecrating someone or something for his chosen use.

In the Old Testament the Israelites indicated this by anointing with special oil. The importance of this holy oil was such that it was a criminal offence to compound such oil for a common purpose.

> [See Exodus 30:31-32 [The Lord said] '**This shall be my holy anointing-oil throughout your generations. It shall not be used in the ordinary anointing of the body…it is holy, and it shall be holy to you.'**]

Objects that were specially anointed were –
- Items used in worshipping God (**tabernacle and its furnishings**)
  [Exodus 30:22-29, 40:9-11  The first passage shows also how the oil was made.]
- Items used in fighting for God (**shields**)
  [e.g. 2 Samuel, 1:21, Isaiah 21:5.]

People who were specially anointed were -
- People chosen by God to speak for him (**Prophets**)
  [I Kings 19:16b]
- People chosen to lead the worship of God (**Priests**)
  [Exodus 28:40-41]
- People chosen by God to lead his people (**Kings**)
  [e.g. David in 2 Samuel 2:4, Solomon in 1 Kings 1:34, 39]

The following story comes from II Kings 9 and shows the importance and meaning of anointing.

### 4) Oil in Scripture – Anointing the King

Elisha sent one of his men with oil to Jehu to pour it on his head and anoint him King. The fellow arrived and extracted Jehu from his military staff meeting. On his return the generals asked Jehu 'Why did that madman come to you?'

Jehu stalled! '**You know the sort and how they babble.**' But they persisted: '**Liar! Come on, tell us!**'

So he said, 'This is what he said to me, "Thus says the Lord, I anoint you king over Israel."'
- The generals then ignored the one who had done the anointing.
- Their low opinion of him was no longer relevant.
- They threw down their garments in homage (as the Palm Sunday crowd did to Jesus).
- Blew trumpets.
- Proclaimed Jehu **King.**
  [See 2 Kings 9, esp. vv.1-6 and 11-13]

Since it was **God who had acted** it was not a matter of debate!

5

A0124

"Anointing with Oil – in the Bible and Today" - taken from www.helpforchristians.co.uk
Copyright: John Richards/Renewal Servicing 2002, but waived for users of the above web-site.

When Samuel anointed the first King, Saul, he made it quite clear that the anointing did not come from himself, but from God .
Samuel took a phial of oil and poured it on his head, and kissed him; he said.  'The Lord has anointed you ruler over his people Israel…'
    [I Samuel 10:1.]

As this article is first appearing in the Jubilee Year of Queen Elizabeth, it may be interesting to some readers to be reminded that an anointing – based on Biblical practice – forms part of the Coronation Service.
Note that first a hymn was sung for the coming of the Holy Spirit.  This included the words -
Thou the anointing Spirit art,
Who dost Thy sevenfold gifts impart.
Thy blessed unction from above,
[ 'Unction' is a word less used than it was and is simply an alternative to the word 'anointing'.]
Is comfort, life, and fire of love…
Then followed a prayer –
O LORD and heavenly Father, the exhalter of the humble and the strength of thy chosen, who by anointing with Oil didst of old make and consecrate kings, priests and prophets, to teach and govern thy people Israel:  Bless and sanctify thy chosen servant, …
While the choir sang Handel's musical version of 1 Kings 1:39-40 **Zadok the priest and Nathan the prophet anointed Solomon King…**
Elizabeth, with her outer robes removed, knelt, and was anointed:
'Be thy Hands anointed with holy Oil.
Be thy Breast anointed with holy Oil.
Be thy Head anointed with holy Oil: as kings, priests and prophets were anointed…'
'Our Lord Jesus Christ, the Son of God, who by his Father was anointed with the Oil of gladness above his fellows, by his holy Anointing pour down upon your Head and Heart the blessing of the Holy Ghost, and prosper the works of your Hands…'
    [Details from Coronation of Her Majesty Queen Elizabeth II, Novello, 1953.]

My Hymn for the Jubilee contains this verse about the Queen:

    Spirit, at her Coronation, through anointing you outpoured
    many holy gifts and graces for her work, at home, abroad.
    Day by day, inspire, equip her for her service of the Lord.

    [Full text available in the HYMNS section of the website.]

The close link with the coming of the Holy Spirit was nothing new: in Biblical times it was so.
**So Samuel took the horn of oil, and anointed him in the presence of his brothers; and the spirit of the Lord came mightily upon David from that day forward.**
    [I Samuel 16:13.  See also Isaiah 61:1 quoted in the next section]

6

"Anointing with Oil – in the Bible and Today" - taken from www.helpforchristians.co.uk
Copyright: John Richards/Renewal Servicing 2002, but waived for users of the above web-site.

The King was seen to have a unique spiritual role for the nation was intended to be God-ruled, not King-ruled.

[Monarchy is King-ruled; democracy is people-ruled.  Israel was, strictly speaking, a theocracy – that is to say God-ruled.]

As the King was the Anointed One par excellence, he became known simply as **the Anointed**. So the Psalmist sings:

Great triumphs he gives to his king
and shows steadfast love to his anointed,
to David and to his descendants forever.

[Psalm 18:50.  Note that the structure of Hebrew verse means that **his king = his anointed.** ]


## 5) God's Anointed One

In the Hebrew Old Testament the word for **Anointed** was **Messiah.**

When, over a century before Christ, the Hebrew Old Testament was translated into Greek (into what would, later, be the language of the New Testament) the word they regularly used to translate the Hebrew word **Messiah** was the Greek word **'Christos'!**

While most Jews still await the coming of the Messiah, Christians believe that he came in the person of Jesus. At the start of his ministry Jesus claimed for himself Isaiah's words

'The Spirit of the Lord is upon me,
because he has anointed me
to bring good news to the poor.
He has sent me to proclaim release to the captives
and recovery of sight to the blind,
to let the oppressed go free,
to proclaim the year of the Lord's favour.'

…Then he began to say to them,
'Today this scripture has been fulfilled in your hearing.'

In other words, Jesus says – I am the Christ/Messiah/Anointed!

[Luke 4:18-19, 21.]

Simon Peter was the first to recognise who Jesus of Nazareth really was **You are the Messiah/ Christ** (Mark 8:29) Because both titles mean exactly the same – the **Anointed One** – Bible translators have to opt for either **Christ** or **Messiah.**

[They are pretty equally divided, with more recent translations tending to opt for **Messiah** for this verse. Thus –

**Christ** comes in the King James Version, Revised Standard Version, New Century Version, New International Version, New American Standard, New King James Version and J.B.Phillips.

**Messiah** is the choice of New English Bible, New American Bible, Today's English Version, New Revised Standard Version and William Barclay.]

7

A0126

"Anointing with Oil – in the Bible and Today" - taken from www.helpforchristians.co.uk
Copyright: John Richards/Renewal Servicing 2002, but waived for users of the above web-site.

Sometimes the New Testament writers add their own translation for their readers' benefit. Thus John writes of Andrew telling his brother **'We have found the Messiah' (which is translated Anointed)** and also explains the Samaritan woman's remark to Jesus **'I know that the Messiah is coming' (who is called Christ).**

> [John 1:41 and 4:25 respectively.
> John's explanation of Andrew's remark is more usually translated **Christ,** rather than **Anointed.** For most readers, however, **'Christ'** does not explain **'Messiah'** as the word **'Anointed'** does.]

Immediately after the Coming of the Holy Spirit at Pentecost, Simon Peter was empowered to preach to the Gentiles at Caesarea (Acts 10:38). He naturally saw Jesus as supremely God's Anointed One.

**'…God anointed Jesus of Nazareth with the Holy Spirit and with power; how he went about doing good and healing all that were oppressed by the devil, for God was with him.'**

> [See also how readily the earliest Christians recognised God's anointing of Jesus. Acts 4:24-31, esp. v. 27. Note the close link with healing in this passage.]


**6) God's Anointed People**

So St. Paul speaks (not surprisingly) of Christians sharing Christ's anointing–
But it is God who
**establishes us with you in Christ** (Greek: Chris-tos)
**and has anointed us** (Greek: chris-as),
by putting his seal on us and
giving us his Spirit in our hearts
**as a first instalment.**

> [2 Corinthians 1:21-22. Note in Old Testament times, the Israelites began to realise that they were God's anointed. Habakkuk wrote: **You came forth to save your people to save your anointed.** 3:13. This paved-the-way for the followers of the Anointed One / the Christ / the Messiah to feel that they shared his Anointing.]

The followers of Christ, the Anointed One, were incorporated into him by baptism.[Romans 6:3-4] They became one with God's Anointed, and in Christ shared his anointing. So, in 1 Peter 2 there is a fine description of Christ's 'anointed' followers which brings together many Old Testament ideas surrounding God's anointing –
…you are a chosen race,
a royal priesthood,
a holy nation,
**God's own people ….** [1 Peter 2:9]

The followers of Jesus were nicknamed **'Christ-ians'** first at Antioch

> [**…it was in Antioch that the disciples were first called 'Christians'.** Acts 11:26.]

King Agrippa used the term

> [**'Are you so quickly persuading me to become a Christian?'** Acts 26:28]

8

"Anointing with Oil – in the Bible and Today" - taken from **www.helpforchristians.co.uk**
Copyright: John Richards/Renewal Servicing 2002, but waived for users of the above web-site.

It must have come from Gentiles (since no Jew would have dubbed them Christ's-followers believing, as they did, that Jesus was not the Christ!)

In our very name **Christians**, therefore, we declare our allegiance to and unity with God's **Anointed One / the Messiah / the Christ.**

From the 2nd century, **'Christian'** was accepted as a title of honour.  By A.D.180, Theophilus, a Christian leader in Antioch wrote **'We are called Christians on this account, because we are anointed with the oil of God'**.

This reflects a very early development in the Christian church in which oil was used in initiation (e.g. baptism/confirmation), as it came also to be used later in Christian marriage, Christian ordination and (as we have seen) in the Christian coronation of a monarch.

For some readers Baptism will speak solely of water, but in many  Christian churches, both east and west, past and present, oil also features and increasingly so.(The Church of England now allows the optional use of oil.)

> [In the 'new' (i.e. A.D. 2000) Common Worship  in addition to the two symbols of water and the sign of the cross, symbolic lights, oil and/or a white robe are also allowed.
> If oil is used it can be used either sparingly or 'poured' – in truly Biblical fashion! It may be used on the occasion that the sign of the Cross is made, marking the candidate as Christ's own.
> In the light of what we have seen in Scripture, no symbol could be more appropriate to emphasise that meaning.]

## 7) God's Anointing Spirit

As the appropriate use of oil is being increasingly rediscovered, it is easy to see why.
When Jesus was
- baptised with water,
- the Holy Spirit descended on him.
   [As all the Gospels record.
   Mark 1:10-11, Matthew 3:16-17, Luke 3:21-22, John 1:32-33.]

These two aspects are highlighted in Jesus's teaching **'Very truly, I tell you, no one can enter the kingdom of God without being born**
- of water
- **and Spirit.'** [John 3:5]

The water of Baptism relates vitally and importantly to the old life. It is a washing away of past sins and a dying with Christ of the old self.
   [See e.g. Romans 6:3-4]

A0128

"Anointing with Oil – in the Bible and Today" - taken from **www.helpforchristians.co.uk**
Copyright: John Richards/Renewal Servicing 2002, but waived for users of the above web-site.

Water of Baptism symbolises God's cleansing of our past.
Oil in Baptism symbolises God's empowering for the future.
This double action is always necessary, and has been neatly expressed in the double petition of the chorus:

- Cleanse me from my sin, Lord
- Put thy power within, Lord…

In Titus we read
**He** [God] **saved us, not because of any works of righteousness**
that we had done, but according to his mercy,
through the water of rebirth
and renewal by the Holy Spirit.
**This Spirit he poured out on us richly through Jesus Christ our Saviour,…** [Titus 3:5-6]

I have not so far said anything about the sick because any use of oil in ministering to them must arise from the Biblical picture that I have outlined. In Scripture -

OIL IS ABOUT –
- THE CALLING OF THE FATHER
- THE COMING OF THE CHRIST
- THE EMPOWERING OF THE HOLY SPIRIT.

Oil is not about us or our sickness.
Oil is about the persons and work of God in Trinity.
It is not about sickness or dying but about empowering and new life!

Why is there less mention of oil in the New Testament?
Oil is mentioned more rarely in the New Testament because Christians did not continue the Jewish sacrifices and offerings.  But there are other reasons.  Oil symbolises God's Anointing.

- At Bethlehem God's Anointed One is visibly incarnate!
- at Pentecost, God's Anointing Spirit is almost visibly out-poured!

Since symbols are used to express what is not visible, one would not expect oil to be used as a symbol at times when Christ and/or his Spirit were both so evident!

What would it have added to Christ's ministry to the sick to use a symbol of himself, when the actual presence, prayer, word and touch of Christ himself was being experienced?

This surely explains why Christ himself did not anoint the sick, but his disciples anointed the sick and healed them when he was not visibly present [Mark 6:13] (see next section).

10

A0129

"Anointing with Oil – in the Bible and Today" - taken from www.helpforchristians.co.uk
Copyright: John Richards/Renewal Servicing 2002, but waived for users of the above web-site.

Also, as we shall see, James teaches it as a ministry to the Christian sick [5:14] There are no cases of anointing the Christian sick in Acts.  Of the eight individual 'healings' in Acts, none comes into this category.

> [On three occasions anointing would not apply: twice when the dead were raised (9:36-41, 20:9-12), and a deliverance/exorcism ministry (the demonised are not usually touched in the New Testament) (16:16-18).
>
> The remaining five were the healings of the lame man; Saul/Paul's recovery of sight; Aeneas healed of paralysis; the cripple healed at Lystra and Publius' father cured (Acts 3:1-16, 9:17-19, 9:32-35, 14:8-10, 28:8).  In no instance was it the healing of a sick Christian sending for elders.  Saul was not baptised when Ananias ministered to him, nor did Saul summon him, nor was he yet a member of the Christian community.]

## 8) Anointing the Sick

There are two main texts.

Jesus called the twelve and began to send them out two by two, and gave them authority over the unclean spirits…

**…So they went out and proclaimed that all should repent.  They cast out many demons, and anointed with oil many who were sick and cured them.**

> [Mark 6:7, 12-13.
>
> Luke in his shorter version of Mark's account (9:6) accurately summarises repentance/forgiveness, deliverance and anointing under the general heading **'good news'** so he does not mention anointing as such. He has: **bringing the good news and curing diseases everywhere** – as concise a sentence as one could wish for!]

The second passage comes in James's epistle in a section on prayer. (James 5:13-16), but first we must see a passage, written two centuries earlier, which forms the basis for the passage in James.  Although the passage is not regarded by all Christians as Scripture, it gives a clear picture of how high a place a physician could be held in God's scheme of things.

Honour physicians for their services, for the Lord created them;
for their gift of healing comes from the Most High…
The Lord created medicines out of the earth,
and the sensible will not despise them…
…he gave skill to human beings
that he might be glorified in his marvellous works.
By them the physician heals and takes away pain;
The pharmacist makes a mixture for them…
My child, when you are ill, do not delay,
but pray to the Lord and he will heal you.
Give up your faults and direct your hands rightly,
and cleanse your heart from all sin.
Offer a sweet-smelling sacrifice…and pour oil on your offering as much as you can afford.
Then give the physician his place, for the Lord created him;…
There may come a time when recovery lies in the hands of physicians,

A0130

"Anointing with Oil – in the Bible and Today" - taken from www.helpforchristians.co.uk
Copyright: John Richards/Renewal Servicing 2002, but waived for users of the above web-site.

for they too pray to the Lord,
that he will grant them success in diagnosis
and in healing, for the sake of preserving life.
[Ecclesiasticus 38:1-2, 4, 6-8, 9-14.]

James writes as follows. I shall quote from the New International Version, not the NRSV. (The notes below tell you why!)

[The Greek is straightforward and uses 'he' as an inclusive word for male or female, - as English-speakers have done for centuries (until the recent policing of our speech to be 'politically correct'.) To be 'inclusive' in the modern style, the NRSV avoids 'he', and since English lacks a singular he/she word, its translators felt that their only option was to use they, and make the entire passage plural!

This is not particularly misleading until James writes concerning the sick person **if he has sinned, he will be forgiven.**

The politically correct avoidance of the word **he** led the NRSV translators to drop the word **if** and to render this **anyone who has committed sins will be forgiven!** As a general comment it might be true, but James was specifically writing about the sufferer and the enormous healing through God's forgiveness in his/her life. The N.I.V. remains true to James's text. I cannot imagine any reader would really assume that God's forgiveness did not apply if the sufferer were a girl or woman?!]

**[13]Is any one of you in trouble? He should pray. Is anyone happy? Let him sing songs of praise.**
**[14]Is any one of you sick? He should call the elders of the church to pray over him and anoint him with oil in the name of the Lord.**
**[15]And the prayer offered in faith will make the sick person well;**
the Lord will raise him up.
If he has sinned, he will be forgiven.
**[16]Therefore confess your sins to each other,**
and pray for each other so that you may be healed
The prayer of a righteous man is powerful and effective.

The influence of the Ecclesiasticus passage is obvious. But the most notable thing is that James bids Christians not, as one might expect, to send for the **physician** but to send for the **elders of the Church.**

Some feel that the elders' anointing is medical – and the positive relationship of Jesus to medicine would certainly not exclude this. Christ's relationship to medicine is outlined in the following notes:

[Christ used **saliva** on one occasion, **mud paste** on another; he commanded the blind man to **wash**, and for Jairus's daughter to be brought **food** (Mark 8:23, John 9:6, John 9:7, Mark 5:43 respectively.) Christ identified closely with the **'physician'** (Luke 4:23, 5:31) and his parable of the Good Samaritan used three of the nine Old Testament means of healing **wine, oil** and **bandages** (Luke 10:34.).

The approach of Christ was much nearer to the physician than to the miracle worker. He prepared people for ministry (Mark 7:33, 8:23); he gathered the right team (Mark 5:40).

"Anointing with Oil – in the Bible and Today" - taken from **www.helpforchristians.co.uk**
Copyright: John Richards/Renewal Servicing 2002, but waived for users of the above **web-site**.

He asked questions about the duration of the illness (Mark 9:21), and about the progress of healing (Mark 8:23b).  He often asked searching questions of the sufferers themselves (e.g. Mark 5:9, 10:51, John 5:6, Matthew 9:28). He frequently gave advice & direction to the newly healed (Mark 1:43-4, 2:11, 5:19, 5:43, 7:36, 8:26, Luke 17:14, John 5:14, 9:35).]
[See my book *Question of Healing Services*, pp.59-63.]

In my view, had James wanted to teach that the Christian sick should be medically anointed he would most naturally have stuck closer to the passage in Ecclesiasticus and bid them summon the **physician.**

James is not excluding this, but in his passage on prayer he is saying that:

- the way to apply prayer to sickness is to summon **the elders of the church** for them to **pray** and **anoint**.  It is most natural – and common sense – to ask spiritual leaders to engage in spiritual tasks, and medical experts to engage in medical ones.  (Although we must guard against putting the spiritual and the medical in watertight compartments.) The Greek suggests that the **elders of the church** are to be called once.

    [James changes his imperatives from the present tense to the aorist, and might be translated thus: Let him keep praying…let him keep praising…let him summon.]

- The **elders** act as representatives of the local Church, there is no mention of selecting an individual with a healing gift.

- The older passage only mentions **oil** in a spiritual context, i.e. in relation to the sacrificial offering of the patient/family.  As Jesus renders such sacrifices obsolete, James transfers the use of oil to the Church's care-and-prayer of the patient. He does not explain it, but assumes that his readers know its significance.

- James avoids the pitfall of giving oil magical properties by placing its use fairly and squarely in the spiritual context of the **faithful prayer** of Christians which will **heal/save,** and of the Lord **raising up** the sick.   James's use of these two words here links the healing both to **salvation** and **resurrection.**

- James's teaching is very modern in its corporate sense both of **sin** and **healing,** and also on the healing importance he places on the forgiveness of sins.

13

"Anointing with Oil – in the Bible and Today" - taken from www.helpforchristians.co.uk
Copyright: John Richards/Renewal Servicing 2002, but waived for users of the above web-site.

## Part III - Ministering & Receiving Anointing Today

### 1) Background

The early Christians anointed liberally, as one would expect from what we have seen of the use of oil and its significance in Bible times. Early records tell of their anointing the sick all over, daily, for a week! It was generous and joyous, and rightly so because that is what oil symbolised.

Calvin (1509-64) and others taught that the New Testament miracles were something confined to the first century. Thus it was not pagans but devout and scholarly Christians who tried to do away with miracles!

The Reformers were rightly uneasy with the then Roman Catholic emphasis on anointing for dying rather than living, but, in spite of being 'Reformers', in their Book of Common Prayer (1662) they did not 'reform' the wrong use of anointing, but abolished it altogether! [A bad principle!] They did away with both Anointing and the Laying on of Hands and axed most references to healing. They promoted, instead, the opinion that sickness should not be resisted as it was God's punishment for sin. This held-back the Church's Ministry of Healing for three centuries!

### 2) The Context

The context is, of course, the Church's Ministry of Healing, which cannot be summarised here, and for which some understanding of healing, faith, prayer and sacrament is necessary.

> [See my book *The Question of Healing Services*.
> Details of this and other books still available from Renewal Servicing can be seen under the Renewal Servicing link on the home page of the website.]

Holy Communion and the Laying on of Hands with prayer are used mainly as sustaining ministries during illness, while Anointing is usually administered once as the passage in James seems to indicate.

Historically there were times when Christians tended to anoint daily at the beginning of an illness for perhaps a week, this seems to have been based on the clear expectancy of improvement.

### 3) Essential Meaning

In anointing a sick person we do not give them something abnormal and extraordinary because they are ill; it is the illness which is to be regarded as abnormal, not the anointing!

The oil is used to re-express, reaffirm, restore, repair and renew the sick Christian's unity with God's Anointed – the Christ. It is a ministry to Christians (as James teaches). The sick might be said to be re-Christ-ed. It brings all the healing, blessing and life the Anointing Spirit wants for God's Anointed People.

The oil proclaims our unity with Christ and expresses a restoration to fullness of life in him.

Some have simply 'never bothered with anointing' (as a prominent Christian leader once admitted to me).

A0133

"Anointing with Oil – in the Bible and Today" - taken from www.helpforchristians.co.uk
Copyright: John Richards/Renewal Servicing 2002, but waived for users of the above web-site.

## 4) The Church

While the preparation of the patient is important, the preparation of God's people is the more urgent and more difficult task.
When a minister anoints one of his people -

- He represents God's people.
- Are they with him and behind him in this action?
- Does he represent the care, concern and commitment of the local church?

The importance of the laity cannot be over-emphasised. It is they alone who can make the action an authentic expression of the church. It is they who mainly comprise the local church, and make it, or prevent it from becoming, the caring committed community.
It is largely upon the laity that the responsibility rests for the ongoing committed care, prayer and support that the patient is going to need whatever the outcome.

The attendance of laity in small numbers should be encouraged if the ministry is to take place in a home. Representatives of both family and church should be present, for both sickness and its healing are corporate.

## 5) The Ministers

In the Early Church, lay-folk used to anoint, but soon, some tended to regard the oil as something magical and divorced from prayer, so the Church authorities restricted its use to priests in an attempt to check this.
Nowadays, even within the Roman Catholic communion, the use of oil by the laity is being once again encouraged.

Anointing usually takes place in the context, public or private, of a Holy Communion service, and is always closely linked with confession and absolution. This, together with the general Biblical theme of consecration, and the teaching of James's epistle, indicates that it should be done by the local priests/ministers, or at least by their chosen delegates.

James indicates that the anointing is done **in the name of the Lord.** This means that it is not a casual or personal act, but an authoritative action. It is best done, therefore, by those whose Christian authority is recognised both by the sufferer and the Christian community which he/she/they represent.

## 6) The Sick

James 5:14-16 urges the sick person to **call for the elders of the church.** It is the **Christian sick** to whom James is giving guidance. He does not deal with the Church's ministry to non-Christians who are ill.

Like the other sacraments / sacramental acts, anointing is so related to Christ, and to God's anointed people, that it is only appropriate within God's family, the church. (In the same way that the Holy Comm-union is appropriate only to those who are 'in union with Christ'.)

15

A0134

"Anointing with Oil – in the Bible and Today" - taken from **www.helpforchristians.co.uk**
Copyright: John Richards/Renewal Servicing 2002, but waived for users of the above **web-site**.

If the person is a non-Christian, then usually the preparation is such that they are led to Christ before the ministry is undertaken.

Sacraments and sacramental acts do not glorify God if administered casually, and, except in an emergency, the minister will usually guide the person to prepare for such ministry by reviewing their life with sufficient time and seriousness for the Lord to reveal hidden resentments, hurts and unconfessed sin.

In this age of instant everything, the preparation needs to be adequate and full. I knew of one person who was born blind and his eyes were totally shrivelled. He received spiritual direction for a year; he was anointed. His eyes became whole and he could see!


## 7) The Situations
Circumstances will dictate whether the anointing should take place in hospital, home or healing service.

Ideally it should take place in worship, and if possible at the Holy Communion service.

It makes it easier both for patient and congregation to be committed to one another if at least some of the local church family or its representatives are present. These might well include children and younger people. See my article **Children and the Healing Ministry.**
Oil should be available at Healing Services in case its use is appropriate for anyone present. To state the obvious: if it is not available it cannot be used, and may therefore deprive a sufferer of a ministry which God might will for them on that occasion. Its availability does not indicate that it will necessarily be used, or be used casually.


## 8) The Forms
An Order of Service, like any other pastoral tool, must be used with loving imagination, sensitivity and flexibility. The style and length of the service will differ according to the patient's illness and place.

The following ought, if possible, to be included :
1. Scripture and some exposition or teaching. This could take place the previous day.
2. Prayer. As the James passage makes clear, Anointing is part of a care and prayer ministry, it is not an impersonal substitute for it.
3. Setting aside the oil for God's use. Consecration of the oil might be done earlier, but it can be meaningful to the sufferer to be present when it is done. 'Grant, we beseech you, almighty Father, that by the operation of the Holy Spirit, this oil may be used for the healing of all infirmities. To those who receive it, and put their trust in your mercy, may this anointing be a heavenly medicine, a spiritual remedy, and inward and abiding unction, for the strengthening and healing of soul, mind and body, and for the renewal of the indwelling Holy Spirit within them.'

16

A0135

"Anointing with Oil – in the Bible and Today" - taken from **www.helpforchristians.co.uk**

Copyright: John Richards/Renewal Servicing 2002, but waived for users of the above web-site.

4. Holy Communion if possible.  Such services bring together in a concise unity so many means of grace, that they are almost inevitably appropriate to those whose lives, upset by illness, need the maximum of divine help, support and guidance.

5. Laying on of Hands.  This expresses the Touch of Christ, and the caring touch of the local Christian community.  As with Anointing, it is usually the head rather than afflicted bodily areas on which hands are laid.  The head expresses – as nothing else does – the person.  The head would most naturally be used in time of commissioning for service, and the close link with this is important, since blessings of health that are given are best seen as equipment for witness and service.

6. Anointing.  For how to administer this, see below.  A prayer such as the following may be used – '(Name).  **In the name of the Lord Jesus Christ, I anoint you with this holy oil, that you may receive the anointing of the Holy Spirit, for the healing of all your infirmities, whether of spirit, of mind, or of body. Amen.'**

7. Laying on of hands is resumed, with prayer.  This may be informal, but the use of an existing prayer, such as the one below, is likely to express great and deeper things than most of us could say off-the-cuff.  The sick need everything we can give.

**'As with this visible oil your body is outwardly anointed, so may our heavenly Father grant of his infinite goodness that your soul may inwardly be anointed with the Holy Spirit, and be filled with strength and comfort.**

May the almighty God restore to you (bodily) health and strength to serve him.

May he send to you freedom from all your pains, troubles and diseases whether of body or mind.

May he pardon you all your sins and offences.

May he give you the strength to serve him truly.

By the working of God's outpoured Holy Spirit within you, may you have perfect victory, and triumph over Satan, sin, disease and death;

**through Jesus Christ our Lord, who by his death has destroyed death, and now with the Father and the Holy Spirit ever lives and reigns, God, world without end. Amen.'**

8. Quiet. A time for the reality of this to 'sink in' is important, and if not within the service, ought to be provided for afterwards.  Often Christians rush away from important times of blessing when they need to give them time to 'take root'.

9. Thanksgiving.

10. Blessing of others present.  The Blessing of the sick Christian has been given individually through the Laying on of Hands.  Those ministering and attending have not been so blessed.  If the numbers are few Blessing may be given individually rather than corporately, i.e. with the Laying on of Hands.

It needs saying that those closest to the sick can sometimes be in greater need than the patient.  Times of ministry to the patient usually and naturally flow-over into the care and prayer of his/ her friends and supporters.


**9) The Oil**

Pure olive oil is easy enough to obtain from a local store.  It is better, however, to get it from the area Christian leader/Bishop.

17

A0136

"Anointing with Oil – in the Bible and Today" - taken from **www.helpforchristians.co.uk**
0106
Copyright: John Richards/Renewal Servicing 2002, but waived for users of the above **web-site**.

In episcopal churches, the bishop at his consecration is commissioned to 'heal the sick'. This ministry (for obvious practical purposes) is largely delegated to the local clergy. On Maundy Thursday the bishop traditionally blesses the oil for his clergy's use.

If anointing is thought to be a fringe activity or suspect, the fact that the oil comes from the area leader makes it clear that the ministry is central to church life.

In addition, it is an encouragement to the sick in their loneliness to feel that they and their suffering are the concern of a wider church family.

## 10) The Anointing

In the past, sometimes the five senses have been symbolically anointed to seal them for God's use. (This is sometimes appropriate for those previously involved in the occult.)

The Roman Church often anoints head and hands. Just as in confirmation the head symbolises the whole person, so traditionally the head has been anointed by the minister dipping his thumb in the oil making the sign of the cross on the forehead. The link with baptism is expressed in this.
The anointing of the hands rightly emphasises recovery and service.
[Probably the public's widest awareness of anointing comes from the televising of Waugh's Brideshead Revisited. The theme of the book is God's grace, and its climax is the use of oil to anoint in preparation for a Christian death.]

Traditionally, the priest then removes the oil with cotton wool. I have always regarded this as pastoral, psychological, theological and sacramental nonsense! If it is a good symbol to apply it cannot also be a good symbol to remove!

If, as is normally the case, a small amount only is used, it can stay there, and the sick person is left with the awareness of what has been given.

## 11) The Prayers

James sees anointing in the context of prayer, and we do right to follow him. The anointing of the sick ought to have prayerful preparation. The wider congregation ought to be praying for such ministries that are undertaken, in part, on their behalf.

As with all healing ministrations, attention must be given to preparation and after care if the occasion is to rest on a sure foundation and its result properly integrated in the life of the sufferer and the local Christian family.

A0137

"Anointing with Oil – in the Bible and Today" - taken from **www.helpforchristians.co.uk**

Copyright: John Richards/Renewal Servicing 2002, but waived for users of the above **web-site**.

## 12) The Outcomes

Sometimes the results may be clear, instant and glorious – as in the case of my own mother who was a cripple and was instantly, and lastingly, healed forty years ago when anointed. Sometimes the results may not be readily apparent!

It is particularly important, therefore, to stress that when God is so specifically invited to help us, **he always responds.**

Those around the sufferer must be watchful to see what God's response has been.  It is often in areas and at levels which we did not envisage.
The most tragic thing is so to centre on the hope of an instant physical healing that if it does not happen God is assumed to have done nothing, and his wise work missed.

If it seems clear what God did not do, then look to see what he did do and build your on-going care and prayer upon it.  It may be in the area of relationships, or past hurts, or future fears, or priorities, or – as James mentions – in the areas of sin and forgiveness.

A0138

"Anointing with Oil – in the Bible and Today" - taken from www.helpforchristians.co.uk
Copyright: John Richards/Renewal Servicing 2002, but waived for users of the above web-site.

## Part IV - Conclusion

Peter said to the lame man: **'I have no silver or gold, but what I have I give you; in the name of Jesus of Nazareth, stand up and walk.'**
    [Acts 3:6]

Like Simon Peter, we must know and admit what we lack, but be generous with what we have! The Church has, on sure Biblical grounds, a ministry to anoint the sick. It must be their needs, not our inclinations, that govern our local church policy regarding its availability.

We – to whom so much has been given – are not, I believe, at liberty to withhold so rich a means of blessing, hope and healing.

This 9th. century prayer, included in the Book of Common Prayer, expresses clearly for our 21st. century Church much of the spiritual reality of which anointing with oil can be both God's symbol and his instrument.

> **Come, Holy Ghost, our souls inspire,**
> **And lighten with celestial fire.**
> **Thou the anointing Spirit art,**
> **Who dost thy sevenfold gifts impart.**
>
> **Thy blessed unction from above**
> **Is comfort, life, and fire of love.**
> **Enable with perpetual light**
> **The dullness of our blinded sight.**
>
> **Anoint and cheer our soiled face**
> **With the abundance of thy grace.**
> **Keep far our foes, give peace at home:**
> **Where thou art guide no ill can come.**
>
> **Teach us to know the Father, Son,**
> **And thee, of both, to be but One.**
> **That through the ages all along**
> **This may be our endless song:**
>     **Praise to thy eternal merit**
>     **Father, Son, and Holy Spirit.**

A0139

# EXHIBIT G

To the Social History Report

0110

## Commercially Available Christian Anointing Oil
### As Typically Sold in Bottles Ranging from 0.25 Oz to 0.34 Oz



0.34 oz bottle



0.34 oz bottle



0.25 Oz. Bottle



0.25 Oz. Bottle



0.25 Oz. Bottle



0.34 oz bottle



0.34 oz bottle



0.34 oz bottle



0.34 oz bottle

A0141

0111

# EXHIBIT H

To the Social History Report

ウェブ　画像　動画　辞書　知恵袋　地図　リアルタイム　一覧 ▾　　　　　　　　　　　検索設定 ☐ ▾　Yahoo! JAPAN　ヘルプ

0112

油注ぎ英訳　　　　　　　　　　　　　　　　　　　検索　　条件指定

約9,970件

検索ツール ▾

日本語　　　　　　　　　　　　　　英語

# 油注ぎ　　　　　　　　　　　Anointing

Abura sosogi

powered by Google 翻訳

### 油注ぎの英語・英訳 - 英和辞典・和英辞典 Weblio辞書
ejje.weblio.jp > ... > 英和辞典・和英辞典 > 日英対訳辞書 - キャッシュ
油注ぎを英語に訳すと 読み方 アブラツギoilcan - 約1031万語ある英和辞典・和英辞典。発音・
イディオムも分かる英語辞書。

### 「"油注ぎ"」に関連した英語例文の一覧 - Weblio英語例文検索
ejje.weblio.jp > ... > 英和辞典・和英辞典 > "油注ぎ"の意味・解説 - キャッシュ
あなた方に関する限り，彼から受けた油注ぎがあなた方の内にとどまっており，あなた方はだれ
かに教えてもらう必要はありません。むしろ，彼の油注ぎがあなた方にすべての事柄について教
えており，またそれが真実であって偽りではないように，そしてそれが ...

### 手注ぎ油の英語・英訳 - 英和辞典・和英辞典 Weblio辞書
ejje.weblio.jp > ... > 英和辞典・和英辞典 > 機械工学英和和英辞典 - キャッシュ
手注ぎ油を英語に訳すと hand oiling - 約1031万語ある英和辞典・和英辞典。発音・イディオムも
分かる英語辞書。

### 注ぎ足すの英語・英訳 - 英和辞典・和英辞典 Weblio辞書
ejje.weblio.jp > ... > 英和辞典・和英辞典 > 英和辞典 - キャッシュ
注ぎ足すを英語に訳すと pour more 《water》 in [into]replenish 《a glass with wine》 fill up 《on
e's [somebody's] cup》 again 《with... - 約1031万語ある英和辞典・和英辞典。発音・イディオム
も分かる英語辞書。

### 油皿の英語・英訳 - 英和辞典・和英辞典 Weblio辞書
ejje.weblio.jp > ... > 英和辞典・和英辞典 > 専門用語対訳辞書 - キャッシュ
油皿を英語に訳すと OIL PANカテゴリ 技術用語 - 約1031万語ある英和辞典・和英辞典。発音・
イディオムも分かる英語辞書。... Weblio専門用語対訳辞書での「油皿」の英訳 ... 油皿に灯油を
注ぎ足すこと例文帳に追加. the action of pouring kerosene into an ...

### 油注射器の英語・英訳 - 英和辞典・和英辞典 Weblio辞書
ejje.weblio.jp > ... > 英和辞典・和英辞典 > 英和専門語辞典 - キャッシュ
油注射器を英語に訳すと oil syringe; oil squirt - 約1031万語ある英和辞典・和英辞典。発音・イ
ディオムも分かる英語辞書。

### 油注入孔の英語・英訳 - 英和辞典・和英辞典 Weblio辞書
ejje.weblio.jp > ... > 英和辞典・和英辞典 > 英和専門語辞典 - キャッシュ
油注入孔を英語に訳すと oil filter hole - 約1031万語ある英和辞典・和英辞典。発音・イディオム
も分かる英語辞書。

### 油注しの英語・英訳 - 英和辞典・和英辞典 Weblio辞書
ejje.weblio.jp > ... > 英和辞典・和英辞典 > JMdict - キャッシュ



What's another word for [find it] A B C D E F G H I J K L M N O P Q R S T U V W X Y Z 0114
What's the opposite of [find it] A B C D E F G H I J K L M N O P Q R S T U V W X Y Z
Translate the Word 油注ぎ To English ⇕ from Japanese ⇕ [translate]

More Tools   Word Meanings   Rhyming Words   Example Sentences   Translats   Find Words   Word Forms   Pronounce Words   Names



word **hIPPO**

# 油注ぎ

Abura sosogi

| English Translation |
|---|

Oil poured

## Search Again

Translate to English ⇕

From Japanese ⇕

油注ぎ          [find it]

## More Words

What is the meaning of the Japanese word 油気?

What is the meaning of the Japanese word 油断のありません?

What is the meaning of the Japanese word 油断のないこと?

What is the meaning of the Japanese word 油断?

What is the meaning of the Japanese word 油性の?

What is the meaning of the Japanese word 油を塗りました?

What is the meaning of the Japanese word 油煙?

What is the meaning of the Japanese word 油田?

What is the meaning of the Japanese word 油絵?

What is the meaning of the Japanese word 油絵の具?

What is the meaning of the Japanese word 油脂?

What is the meaning of the Japanese word 油菜?

## Like Us on Facebook

# EXHIBIT I

0116



**The Asia-Pacific Journal** | Japan Focus
Analysis of the forces shaping the Asia-Pacific and the world

About    Subscribe                    Archive    Search

Course Readers    3/11 Articles

November 1, 2016
Volume 14 | Issue 21 | Number 4

# Nippon Kaigi: Empire, Contradiction, and Japan's Future

Sachie Mizohata



Abe Shinzo speaking at Nippon Kaigi event "on the Meiji spirit," 16 July 2012

**Sachie Mizohata** is an independent consultant based in Luxembourg. She is the co-founder of social-issues.org, a collaborative online community platform for social scientific research, through which she promotes e-humanities and collective modeling of social phenomena such as human well-being based on knowledge elicitation system used for OECD surveys. Recently, she contributed four chapters to Japan's Shrinking Regions in the 21st Century (Matanle and Rausch with the Shrinking Regions Research Group, Cambria, 2011).

## Introduction

Nippon Kaigi (NK, the "Japan Conference") is Japan's largest and most powerful conservative right-wing organization, whose members include current Prime Minister Abe Shinzō and most of his Cabinet.[1] This nationalist non-party political group was relatively unknown until recently. A surge in publication and media attention of late, however, has made this arcane society suddenly visible, particularly in regard to its influence on politics, nationalist agenda, and revisionist causes. Many recent publications[2] associate Nippon Kaigi with Japan's rightward leaning trends: political climate, leadership, and a new current of nationalist sentiment. They report that NK agendas are essentially aligned with Abe's political ambitions and views, most notably constitutional revision. As the 2016 Upper House election results strengthened their ability to shape Japan's political agenda, Nippon Kaigi merits concern and scrutiny. NK adherents profess to promote Japan's prosperity and international prestige, to restore Japan's national pride and unify the country. These goals seem honorable and appealing to many Japanese. Nonetheless, since NK supporters are uncritical in their affirmation of the imperial past and suppression of civil liberties, they may achieve the opposite results. Herein lies their contradictions and paradoxes.

In this paper, I first provide an overview of Nippon Kaigi and its emerging background. The next section examines NK's vision of a 'proud' nation. The third section reviews key elements of NK's ideology. A final section examines their contradictions.

## What is Nippon Kaigi?

Nippon Kaigi's ideological foundations and legitimacy are rooted in two major religious movements in early 20th century Japan. One is **Seicho no ie 生長の家** (literally House of Birth and Growth), a syncretic religious organization founded by Taniguchi Masaharu in 1930. The other one is Jinja Honcho 神社本庁, the Association of Shinto Shrines, an administrative organization organized in 1946 that oversees some 80,000 Shinto shrines.[3]

0117



Seicho no ie          Jinja Honchō

Nippon Kaigi was established in 1997 through integration of two existing groups. One was *Nihon o mamoru kai* (Society for the Protection of Japan) founded in 1974. The other was *Nihon o mamoru kokumin kaigi* (People's Conference/National Conference to Protect Japan) founded in 1981).

*Nihon o mamoru kai*, originally a union of Shinto and Buddhist religious organizations, rallied under the banner of anti-communist and opposition to the Buddhist Soka Gakkai, which they branded a threat to Japanese society. This is ironic since New Komeito (an arm of Soka Gakkai) is an indispensible coalition partner of the ruling Liberal Democratic Party (LDP).[4]

*Nihon o mamoru kokumin kaigi* originally consisted of rightist cultural luminaries, business leaders, and imperial army veterans. They were keen on making the emperor again the head of state and implementing constitutional changes, education reforms, and a strengthened defense posture, which coincide with present Nippon Kaigi objectives.[5]

Today Nippon Kaigi has approximately 38,000 members. Its monthly magazine, *Nippon no ibuki* (Breath/Vigor of the Nation) deals extensively with denouncing criticism of the Nanking Massacre as historical fabrication or the Tokyo Trial as victor's justice and illegitimate. NK has 47 chapters in all prefectures, which are further divided into some 240 local chapters. Although lacking a strong membership base, their outsize influence rests on direct connections with lawmakers: the Parliamentary League for Nippon Kaigi (Kokkai giin kondankai) of 280 members (PM Abe as a special advisor to it; Inada Tomomi, Defense Minister; Koike Yuriko, former Defense Minister and present Tokyo governor) as well as its Local Assembly Union (Nippon Kaigi chihō giin renmei) with 1,692 members.[6] In other words, "Nippon Kaigi has backroom clout ... and a network that reaches deep into the political establishment."[7]



At present, NK's president is Takubo Tadae, professor emeritus at Kyorin University, who has succeeded Miyoshi Tōru, the third NK president (2001 — 2015) and former Chief Justice of the Supreme Court. In practice, secretary-general Kabashima Yūzō is at the helm. Other key members include a spectrum of professionals from business such as former chairperson of Bridgestone Tire to conservative academics, public figures, and Japan Medical Association Chairperson. In addition, given its religious roots, it is worth mentioning that 24 out of 62 NK representatives are from religious organizations.[8]

A0148



日本会議名誉会長・元最高裁判所長官・三好達による「…

Miyoshi Tōru's "Tennō Heika Banzai (Long live the Emperor)" charge at Meiji Jingu Kaikan on National Foundation Day on February 11, 2016.

Active NK supporters in academia figure prominently in the debate over reinterpreting Japan's pacifist constitution. In summer of 2015, the role of NK academics became obvious when tens of thousands of people protested against the security legislation. While the overwhelming majority of legal scholars and practitioners condemned the "war bills" as unconstitutional, Cabinet Secretary Suga Yoshihide claimed during the Diet discussion that many constitutional scholars supported the bills. Having been urged to mention such proponents to support the position, Suga lamely cited three scholars: Nagao Kazuhiro of Chuo University, Nishi Osamu of Komazawa University, and Momochi Akira of Nihon University. All three are Nippon Kaigi members.[9] More tellingly, these professors are also the members of the two offshoots set up by the NK: Utsukushii Nihon no Kenpō o Tsukuru Kokumin no Kai (National Society to Create a Constitution for a Beautiful Japan; hereafter, **the Kenpō group**) as well as 21 Seiki no Nihon to Kenpō Yūshikisha Kaigi (Association of Experts on the Constitution for 21st Century Japan). We observe an intensification of the lobbying capacity of NK through a multiplication of groups and associations.[10]

The authors of recent publications note that NK's strength resides with formidable skills and sustained grassroots efforts for mass organizing to mobilize people and resources. They hold lectures and rallies to pressure local assemblies to submit resolutions to Tokyo by bombarding them with requests, petitions, and phone calls. NK predecessors pushed through the law recognizing the national anthem and flag as Japan's national symbols in 1999. Then, NK collected about 4 million signatures calling for reform of the Fundamental Law of Education (Kyoiku kihon hō), which in turn was enacted in 2006 in Abe's first stint as Prime Minister.[11] Furthermore, NK has unceasingly pressured, through various local and national groups, against initiatives on gender-free education, sex education in schools, and gender equality in political participation, while promoting traditional family values, gender norms, and women's primary roles as mothers and wives at home.[12]

These activities illustrate NK's values. They fulminated against bills proposed by the Democratic Party of Japan as 'four bad laws,' which included 1) legalizing suffrage for foreign permanent residents, 2) women using their maiden names after marriage, 3) a national Human Rights Protection Bill (Jinken yōgo hōan), and 4) the right of a woman to accede to the emperorship.[13] NK launched a successful counter-campaign of signature collection against each of these. Overall, its political activities and documents reveal not only their ultra-conservative and inward-looking nature, but also their anathema to the left and malaise with women — except like-minded colleagues.

In short, NK has strong influence on leading decision-making bodies. They aim at promoting constitutional changes and traditional education and values.

**What are NK's Objectives?**

The above unveils NK's uncommon capacity to lobby and push forward bills and laws that have deep impact on the daily life of the Japanese. The NK website[14] describes six organizational objectives:

1. A beautiful tradition of the national character for Japan's future

(美しい伝統の国柄を明日の日本へ)

2. A new constitution suitable for the new era

(新しい時代にふさわしい新憲法を)                                                                     0119

3. Politics that protect the country's reputation and the people's lives

(国の名誉と国民の命を守る政治を)

4. Creating education that fosters Japanese sensibility

(日本の感性をはぐくむ教育の創造を)

5. Contributing to world peace by enhancing national security

(国の安全を高め世界への平和貢献を)

6. Friendship with the world tied up with a spirit of co-existence and co-prosperity

(共生共栄の心でむすぶ世界との友好を)

The lengthy description of their objectives can be summed up in the following points: 1) Promote worship of the imperial household at the heart of our state and people, whose imperial lineage can be traced over 125 generations of unbroken descent (back to origins of the sun goddess). 2) Eliminate the occupiers-drafted constitution and accompanying problems that inhibit the independent will of the state to protect its security and turning national defense over to a foreign power. NK therefore seeks to amend the constitution to fully utilize the Self-Defense Forces. 3) Restore a politics that emphasizes the importance of national interests, reputation, and sovereignty, including paying homage to Japan's war dead at Yasukuni shrine. 4) Nurture young people to cultivate patriotic spirit, respect for the national anthem, flag, and history, and cherish quintessential Japaneseness. 5) Bolster defense forces in order to effectively assume global leadership and counterbalance threats posed by China and North Korea. 6) Finally, build friendly relations with other countries through exchange programs. In short, their overarching concerns are to promote a narrow state-centric notion of prosperity and well being. Stated differently, they are unconcerned about the welfare of ordinary Japanese.



**Aum Shinrikyo facility for manufacturing sarin, Satyan 7, Yamanashi Prefecture, 1995**

Particularly notable is NK's longing for national pride and traditional virtues, as noted in their reiteration of pride and tradition. Why so? A good way to understand them may be looking at their historical background, starting two years prior to NK's founding year; it was "the year of the Kobe earthquake and Aum Shinrikyo's deadly gas attacks on Japan's subway. … The two events … had a profound impact on the nation's confidence."[15] Especially, the latter generated a vague sense of national drift and moral decay. Meanwhile, the LDP's single-party rule shifted to LDP-led coalition governments. In the post-bubble recession, persistent economic crises deepened and conditions that supported reliance on the premier power (the U.S.) weakened, reinforced by population aging, overseas relocations of Japanese firms in tandem with the rise of China and globalization.[16]

At that time, the war generation which experienced war first-hand was aging and disappearing. It made up 75% of the population in 1950, and was reduced to roughly 23% by 2000.[17] By then, Emperor Shōwa, distant reminder of the lost war, was long gone. Norma Field notes an undercurrent of revisionism: "Hirohito missed his moment for saying 'I'm sorry,'" leaving a legacy of still unresolved problems, and "a responsibility [of ordinary Japanese citizens] whose continued denial has been translated into silent acquiescence to the harsh discipline required by [country rebuilding and] economic success."[18] Muto Ichiyo thus stresses: "In this fashion, a vessel was created to preserve and nurture the idea that the wartime actions of the empire were not wrong, and even that they were right."[19]

In this milieu, the political climate for Japan's wartime deeds had changed. Gavan McCormack delineates:

> Beginning in the 1990s, the official Japanese stance on its past changed. After four decades in which the past was set aside, … as the Cold War crumbled and affluence palled, the problem of reconciliation with the region began to be faced. … As part of this burgeoning international pressure on Japan, … dozens of law suits demanding apologies and compensation have been lodged with Tokyo district courts on behalf of former 'comfort women' and the many other victims of Japan's colonialism and aggression.[20]

This conversely attests to the maturation of human rights discourse, especially in the form of global feminism, as well as the gradual decline of US hegemony in the post-Cold War political context. Moreover, 1995 marked the Murayama Statement in which the Prime Minister delivered an official apology to neighboring countries. Humiliated by "apology diplomacy", NK forerunners gathered 5.2 million

A0150

0120

signatures opposing the landmark statement.[21] 1996 saw the formation of the NK affiliated group, Japanese Society for History Textbook Reform (新しい歴史教科書をつくる会) led by Nishio Kanji, Fujioka Nobukatsu, and others to remove or downplay critical descriptions of Japan's war conduct. Their action accorded with official textbook treatments: "the Japanese system exercises control primarily through state screening."[22]



Japanese Society for History Textbook Reform textbooks

Japan's selective memory came under increasing international censure. As Akiko Hashimoto shows, such war reflections, identity politics, and scrutiny engendered or unraveled a sequence of emotions in the course of Japan's postwar 'long defeat.' Hashimoto eloquently depicts "the desire to repair a damaged reputation" to create a positive national identity.[23] Kato Norihiro points out that words such as "pride" were seldom used in the public sphere when Japan enjoyed quiet confidence, gained by economic boom and pro-American peace diplomacy under Article 9. Kato thus sees Japan's growing anxiety, malaise, and shaken confidence as leading to the emergence of Nippon Kaigi: "In reality it is akin to Japan's version of the Tea Party: Like the Tea Party in the United States, it is a product of deep conservative anxieties about the future. … Both Nippon Kaigi and the Tea Party cast themselves as 'grassroots' movements that represent 'traditional' values of 'the people.' One Tea Party slogan is 'Take Back America,' and in the last election one L.D.P. slogan was 'Take Back Japan.'"[24] In Kato's view, there are two ways to rehabilitate national identity to restore honor to Japan. One viable way is to face the past wrongdoings. Another is to repudiate them and to forge or project a sense of pride in national belonging through cover-ups and self-adulatory slogans.[25] The two precisely oppose each other. NK chiefly adopts the latter (in a futile attempt) to change the national memory and to reclaim a positive Japanese identity.

Furthermore, according to <u>historian Yamazaki Masahiro</u>, NK has two outstanding goals. One is to restore Yasukuni's national status, and another is to alter the constitution.[26] As for the latter, NK established the Kenpō group in 2014 with local chapters across the country. NK launched a campaign to collect 10 million signatures for constitutional revision. In 2015, it held a national rally at the Nippon Budōkan Hall, where PM Abe sent a congratulatory video reaffirming his pledge to revise a constitution suitable for the 21st century.[27]

In sum, NK's emergence coincided with a moment in the 1990s when the postwar legacy of problems intensified in the historical context of the rise of international criticism and international anger over memory of colonialism and war. This took the form of reactions to Japan's international apologies, textbook debates, the maturation of human rights discourses, decline of the war generation, and was accentuated by Japan's economic downturn. In parallel, revisionist discourse, impervious to pressures for a shared history with neighboring countries, grew powerful as did state leaders holding such views.

### NK'S Ideological Foundations

Recall that both *Nihon o mamoru kai* and *Nihon o mamoru kokumin kaigi* share the same word to name their groups: "*mamoru*" (to defend, protect, preserve, or safeguard). The word conveys their concern that something at stake was being lost.

> If Nippon Kaigi hopes to revive or "reclaim" past glory by rewriting history and revising the constitution — what are the ideological sources for their legitimacy and justification? NK has two major religious components; the first is Seicho no ie, from which many of NK's key figures originally came. The founder of this syncretic

0121



Taniguchi Masaharu

religious organization, Taniguchi, embraced the idea of kokutai (national polity) — the central plank to worship the emperor as a divine ruler, and to see Japan as the center of the world and the Yamato race as superior to other races, which in turn could justify imperial ventures abroad in the name of national defense. He proclaimed that the postwar constitution was the root of all evils and called for the revival of the prewar Meiji Constitution. As a war sympathizer, Taniguchi was barred from public service in the postwar era before restarting Seicho no ie in 1949 championing two major issues: anti-communism and emperor veneration.[28] In 1964, Seicho no ie established its political wing called Seicho no ie seiji rengō (active until 1983) and its student wing Seicho no ie gakuseikai zenkoku sōrengō in 1966 (Seigakuren, Confederation of National Student Associations). Seicho no ie withdrew from the political arena in 1983. Subsequently, having shifted from its anti-leftist-nationalist approach of the past to focus on ecology issues, it publicly criticized the Abe administration before the 2016 Upper House election and declared that it would not to support it.[29]

One of the student adherents of the early Seicho no ie was NK's secretary-general Kabashima who built a right-wing movement at Nagasaki University in the late 1960s with his senior leader Andō Iwao, and subsequently established a rightist organization Nihon seinen kyōgikai in 1977 (Japan Youth Council). The Nihon seinen kyōgikai developed into a secretariat of the Nippon Kaigi and is presently the nucleus of NK. Kabashima is also the chairman of the Nihon Seinen Kyōgikai, whose headquarters is located in the same building as NK. Its goal of constitutional reform was inscribed in the April 2015 issue of the Seinen Kyōgikai magazine, Sokoku to seinen (Fatherland and youth). The organization affirmed its pledge for constitutional amendment and promoted the campaign in light of the results of the last parliamentary election.[30]

Another founding father of Nippon Kaigi is Murakami Masakuni, Liberal Democratic Party veteran, and heavyweight.[31] As a leader of both forerunner organizations, Murakami worked as a bridge to the political world for the Nihon Seinen Kyōgikai and played a crucial role in the formation and development of NK. Nowadays, however, Murakami openly criticizes the Abe administration and its underhanded dealing with the state secrecy law, security laws and constitutional changes. NK deliberately avoids discussing its agenda before each election. With the focus of election campaigns placed on the economy, NK's issues are deliberately played obfuscated. However, with its electoral victory in hand, the ruling coalition claims public endorsement for these contentious issues and rams through the Diet unpopular laws. His criticism implies the existence of other dissidents inside NK.

Initial members of NK include at least three more men from the former Seigakuren. One is Momochi Akira, as discussed earlier with regard to the security legislation. Takahashi Shirō of Meisei University is former deputy chairman of the Japanese Society for History Textbook Reform and a revisionist scholar whom the Japanese government sent to UNESCO meetings to oppose incorporating Nanjing Massacre-related materials in the Memory of the World Register list. Ito Tetsuo is the head of the Japan Policy Institute, a rightist think tank known as Abe's brain trust for nationalist policies. The above three were involved with Seicho no ie in combatting the leftist student movement in the 1960s-70s, and all are members of Nippon Kaigi's policy committee.[32] Another Seigakuren person, Eto Seiichi, has served to bridge NK and Abe's LDP.[33] Eto is a Nippon Kaigi backer and Special Advisor to the Prime Minister. He is Abe's long-term political associate who supported his drive for a rare second term in office, which Miyoshi Tōru calls one of NK's great achievements.[34]

In addition to older male sympathizers, there are female Seicho no ie-related NK sympathizers. Inada Tomomi, who is viewed as a strong contender for the LDP presidency, shows her old copy of Taniguchi Masaharu's Seimei no jissō (Truth of Life) in a meeting (the video is available in Japanese).[35] She recalls that the book was given by her grandmother and her parents who were avid readers of it. Inada herself belongs to Taniguchi Masaharu Sensei o manabu kai (the Association to Learn About Taniguchi Masaharu Sensei, led by Nakajima Shoji), whose members advocate Taniguchi's fundamentalist views.

This association is related to the management of Tsukamoto Kindergarten in Osaka which emphasizes cultivation of patriotism and respect for the national flag and national anthem. In 2015, Madam Abe Akie was appointed as honorary principal.[36] The principal is NK's representative in Osaka, and its associated elementary school is to open next year.[37] As shown in the video below, children sing Japanese martial songs after they chant aloud the imperial Rescript on Education (Kyōiku Chokugo): the Imperial Rescript on Education between 1890 and 1946.[38] The Rescript officially adopted the idea of kokutai, Shinto as the state religion (State Shinto), in short Shinto ultra-nationalism. This not only reflects their key goal but approach for indoctrinating young people in love for the nation, pride, and dedication to public ends, which have been subverted, in their reading, by the postwar education system.



Inada Tomomi

The June 1998 issue of *Nippon no Ibuki* argues to 'rectify' the educational system, which is distorted by the supremacy of test scores and educational qualifications, 'excessive' focus on human rights, 'excessive' individualism, a masochistic view of history, and strong biases supportive of Nikkyōso (Japan Teachers Union), which have resulted in anti-Japanese ideology in schools.[39] Thus far, we have noted three central organizations, the Nihon seinen Kyōgikai, Japan Policy Institute, and Taniguchi Sensei o manabu kai, all associated with NK. These key members of Seichō no ie-related groups have played seminal roles.



Tsukamoto kindergarten group recitation highlighting nationalist and imperial themes

Besides Seichō no Ie, another important religious organization is Jinja Honchō: "one of Japan's most successful political lobbies."[40] Although the name conveys the impression that it is a public institution, it is in fact a private institution. Jinja Honchō was established in February 1946, very soon after the abolition of the Jingiin (Institute of Divinities) (due to the Shinto Directive issued by GHQ (General Headquarters of the Supreme Commander for the Allies Powers) to prevent the use of Shinto for political purposes. Jingiin was formally incorporated into the state bureaucracy under the aegis of the Home Ministry, which administered governmental sponsorship, perpetuation, and dissemination of State Shinto. Jingiin evaded war responsibility as a non-military entity, despite having the lead in propagating ultra-nationalistic ideology and promoting the war. Under provisions guaranteeing freedom of religion, Jinja Honchō was formed by then religious leaders to take over some of the functions of the Jingiin. This means that, although it did not enjoy the same privileges as before, it was able to restore its prewar religious order and revitalize its ideology privately.[41]

The Jinja Honchō had long sought to reinstitute the calendar system based on the emperor's reign, the gengō prewar calendar having been proscribed by the GHQ which saw it as a vehicle for reasserting imperial authority. With Seichō no ie, Nihon Seinen Kyōgikai, Shinto Seiji Renmei and others, Jinja Honchō founded Gengō Hōseika Kokumin Kaigi (People's Conference /National Conference to Implement the Congo Legislation), the forerunner of Nihon o mamoru Kokumin Kokumin Kaigi, in 1978.[42] Soon its goal became a

0123

reality; "in 1979, Japan's conservative government ensured that the emperor-centered calendar would continue by passing legislation that mandated continued use of the *gengō* practice."[43] To date the gengō has been continuously used by public agencies.

Today Jinja Honchō has a political wing, which is called Shinto Seiji Renmei (神道政治連盟Shinto Association of Spiritual Leadership). *In 2016, during the New Year holidays, shrines provided advertisements for constitutional revisions at the request of* Jinja Honchō that responded *to* the movement of the abovementioned Kenpō group.[44] After the 2016 reshuffle of the Abe administration, 19 out of the 20-member Cabinet are members of the Shinto Seiji Renmei, while 14 are members of Nippon Kaigi.[45] Therefore, in other words, the political elements and Shinto-inspired elements have been yoked together to compose the Abe government. Note that Jinja Honchō's president is Tanaka Tsunekiyo, a representative of the Kenpō group and one of NK's vice-presidents.

In addition to Jinja Honchō, NK boasts affiliations with many Shinto and other religious organizations,[46] though not limited to faith-based organizations (e.g., Nihon Jyosei no Kai or Association of Japanese Women that advocates traditionalist causes). These groups with arguably irreconcilable differences of religion co-exist and collaborate under the same NK organizational umbrella. In NK's view, this may be seen as "a coexistence of deities without conflicts" in accord with Japanese "national spirit" to respect harmony, as underscored in their goal statement.[47] Certainly, this arrangement of different groups yoked together blurs the separation between its religious and political institutions, which also link to NK's goal to ease "the excessive separation of religion and state."

While reading NK documents, we take note of their understanding of "tradition". According to Shimazono Susumu, professor in religious studies, the Japanese tradition cited by the Nippon Kaigi is primarily equated with the concept of kokutai, which denotes "the ideology of *bansei ikkei* ('ten thousand generations in a single line')"[48], the allegedly unbroken line of imperial rulers, plus notions of Japan as a uniquely incomparable country, and the supremacy of the Yamato race. Shimazono contends that unbroken history without rupture, albeit mythological, is important to them as demonstrative of imperial continuity and sacerdotal majesty.[49]

Yamazaki argues that NK's ideology is well articulated in two treatises: *Kokutai no Hongi* (Fundamentals of the National Polity) and *Shinmin no Michi* (The Way of the Subject), issued by the Ministry of Education in 1937 and 1941 respectively. As for the first manifesto, he uncovers NK's ideological links between these documents and its goal statement; the discredited wartime terms and rhetoric are replaced with equivalent words. The *kokutai* (国体) is replaced with *kunigara* (国柄), and *banpōmuhi* (万邦 無比) with *sekaini rui o minai* (世界に類を見ない) 'without parallel in the world.'[50] As for *The Way of the Subject*, it explained how Japanese imperial subjects were expected to see "who they were — or should aspire to be — as a people, nation, and race."[51] These moral virtues included prioritizing the spirit of harmony, self-sacrifice, and devotion to the public good, which are found in a draft constitution compiled by the LDP.



Kokutai no Hongi

Both manifestos relate to the wartime slogan "'Hakko Ichiu,' which literally means putting all the eight corners of the world under one roof."[52] Or more simply: the world as a single family under Japanese control. The result is to wrongly applaud Japan as a liberator of Asia from Western colonialism. Thus NK members refer to World War II as the Great East Asia War, supposedly viewing themselves as spiritual successors of the prewar government.[53]

Concerning NK's official ideology and its effort to "defend", "protects", or "preserve" the tradition, Muto Ichiyo summarizes:

> The premise is that something has been lost. What is it? It is the essence of the Empire of Japan. To Abe, the 'postwar' has been an extremely unfortunate era. The reason is that the honor of the glorious Japanese empire was denied and the Occupation imposed the constitution on Japan. It is not only Abe who thinks this way; this thinking is fairly deeply rooted in postwar Japanese leadership long dominated by the LDP. In fact it is my contention that in the postwar Japanese state, the continuity of the Japanese empire was preserved, if surreptitiously, as a principle of the legitimacy of the state.[54]

Postwar Japan started in effect with the Imperial Rescript on Surrender, as outlined by Herbert P. Bix: "a masterpiece of propaganda packed with terms like "preservation of the national polity," "subjects of the

A0154

0124

empire," and the "indestructibility of the divine land."[55] The essence of imperial rule is the persistence of antiquated apparatus, tools, and inherited patterns of thinking in the NK: recycling the kokutai and myths, suggesting Japanese uniqueness, self-deluding superiority[56] (e.g., recent boom in books and TV shows), patriotic exhortation, pristine singular identity,[57] reinstatement of State Shinto[58] to restore imperial divine sovereignty and its legitimacy. This means, in NK's view, there has been no conclusive rupture with the past, except for war-renouncing Article 9 — a constant reminder of Japan's defeat. That's why it is of utmost importance for them to regain belligerency as the state's lost sovereign right to reclaim Japan's unbroken history.

We have reviewed the major claims of NK. Significantly, some NK members are associated with members of Zaitokukai and participants in xenophobic hate speech rallies directed at Japan's Korean population (Zainichi), which contain disturbing rhetoric and incite hostility towards disadvantaged groups.[59] Nippon Kaigi seeks to return Japan to greatness, by repurposing imperial essence, military powers, Shinto, and tradition — in a quest for imperial continuity. These gaps between NK's goals for a beautiful Japan and its offensive mindset and strategies give rise to major contradictions.

### NK's Contradictions

NK expresses hope to build a great and 'proud' nation. Although NK members have not reached consensus on what parts and how to amend the constitution, we examine three issues which the Japan Policy Institute (run by a Special Advisor to PM) identifies as priorities and the contradictions to which they give rise: 1) Article 9; 2) the provision on emergencies in time of crisis; and 3) Article 24 on family values. (For a comprehensive study, see Lawrence Repeta's work: Japan's Democracy at Risk — The LDP's Ten Most Dangerous Proposals for Constitutional Change http://apjjf.org/2013/11/28/Lawrence-Repeta/3969/article.html .)

### Article 9

NK routinely dismisses the postwar constitution as a humiliating reminder of Japan's defeat and an American imposition. NK's Miyoshi Japan's national security is jeopardized by war-renouncing Article 9, which unfairly prevents Japan from achieving the necessary conditions for a sovereign state. PM Abe also insists on adherence to a 'proactive pacifism' that would enable Japan to become a "normal country", by which he means that the Self-Defense Forces (SDF) would be a full-fledged National Army so as to protect against territorial threats by bolstering the U.S.-Japan alliance at home and abroad.

The right to collective self-defense is, however, a two-edged sword. Miyazaki Reiichi, a former Director-General of the Cabinet Legislative Bureau, argues that a state's inherent right to individual self-defense is clearly distinct from the right to collective self-defense, as the latter constitutes the right to assist and defend an ally under attack, even if Japan is not attacked. Miyazaki thus thinks that it would clearly go against Article 9.[60] Moreover, Magosaki Ukeru, a former foreign ministry official, argues that the new security legislation makes no contribution to Japan's defense or regional stability. Instead, it rather heightens regional tensions and increases the risk of increased conflict, bringing back disturbing echoes of its imperial past to neighboring countries. It also allows the U.S. to make extensive use of Japan's SDF to assist it in its costly military operations, a process likely to increase Japan's military subordination.[61]

Retrospectively, these views have proven accurate[62] in light of the Prime Minister's promise concerning the security legislature at the U.S. Congress on April 29, 2015 to be enacted in the summer, even before the bills were brought up for deliberation in the Diet. Similarly, The Stars and Stripes on May 13 of 2015 reported that the 2016 U.S. defense budget was drawn up in anticipation of Japan's passage of the military expansion bills.[63] As John W. Dower concludes, "Japan will have no choice but to become a participant in America's global military policies and practices, even where these may prove to be unwise and even reckless."[64] Abe's embrace of two allies' partnership only deepens Japan's servility as a U.S. client state, which is incompatible with the interests of national security and economic prosperity that the NK incumbents wish to pursue to rebuild a 'proud' country capable of global leadership. Similarly, rightists wish to place the U.S.-Japan relationship on an equal footing, contradicting their complacency about the U.S.-Japan alliance, particularly the U.S. military presence in Japan and the unequal Status of Forces Agreement between Japan the United States.

NK members stick to the traditional security discourse that narrowly focuses on the safety of the state. Put differently, they virtually ignore a multitude of other threats to human security, and thus fail to get security priorities right. Moreover, they simply ignore civil society initiatives as a basic alternative to military solutions when managing conflicts when discussing threats posed by other countries. During the Upper House Budget Committee session October 5, 2016, Defense Minister Inada (also a NK member) claimed that military budgets take precedence over child welfare while calling for doubling military investment.

A0155

0125

She stated: "If we use the money earmarked for child-care benefits to increase the defense budget [given limited financial resources], Japan's military spending will come close to the international standards."[65]

By contrast, Amartya Sen contends that security is ultimately a people-centered matter, hence "national security" is merely "one component of human security."[66] "Human security means protecting fundamental freedoms … It means protecting people from critical (severe) and pervasive (widespread) threats and situations."[67] Sen notes that, "sometimes national security in the political context seems like a barrier rather than a component in fostering human security. But at the same time, when we consider reducing the budget for national security, we also have to think of the other implications. There's no reason why there should be a conflict between the two."[68]

In effect, we impose social costs thanks to misplaced security priorities. Japan's important national security issues certainly include its worsening inequalities and poverty in recent years. As for the latter, roughly one out of six Japanese people live beneath the poverty line, wherein households earn less than half the median income (1.22 million yen in 2012).[69] This makes Japan's poverty rate fourth highest among the Organisation for Economic Cooperation and Development (OECD) member countries, and Japan's child poverty rate is even higher. This is at odds with Japan's declared commitment to human security, which the Prime Minister recognized in his speech at Harvard's Kennedy School in 2015.[70] As boasted, Japan embarked on the initiative on human security to demand protection from various insecurities, which was co-chaired by Sadako Ogata and Amartya Sen under the Commission in 2003 within the United Nations framework. Therefore, NK's narrative on protection of the country rings hollow, due to its narrow conception of state security as well as the NK-dominant government's lack of commitment to improving human security.

### An Emergency Clause Against Human Freedoms and Human Rights

The second elements that NK claims to change are constitutional democracy and individual freedoms. The constitution drafted by the LDP grants many new powers to the government in the event of emergencies, if so declared by the PM, to suspend ordinary constitutional processes. Simultaneously, it deletes the principles of popular sovereignty and the universality of human rights, and specifies that the exercise of individual freedoms and rights shall not violate 'the public interest and public order', in any ways this might be interpreted by the authorities (cf. the Meiji Constitution: "Freedom of speech, writing, press, assembly, and association were now guaranteed only 'to the extent that they do not conflict with the public peace and order'"[71]). If deemed as infringement, the government can hence restrict speech, press, and expression. Moreover, in compensation for freedoms and rights, the draft constitution invokes much more the individuals' duties to the state, such as respect for the national flag and anthem, defending the country stoutly, upholding the new constitution, etc.[72] Overall, NK members see democracy, human rights, and individual freedoms as Western notions, which are therefore irrelevant to Japanese characteristics and values. To them, these imported or imposed notions have to be replaced by a Japanese-specific social order and traditional priorities, grounded in the imperial institution, thereby putting national interest above individuals' rights.[73]

Needless to say, the individual's right is enshrined in the Universal Declaration of Human Rights, irrespective of citizenship or culture. NK's advocacy of limiting substantive freedoms that people enjoy, runs counter to international efforts to expand freedoms that are set out in the UN guiding principles. Specifically, it is the very opposite of human development, i.e. a shared vision of the United Nation agencies and countries, incarnated by the United Nations Development Programme (UNDP). The UNDP defines human development as enlarging people's freedoms or "reducing the unfreedoms and insecurities of various kinds that plague human lives."[74] This notion has been fruitfully developed by Mahbub ul Haq and Amartya Sen.[75]

Sen provides two major reasons to explain why freedom is so valuable, by citing two distinct yet partially overlapping contents of freedom: opportunity freedom and process freedom. He argues:

> First, more freedom gives us more *opportunity* to pursue our objectives — those things that we value. It helps, for example, in our ability to decide to live as we would like and to promote the ends that we may want to advance. … Second, we may attach importance to the *process* of choice itself (emphasis in the original). We may, for example, want to make sure that we are *not being forced into some state because of constraints imposed by others* (emphasis added)."[76]

Today's Japan tramples on both types of freedoms, and thus suffers from democratic deficits. The deprivation of basic opportunity freedom refers to widespread impoverishment (lack of freedom to achieve

0126

well-being), as discussed above. Process freedom refers to access to information, public participation in decision-making, transparency as well as free speech and media freedom. As mentioned above, NK's Murakami severely criticizes the fact that new legislation was forced through the Diet over strong public opposition, while the present government obfuscated the issues at stake. On top of that, Japan's press freedom ranking has declined sharply in recent years. In the 2010 Reporters Without Borders index, Japan (under the Hatoyama administration) ranked 11 out of 178 countries. In the 2016 index, the country ranked 72 out of 180 countries. These facts reflect deficiencies in assuring both opportunity and process freedoms by a government that represents the will of people.[77] In short, NK's advocacy of scaling back civil liberties would expose Japan to domestic criticism as well as international scrutiny over universal norms and values of democratic freedoms, human rights, and the rule of law.[78] Concomitantly, this would undermine the goal of securing a respected place for Japan's standing in the world community (cf. Japan as claimant to a permanent seat on the United Nations Security Council).

**Article 24 and Anti-Women Bias**

Finally, NK is keen to limit women's freedoms and human rights. Sugano Tamotsu, whose book titled *Nippon Kaigi no Kenkyu* (Research into Japan Conference) has been a recent best-seller, points out that NK's focus is mainly on issues of "women and children" (e.g., anti-gender equality, against woman as Empress, not to mention anti-abortion views since the earlier Taniguchi's epoch).

This leads us to look at NK's underlying biases against women. They attribute today's family-related problems (e.g. family instability) to the postwar constitution. They assert that Article 24, which affirms conjugal equality, individual choice, and mutual consent for marriage, has a noxious influence on families due to such Western individualistic nature of marriage and personhood.[79] To them, proponents of keeping separate surnames for married couples wish to dissolve marriage and family; thus, they believe that there should be a legal definition of the family to be safeguarded. (This means that their definition of the nature of the family would consequently determine the related concepts of gendered-roles within the households, marriage, and personhood of the wider society.) Since they define the ideal 'Japanese family' as three generation households with ancestral lineage and family ties, they wish to revert from the nuclear family to traditional family norms.

NK's model fits the LDP's long-held vision of "a Japanese welfare society", which gives continuing priority to economic growth over families and social protections, consigning women to family care.[80] This reflects the LDP draft, which extols and obligates traditional family values. The LDP proposed Preamble states: "The Japanese people take pride in their country and land…. they also respect harmony and form a nation where families and the whole society mutually support each other." Higuchi Yōichi, leading authority on constitutional law, argues that the wordings of "land", "harmony", "support", and "family" carry legal significance and weight within Japan's history. For the war generation, "support" evokes wartime systems of neighborhood mutual group for mandatory help and watch for the possible infractions of laws; "harmony" means subservience to the interests of the state, and "the family" stands for male-domination to revoke gender equality.[81] And, no doubt such family spirit, filial obedience, and hierarchy are a metaphor for the imperial power structure.

NK's idealized role of family is akin to the Meiji's Civil Code on the legal regulations of marriage and kinship, enforcing obligations of domestic duties, gender divisions, etc. Such familial ideal is suggestive of the *ié*, the patriarchal family system, which traditionally privileged the family head and subjected women to servitude to the ié. NK's notion reinforces patriarchal primacy to produce offspring to preserve blood lines, which is closely associated with their male-preference-primogeniture in family arrangements: male-only imperial succession.[82] NK's belief in hewing to the tradition of male emperors, however, proves simply false since there were formidable female emperors in Japan's early history.



**Establishment of "office for the encouragement of building a society in which all women shine," 2014**

Moreover, NK's willful disregard of equality between women and men is in opposition to international conventions and remedial actions for gender equality (e.g., the Convention on the Elimination of All Forms of Discrimination against Women – CEDAW). NK's obsolete traditional model of family fails to keep up with women's diverse lifestyles, families, and work styles, and does not accommodate them with viable options. On the contrary, women are roundly penalized in various forms if they do not comply with or fit the NK/LDP model of family functioning and of women's roles. Consider the facts that "about 1 in 3 women in Japan aged between 20 and 64 who live alone are living in poverty."[83] 54.6% of single parent/lone adult (overwhelmingly mothers) households containing one or more children is considered poor, living on less than half of median income.[84] Note, too, the gender disparity found in the *womenomics* initiative to promote women's advancement and empowerment in the business world under Abenomics. In the Gender Equality Bureau Cabinet Office, there is not a single woman in the photo of "a group of male leaders who will create a society in which women shine."[85] It will be difficult to build a proud and prosperous nation without overcoming Japan's deep-seated sexism and addressing women's adversities (e.g. the very small percentage of women in the Japanese parliament[86]).

In sum, NK is fraught with contradictions and theoretical incoherence. Interestingly, as noted above, certain basic discrepancies have emerged between the Abe administration and NK owing to their different emphasis and priorities. Above all, NK's reactionary efforts run counter to international efforts and international commitments to human rights including women's rights.

**Conclusions**

Nippon Kaigi is embedded in Japan's officialdom, and its influence is re-directed to mainstream political activities under Abe's stewardship. NK efforts go hand in hand with government intervention in education, declining investigative journalism, readjustment and glorification of the imperial past, nationalistic sentiments, military buildup, unilateral decisions, impositions, and initiatives at the expense of human welfare and human development.[87] Still, their efforts also include reconciling contradictions which, I think, emanate from the Janus-faced nature of their identity in handling various issues: actions/practices as opposed to intentions, separate messages for domestic and international audiences, etc. (e.g., pacifist narrative versus their opposite insular stance toward neighboring countries and affirmation of imperial Japan; different views about the role of the emperor: "the emperor on the one hand and the United States on the other, the inner and outer axes of national identity." [88]) In short, NK's revisionist practices expose problems and contradictions.

*Related articles*

1. David McNeill, Nippon Kaigi and the Radical Conservative Project to Take Back Japan http://apjjf.org/-David-McNeill/4409.

2. Hayashi Keita and Sato Kei, Japan's Largest Rightwing Organization: An Introduction to Nippon Kaigi http://apjjf.org/-Mine-Masahiro/4410

A0158

3. Muto Ichiyo, Retaking Japan: The Abe Administration's Campaign to Overturn the Postwar Constitution    0128

http://apjjf.org/2016/13/Muto.html

## Notes

1 There are 16 NK members out of 20 cabinet ministers, as of September 3, 2016; here
2 Recently published books include: 1) *Nippon Kaigi no Kenkyu* by Sugano Tamotsu, 2) *Nippon Kaigi no Zenbou* by Tawara Yoshifumi, 3) *Nippon Kaigi to Jinja Honchō* by Narusawa Muneo (ed), 4) *Nippon Kaigi* by Yamazaki Masahiro, and 5) *Nippon Kaigi no Shotai* by Aoki Osamu.
3 See their site: here
4 Sugano, 2016; Yamazaki, 2016, pp. 66-67.
5 Yamazaki, 2016, p. 68.
6 Yamazaki, 2016, p. 28.
7 See here
8 See Sugano, 2016, pp. 30-31 and here
9 Sugano, 2016; Yamazaki 2016.
10 Some observers are dismissive of Nippon Kaigi describing it as devoid of outstanding talent and resources. (At the same time, they underline its influence on politics.) Sugano Tamotsu notes that NK is built on a handful of influential nationalists. For instance, joint representatives of Utsukushii Nihon no Kenpō o Tsukuru Kokumin no Kai (National Society to Create a Constitution for a Beautiful Japan) are Sakurai Yoshiko, Takubo Tadae, Miyoshi Tōru, etc. Sakurai and Takubo serve as representatives of the Japan Institute for National Fundamentals. Many officers of the affiliated organization overlap those of NK.
11 It made it compulsory to teach "love of country" as part of school curricula, and incorporate teaching guidelines about the national anthem and flag, moral virtues, respect for the emperor, mythology, national territories and waters, importance of the Self-Defense Forces, and so on. See Sugano, 2016.
12 Yamaguchi, Tomomi. 2016. "Nippon Kaigi no target no hitotsu wa kenpō 24jyō no kaiaku" in *Nippon Kaigi to Jinja Honchō*, Tokyo: Shukan kinyōbi, pp. 172-183.
13 In an interview (in Japanese), Kabashima Yuzō talked about the NK's history and more: See here
14 See here
15 See McNeill, David: here
16 See Kato, Norihiro. 2015. *Sengo Nyūmon*. Tokyo: Chikuma shinsho.
17 Kato. 2015. *Sengo Nyūmon*. pp. 514-515.
18 Field, Norma. 1993. *In the Realm of a Dying Emperor*. New York: Vintage Books, pp. 201-202.
19 See Muto, Ichiyo: here
20 See McCormack, Gavan: here
21 See Kabashima's video: here
22 See Nozaki, Yoshiko and Mark Selden: here
23 Hashimoto, Akiko. 2015. *The Long Defeat*. New York: Oxford University Press, p. 5.
24 See Kato, Norihiro: here
25 Kato, Norihiro. 2015. *Sengo Nyūmon*. Tokyo: Chikuma Shobō, p. 433.
26 Yamazaki, 2016, p. 89.
27 See Yoshida, Reiji: here
28 Sugano, 2016; Yamazaki 2016.
29 See Sugano, 2016, Yamazaki, 2016, here and here.
30 Sugano, 2016, p. 85.
31 See Sugano, 2016, p. 52, p. 62, and his interview: here as well as here
32 Sugano, 2016, Yamazaki, 2016.
33 See Sugano, 2016.
34 Shimazono, Susumu and Yamazaki Masahiro. "Nippon Kaigi to Shūkyō Nationalism" in *Kotoba*, summer 2016, p. 139.
35 Around 30 minutes in the video here
36 See here
37 See here
38 The Rescript requested that people as "loyal subjects" of "Our Emperor" should be "filial to your parents," "as husbands and wives be harmonious," and "furthermore, advance the public good and promote common interests; always respect the Constitution and observe the law; should emergency arise, offer yourselves courageously to the State; and thus guard and maintain the prosperity of Our Imperial Throne coeval with heaven and earth." See here
39 See the June 1998 issue of *Nippon no ibuki*, p. 11, which was quoted by Yamazaki, 2016, pp. 139-140 here.
40 McNeill, David: here
41 Shimazono, Susumu and Yamazaki Masahiro. "Nippon Kaigi to Shūkyō Nationalism" in *Kotoba*, summer 2016, pp. 142-143. Yamazaki, 2016, pp. 72-74.
42 Its founder was former Chief Justice of the Supreme Court, Ishida Kazuto. See Yamazaki, 2016.
43 Dower, John. 1993. *Japan in War and Peace*. New York: New Press, p. 2.
44 Kataoka, Nobuyuki. 2016. "Jinja no nottori jiken" in *Nippon Kaigi to Jinja Honchō*, Tokyo: Shukan kinyōbi, p. 141.
45 See the list created by Yamazaki Masahiro: here
46 Such groups include Yasukuni Shrine, Ise Shrine, Reiyūkai (靈友会 Spiritual-Friendship Association), Sūkyō Mahikari (崇教眞光), Makuya of Christ (キリストの幕屋), Gedatsu-kai (解脱会), The Institute of Moralogy (モラロジー研究所), Rinri Kenkyūshō (倫理研究所, Institute for Ethics or Ethics Study Group), and the like.
47 See here
48 Dower, John. 1999. *Embracing Defeat*. New York: New Press, p. 307.
49 Shimazono, Susumu. 2016. "Jinja to kokka no kankeiwa dō henka shitaka" in *Nippon Kaigi to Jinja Honchō*, Tokyo: Shukan kinyōbi, p. 121.
50

A0159

0129

Yamazaki, 2016, p. 127.

51 Dower, John. 1999. *War Without Mercy*. New York: Pantheon Books, p. 24.

52 See here

53 Yamazaki, 2016, pp. 164-165.

54 Muto, Ichiyo: here

55 See Bix, Herbert P.: here

56 See my working paper: here

57 For example, political scandal over Renhō's dual citizenship: See Murai, Shusuke: here

58 For instance, Yasukuni pilgrimage, tour to Ise Shrine on the occasion of the G7 in 2016.

59 Sugano, 2016.

60 Miyazaki, Reiichi. 2014. "Kenpō 9 jo to shūdanteki jieiken wa ryōritsu dekinai," *Sekai*, August. Tokyo: Iwanami shoten, pp. 148-154.

61 See Magosaki's interview by Iwakami Yasumi: here; Magosaki Ukeru and John Junkerman, Japan's Collective Self-Defense and American Strategic Policy: Everything Starts from the US-Japan Alliance here

62 See McCormack, Gavan: here; Recently, for example, large SDF transport helicopters have been carrying construction equipment into the planned site of the U.S. military helipad in Takae, Okinawa. See here

63 See Slavin, Erik: here

64 See Dower, John: here

65 See Editorial: here

66 See here

67 See here

68 See here

69 See here

70 See here

71 Dower, John. *Embracing Defeat*. p. 381.

72 See Lawrence Repeta's work on the LDP draft constitution: here

73 See the Japanese videos: here and here 1) Inada Tomomi: "I think that such politics placing the people's life first is wrong." 2) Former Minister of Justice, Nagase Jinen: "The people's sovereignty, basic human rights, and pacifism — these three are the postwar regime itself imposed by MacArthur on Japan, therefore we have to get rid of them to make the constitution on our own." Their brazen remarks make clear their disinterest in achieving social improvement and prosperity for the public.

74 Sen, Amartya. 2005. "Principal Voices," in *TIME magazine*, November 21, p. 13.

75 See here

76 Sen, Amartya. 2009. *The Idea of Justice*. Massachusetts: The Belknap Press of Harvard University Press, p. 228.

77 See here

78 See McCormack, Gavan: here

79 Yamaguchi, Tomomi. 2016. "Nippon Kaigi no target no hitotsu wa kenpō 24jyō no kaiaku" in *Nippon Kaigi to Jinja Honchō*, Tokyo: Shukan kinyōbi, pp. 172-183.

80 See Osawa, Mari. 2011. *Social Security in Contemporary Japan*. New York: Routledge / University of Tokyo Series

81 Higuchi's interview by Iwakami Yasumi: See here

82 For example, see Fukushima Mizuho's work on marriage and family.

83 Aoki, Mizuho: See here

84 See here

85 See here

86 See: here

87 See here

88 McCormack, Gavan: See here

Created by DataMomentum

A0160



0130

## WORLD

HOME    UK    US    WORLD    CHURCH    SOCIETY    LIFE    ENTERTAINMENT    COMMENT

**LATEST:**    These 4 reasons are why youth workers are leaving the church    ◀ ❚❚ ▶

# Hidden Christians: How Japan tried and failed to exterminate Christianity



**Mark Woods**    MANAGING EDITOR    Published 18 September 2015 | 12:40 PM

Share on Facebook    Share on Twitter    Pin it    Next Post >>





A 16th-17th centuryJapanese painting entitled 'Japanese Christians In Portuguese Costume'
| Wikipedia

Underground Christians kept the faith in Japan during 300 years of often brutal persecution – but their story is barely known in the Western world.

Now the 'Hidden Christians' are being recognised in an exhibition showcasing the moving story of Christians who remained true to their faith without priests, seminaries or churches.

The Vatican Library and Secret Archives contain testimonies of Christians who between the 16th and 19th centuries lived under violence and humiliation.

Collected by Fr Mario Marega, a missionary to Japan in the early 20th century, letters and documents written on fragile rice paper have been recently restored by the Vatican archives and library.

The Hidden Christians story begins when Christianity was first brought to Japanin 1549. A thriving Church grew up. However, persecution broke out under the ruling Shogun Toyotomi Hideyoshi, who was alarmed by the report of a Spanish captain whose vessel was shipwrecked. In an effort to impress the Japanese, the captain claimed that the missionaries were there to prepare the way for a European conquest. On a winter's morning in February 1597, 26 Christians were crucified.

Advertisement

Hidyoshi's successor Tokugawa Ieyasu decided to eliminate Christianity from Japan altogether. A Protestant English trader, Will Adams, told the Shogun about the religious wars that were ruining Europe and laid the blame on the Catholic priests. In 1614 an edict of expulsion declared that "the Kirishitan band have come to Japan...longing to disseminate an evil law, to overthrow true doctrine, so that they may change the government of the country and obtain possession of the land" (CR Boxer, *The Christian Century in Japan*). At this point there were an estimated 300,000 Christians in the country, with Nagasaki described as 'The Rome of Japan' for the number of Christians there.

Under Iemitsu, appalling cruelty was used against Christians. One English witness described seeing 55 people including women and children burnt alive. Christians among the spectators sang hymns

0132

and psalms as they burned. Seeing that martyrdom was embraced by Christians, Iemitsu turned to torture.

A favourite method was to hang Christians in a pit half full of excrement, leaving one arm free so that the sign of recantation could be made; most survived only a day or two, though one young woman lived for two weeks. In 1632 the Christian cause suffered a heavy blow when the Portuguese Provincial missionary, Christovao Ferreira, apostasized after six hours in the pit and began to collaborate with his former persecutors.

Imietsu forbade missionaries to return to Japan. Some tried, including a group of 10, captured in 1643 and tortured into denying their faith. A Dutch eyewitness wrote that they "looking exceedingly pitiful, their eyes and cheeks strangely fallen in; their hands black and blue and their whole bodies sadly misused and macerated by torture".



Among methods used to determine whether someone was a Christian was the "fumie", a picture of Jesus or the Virgin Mary on which suspected Christians were ordered to trample. If they refused or were hesitant it was taken as sign of guilt. Many are preserved at the Ueno Museum in Toyko, rubbed flat by the trampling of thousands of feet. The fumie is at the heart of Shusako Endo's famed novel *Silence*.

Up to 6,000 martyrs may have died between 1614-1640 alone, and for many years the Church was presumed extinct. However, in 1865, after Japan had been forced to open its borders to foreign trade and foreign residents, villagers from a village near Nagasaki visited a new Catholic church built by the Paris Foreign Missions Society. They told the priest that they and their families had maintained Christian worship in secret for 250 years. Their prayers contained smatterings of old Portuguese and Latin and they had preserved old rosaries that belonged to their martyred fathers.

A 17th century netsuke depicting Christ.
| Wikipedia/Musee Guimet

It was later found that tens of thousands of believers survived. Pope Pius IX called it a miracle.

  

# Exhibit 2

University of Pennsylvania
Carey Law School
3501 Sansom Street
Philadelphia, PA 19104-6204
Tel. (215) 573-6400
efeldman@law.upenn.edu

Eric A. Feldman, J.D., Ph.D
*Heimbold Chair in International Law*
*Professor of Law*
*Professor of Medical Ethics & Health Policy*
*Deputy Dean for International Programs*
*Chair-Elect, Faculty Senate*

To:     Michael Sellers, John Brown Associates
From:  Eric A. Feldman
Date:   April 13, 2023
Re:     Expert Opinion on Japanese Criminal Procedure
          *In the Matter of the Extradition of Masahide Kanayama*

My name is Eric A. Feldman and I hold the Heimbold Chair in International Law at the University of Pennsylvania Law School, where I am also the Deputy Dean for International Programs. I have been asked by Michael Sellers of John Brown Associates to prepare this document on behalf of the Law Offices of David M. Dudley. I have not previously worked on this case (*In the Matter of the Extradition of Masahide Kanayama*), and I make no representations as to the particular facts of the case.

I submit the following factual statements to the court on the basis of my expertise in the Japanese legal system. That expertise rests on my graduate work at the University of California, Berkeley (both JD and PhD) focused on Japanese law, 3.5 years living in Japan doing research for a PhD thesis on the Japanese legal system, more than 25 years teaching about the Japanese legal system at the University of Pennsylvania Carey Law School, New York University School of Law, Stanford Law School, Georgetown University Law Center, lectures on Japanese law in several continents, and regular research trips to Japan. My statements below represent my best efforts to distill clear, objective, factual information about criminal procedure in Japan so as to enable the court to understand how individuals are treated from arrest through conviction.

**Arrest**

When police or prosecutors ask a judge to issue an arrest warrant in Japan, their request is rarely refused. As CCP Article 199(1) makes clear, law enforcement officials can only obtain an arrest warrant from a judge if there are reasonable grounds to suspect that the individual in question committed a crime. The standard is similar to probable cause in the US, but generally more lenient; under CCP 199(2), judges are prohibited from issuing warrants only "where the judge deems that there is clearly no necessity to arrest the suspect." In 2021, of 74,992 arrest warrants requested at district and summary courts across Japan, 73,832 were issued, 43 dismissed, and 1,047 withdrawn, a dismissal rate of 0.06%
(01_Number_of_arrest_warrants_requested_or_issued.pdf (courts.go.jp)). In short, the system in

1

Japan largely operates as arrest warrant on demand, with very few cases in which courts refuse to issue a warrant.

Social stigma surrounding arrest in Japan has led police to find ways of questioning suspects without arresting them. In what is known as 'voluntary accompaniment,' police often coax suspects to submit to questioning in the absence of an arrest warrant, even though they could almost certainly succeed in obtaining a warrant through a showing of probable cause. They may do so by inviting suspects to have a casual chat, or asking them about a crime they say someone else committed, or perhaps threatening them with arrest if they won't show up at the police station voluntarily. There has been significant debate in Japan about the 'voluntary' nature of these interactions, but they continue unabated.

### Detention

In Japan, suspects who are arrested but not yet charged can be detained and questioned for 23 days, first by police, then by prosecutors. Under Article 203 of Japan's Code of Criminal Procedure (CCP), individuals who are arrested can be detained by the police for up to 48 hours. They must then either be released or be referred to a public prosecutor with the evidence the police have so far collected. Article 205 of the CCP enables prosecutors to hold suspects for an additional 24 hours. After this initial 72-hour period (48 hours + 24 hours) prosecutors must either release the suspect, institute prosecution, or request authorization from the court for additional detention. Courts almost always grant detention requests. According to the 2021 White Paper on Attorneys (https://www.nichibenren.or.jp/library/en/about/data/WhitePaper2021.pdf), requests are granted in over 95% of cases. Decisions about pretrial detention are made by judges who review a case file provided by prosecutors. Suspects and their counsel have little to no input on the file's contents. Judges typically determine that detention is appropriate based upon an assessment of the suspect's flight risk, crime risk to the community, or risk of tampering with case evidence. Once the court determines that detention is justified, Article 208 of the CCP allow prosecutors to detain suspects for 10 days. At the end of those 10 days prosecutors can request an additional 10 days of detention, which is routinely granted. In total, therefore, suspects can be detained and questioned for 23 days before they are formally charged with committing a crime.

During these 23 days of detention suspects are generally kept in police station holding cells and are under regular surveillance. In many cases they are not permitted to see their families. If prosecutors desire to question a suspect beyond the 23-day detention, they can have the suspect rearrested for a different offense (*bekken taiho*) and the 23-day process begins again. In essence, 23 days is the floor; detention can continue for much longer, especially for those who maintain their innocence or simply remain silent. In such cases, even when a suspect is indicted and requests bail, judges often refuse their bail request. When that happens detention can last months, or even years.

**The Right to Counsel**

Although the right to counsel is enshrined in Japan's constitution, in practice there are significant limitations on how it is exercised. Article 37 of the Constitution of Japan states that "In all criminal cases the accused … shall have the assistance of competent counsel who shall, if the accused is unable to secure the same by his own efforts, be assigned to his use by the State." Until a suspect is formally charged, however, the right to counsel is limited. Although Article 34 of the Constitution guarantees the right to counsel after arrest and before indictment, it says nothing about the state's obligation to pay attorney fees. As a result, until 2006 most criminal suspects had no legal counsel while they were being interrogated by police and prosecutors during their 23-day detention. Undergoing intense interrogation without counsel led most suspects to confess, leading almost inevitably to conviction.

In 2004 the Japanese Parliament (Diet) passed the Comprehensive Legal Support Law, which created the Japan Legal Services Center (JLSC, generally known as Hō Terasu). Since 2006 the JLSC has provided free legal services to those who cannot otherwise afford them, including criminal defendants. Unfortunately, two critical needs of criminal suspects are unmet by the JLSC. First, because JLSC attorneys are appointed only after suspects are formally detained, suspects can be held and questioned for up to 72 hours before they meet a JLSC attorney. In other words, there is no right to a court-appointed attorney until court-authorized detention, which may not occur for the first 72 hours after arrest.

Second, and most significantly, the right to counsel during interrogation is sharply limited by Article 39 of the CCP, which provides prosecutors with the discretion to refuse attorney requests to speak with their clients. This practice has been challenged in the Supreme Court of Japan as a violation of the right to counsel, but the Court has been unreceptive, arguing that the right to counsel is not absolute but must be balanced against the necessity of criminal investigation (Judgment of the Supreme Court, Grand Bench, March 24, 1999, https://www.courts.go.jp/app/hanrei_en/detail?id=433). Even when detained suspects are permitted to meet with their attorneys, prosecutors can determine the time, location, and duration of those meetings, which in practice means that such meetings are generally short and infrequent.

**Interrogation and the Right to Silence**

The right to silence in Japan is often of limited value to criminal defendants, who are sometimes not informed of the right and frequently forced to endure intensive interrogation even if they invoke the right. Under Article 198(2) of the CCP, which says that a suspect is not obligated to make statements or answer questions "against his/her will," suspects in Japan have the right to remain silent. However, the right to silence is compromised by CCP Article 203, which requires police to inform suspects that they can provide an explanation about their alleged crime. In cases in which suspects are invited to provide an explanation but not informed of the right to remain silent, the Supreme Court has said that a suspect's explanatory statement can be used as evidence. Even the more wholesale failure to inform a suspect of the right to remain silent has not been found by the Supreme Court to be a constitutional violation. In practice, this means that confessions are likely to be considered voluntary and admissible, even when obtained from suspects who were unaware of their right to silence.

3

A0167

Suspects who avail themselves of the right to silence and refuse to answer questions must still submit to intensive interrogation. Sometimes they are forced to sit for hours on end while prosecutors question them, yell at them, and press them to confess to their alleged crimes, all without the presence of counsel. The longer suspects hold out, the greater the pressure applied by prosecutors who are intent on securing a confession. For this reason, Japan's criminal justice system has sometimes been referred to as "hostage justice (*hitojichi-shiho*)." The right to silence is rendered a formality that in too many cases is honored in the breach.

### Confession:

Obtaining a confession from criminal suspects is the chief goal of Japan's public prosecutors. Suspects are informed of the right to silence only once, at the outset of questioning. During subsequent interrogation sessions during their detention, it goes unmentioned. After multiple days of interrogation, most suspects eventually speak. When they do, they most commonly confess. Under Article 198(3, 4) of the CCP, confessions can be recorded in a written statement that is then either read by or read to the suspect for verification and signed if affirmed. After days of long questioning and hearing a statement that is quickly recited to them, suspects often sign statements without full cognition of their content.

The emphasis on confession in Japan has its roots in the Chinese legal system, and in Tokugawa Japan (1600-1868) confessions were necessary for conviction and punishment. In contemporary Japan, prosecutors place great weight on confessions and make use of their power to extract confessions from criminal suspects. Japan's focus on confession has corollaries in other legal systems. Criminal procedure in China currently relies on a 'plea leniency' procedure that incentivizes defendants to plead guilty as charged in order to reduce their sentences. This results in a conviction rate of 99.9% and is controversial because it can be manipulated and abused by the police, prosecutors, and courts, thereby infringing on defendants' rights. Plea bargaining in the US serves a similar purpose by pressing defendants to plead guilty to a lesser charge in an effort to obtain a lighter sentence, a process followed in over 97% of federal cases. All three countries have what is in effect a 'trial tax,' ie, the threat (and likelihood) of a harsher punishment for defendants who refuse to plead guilty. What distinguishes the Japanese case is that prosecutors can subject suspects to harsh questioning while denying them access to counsel, thereby depriving suspects of their constitutional rights and potentially leading to false confessions. Nonetheless, a confession once obtained is the gold standard in Japan, and the absence of due process protections is generally overlooked.

### Conviction:

Criminal defendants stand little chance of acquittal once their case makes it to court. The success rate of Japanese prosecutors is notoriously high, consistently above 99%. One might infer from the data that almost no criminal defendants prevail at trial. For those who confess, that is true. Even for those who contest their guilt, the situation is only slightly less dire. Japan's well-publicized 99% conviction rate is a measure of convictions in all prosecuted cases, including those in which defendants plead guilty. If one looks only at the conviction rate in contested

cases, ie, those cases in which defendants maintain their innocence, Japan's conviction rate falls to 96%. The comparison to the US is instructive. As in Japan, prosecutors in the US have an almost unblemished record when it comes to convicting criminal defendants in uncontested cases. In contested cases, however, the conviction rate in the US is 83% (with some variation across jurisdictions). Put another way, defendants who maintain their innocence and go to trial are four times more likely to be convicted in Japan than in the US. For those who proclaim their innocence in Japan, the 96% conviction rate is a stark reminder that their protestations are unlikely to lead to acquittal.

A0169

# Exhibit 3

# Masahide Kanayama, MD
### Curriculum Vitae

**CURRENT POSITION**

Director
　　The New York Endometriosis Center
　　Advanced laparoscopy andendometriosis treatment New
　　York, NY
2.　American board of Ob-Gyn certified specialist
3.　Clinical assistant professor
　　Department of Ob-Gyn and Reproductive Sciences Mount
　　Sinai School of Medicine, New York, NY
4.　Visiting scientist and investigator
　　Department of Cancer immunology and Gynecologic Pathology The
　　Johns Hopkins University School of Medicine
　　Baltimore, MO.

Office address: 150 East 55th street, 5th floor, New York, NY 10022 Telephone:

1-212-421-1016,  Fax: 1-212-421-1019

E. mail: masahide.kanayama@gmail.com

Web site: www.Gynecosurgery.com

Citizenship: Japan, permanent residence holder in the United States

**EXPERIENCES**

1.　1999 to current
　　Director, New York Endometriosis Center New
　　York, NY
2.　1997-1999
　　Mount Sinai School of Medicine, Assistant professor of Obstetrics and Gynecology
　　Mount Sinai Medical Associates, Assistant attending
　　New York, NY

A0171

**EDUCATION, RESEARCH, AND TRAINING**

I.   Residency and postgraduate clinical training
     1991-1995     Mayo Graduate School of Medicine
                   Mayo Clinic
                   Rochester, Minnesota, USA.



          Advanced laparoscopic surgery and gynecologic oncology trainings
          Under Dr. Karl Podratz, Dr. Raymond Lee, and Dr. Maurice Webb.

          Recognized as the teacher of the year in 1993 and 1994 by Mayo Medical
          School.

II.   Medical School
      Medical College of Wisconsin, Milwaukee, WI MD
      conferred in 1991.

Ill.  Research fellowship
      1988-1989 the National Cancer Center Research Institute Tokyo,
      Japan
      Division of molecular genetics, Lab of Masaaki Terada MD.

IV.   Undergraduate education
      1981-1985 Creighton University College of Arts and Sciences
                   Omaha, NE, USA
                   BS degree in chemistry and Honors program "magna
                   cum laude" graduate, May 1985.

V.    High school education
      1978-1981 Komaba Toho High School Tokyo,
                   Japan
                   High school diploma, March 1981

VI.   Research collaborations (Dr Robert Kurman and Dr TC. Wu's labs)
      Department of Gynecologic pathology and cellular immunology, The
      Johns Hopkins University School of Medicine, Baltimore, MD.

A0172

**BOARD CERTIFICATION**

Diplomat, American Board of Obstetrics and Gynecolgy (ABOG)

**MEDICAL LICENSURES**

1. The National Board of Medical Examiner Certification
2. The State of Minnesota medical license
3. The State of New York medical license
4. The State of Connecticut medical license

Professional Affiliations:

1. American Associations of Gynecologic Laparoscopists
2. American college of Obstetricians and Gynecologists
3. Society of Laparoscopic Surgeons
4. International Society of Gynecologic Endoscopists
5. European Society of Human Reproduction and Embryology, A panel section on endometriosis and endometrium
6. American Medical Association
7. Minnesota Ob-Gyn association, Minnesota Medical Society
8. Mayo Alumini Association
9. Doctors Mayo Socirety
10. Japanese Medical Society (USA chapter, New York section).

**RESEARCH, PUBLICATIONS, ARTICLES, ABSTRACTS, AND PRESENTATIIONS**

1. "Rat Luteal Angiogenesis: primary characterization."
   J. Rone, MD.Kanayama, AL.Goodman
   Abstract and oral presentation in 1998 Annual International Endocrine Society Atlanta, GA, USA.

2. "Detection of a neuron-specific 9.0 kb transcript which shares homology with the antisense GAG genome of HIV-1 from both normal and AIDS individuals." TC.Wu, MD.Kanayama, R. Hruben, W. Whitehead, B. Raj

A0173

Am. J. Pathol.  1993, Jan. 142(1);25-31.
Presentation at 1992 US and Canadian Academy of Pathology meeting.

3.  "In situ hybridization of HIV-1 by a riboprobe generated from the GAG gene of HIV-1"
    MD.Kanayama,TC.Wu, W.Whitehead, B.Raj Modern
    Pathol. 1992, Jan 5(1);109
    Oral presentation at 1993 Annual Minnsota Ob-Gyn Society Meeting

4.  "Virus-associated RNAs (VA-1 and VA-II): an efficient target to detect adenovirus
    infection by in situ hybridization."
    TC.Wu, MD.Kanayama,R.Hruben, W-C Au, FB.Askins, GM.Hutchins Am. J.
    Pathol. 1992. April 140 (4); 991-998

5.  "Detection of adenovirus VA-I and VA-II in adenovirus-associated
    meningoencephalitis,enteritis, cystitis, hepatitis, pneumonia by RNA in situ
    hybridization."


    TC.Wu, W.Chou, MD.Kanayama, W.Fork, R.Hruben, GM.Hutchin Modern
    Pathol. 1994, Jan 7 (1); 128
    Presentation at 1994 US and Canadian Academy of Pathology Meeting
    Montreal Canada

6.  "Localization of Epstein-Barr Virus encoded small RNAs (EBER-1) by in situ reverse
    transcription: first successful generation of cDNA in the tissue section." TC.Wu,
    Y.Ling,  MD.Kanayama,P.Charache, RJ.Kurman
    J. Biomed. Sci.  1995 Feb (2); 249-255.
    Oral presentation at 1995 US and Canadian Academy of Pathology Meeting. Berlin,
    Germany

7.  "Preventive and Therapeutic Vaccines for Human Papilloma-virus-associated
    cervical cancers."
    M. Ling, MD.Kanayama, R.Roden, TC.Wu
    J. Biomed. Sci,  2001 7(5); 341-356.

8.  "Detection of low copy HPV in basal cells of cervical lesions by a novel in situ
    hybridization."
    MD.Kanayama, CC.Huang, ML.Kashima, TC.Wu

A0174

Presentation in the First International Congress of Human Paillomavirus infections and cervical cancer, Quebec, Canada.

9.  "Cardiac myocytes do not undergo programmed cell death in heart allograft rejection: failure to identify apoptotic cells by in situ end labeling of nuclear DNA fragments."
    TC.Wu, MD.Kanayama, R.Hruben, GM.Hutchin, RJ.Kurman
    Modern. Pathol. 1994 Jan, 7(1):32.
    Presentation in 1994 US and Canadian Academy of Pathology Meeting
    Monteal, Canada.

10. "Constriction of the umbilical cord by an amniotic band, with fetal compromise illustrated by reverse diastolic flow in the umbilical artery; successful intervention."
    MD. Kanayama, TA.Gaffey, PL.Ogburn, Jr.
    J. Reprod. Med. 1996 Jan. 40(1); 71-73.

11. "Free fatty acids levels in normal pregnancy: prospective studies"
    MD.Kanayama , J. VanWinter, PL. Ogburn, Jr.
    Am. J. Obstet. Gynecol. 1996, June 174(2);375.
    Presentation at the 1996 Annual Society of Perinatal Obstetricians Meeting,
    Kona, Hawaii.

12. "Deficiency of n3 and n6 fatty acids in pregnancy:time courses and effect of antioxidant nutrients."
    KB.Schwarz, J.Cox, S.Sharma, TH.Risby, PL.Ogburn, J.VanWinter,
    MD.Kanayama,D.Bibs, RT.Holman.
    J. Nutr. Envir. Med. 1999, (8); 335-344.

13. "Rapid identification of HPV DNA subtypes by application of the reverse dot blot hybridization"
    MD.Kanayama, JT.Chen, GS. Hsue, MJ. Borowitz, RJ.Kurman, TC.Wu Abstract presentation at 2000 InternationalPapillomavirusMeeting San Francisco, CA.

14. "Advanced laparoscopic treatment of DIE (deep infiltrating endometriosis) for chronic pelvic pain and infertility by novel reverse excision technique: primary report. Of 262 cases"
    MD. Kanayama
    Oral and abstract presentation at 2010 EPS international Obstetrics and Gynecology Summit, Nanjing, China








# Exhibit 4

# Handwritten Testimonials





Dr. Kanayama + Staff,

Wishing you all the smooth the season can bring.

Our family cannot express deep, heartfelt care + gratitude for your warmth and personal care for Cassandra. She is doing so good, confident and alive! Thank you being there for the time! Cassandra's Family

---

Season of Kanayama,

I am pleased to give you a small card as my true appreciation for giving me back my left. I feel nothing now. Thank you and God for me. The message was sent for the youth for appreciate all the youth for all you do to help so many people. Thank you again, God bless you and always.

Best regards,
Tammy Nura

---

Dr. Kanayama + staff,                    12/9/12

As you know, due to your skillful hands + impressive knowledge of the female body, my husband + I were able to conceive our first child in April. We cannot express our thanks to you enough for making this miracle a reality, and therefore wanted to share this with you. Both announcement coming soon!

Blessings, The Kirb's

---

Dr. Kanayama,

Our precious daughter was born 5.29.11. We are thankful for you diagnosing my endometriosis to help heal my infertility problems. Thank you. May God continue to bless you.

Tom & Edna Kim

---

Dear Dr. Kanayama and Sabrina,

Thank you very much for helping us have this beautiful baby boy. The entire office was always

SEASON'S GREETINGS!

PROUD PARENTS:
KINGA AND GREG

Professional and friendly. We will continue to refer our friends. Best wishes for a great 2011! Thank you!

---



Sending friendly wishes for a happy holiday!

May you have a very Merry Christmas and wonderful new year! 2011 !! May your holiday be filled with good times!

Love,
Brandi Gummo

---

Dear Dr. Kanayama,

I hope all is well with you during this time of the year! Christmas is the promise of Peace and Hope in the world. May the peace and hope of Christmas be yours! It has been about 3 months since my surgery, and I have never felt this great in a very long time! You ARE a miracle worker! I can not Thank you enough for all you've done for me. I will actually be able to enjoy this holiday season PAIN FREE !! It also means a lot to me that you are willing to help my family and I fight the insurance company to get our money back. If only there were more doctors out there like you, we would All be so much better then. Again, Thank you with the bottom of my heart for changing my life around for the better and giving me my life back.

Thank You! Thank you! Thank you

---



---



With sincere appreciation and warmest thanks to you.



# Instagram Testimonials



newyorkendometriosis    Following ⌄    Message    +⌖    •••

371 posts    86K followers    72 following

**Kanayama Endometriosis Center**
M Kanayama MD., Endo-Adeno sub-specialist, Mayo grad, Novel laparoscopic haptic-endo/adeno excision ☎212-421-1016, All ye are weary & heavy laden
www.gynecosurgery.com

**Dr. Kanayama's Instagram site has 86,000 followers — an extraordinary indication of just how compelling his unique capability to treat advanced stage endometriosis is. The pages of the site are filled with testimonial posts from patients as well as encouragement from Dr. Kanayama.**

**On the following pages are additional testimonials and messages from patients that have been posted on Dr. Kanayama's Instagram site.**

A0182



# 11 Year old girl with advanced endometriosis successfully treated by Dr. Kanayama

 



10:59 ● ▯ ▯ ▯ ▯ ●                    📶 5G⁺ 35% ▮

← **Notifications**                                    Filter

**coachfabiolarodriguez** mentioned you in a reel: Eleven year old, Lina has been suffering from endometriosis pain since she was 9 years old. She has gone to several doctors and specialists in search of answers. They never thought of "endometriosis" because of her age. Without any diagnosis made, she was placed on various hormones, injections and patches. Her mother, @3genendowarrior has stage 4 endometriosis and has had 10 surgeries to date. Her daughter, Lina is now 3rd generation with this disease. We can clearly see there is a genetic component to endometriosis. @3genendowarrior has been

searching high and low for the right doctor and after being disregarded for so many years she found Dr. K, at @newyorkendometriosis . She credits him for saving her daughters life. Lina's organs were completely moved and in the wrong spots due to the pulling of endo adhesions. If she continued to go untreated the affects could have been fatal. After her surgery Dr. K, said "she must have been in a tremendous amount of pain, it was like a monster growing inside of her."

For the first time Lina, will get to share her story! If you or someone

searching high and low for the right doctor and after being disregarded for so many years she found Dr. K, at @newyorkendometriosis . She credits him for saving her daughters life. Lina's organs were completely moved and in the wrong spots due to the pulling of endo adhesions. If she continued to go untreated the affects could have been fatal. After her surgery Dr. K, said "she must have been in a tremendous amount of pain, it was like a monster growing inside of her."


    



fernandaferrara_br



@newyorkendometriosis



 fernandaferrara_br 14 months of trying, 2 surgeries (1 being unsuccessful) and lots o praying later here we are. I was told the pain was normal, I was told I needed IVF, I was told I needed a hysterectomy, I was told "it can't be that bad." I knew all that wasn't it, I knew God had a plan, and he did. He guided me to the most amazing specialist. @newyorkendometriosis believed me, he knew what I was feeling, he knew how bad it was, he knew he could change my life; and he did. My surgery was June 12th. Got pregnant about a month later (will talk about that in stories soon). In his words "this is a miracle" and it is. Thanks to him I am 11 weeks pregnant, happy and probably the healthiest I've ever been. So don't give up, if in your heart you know there's something unexplained keep searching. Get 3, 10, 20 opinions if needed be. In the end only YOU know what's right!
#endometriosis #endowarrior #endosisters #pregnant #11weekspregnant #ultrasound #beleiveinyourself #surgery #godsplan #yourenotalone #1in10 #wecanhelp
1h



jes_lambiase_fitness



2/6

jes_lambiase_fitness I am so excited to write this post, as I am on the other side of my excision surgery for Endometriosis! I was diagnosed with stage 3+ Endo. Dr.Kanayama meticulously found and removed around 70 lesions of the disease! 70!!! Some were extremely deep and most were in very painful locations.

First, I can't say enough about Dr.Kanayama. He is the most skilled surgeon and the kindest man. I haven't met another Dr. That cares so deeply about his patients... he has made it his mission to help women like me and spread awareness for Endo and how it should be handled. He's also the first Dr. ever that said "I don't recommend any medications". I've been dealing with this disease, searching for answers and help for a very long time. I even had surgery in October with a reproductive endocrinology that looked around, told me I was fine and sent me home. My symptoms only got worse, that lead me to make an appointment with @newyorkendometriosis . I've never felt so heard or validated!! None of this was in my head. The worst of my "every day" pain was in my right lower abdomen and hip shooting down behind my knee, my lower back/tailbone and bladder. The pain ranged from a deep ache to shooting/stabbing pain. I also suffered from severe abdominal distention, brutal cramps, extreme fatigue, depression, nausea etc. At my post op appointment we sat and reviewed a TON of photos where he showed me every point of Endo, where he removed and how it related to my symptoms.

# Dr. Kanayama as Featured Speaker, Panelist







**"Dr. Kanayama's success rate for stage three patients is 92%...the chance my endometriosis will return after five years is only 8%. This incredible doctor has given me a chance for a pain free life!"**

I sought out a second opinion when my first surgeon recommended botox injections with physical therapy, treatments I knew would only address my symptoms and pose a serious risk to my health. I decided to go to the best in the business: Dr. Masahide Kanayama at @NewYorkEndometriosis Center. He was able to remove all of the endometriosis and provide me with the correct diagnosis of stage three.

Dr. Kanayama's success rate for stage three patients is 92% – the chance that my endometriosis will return after five years is only 8%. This incredible doctor has given me a chance at a pain-free life!

I AM BEGGING YOU to pursue proper diagnosis and treatment for this horrible disease. There is hope out there! Your pain is real and not worth living with. I am an #endowarrior and I AM STRONG.



marking 7 weeks post op thanks to the wonderful @newyorkendometriosis ..with only 3 incisions a few mm big (both sides of bikini line plus belly button) - he was able to excise the endometriosis that attacked my body and fix every bit of damage from my previous surgeon. It's still a very long road ahead but I have not felt an ounce of endometriosis pain for the longest time now thanks to Dr Kanayama and his skill set!! While I thought my last 2 surgeries would be successful and I put all my trust into that team who would later put me through hell and back - through a lot of medical malpractice that caused more damage than good, to being denied access to the treatment I knew I needed, this round and experience with a true specialist who wants the absolute best for patients has been 100% different and it is slowly giving me my life back. While there is no cure, there is still some hope left 🙏

and yes, I do have heating pad burns all over my stomach which is the unfortunate and cruel reality of living a lifetime with endometriosis that attacks your major organs .. when they say this is one of the top 10 most painful and debilitating diseases out there, they ain't lyin

A0186











**meghantreine16**  2w

I have been suffering with endometriosis for over 20 years. The pain is fierce, relentless, and feels like your insides are being rip apart with barbed wire or broke glass.

After going to 3 doctors and having 2 surgeries, I have been told:

- [ ] I don't need to come off the birth control pill and I could stay on it through menopause.
- [ ] The migraines are normal and to take meds
- [ ] My appendix is inflamed and needs to be removed
- [ ] Hysterectomy was my only option

Each time I challenged the doctors solutions, they offer no other options.

These options did not resonate with me. As I always felt that there just has to be another way that would allow me to be pain free and keep my uterus, ovaries and other parts.

As I kept doing research, I found a Dr. Kanayama at New York Endometriosis. After reading about him and learning his method on how to treat endo. I made my appointment to see him. He educated me on what my previous doctor did and informed me of how I was misdiagnosed.

My previous surgeries burned my endometriosis which made it spread like wildfire. This process caused more endo to













❤️ 💬 ✈️ 　 🔖

👥 Liked by **msmarissarae** and 73 others

**lyme_for_a_time** Surgery was a success!!! Let me start with the @greenwich_hospital it was amazing. Everyone was so kind, from the pre-op phone calls to the post op care. I was given a paper gown which was hooked up to a lovely machine that inflates your gown with warm air. I seriously haven't ever been that relaxed before surgery. Dr K was of course very kind and there to answer any last minute questions. In the operating room he oversaw every step and came to my side, placed his hand on my shoulder and told me he would take good care of me. In the moment prior, I was starting to feel the reality of what was about to happen but Dr Ks compassion calmed me right down. Skip to post op appointment, Dr K showed me all the pictures and explained in detail what he found, how he excised it and why that would enable the best healing possible. My family and I were stunned at everything he found and removed. One adeno-fibroid in particular was half the size of my uterus. It took 50-60 excisions to remove it laparoscopically. That alone shows you his patience and dedication to your healing process. Also I



just physical. For me, my hardest part of healing has been m...

I feel like decades of good or bad choices, incidences, circumstances and everyday life leaves some kind of stored mark on our bodies. This surgery not only was to help release my organs from being stuck together but it also released old stored trauma from emotional situations.

The birth control pill masked my pain so well for the last decade I didn't have to deal with the severity of what was growing inside of me.

After couple of years of other pressing health issues, I finally got the opportunity to address my endometriosis.

One of the emotions I'm most proud of is my courage. The courage to not accept the prior 3 doctors medical options and to keep searching for what I believe was best for me. Not only did I find the right doctor, but I found THE BEST DOCTOR.

Dr Kanayama gives 110% to his patients. He is the most supportive and responsive doctor. I usually have lots of worry and fear after a surgery but not with Dr. Kanayama. When I had an issue and called his office, he called me back right away and it didn't matter what time of the day it was. His care for us who are suffering is a rarity in the medical field. He is the most genuine, kind, caring doctor I ever had. I want to encourage others who are suffering with endometriosis to please seek out Dr Kanayama. You are not a number to him. He sees you, he hears you, he listens to you and most of all, he will help you! @newyorkendometriosis











**Ladies, do not give up finding answers to your endometriosis symptoms! I went to countless doctors before Dr. Kanayama who told me I did not have endometriosis and medically gaslit me. He is the only one who listened and he found 50+ areas of endometriosis two other surgeons missed. I have less pain immediately after surgery with Dr. Kanayama than I had when I walked into the hospital to go into surgery. I am eternally grateful to Dr. Kanayama!**

@NEWYORKENDOMETRIOSIS

1:35 ⚫️⚫️⚫️⚫️⚫️ •                    📶 5G⌵ 100%▮
lyme_for_a_time Surgery was a success!!! Let me start with the @greenwich_hospital it was amazing. Everyone was so kind, from the pre-op phone calls to the post op care. I was given a paper gown which was hooked up to a lovely machine that inflates your gown with warm air. I seriously haven't ever been that relaxed before surgery. Dr K was of course very kind and there to answer any last minute questions. In the operating room he oversaw every step and came to my side, placed his hand on my shoulder and told me he would take good care of me. In the moment prior, I was starting to feel the reality of what was about to happen but Dr Ks compassion calmed me right down. Skip to post op appointment, Dr K showed me all the pictures and explained in detail what he found, how he excised it and why that would enable the best healing possible. My family and I were stunned at everything he found and removed. One adeno-fibroid in particular was half the size of my uterus. It took 50-60 excisions to remove it laparoscopically. That alone shows you his patience and dedication to your healing process. Also I felt validated like never before. After feeling alone in my pain for so very long....the bond between myself and Dr K is one of a kind. He believed me, heard me and understood me when no one else did. His years of experience and dedication to perfecting his technique is one that cannot be matched. Those of us in the chronically ill community tend to have a poor opinion and reluctant attitude towards doctors, rightly so. Let me say, Dr K has an energy about him of confidence without ego, understanding without prejudice and knowledge without arrogance. When you know you know, these are one in a million qualities. If you are wondering, give him a chance to show you, give him the opportunity to help you......give yourself permission to trust again. My diagnosis: adenomyosis, endometriosis, fibroids, chocolate cysts and adeno-fibroid (I can't remember the correct term for the last one) @newyorkendometriosis



skyllajones                                    1/5

1/4

7:48 ⚫️📶 N ◉ ▣ 🖼                  ⚫️ 📶⌵▪️ 44%▮
alikates.co and newyorkendometriosis    ⋮
🎵 Animal Island • Gimme That Sunshine

View insights

♡    ◯    ◁                              🔖

Liked by msmarissarae and 2,310 others
alikates.co This will be the second time I'm leaving New York with a heart full of gratitude.

A year ago last year I had a life changing surgery for endometriosis.

I came home from surgery and thought I have to do something to help spread awareness to this condition

A0192



Liked by **msmarissarae** and **2,310 others**
alikates.co This will be the second time I'm leaving New York with a heart full of gratitude.

A year ago last year I had a life changing surgery for endometriosis.

I came home from surgery and thought I have to do something to help spread awareness to this condition that gets misdiagnosed.

I created a free 30 page guide speaking more about my story, common signs, questions answered from my doctor & more!

The intention of this guide was to help 1.

It's helped dozens of women advocate for their health and find relief.

0060

http://www.vitals.com/doctors/
Dr_Masahide_Kanayama/reviews

**Dr. Masahide Kanayama Ratings at vitals.com**



# Dr. Masahide Kanayama MD

PATIENT REVIEWS

★ **5.0** of 5
April 25th, 2017
**True Specialist**

| wait time | 20 minutes |
| --- | --- |
| easy appointment | ★★★★★ |
| promptness | ★★★★★ |
| friendly staff | ★★★★★ |
| fair and accurate diagnosis | ★★★★★ |
| bedside manner | ★★★★★ |
| spends time with patients | ★★★★★ |
| appropriate follow-up | ★★★★★ |

Best Visit Ever. His knowledge of Endometriosis brought tears to my eyes. I finally got the information I needed to move forward and get the correct treatment. Never been happier.

★ **5.0** of 5
April 6th, 2017
**Changed my Life**

| wait time | 15 minutes |
| --- | --- |
| easy appointment | ★★★★★ |
| promptness | ★★★★★ |
| friendly staff | ★★★★★ |
| fair and accurate diagnosis | ★★★★★ |
| bedside manner | ★★★★★ |
| spends time with patients | ★★★★★ |
| appropriate follow-up | ★★★★★ |

There are telling my eyes as I write this review. I got my life back. I feel like me again. All one point in my life I don't think that would ever be possible. I felt like I lost myself. God bless you Dr Kanayama, you an d your staff mean the world to me. I can not express enough what you have done for me but every morning when I wake up I smile. Best Endometriosis specialist ever.

★ **5.0** of 5
February 21st, 2017
**Best Endometriosis Specialist**

| wait time | 20 minutes |
| --- | --- |
| easy appointment | ★★★★★ |
| promptness | ★★★★★ |
| friendly staff | ★★★★★ |
| fair and accurate diagnosis | ★★★★★ |
| bedside manner | ★★★★★ |
| spends time with patients | ★★★★★ |
| appropriate follow-up | ★★★★★ |

He not only gave me hope he gave me my happiness back. He is Endometriosis Specialist and Best Surgeon. Highly Recommend this doctor. I can breathe again and enjoy my life again. Thank you for everything.

★ **5.0** of 5
November 25th, 2016
**Amazing Doctor!**

| wait time | 15 minutes |
| --- | --- |
| easy appointment | ★★★★★ |
| promptness | ★★★★★ |
| friendly staff | ★★★★★ |
| fair and accurate diagnosis | ★★★★★ |
| bedside manner | ★★★★★ |
| spends time with patients | ★★★★★ |
| appropriate follow up | ★★★★★ |

Dr Kanayama is the best ! He's so caring and helpful! Highly recommend him!!!

★ **5.0** of 5
November 21st, 2016
**So grateful for a doctor like you !**

| wait time | 15 minutes |
| --- | --- |
| easy appointment | ★★★★★ |
| promptness | ★★★★★ |
| friendly staff | ★★★★★ |
| fair and accurate diagnosis | ★★★★★ |
| bedside manner | ★★★★★ |
| spends time with patients | ★★★★★ |
| appropriate follow up | ★★★★★ |

Dr Kanayama is a life saver I've suffered from endometriosis since my teen years... I am finally living a beautiful pain free life. I can't thank Dr Kanyama and his team enough for helping me live again !

★ **5.0** of 5
October 26th, 2016
**Gave me back my life**

| wait time | 20 minutes |
| --- | --- |
| easy appointment | ★★★★★ |
| promptness | ★★★★★ |
| friendly staff | ★★★★★ |
| fair and accurate diagnosis | ★★★★★ |
| bedside manner | ★★★★★ |
| spends time with patients | ★★★★★ |
| appropriate follow up | ★★★★★ |

I cannot express what you have done for me and the gratitude that I will forever feel for meeting you. You gave me back my life and allowed me to be a teenager again. I suffered since I was 13 and struggled to college even at times thought about ending my life when my mom found you, the first thing I thought was another doctor and I really didn't want to go. however, when I met you I felt this calming feeling and you told me that the pain wasn't in my head and that you understood my suffering and that you would make it go away. After the surgery, I was able to go back to school and hang out with my friends and enjoy life again. Your words will never be forgotten because you made the pain go away and you gave me life. Forever grateful. You are a GIFT.

0061





**Dr. Masahide Kanayama Ratings at WebMD**     http://doctor.webmd.com/doctor/212750/
masahide-kanayama-md-ratings

**WebMD**   HEALTH A-Z   DRUGS & SUPPLEMENTS   LIVING HEALTHY   FAMILY & PREGNANCY   NEWS & EXPERTS     [SEARCH]

Talk to your doctor about an IUD.*
Learn more >

Physician Directory › Obstetrics & Gynecology › New York › New York › Dr. Masahide D. Kanayama, MD › Ratings

## Physician Directory     🅷 Hospital Directory   🅿 Pharmacy Directory   Ⓢ Insurance Directory

Search by Name, Specialty, Condition or Procedure     Hawthorne, CA 90250     [Find Physician 🔍]

**Masahide D. Kanayama, MD**
Obstetrics & Gynecology

Is this you?
Enhance your profile.

★★★★★
5 Ratings
Rate This Doctor

Masahide D Kanayama MD
150 E 55th St FL 5

📞 (212) 421-1016

## Dr. Kanayama's Rating     [Rate This Doctor]

### Overall Rating
5 Ratings                                   ★ ★ ★ ★ ★

---

### Physician

Explains conditions & treatments             ★ ★ ★ ★ ★

Takes time to answer my questions            ★ ★ ★ ★ ★

### Office

Location        Masahide D Kanayama MD 150 E 55th St FL 5

Average office wait time                **Under 15 Minutes**

Scheduling flexibility                       ★ ★ ★ ★ ☆

Office cleanliness                           ★ ★ ★ ★ ★

Courteous staff                              ★ ★ ★ ★ ★

‹ Previous: Dr. Kanayama's Experience          Next: Dr. Kanayama's Insurance ›

**Dr. Masahide Kanayama Yelp Reviews**



## Recommended Reviews for Kanayama Masahide, MD



**Yvette F.**
Manhattan, NY
29 friends
13 reviews
47 photos

⭐⭐⭐⭐⭐ 6/28/2017

Dr. Kanayama is amazing. The only doctor who properly diagnosed my fibroid issue and treated it accordingly. Network doctors wanted to give me a hysterectomy but Dr. Kanayama prescribed effective treatment and follow up. He also provides holistic and nutritional regimens to assist in medical treatments to provide comprehensive care. I gladly pay out of network costs to consult with him.



**L.F.**
New York, NY
1 friend
44 reviews
7 photos

⭐⭐⭐⭐⭐ 10/2/2015

My experience with Dr. Kanayama has been life changing in the best way possible. Most people who schedule an appointment with Dr. Kanayama are so desperate & sick that they absolutely do need surgery...

Here is my story:

At 14 I was hospitalized in Rochester, NY and they had know idea what was wrong with me. (The university of Rochester is considered a well known/good hospital). I was there for a week undergoing tests while in excruciating pain. I had to have a laparoscopic surgery in order to diagnosis my endometriosis. From my experience, any doctors who do not specialize in endometriosis... run far far far away! I was young and we knew nothing about this disease. My doctors knew nothing about it either, but they all act like they do. From 14-17 I was a test guinea pig letting these under qualified obgyn surgeons who I trusted open me. Every 3 months I would be in surgery because the second I woke up in recovery, I would have the same exact endometriosis pain. They performed all my operations with a laser which actually makes endo much worse by creating more scar tissue & lesions. I also at 16 years old had a laparotomy to take care of a fibroid imbedded in my uterus. This is a huge surgery for someone so young. I once again woke up in recovery in the same excruciating pain & I knew it was another failed operation meanwhile my doctor insisted she had removed the fibroid. I also went in for operations to get my nerves cut.. that didn't work either. The doctor was trying to push me on Lupron.. Lupron makes you go into menopause.. I was 15 years old.. luckily I did my research & refused.



## Kanayama Masahide, MD ⊘ Claimed

★★★★☆ 4 reviews

Obstetricians & Gynecologists

cont'd

7 surgeries later & I was in my senior year of HS sick as can be. Now the endo is so bad I cry when I go to the bathroom, I threw up everyday at school.. I could barely walk.. I wouldn't wish this on my worst enemy. I was so desperate & knew I wouldn't make it through college.. I was lucky I was graduating high school at this point.

Fast forward to December 2007. In my desperation, I started googling specialists for endo & didn't even realize they existed (would've been great if my original doctor suggested this). The New York Endometriosis Center came up on my google search & I did my research/read all the wonderful testimonials of women who had been through what I had. I immediately picked up the phone & called Dr. Kanayamas office. Sabrina picked up the phone & I broke down. She immediately put me through to Dr. Kanayama who literally put me at ease and made me feel so much better. He gave me his personal contact info and couldn't have had a better bedside manner. I flew to NYC right away and unlike the doctors in Rochester who cannot see endometriosis through an ultra sound or find it in an exam... Dr. Kanayama pinpointed it immediately. We scheduled my surgery in December 2007 in the beautiful Greenwich hospital. My surgery was a lot longer than expected because I was an absolute mess. Everything in my pelvic cavity was tied and knotted together in a huge web of scar tissue from all the laser operations I had. This is why I was so ill. He kept my mom up to date my entire surgery. I was stage 4 endometriosis which is the worst. I had it in my rectum, bladder, small intestine, uterus, fallopian tubes. On top of this, my uterine fibroid was still there and there was zero sign of any incision or that my Rochester doctor even attempted to remove it. So she put me through that hell surgery and basically opened and closed me and then lied.

I woke up in recovery feeling like a brand new person. My surgery was somewhere around 8 hours long and he did a lot of cutting and it was definitely invasive, but it was an easier recovery than any laser surgery I had back home. I was walking the streets on NYC (slowly) that same day. I hadn't felt that good since before my diagnosis 3 years earlier. Also, his incisions are by far the tiniest things ever and they are hidden below your bikini line and inside your belly button. Most doctors cut on your stomach and above your belly button. They literally were gone within a week..

I went off to college pain free and healthy and was pain free for 8 years... that is INCREDIBLE if you have endometriosis. I was not good about following up with Dr. Kanayama because I was a young adult living my life in Ohio and put this disease behind me. I did not have any yearly follow-up appointments although I should have. 8 years later (nov. 2015) I began to notice some pain again. I was home in Rochester at my obgyn and she said everything was perfect. I knew it wasn't perfect and I requested an ultra sound. I called them weeks later and they said nope everything is fine. It wasn't fine and I went to Kanayama who found a 5 cm chocolate cyst on my ovary via ultra sound. I immediately scheduled surgery where once again I feel like a brand new

# Exhibit 5

A0200

# Video Presentation



https://vimeo.com/user71401230/kanayama?share=copy

Please click on the link above to view video presentation of video and photographic evidence demonstrating that stains have disappeared naturally and no permanent damage has occurred to the structures at Naritasan Temple and Katori Shrine

# Photo Excerpts from the Video Presentation

## I.
## INTRODUCTION

"As is shown below, the supplemental evidence put forth by the Japanese government concerning the present condition of the alleged stains is demonstrably false -- and is provably false by video and photographic evidence submitted herewith . . . .Because absolutely no stains remain at the two sites claimed by the Japanese to have been "damaged" -- they disappeared naturally and (as conceded by the government) neither location effectuated any repairs -- probable cause to believe that Dr. Kanayama committed any crime has been "obliterated;" Further, without evidence of any damage, the government cannot demonstrate that an analogous felony offense exists in the United States as required by the treaty
and thus, cannot satisfy its burden of establishing dual criminality."

*Sur Reply at p.2-3*



002



Defense attorneys **David Dudley** (001) and **Lawrence Schoenbach** (002) visited Naritasan Temple and Katori Shrine on December 18, 2017, and December 29, 2017, where they made High Definition videos and took photographs of the sites where alleged defacement occurred, and where the government claims there is still visible defacement.

2 of 26

A0202

### Key Photos — Naritasan Temple



*The prosecution claims that on column 2 at Naritasan Temple, there was a single 6 x 2 cm stain visible in 2015 (shown in photo 005 above), and that this stain remains visible as a "black" stain 3 x 0.9 cm. (Gov't Reply MOL at p. 4 and Supp Ex 1 at p. 6). The photo on the right, taken on December 29, 2017, conclusively demonstrates the falsity of this claim . There is no damage.*

3 of 26

A0203

**Key Photos — Katori Jingu Shrine**

007


008


009


010


*The prosecution claims that the steps at Katori Jingu Shrine the stains are s "still visible as blackish stains or black spotted stains" (Supp. Ex. 2 at p 6). The photo above, taken on December 18, 2017, conclusively demonstrates the falsity of this claim. There is no damage.*

4 of 26

## II
## DETAILED PRESENTATION OF PHOTOGRAPHS OF
## NARITASAN SHINSHO-JI TEMPLE

011


012


**Orientation Photos of the Temple Complex, Which Receives
10 Million Visitors Per Year According to Prosecution Documents**

013


**Naritasan Shinsho-ji Temple 成田山**
*This is the So-mon Gate of the Naritasan
Shinsho-ji Temple where the three columns that
were allegedly defaced are located.*

**Defense Attorney David Dudley at the
So-mon Gate on December 18, 2017**
*The three columns where the defacement
allegedly occurred in 2015 are marked 1,2,3.*

014


5 of 26

A0205

**The Prosecution Alleges, Without Photographic Evidence, that as of October 18, 2017, "black stains ... still visible on the poles." (Gov't Reply at p 4)**

**ACTUAL SIZE OF ALLEGED MARK ON COLUMN 1**

**2015 4 x 2 cm**
**2017 3.5 x 1 cm**



NO PHOTO PROVIDED

**ACTUAL SIZE OF ALLEGED MARK ON COLUMN 2**

**2015 — 6 x 2 cm**
**2017 — 3 x 0.9 cm**



NO PHOTO PROVIDED

**ACTUAL SIZE OF ALLEGED MARK ON COLUMN 3**

**2015 — 5 x 2 cm**
**2017 — 5 x 1.5 cm**



NO PHOTO PROVIDED

015

On the right, Japanese government photo (015) and Japanese Press Photo (016) showing alleged stain on Column 2 in 2015

Below, English translation of Japanese prosecutor report summarizing the alleged damage.



> b. By the vandalism committed in this temple, unvarnished portions of three poles on the east side of the *So-mon* (Main Gate) were sprayed with oil-like substance leaving damp stains on each pole as follows:
>
> (1) First pole from south: approx. 4 centimeters long and approx. 2 centimeters wide stain;
>
> (2) Second pole from south: approx. 6 centimeters long and approx. 2 centimeters wide stain; and
>
> (3) Third pole from south: approx. 5 centimeters long and approx. 2 centimeters wide stain.
>
> Those sprayed portions, into which oil-like substance had penetrated, are still left with blackish stains as follows:
>
> (1) First pole from south: approx. 3.5 centimeters long and approx. 1 centimeter wide stain;
>
> (2) Second pole from south: approx. 3 centimeters long and approx. 0.9 centimeter wide stain; and
>
> (3) Third pole from south: approx. 5 centimeters long and approx. 1.5 centimeters wide stain.

Gov't Supp Ex 1 at p. 6

016
- 記事写真 -
「油」被害:成田山も　１６個でしみ　柱や扉、壁に点々と　／千葉



成田山新勝寺の総門で柱に付いた油のような塗料のしみを実況見分する成田署員ら

http://sp.mainichi.jp/graph/2015/04/11/20150411ddlk12040014000c/001.html

6 of 26

017



Left: December 29, 2017 photo of column 2.

Below: Closeup of column 2 in 2015 after alleged defacement.

018



A0207

**Side by Side Comparison**











*The prosecution claims that on column 2 at Naritasan, there was a single 6 x 2 cm stain visible in 2015, and that this stain remains visible as a "black" stain 3 x 0.9 cm. (Gov't Reply MOL at p. 4 and Supp Ex 3 at p. 6). The photo on the right, taken on December 29, 2017, conclusively demonstrates the falsity of this claim. There is no damage.*



8 of 26

A0208

COLUMN

1



December 29, 2017

COLUMN

2



**December 29, 2017**

10 of 26

A0210

COLUMN

3



December 29, 2017

### III
### DETAILED PRESENTATION OF PHOTOGRAPHS OF
### KATORI JINGU SHRINE




**Orientation Photos of the Katori Shrine Complex, Which Receives
2 Million Visitors Per Year According to Prosecution Documents**



**Haiden or Main Worship Hall**
*The alleged defacement took place at the entrance to the Haiden.*

12 of 26

A0212

**Site of Alleged Defacement where Prosecution alleges defacement**
**"still visible as blackish stains or black spotted stains"**
*(Supp Ex 2 at p 6).*

039



**Areas Where Prosecution Alleges**
**"blackish stains or black spotted stains" are still visible**

040



*(Supp Ex 2 at p 6).*

1. "Square pole on the west…"
2. "Square pole on the east…"
3. "The stairs…"
4. "The offertory box…"

13 of 26

A0213

Prosecution Photos Offered in Support of the Claim of 2015 Damages



Vermilion-colored Hall of Prayer, a wooden structure, southeast of the Hall of Worship



Vermilion-colored stairs, etc. in the front of the above (Photographed from the northwest side)



Same as the above (Enlargement)



Same as the above (Photographed from the south side)

*These photographs, presented in exactly the degraded quality seen here, are the only photographs of the alleged defacement at either site presented by the prosecution. The quality of the photos is too poor to see the alleged damage, but the photos do make it possible to infer where the prosecution alleges the damage to be.*

A0214

## Japanese Press Photographs

*Although the government photographs are not of adequate quality to be useful, press photographs appeared in Japanese media in 2015 which appear to be relevant.*



http://www.yomiuri.co.jp/matome/archive/
20150602-OYT8T50088.html



www.chibanippo.co.jp/news/national/259534

A0215

**Side by Side Comparison**









16 of 26

A0216

# 1

WEST POLE

December 18, 2017

049



A0217

# 1
WEST POLE

December 18, 2017



051



18 of 26

# 2

**EAST POLE**

December 18, 2017





19 of 26

055

054

2

EAST POLE

December 18, 2017

2

EAST POLE

056

December 18, 2017



21 of 26

A0221

# 3
STAIRS

**December 18, 2017**

057



058



22 of 26

A0222

# 3

STAIRS

**December 18, 2017**

059



060



23 of 26

# 3
STAIRS

December 18, 2017









# 3
## OFFERTORY BOX

December 18, 2017

064



065



# 3

**December 18, 2017**

OFFERTORY BOX

066



067



26 of 26

# Exhibit 6



**FEATURES | SOCIETY | EAST ASIA**

# Anti-Korean Sentiment Simmers in Japan

## Alongside rising tensions between their governments, ethnic Koreans living in Japan face daily discrimination and bullying.

By **Cristian Martini Grimaldi**

September 29, 2022



Vans belonging to far-right groups demonstrate in downtown Kobe City.
Credit: Cristian Martini Grimaldi

There is a Japanese word meaning "half men," a derogatory term that was coined at the end of the 19th century. The term is now only used disparagingly to describe ethnic Koreans. TV, radio, and newspapers have all banned it, but it persists in the ears of the general public by making an unpleasant amount of social media appearances, especially in the past few years, likely in response to the tense diplomatic relations between the two countries.

In 2019, as tensions between Japan and Korea increased, Kawasaki, which is home to one of the largest Korean communities in the greater Tokyo area, enacted the first law against hate speech in Japan, with repeat offenses subject to a fine of up to 500,000 yen ($4,000). Prohibited actions listed include promoting physical assaults on minorities, seeking to have minorities evicted from their homes, and referring to them in a derogatory manner.

To understand why this type of legislation is necessary, we need to go to Shin-Okubo, the little Korea in Tokyo.

"*Kaere!*" go home. That's what Na, a 24-year-old from Busan who now works at a fast-food shop in Shin-Okubo, is often told when she is overheard talking in her native Korean.

"They targeted my appearance and made fun of my use of Japanese, as I was still not fluent at the time," Na recalled.

**Enjoying this article? Click here to subscribe for full access. Just $5 a month.**

But the stifled resentment against ethnic Koreans doesn't detonate only at the hearing of the "wrong" accent. There is a troubling tendency to lay blame on Koreans for nearly any misfortune that befalls Japan. After the 500-

year-old Shuri castle in Okinawa caught on fire in 2019, fake news began circulating on the web that the fire was an arson attack perpetrated by Koreans residing in Japan. The origin of the disinformation remains unknown.

Earlier this summer, in the immediate aftermath of former Prime Minister Abe Shinzo's assassination in broad daylight on July 8, baseless rumors began flying online that his killer was an ethnic Korean who hated Japan. South Korea's consulate in Fukuoka reportedly warned that Koreans living in Japan might become the victims of violence as a response to the misinformation.

Just recently a Japanese court sentenced to four years in prison a 23-year-old man who had set fire to empty houses in a neighborhood populated by Korean residents in Kyoto prefecture.



Vans belonging to far-right groups demonstrate in downtown Kobe City. Photo

A0230

by Cristian Martini Grimaldi.

Perhaps no issue evokes stronger emotions on both sides than the "comfort women" question. The euphemism refers to those Koreans, Chinese, Filipinos, Taiwanese, and others who were forced into prostitution for the Japanese military during World War II.

Hyun, 38, is the Korean manager of a Family Mart (the widespread Japanese convenience store chain). "Sure, Japan has apologized for its crimes by compensating the victims. But many Koreans don't feel is enough," he claims.

That may be because it is common to hear Japanese disparage the victims even today. Mao, a 22-year-old student who was born in Japan to Korean parents pointed out that ethnic discrimination seeps even into the classroom. "I had a lecturer at the university who once said aloud that Korean women have considerably more sex appeal than the Japanese... The fact that they chose to become comfort women in the past is actually no coincidence."

The historical grievances sometimes pop up in odd places. Just before COVID-19 hit, Korean customers took retaliatory action against a divisive ad campaign by Uniqlo, the Japanese apparel retailer.

In the ad, Iris Apfel, a 98-year-old businesswoman and fashion icon, responded, "I can't remember that far back!" when asked what she wore as a young woman. Koreans claimed this was a hidden message about historical amnesia – specifically toward Japanese colonial rule on the Korean Peninsula. Koreans started a boycott, leading Uniqlo's sales in South Korea to drop by over 60 percent.

The historical struggle over comfort women broke out once again in January 2021 after the Seoul Central District Court ordered Japan to compensate each of the 12 Korean "comfort women" who sued Tokyo in 2016, with 100 million Korean won (about $82,000). However, Japan appealed the decision based on the principle of sovereign immunity. The court decision, following on the heels of a separate decision awarding compensation to Koreans forced into labor during World War II, is at the center of recent tensions between South Korea and Japan.

**Enjoying this article?** Click here to subscribe for full access. Just $5 a month.

Japan and South Korea came to an agreement in 1965 whereby the former would have given Seoul $500 million, 1.6 times the Korean budget at the time, in exchange for settling once and for all the historical disputes between the two nations. Tokyo maintains that any other claims to compensation are null and void, while Korean courts have ruled that individuals – as opposed to the South Korean government – are still free to pursue legal redress.

The fraught emotions underneath the dispute are driving controversy around a recent art exhibition.

The "Non-Freedom of Expression Exhibition," organized by a citizen's group, features about 60 pieces by 16 artists. It traveled all over Japan starting in 2019, despite being repeatedly forced to close or cancel showings due to protests and threats. This year the exhibit has opened again in Aichi, Tokyo, Kyoto, Osaka, and Kobe.

Included in this exhibition are exposed photographs of former wartime comfort women and one statue representing them: the so-called

*heiwa no shoujo zo,* the Statue of Peace. The first version of the Statue of Peace was initially built in Seoul in 2011 in front of the Japanese Embassy in order to pressure the Japanese government to express regret to the victims of sexual slavery.



The Non-Freedom of Expression Exhibition, which was a part of the 2019 Aichi Triennale art festival, has been received with protests from those opposed to the historical perspective that the art installations convey.

Yamashita Shunsuke is the head and founder of the nationalist party Okirukai ("waking Japan up"), whose purpose is, in

of a right-wing group against the "Non-Freedom of Expression Exhibition." Photo by Martini Grimaldi.

the words of Yamashita himself, to place importance on the figure of the Emperor.

"If you look at those exhibit you can see that they are disparaging the Emperor himself. Nobody has that right!" he said when I met him in Kobe during a protest. He had just given a speech to a small crowd of supporters.

"If you go on YouTube you can see one artwork of this exhibition, it is a video showing a photograph of Emperor Hirohito being burned and stepped on," he said.

To prevent the exhibition from taking place, different far-right groups and nationalists gathered to protest in front of the Hyogo prefecture government building.

One woman holds a sign that reads "Stop the hate against Japanese! We will not allow you to act against Japan!"

"This is an exhibition from the 'anti Imperial system group,' a far-left association," she said. Finding the names of the actual organizers of the exhibition is very hard if not impossible, even with a refined online search – something the woman disparagingly called "a very Korean way of doing it things, they hide behind a screen."

Downtown in the cities where the exhibition took place a long caravan of white, gray, and black vans with the flags of the Imperial Army displayed on both sides took part in a demonstration. The vehicles are often decorated with images of author Yukio Mishima, taken as the symbol of the far-right groups, and the imperial family emblem displayed on flags.

During one protest I attended in Kobe, the minivans of the far-right groups poured into the streets, playing nostalgic military marches. One of the vans has a long call-to-war-action line on its side: "It is the true desire of us men to give our lives for serving our country."



Vans belonging to far-right groups demonstrate in downtown Kobe City. Photo by Cristian Martini Grimaldi.

**Enjoying this article?** Click here to subscribe for full access. Just $5 a month.

Their intent is loud and clear, as it is not just spoken but yelled out of the huge speakers placed on top of the vans: *Haji wo shire!* ("Shame on you" – for accepting the exhibition), *Dete ike*! ("Get out" – of Japan), and *Funsaiseyo!* ("Let's destroy" – presumably the exhibition).

The ultra-nationalist group, which goes by the name *zaitokukai*, spreads the slogan of *"Tottoto kuni ni kaette kudasai"* or "go home in a hurry!" To understand who they are targeting, we simply have to decode their name: Zaitokukai is shorthand for "Citizens against the privileges of the Zainichi," or ethnic Koreans living in Japan.

For many Koreans in Japan, the details of past financial settlements mean nothing. More important are their daily lived experiences as targets of bullying and anti-Korean slurs.

You have read **2** of your **5 free articles** this month.

Subscribe to
Diplomat All-Access

A0235

Enjoy **full access** to the website *and* get an automatic subscription to our magazine with a *Diplomat All-Access* subscription.

### SUBSCRIBE NOW

Already a subscriber? **Login here**

## AUTHORS

**GUEST AUTHOR**

### Cristian Martini Grimaldi

Cristian Martini Grimaldi is a freelance Italian journalist living in Japan contributing for La Repubblica and La Stampa. His latest book is "Japan does it better?"

## TAGS

Features    Society    East Asia    Japan

Anti-Korea sentiment in Japan    Japan anti-Korean protests

Japan historical revisionism    Koreans in Japan

right-wing groups in Japan    Zainichi

A0236

# Exhibit 7



**FEATURES** | ECONOMY | POLITICS | SOCIETY | E/

# In Japan, Will *Hafu* Ever Be Considered Whole?

## Mixed-race individuals and their families seek acceptance in a homogeneous Japan.

By **J.T. Quigley**
October 03, 2013



Credit: dejalovely (YouTube), Michael Connolly, Hafu movie poster courtesy of Megumi Nishikura

"Spain! Spain!" the boys shouted at her and her brother, day in and day out at a summer camp in Chiba prefecture. The incessant chanting eventually turned into pushing and hitting. One morning, she even discovered that her backpack full of clothes had been left outside in the rain.

"It was the worst two weeks of our lives," recalls Lara Perez Takagi, who was six years old at the time. She was born in Tokyo to a Spanish father and Japanese mother.

"When our parents came to pick us up at the station, we cried for the whole day. I remember not ever wanting to do any activities that involved Japanese kids and lost interest in learning the language for a long time, until I reached maturity and gained my interest in Japan once again."

By the year 2050, 40 percent of the Japanese population will be age 65 or older. With Japanese couples having fewer children than ever before, Japan is facing a population decline of epic proportions. However, one demographic continues to grow: Japanese and non-Japanese mixed-race couples. But in one of the world's

A0239

most homogeneousous countries, is Japan ready to accept their offspring?

Biracial Japanese nationals like Takagi are an increasingly common sight in Japan. The latest statistics from the Japanese Ministry of Health, Labor, and Welfare indicate that one out of every 50 babies born in 2012 had one non-Japanese parent. Additionally, 3.5 percent of all domestic marriages performed last year were between Japanese and foreigners. To put those numbers into perspective, the earliest reliable census data that includes both mixed race births and marriages shows that fewer than one out of 150 babies born in 1987 were biracial and only 2.1 percent of marriages that year were between Japanese and non-Japanese.

**Enjoying this article?** Click here to subscribe for full access. Just $5 a month.

Takagi is one of a growing number of *hafu* – or half Japanese – who have grown up between two cultures. The term itself, which is derived from the English word "half," is divisive in Japan. Hafu is the most commonly used word for describing people who are of mixed Japanese and non-Japanese ethnicity. The word is so pervasive that even nontraditional-looking Japanese may be asked if they are hafu.

Rather than calling someone mixed-race or biracial, some believe that the term hafu insinuates that only the Japanese side is of any significance. That could reveal volumes about the national attitude toward foreigners, or perhaps it's just the word that happened to stick in a country where mixed-race celebrities are increasingly fixtures on television.

**No Entry**

Olaf Karthaus, a professor in the Faculty of
Photonics Science and Technology at the Chitose
Institute of Science and Technology, is the father
of four "hafu" children. Far from the hustle and
bustle of Tokyo, he raised them in Japan's
northern island of Hokkaido, which makes up
20 percent of Japan's total land mass, yet houses
only five percent of the population.

In 1999, Karthaus visited an *onsen* (hot spring)
with a group of international friends, all
married to Japanese spouses. The onsen had
decided to deny entry to foreigners after some
negative experiences with Russian sailors,
hanging signs that read "Japanese Only" and
refusing entry to all foreigners.

The Caucasian members of his group were flatly
denied access to the bathhouse based on their
foreign appearance. When management was
asked if their children – who were born and
raised in Japan and full Japanese citizens –
would be allowed to bathe, the negative attitude
toward anyone who appeared to be non-
Japanese became shockingly clear.

"Asian-looking kids can come in. But we will
have to refuse foreign-looking ones," was the
onsen's answer. Negative sentiment had trickled
down from a group of rowdy sailors to
defenseless toddlers.

Karthaus, along with co-defendants Ken
Sutherland and Debito Arudou – an equal rights
activist who was born in the U.S. but became a
naturalized Japanese citizen – sued the onsen
for racial discrimination. The plaintiffs won,
and the onsen was forced to pay them one
million yen ($10,000) each in damages. The case
made international headlines and shed light on
issues of race and acceptance in Japan.

Regardless of Karthaus' negative experience, he expresses a deep fondness for Japan and says that none of his children have been direct victims of racism.

**Enjoying this article? Click here to subscribe for full access. Just $5 a month.**

"My son got called a *gaijin* (a Japanese term that literally means outsider – as opposed to the more formal *gaikokujin*, which means foreigner) once, in the third grade. But there was no discrimination otherwise for my other kids," Karthaus tells *The Diplomat*. "My eldest daughter actually dyed her hair to look *more* foreign."

**Legal Complexity**

Many observers see a loosening of immigration policy as a potential remedy to the birth-rate issue, but Japan, which along with the Koreas topped the list in a Harvard Institute study of the most racially homogeneous countries, is largely unwilling to accept an influx of foreigners.

"Although the government cannot prevent media hyperbole, the Justice Ministry could do much more with its crime statistics, which belie the common perception that immigrants are to blame for increases in petty crime and drug abuse," writes *Bloomberg*.

For those foreigners who have made a home in Japan, the law for any biracial children they have is complex. While children can enjoy the benefits of dual citizenship, the government doesn't allow hafu to retain their dual nationality after age 22. According to the Tokyo Legal Affairs Bureau, this decision is based on concerns over what would happen in the event of international friction or military action

between a dual-citizen's other country and Japan.

"It's not just a matter of 'but what if we declare war on your other country – which side will you choose?'" says Arudou, who changed his name from David Aldwinckle after obtaining Japanese citizenship in 2000. He renounced his U.S. citizenship two years later, in accordance with the strict rules against being a dual national.

"There have been debates on revising to allow dual [citizenship], due to Nobel Prize winners who naturalized overseas, but they failed because, again, people worried about loyalty and hidden foreigners," Arudou adds.

The denial of dual citizenship beyond age 22 was actually put in place quite recently, in a 1984 amendment to the Japanese Nationality Act. Japan is a *jus sanguinis* country, meaning that citizenship is based on blood, not location of birth. With an increase in the number of mixed-race couples giving birth to children with dual citizenship, the government decided that restrictions were necessary to preserve national sovereignty.

Dual citizens are asked to begin thinking about which nationality to choose by age 20, as this is the age that Japan considers to be the beginning of adulthood. At 20, a dual national is considered mature enough to make an informed decision about which passport to retain.

The government has taken steps to ensure that the rule is understood by hafu, with awareness posters and leaflets explaining the situation. If a dual citizen fails to choose their citizenship before the deadline, the Ministry of Justice will send a reminder to declare a single nationality – after a one month grace period without a response, their Japanese nationality is revoked.

There is no penalty beyond the loss of citizenship.

"What does Japan gain by, in effect, rejecting my children and thousands of other young dual citizens living in Japan and around the world, at the very moment when they come of age and are at last able to become productive members of society?" Arudou, who is also a columnist for *The Japan Times,* asked in a 2010 editorial.

Not surprisingly, the Tokyo Legal Affairs Bureau says that it is not in a position to speculate about the future of the Nationality Act and if an increasing presence of mixed race couples and their children would lead the government to relax the dual nationality laws. However, a spokesperson acknowledges that the issue is likely to be raised and that citizens and the government must hold an open debate about the requirements for not only becoming a Japanese citizen, but for also retaining dual citizenship.

"Why wouldn't a person who is raised in Japan not be Japanese?" asks Takagi. "Japanese are behind when it comes to being more aware of the people who live in their country; their educational system hasn't changed in more than 30 years. With globalization more and more present, eventually there will be a need for change. The educational system must be adapted for children who grow up between more than one culture."

Takagi takes the Japanese government to task for refusing to adopt a more internationally minded approach to dual citizenship, as seen in other developed countries.

**Enjoying this article? Click here to subscribe for full access. Just $5 a month.**

"There is lack of progress when it comes to adaptation and flexibility in all aspects," she adds. "Many countries and regions in the world admit and respect dual citizenship, including the U.S., U.K., France, Canada, and Australia. Most countries do not think that a citizen will lose the nationality of their homeland even if they succeed in gaining another country's nationality."

## Documentary

Takagi, along with Japanese-American Megumi Nishikura, co-directed and produced *Hafu: The Mixed-Race Experience in Japan*, a documentary that explores the trials and tribulations of being mixed race in Japan. It will premiere at Shibuya Uplink Theater on October 5.

Lara Perez

Megumi_Lara_Directing-6273

Takagi (left) and Megumi Nishikura (right) directir documentary film Hafu. (Photo credit: Michael Co

"For 87 minutes, I want audiences to walk in the shoes of five hafus and experience firsthand what it is like to be half-Japanese in Japan today," Nishikura says. "Because of the way they look or

cultural influences from other countries, hafu often experience feeling 'other-ed' in Japanese society. I believe that the definition of what it means to be Japanese needs to include hafu. Ultimately, I believe that with changing demographics, Japan is at a turning point – I believe that a more multiracial and multicultural Japan is a good thing, but it is up to the Japanese people to embrace this change or not. I do hope people will walk out of the theater feeling that a positive future awaits Japan."

Takagi and Nishikura were inspired to make their documentary after a chance encounter with Marcia Yumi Lise, a sociologist who co-founded The Hafu Project – a series of portraits and in-depth interviews that probe the half-Japanese experience and shed light on what it means to be hafu both inside and outside of Japan. To date, the project has collected 130 portraits and 65 extensive interviews that explore topics ranging from background and upbringing to personal identity and sense of belonging. Exhibitions for The Hafu Project have taken place around the world and are supported by local Japanese embassies.

"In 2009, myself and Takagi met Lise and [Hafu Project photographer] Natalie Maya Willer when they came to expand their project in Japan. In my own research, I noticed the lack of in-depth media attention for hafu and was bothered by the stereotypes of hafu perpetuated by the mass media. So one of our motivations in making this film was to create awareness of the hafu experience and give us a platform to truly tell our stories," Nishikura explains.

Unlike Takagi's summer camp experience, Nishikura says that her childhood was generally free from discrimination based on her mixed roots.

"When I attended Japanese elementary school I was aware that I received extra attention from my classmates for being mixed but I don't have any painful memories. I do remember that when I encountered children who I did not attend school with, they would stare at me or call me 'gaijin'."

Speaking of her experience with The Hafu Project, Lise adds:

"As a hafu brought up in Japan and having a foreigner's appearance in the eyes of many people in Japan, I have experienced on many occasions 'differentiation' but not discrimination. Being surprised that you can speak Japanese fluently doesn't count as discrimination, I don't think – although being exposed to such treatment, constant subtle differentiation, on a daily basis can really get you thinking. I think somebody called it 'racial fatigue.'"

Lise also points out that after more than 60 interviews with her hafu subjects, the number who had experienced racial discrimination over the course of their lives was "near zero."

"I came across at least five people with cases of bullying at school based on the fact that they were 'different'," she notes. "Does that constitute as racial discrimination?"

The ethnicity of a hafu's non-Japanese parent may play a role in how they are received by locals in Japan. Deja, a YouTube personality who posts videos in both Japanese and English, has an African American father and a Japanese mother. As the only Black-Japanese person at her school, Deja's darker skin color instantly set her apart from her fair-skinned Japanese classmates.

"I remember sitting in class one day when the teacher left for a brief moment, and this boy stood on his chair and said in Japanese 'Raise your hand if you're not from Japan!' Everyone looked at me," Deja recalls. "I didn't raise my hand."

**Enjoying this article?** Click here to subscribe for full access. Just $5 a month.

She continues, "Because of my skin color, no one suspects that I was actually born and raised in Japan. I have been put down by strangers on the street. Sometimes I hear children behind me, if I'm talking in Japanese, saying things like 'the foreigner spoke Japanese!'"

Deja feels that Caucasian-Japanese hafu are more widely accepted by the people of Japan, pointing out that they can blend in better with their lighter skin. "At first glance, I think that Black-Japanese are seen as just black," she says. She added that younger people are generally more open-minded than middle-aged Japanese, a statement that may ring true in most parts of the world.

Even Nishikura admits that most people fail to recognize her Japanese side.

"In my day-to-day experience in Japan, on first encounter, I am often treated as a foreigner – not able to speak Japanese and a visitor to Japan," she observes. "I have been stopped by the police on the street and asked if I am Japanese or not. I usually just tell them I am hafu and that seems to end their questioning. Obviously, though, they are singling me out of the crowd as I don't look like the average Japanese."

Nishikura adds, "When someone recognizes and asks if I am hafu I am delighted! 'You see the

part of
me
that is

HAFU_B5_Flyer_Front_new

Japanese?!'"

Despite any negativity she has faced in Japan,
Deja enjoys being an ambassador for both of her
backgrounds.

"I think that, with being hafu, it makes me
happy that some Japanese people see me as a
bridge to getting an American viewpoint."

It is unclear whether the Japanese government
will ever recognize hafu as lifelong dual citizens,
but one thing is certain: Japan, and the people
who populate it, is changing. With an increased
number of mixed race babies born each year,
more and more ordinary Japanese will be
exposed to the subtle diversification of their
homogeneous homeland. Perhaps simply

A0249

becoming more visible will be the first step toward acceptance of biracial Japanese.

In the end, choosing to embrace its biracial citizens – or shun them – will be a decision with profound implications for Japan's uncertain future.

Hafu: The Mixed-Race Experience in Japan *will be shown at* Shibuya Uplink Theater *from October 5 until October 18. A post-screening Q&A session with director Megumi Nishikura and a person featured from the film will take place on October 8. Tickets can be purchased at the Shibuya Uplink box office.*

*J.T. Quigley is assistant editor of* The Diplomat.

**TAGS**

Features     Economy     Politics     Society     East Asia

biracial Japanese     Debito Arudou     hafu     Hafu documentary

Hafu: The Mixed-Race Experience in Japan     Japan demographics

mixed race in Japan

# Exhibit 8

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                     :

IN THE MATTER OF THE EXTRADITION     :
OF MASAHIDE KANAYAMA            :       17 Crim. Misc. 1 Page 003 (ER)
                                       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X      **NOTICE OF MOTION**

       PLEASE TAKE NOTICE that, upon the accompanying (1) Memorandum of Law of the

United States of America in Support of Extradition; (2) Declaration of Elizabeth M.M.

O'Connor, dated February 28, 2017, and all attachments thereto (filed in this matter on or about

May 30, 2017); (3) documents in support of the Extradition Request submitted by the Embassy

of Japan and certified on November 25, 2016, by Jason P. Hyland, Charge d'Affaires ad interim

at the United States Embassy in Tokyo (filed in this matter on or about May 30, 2017); and (4)

all prior pleadings herein, the United States of America, by and through its attorney, Joon H.

Kim, Acting United States Attorney for the Southern District of New York, will move this Court

for a certification of extraditability pursuant to Title 18, United States Code, Section 3184.

A0252

PLEASE TAKE FURTHER NOTICE that, pursuant to the Court's Order dated July 11, 2017,

opposition papers are to be served by September 29, 2017, and reply papers are to be served by

October 20, 2017.

DATED: New York, New York
        August 22, 2017

                                              JOON H. KIM
                                              Acting United States Attorney for the
                                              Southern District of New York

                        By:    _____
                                              TARA M. La MORTE
                                              Assistant United States Attorney
                                              1 St. Andrews Plaza
                                              New York, NY 10007
                                              (212) 637-1041
                                              tara.lamorte2@usdoj.gov

cc (via email): Patrick Joyce, Esq.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                                        :
IN THE MATTER OF THE EXTRADITION           :
OF MASAHIDE KANAYAMA                        :        17 Crim. Misc. 1 Page 003 (ER)
                                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


### MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA
### IN SUPPORT OF EXTRADITION


                            JOON H. KIM
                            Acting United States Attorney for the
                            Southern District of New York
                            1 St. Andrews Plaza
                            New York, NY 10007


Tara M. La Morte
Assistant United States Attorney
-Of Counsel-

A0254

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ................................................................................................... 2

DISCUSSION ...................................................................................................... 6

A.   General Principles of Extradition .............................................................. 6

B.   Japan's Extradition Request Satisfies the Test for Certifying the Fugitive as Extraditable.... 9

    1. This Court Has Authority Over the Proceedings .................................... 9

    2. This Court Has Jurisdiction Over Kanayama ...................................... 10

    3. The Applicable Extradition Treaty Is in Full Force and Effect. ............. 10

    4. The Alleged Crimes Are Encompassed by the Extradition Treaty........... 11

    5. There Is Probable Cause That the Fugitive Has Committed the Offenses Charged. ......... 13

    6. The Evidence Japan Presents to Satisfy Its Burden of Proof Is Admissible...................... 15

       a.   No Live Witnesses ...................................................................... 15

       b.   Certification of Documents ........................................................ 16

       c.   Limitations on the Fugitive's Evidence ...................................... 16

CONCLUSION...................................................................................................... 18

A0255

## PRELIMINARY STATEMENT

On or about May 30, 2017, the United States filed a complaint (the "Complaint") for the extradition of Masahide Kanayama, at the request of the Government of Japan pursuant to the Treaty on Extradition Between the United States and Japan, U.S.-Japan, Mar. 26, 1980, 31 U.S.T. 892 (the "Extradition Treaty").

Japan has submitted a formal request for Kanayama's arrest, extradition, and surrender, supported by appropriate documents, to the United States Department of State. By statute, this Court must consider the evidence of criminality presented by Japan to determine whether it is "sufficient to sustain the charge under the provisions of the proper treaty or convention." 18 U.S.C. § 3184. If the Court finds the evidence sufficient to sustain the charges against Kanayama, the Court must "certify the same" to the Secretary of State, who decides whether to surrender the fugitive "according to the stipulations of the treaty or convention." *Id.*

As summarized in the Complaint, Kanayama is wanted by Japan on two counts of damaging religious and historical shrines, in violation of Article 260 of the Japanese Criminal Code. These offenses correspond to violations of various United States statutes, including, for example, New York Penal Law section 145.10 (criminal mischief in the second degree), and section 145.05 (criminal mischief in the third degree), both felony crimes. In particular, the Government of Japan alleges that on March 25, 2015, Kanayama used an oily liquid to deface the main gate of the Narita-san Shinsho-ji Temple in Narita, Japan, and to deface various portions of the Katori Jingu Shrine in Katori, Japan, collectively causing damages of approximately $21,300. Japan issued arrest warrants for Kanayama on or about December 8, 2015, and April 4, 2015, respectively, and those warrants have since been renewed.

The United States respectfully submits this memorandum to set forth the factual background of this case; to set forth the legal standards and protocols that govern extradition proceedings under 18 U.S.C. § 3184; and to discuss the application of those standards to the facts of this case. As discussed below, the Government of Japan engaged in a thorough investigation of this matter, and has demonstrated more than sufficient evidence to sustain the charges against Kanayama.

## BACKGROUND

The Government of Japan formally requested the extradition of Kanayama through a diplomatic note dated December 12, 2016 (the "Extradition Request"). *See* Declaration of Elizabeth M. M. O'Connor dated February 28, 2017, attachment (filed on or about May 30, 2017). Based upon the information provided by the Government of Japan in support of its Extradition Request,[1] the facts underlying Japan's charges against Kanayama are as follows:

In April 2015, Japanese police received separate complaints of damage from the Narita-san Shinsho-ji Temple in Narita, Japan, and the Katori Jingu Shrine in Katori Japan. In response to those complaints, Japanese police obtained videofootage from the security cameras installed at both sites. (Rec. Ex. 5; *see also id.* Ex. 16 (containing still shots)). Videofootage obtained from the Narita-san Shinsho-ji Temple revealed that on March 25, 2015, a man wearing a black long-sleeved and streaked windbreaker with a hood, a grey jacket, a whitish collared shirt, dark-blue jeans, and black shoes, carrying a camera, and with black thinning hair, was roaming around the Narita-san Shinsho-ji Temple, and between 3:37 p.m. and 4:06 p.m., around *Nio-mon* (gate), *Komyo-do* (hall), *Okuno-in* (inner sanctuary), and *Somon* (main gate), was touching poles. (Rec.

---

[1] The Government manually filed these documents, along with the Complaint, on or about May 30, 2017. The documents are organized as tabbed exhibits, and will be referenced herein as "Rec. Ex. __."

2

A0257

Ex. 5; *see also id.* Exs. 12, 16 (containing still shots)). These were among the locations that were

the subject of the complaint to the Japanese police. (Rec. Ex. 11; *see also id.* Ex. 12). A review

of photographs taken of the *Somon* by a tourist and an employee of the shrine at approximately

2:24 p.m. and 4:07 p.m., respectively, showed that the oil defacement occurred between 3:30

p.m. and 4:07 p.m. (*see* Rec. Ex. 6), and the videofootage showed the man, now suspect,

touching the poles on the east side of *Somon* at around 4:06 p.m (*see id.*). The surveillance

footage did not reveal any other persons actually touching the poles in this timeframe. (*Id.*). A

company with experience in temple construction provided a quotation of approximately 120,500

yen of damage, which is about $1,008.00. (Rec. Ex. 10; *see also id.* Ex. 12).

Similarly, videofootage obtained from the Katori Jingu Shrine showed a man closely

resembling the individual who was seen on surveillance video touching the aforementioned sites

at the Narita-san Shinsho-ji Temple. Specifically, footage from March 25, 2015—the same date

that the man vandalized portions of the Narita-san Shinsho-ji Temple—revealed the man

touching a black pole located in the west front of the Hall of Worship, another black pole in the

east front of the Hall of Worship, and swinging up his right hand in a manner suggesting

spraying some kind of liquid towards the offertory box of the front of the Hall of Worship at

approximately 5:02 p.m. (Rec. Ex. 7). These locations were among the same locations that were

the subject of the complaint to the Japanese police and determined to be damaged with an oily

liquid. (Rec. Ex. 9; *see also id.* Ex. 13). An interview of staff members of the Katori Jingu

Shrine revealed that staff did not notice any stains at the offertory box in connection with a

collection at 4:48 p.m., did not notice any stains in the Hall of Worship at around 4:52 p.m., but

noticed that some kind of liquid had been sprayed on the offertory box and nearby poles at

around 9:36 p.m., in connection with patrol duty. (Rec. Ex. 7). At 5:13 p.m. on March 26, 2015,

a priest who opened the front door of the Hall of Worship discovered an oil-like liquid sprayed over the stairs in front. (*Id.*). A company experienced with temple restoration provided a quotation of 2,423,248 yen of damage, which is approximately $20,282.00 (Rec. Ex. 11; *see also id.* Ex. 13).

As the security footage last showed the man at the Narita-san Shinsho-ji Temple at around 4:06 p.m., and then at the Katori Jingu Shrine approximately 51 minutes later, around 4:57 p.m., Japanese investigators determined that the suspect may have used a car to travel from one location to the other. Investigators test-drove various routes from the Narita-san Shinsho-ji Temple to the Katori Jingu Shrine, and determined that one could travel from one shrine to another within that timeframe using one particular route – the Higashikanto Expressway. (Rec. Ex. 5).

Japanese investigators next examined surveillance images from two tollgates along the Higashikanto Expressway: (1) the Narita tollgate, near the Narita-san Shinsho Temple; and (2) the Sawara-Katori tollgate, near the Katori Jingu Shrine. That examination revealed that on March 25, 2015, at around 4:30 p.m.—after the suspect was last captured on surveillance at the Narita-san Shinsho Temple—a gray Toyota Prius entered Higashikanto Expressway at the Narita tollgate, and at around 4:41 p.m.—before the suspect was captured on surveillance at the Katori Jinjgu Shrine—a gray Toyota Prius exited the Higashikanto Expressway via the Sawara-Katori tollgate. (Rec. Ex. 5). The surveillance footage from the Sawara-Katori tollgate revealed that the driver of the Toyota Prius resembled the suspect, in that he had black hair and was wearing a dark long-sleeved jacket with a white hood. (Rec. Ex. 5). In addition, expressway tickets collected at each of the tollgates at the relevant times were observed to be issued to a car with a license plate ending in "14." (Rec. Ex. 5).

4

A0259

From inquiries to car rental shops in the vicinity of Narita City and the Narita International Airport, investigators learned that a gray Toyota Prius with license plate number "Narita 300Wa414" was rented from Orix Rent-A-Car at the Narita International Airport terminal. (Rec. Ex. 14). The renter was determined to be Masahide Kanayama, who had presented his passport and international driver's license with face photo for the purposes of renting the car. (*Id.*). An employee from the car rental shop stated that the renter, Kanayama, left the shop with the car at approximately 2:33 p.m. on March 25, 2015, and returned the car on March 26 at 10:19 a.m. (*Id.*). The photograph resembled the individual on the security footage from the shrines. (*Id.*; *see also* Ex. 15).

Once Kanayama surfaced as the suspect, investigators determined through online searches that he is the founder and director of the International Marketplace Ministry ("IMM"), a non-profit organization he established in Japan in 2013. (Rec. Exs. 17, 18). Through IMM, Kanayama has engaged in Christian missionary activities in Japan and other countries throughout the world. IMM's website contained two YouTube videos of lectures presented by Kanayama on November 3, 2012, and December 31, 2012, during which he states that he poured oil onto various shrines for religious purposes. (Rec. Exs. 17, 18). Investigators also learned from their searches that Kanayama was a practicing ob-gyn who traveled to the United States to practice medicine. (Rec. Ex. 3).

Using Kanayama's passport information, investigators then obtained and reviewed Kanayama's flight records. Those records revealed that Kanayama was in Japan at the time of the vandalism. Specifically, flight records revealed that Kanayama departed JFK International Airport on March 20, 2015, and entered Japan via the Narita International Airport on March 21. On April 1, 2015, Kanayama departed Japan through the Narita International Airport and arrived

A0260

in India that same day.  He departed India on April 7, touched down through the Narita

International Airport, and departed from there back to JFK International Airport.  (Rec. Ex. 19).

 The Japanese investigators retained an expert in forensic odontology and anthropology,

Professor Masatsugu Hashimoto, to analyze the photographs of the individual depicted in the

passport photograph as compared to the individual captured in the video footage from the Narita-

san Shinsho Temple and Katori Jingu Shrine.  Examining, among other things, facial and

morphologic features, the expert concluded that there is a "very high possibility" that the

individual depicted in the footage obtained from the Narita-san Shinsho Temple and Katori Jingu

Shrine, and Kanayama's passport, are the same person.  (Rec. Ex 16; *see also id.* Ex. 15).  He

also observed the colors of the suspect's jacket, shirt, pants, and shoes in the Narita-san Shinsho

Temple footage are identical to those captured in the video surveillance from the Katori Jingu

Shrine.  (Rec. Ex 16).

 In light of this information, Japan's Sakura Summary Court issued arrest warrants for

Kanayama.  (Rec. Exs. 1, 2).[2]

 Kanayama was arrested in New York, New York, on June 2, 2017, and is currently

released with bail conditions.

<div align="center">

**<u>DISCUSSION</u>**

</div>

**A.** **General Principles of Extradition**

 An extradition hearing is not a criminal or civil proceeding, but is *sui generis*.

Extradition is primarily an executive responsibility with a specially defined role for a judicial

officer, who determines only whether to certify to the Secretary of State that the submitted

evidence is "sufficient to sustain the charge," *i.e.*, whether there is probable cause.  18 U.S.C. §

---

[2] These arrest warrants have since been renewed; the United States is awaiting receipt via formal diplomatic channels.

3184. The Secretary of State makes the ultimate decision regarding whether the fugitive should be surrendered to the requesting country. *See id.*; *id.* § 3186; *Lo Duca* v. *United States*, 93 F.3d 1100, 1103-04 (2d Cir. 1996). It is well-established that "the function of the extraditing magistrate is not to decide guilt or innocence but merely to determine whether there is 'competent legal evidence which . . . would justify his apprehension and commitment for trial if the crime had been committed in that state.'" *Shapiro* v. *Ferrandina*, 478 F.2d 894, 900-91 (2d Cir. 1973) (quoting *Collins* v. *Loisel*, 259 U.S. 309, 315 (1922)); *see also Prasoprat* v. *Benov*, 421 F.3d 1009, 1014 (9th Cir. 2005) (finding that the court's inquiry is limited to "whether the crime is extraditable and whether there is probable cause to support the charge" and that "the judicial officer *must* certify the individual as extraditable to the Secretary of State" if those requirements are met) (emphasis in original).

At the hearing held pursuant to 18 U.S.C. § 3184 on the question of extraditability, the Court should consider the evidence presented on behalf of the requesting country and determine whether the legal requirements for certification, as defined in the applicable treaty, statutes, and case law, have been established. If any evidence is offered by the fugitive, the Court rules on its admissibility. Once the evidentiary record is complete, the Court should make written findings of fact and conclusions of law as to each of the elements for certification, including separate findings for each offense as to which extradition is sought. *See* 18 U.S.C. § 3184; *Shapiro*, 478 F.2d at 905-06. If the Court certifies the evidence to the Secretary of State, the Court must commit the fugitive to the custody of the United States Marshal to await the further determination by the Secretary regarding surrender of the fugitive to the representatives of the requesting state. The Court provides its certification to the Secretary of State together with a

copy of the evidence and a transcript of any testimony presented at the hearing. *See* 18 U.S.C. § 3184; *Cheung* v. *United States*, 213 F.3d 82, 88 (2d Cir. 2000).

An extradition hearing is unique in nature. *See, e.g., Martin* v. *Warden, Atlanta Pen*, 993 F.2d 824, 828 (11th Cir. 1993); *Jhirad* v. *Ferrandina*, 536 F.2d 478, 482 (2d Cir. 1976) (extradition is *sui generis*). It is not a criminal proceeding, as its purpose is to decide probable cause under the treaty, and not guilt or innocence—that being reserved for the foreign court. *Neely* v. *Henkel*, 180 U.S. 109, 123 (1901); *Benson* v. *McMahon*, 127 U.S. 457, 463 (1888); *Simmons* v. *Braun*, 627 F.2d 635, 636 (2d Cir. 1980). Accordingly, a fugitive is not entitled to the rights available in a criminal trial. *Neely*, 180 U.S. at 122 (rights available to one charged with a criminal offense in this country not applicable to offenses committed outside the United States against the laws of another country); *accord Charlton v. Kelly*, 229 U.S. 447, 461 (1913); *Martin*, 993 F.2d at 829. For example, a person whose extradition is sought has no right to discovery, *Prasoprat*, 421 F.3d at 1014; *Messina* v. *United States*, 728 F.2d 77, 80 (2d Cir. 1984); no right to cross-examine witnesses who might testify at the hearing, *Oen Yin-Choy* v. *Robinson*, 858 F.2d 1400, 1407 (9th Cir. 1988); *Messina*, 728 F.2d at 80; a severely limited right to present evidence, *Messina*, 728 F.2d at 80; and no Sixth Amendment right to a speedy trial, *Jhirad*, 536 F.2d at 485 n.9.

In fulfilling its function under section 3184, the Court should liberally construe the applicable extradition treaty in order to effect its purpose, namely, the surrender of fugitives to the requesting country. *See, e.g., Valentine* v. *United States ex rel. Neidecker*, 299 U.S. 5, 14 (1936). Accordingly, the Supreme Court has made clear that an extradition treaty "should be construed more liberally than a criminal statute or the technical requirements of criminal procedure." *Factor* v. *Laubenheimer*, 290 U.S. 276, 298 (1933). Foreign governments are not

8

expected to be well versed in our criminal laws and procedures. *Grin* v. *Shine*, 187 U.S. 181, 184 (1902). Thus, "[f]orm is not to be insisted upon beyond the requirements of safety and justice." *Skaftouros* v. *United States*, 667 F.3d 144, 156 (2d Cir. 2011) (quoting *Fernandez* v. *Phillips*, 268 U.S. 311, 312 (1925)).

Statements by the United States Department of State as to the force and interpretation of treaties should be given great weight by the Court. *El Al Israel Airlines, Ltd.* v. *Tseng*, 525 U.S. 155, 168 (1999); *Sumitomo Shoji America, Inc.* v. *Avagliano*, 457 U.S. 176, 184-85 (1982) ("Although not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight."); *Ahmad* v. *Wigen*, 726 F. Supp. 389, 402 (E.D.N.Y. 1989), *aff'd*, 910 F.2d 1063 (2d Cir. 1990) ("The State Department's view deserves deference, unless it represents a substantial departure from national or international norms.").

**B.**     **Japan's Extradition Request Satisfies the Test for Certifying the Fugitive as Extraditable**

An extradition certification is in order where: (1) the judicial officer is authorized to conduct the extradition proceeding; (2) the court has jurisdiction over the fugitive; (3) the applicable treaty is in full force and effect; (4) the crimes for which surrender is requested are covered by the applicable treaty; and (5) there is sufficient evidence to support a finding of probable cause as to each charge for which extradition is sought. *Fernandez*, 268 U.S. at 312; *Murphy* v. *United States*, 199 F.3d 599, 601 (2d Cir. 1999); *Austin* v. *Healey*, 5 F.3d 598, 600-02 (2d Cir. 1993).

1. <u>This Court Has Authority Over the Proceedings</u>

The extradition statute authorizes proceedings to be conducted by "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State." Consequently, both magistrate judges and district judges may render a "certification" under secction 3184. See Austin, 5 F.3d at 601-02 (magistrate judge had authorization to conduct the extradition hearing without specific delegation of authority).

2.  <u>This Court Has Jurisdiction Over Kanayama</u>

This Court has personal jurisdiction over a fugitive found within its jurisdictional boundaries. 18 U.S.C. § 3184 (establishing that magistrate judge "may, upon complaint made under oath, charging any person found within his jurisdiction, . . . issue his warrant for the apprehension of the person so charged"); *Pettit* v. *Walshe*, 194 U.S. 205, 219 (1904) ("The commissioner or judicial officer here referred to is necessarily one acting as such within the state in which the accused was arrested and found."); *In re Pazienza*, 619 F. Supp. 611, 616 (S.D.N.Y. 1985). This Court has personal jurisdiction over Kanayama, as he was located and arrested in the Southern District of New York.

3.  <u>The Applicable Extradition Treaty Is in Full Force and Effect.</u>

The extradition statute, 18 U.S.C. § 3184, provides for extradition in instances in which a treaty or convention is in force between the requesting state and the United States. The courts generally defer to the executive branch on the question of whether a treaty is in force. *Terlinden* v. *Ames*, 184 U.S. 270, 288 (1902); *see also NY Chinese TV Programs, Inc.* v. *U.E. Enterprises, Inc.*, 954 F.2d 847, 852 (2d Cir. 1992).

Here, the United States has submitted a declaration from Elizabeth M.M. O'Connor, an attorney in the Office of the Legal Adviser for the Department of State, attesting that there is a

A0265

treaty in full force and effect between the United States and Japan. *See* O'Connor Decl. ¶¶ 2-3. This Court should defer to the Department of State in this regard. *See Terlinden*, 184 U.S. at 288.

    4.  <u>The Alleged Crimes Are Encompassed by the Extradition Treaty.</u>

    An extradition treaty obliges the United States to surrender fugitives under the circumstances defined in the treaty. Article 1 of the Extradition Treaty applicable in this case provides for the return of fugitives charged with, or convicted of certain extraditable offenses as defined in Article 2. As relevant here, Article 2 of the Extradition Treaty defines offenses as extraditable if they are among those listed in the Schedule annexed to the Treaty, which is an integral part of the treaty, if the offense is punishable by the laws of both the United States and Japan by a deprivation of liberty for a maximum term of not less than one year. *See* O'Connor Decl. (attaching Extradition Treaty, 31 U.S.T. 892).

    The documents submitted by the Government of Japan establish that Kanayama has been charged in Japan with two counts of damage or destruction of structure (vandalism), in violation of Article 260 of the Japanese Penal Code. (Rec. Exs. 1, 2, 22). That crime is incorporated in the Extradition Treaty's Schedule, *see* Extradition Treaty, Schedule at 19 ("An offense relating to damage of property, documents, or facilities."), and a violation of Article 260 is punishable in Japan by imprisonment for more than one year (*see* Rec. Ex. 22).

    The Court must further determine whether the crime for which extradition is sought is also a crime in the United States, a requirement known as dual criminality. When considering whether the offenses at issue here are dually criminal in both the United States and Japan, the Court should examine the description of the alleged misconduct provided by Japan in support of its charges and decide whether that conduct would have been criminal if it had been perpetrated

A0266

in the United States. Significantly, however, a requesting country is not obliged to produce

evidence on all elements of a criminal offense or to establish that its crimes are identical to ours.

*Kelly* v. *Griffin*, 241 U.S. 6, 15 (1916); *Shapiro*, 478 F.2d at 908 (dual criminality is satisfied if

"the laws of both the requesting and the requested party appear to be directed to the same basic

evil"). The Supreme Court noted in *Collins* v. *Loisel*, 259 U.S. 309 (1922), that dual criminality

is not a technical concept involving a comparison of the elements of the two countries' offenses:

> The law does not require that the name by which the crime is
> described in the two countries shall be the same; nor that the scope
> of the liability shall be coextensive, or, in other respects, the same
> in the two countries. It is enough if the *particular* act charged is
> criminal in both jurisdictions.

*Id.* at 312 (emphasis added); *see also Lo Duca*, 93 F.3d at 1111-12 ("[I]n applying the dual

criminality requirement . . . we have never considered only the statutory text. Rather, we have

looked towards the conduct of the accused to see if it falls within the proscription of American

criminal law.").

Dual criminality is established if the conduct underlying the foreign offense would be

criminal under U.S. federal law, the law of the state in which the extradition hearing is held

(here, New York), or the law of a preponderance of the states. *Hu Yau-Leung* v. *Soscia*, 649

F.2d 914, 918 n.4 (2d Cir. 1981). Kanayama's alleged criminal activity in Japan, had it occurred

in the United States, could be prosecuted, for example, as a felony in violation of several New

York statutes. In particular, Kanayama's conduct, if committed here, would violate New York

Penal Law § 145.05, a felony crime, which provides that one is guilty of criminal mischief in the

third degree if, with the intent to damage the property of another and having no right to do so nor

any reasonable ground to believe that such a right exists, he or she "damages property of another

person in an amount exceeding two hundred fifty dollars." Similarly, New York Penal Law

§ 145.10, criminal mischief in the second degree, prohibits the same conduct if the damage is "an amount exceeding one thousand five hundred dollars." As noted above, the total damages caused by Kanayama's crimes in Japan exceeds $20,000. As felonies, these offenses are punishable in New York by more than one year imprisonment.

    5.   <u>There Is Probable Cause That the Fugitive Has Committed the Offenses Charged.</u>

       The standard of proof to find the evidence "sufficient to sustain the charge" pursuant to 18 U.S.C. § 3184 is the familiar domestic requirement of probable cause. The Court must conclude there is probable cause to believe that the crimes charged by Kanayama were committed and that the person before the Court committed them. *See Ahmad*, 910 F.2d at 1065-66. The evidence is sufficient and probable cause is established if a person of ordinary prudence and caution can conscientiously entertain a reasonable belief in the probable guilt of the accused. *Gerstein* v. *Pugh*, 420 U.S. 103, 111 (1975). As the Supreme Court stated in *Benson* v. *McMahon*:

> [T]he proceeding before the commissioner is not to be regarded as in the nature of a final trial by which the prisoner could be convicted or acquitted of the crime charged against him, but rather of the character of those preliminary examinations which take place every day in this country before an examining or committing magistrate for the purpose of determining whether a case is made out which will justify the holding of the accused, either by imprisonment or under bail, to ultimately answer to an indictment, or other proceeding, in which he shall be finally tried upon the charge made against him.

127 U.S. at 463; *see also Collins*, 259 U.S. at 316 ("The function of the committing magistrate is to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction.").

       Here, the evidence described above more than establishes probable cause that Kanayama committed the crimes for which Japan seeks extradition. As an initial matter, the evidence

A0268

establishes probable cause that there was damage to a structure. With respect to the Narita-san
Shinsho-ji Temple, Japanese authorities obtained photographs taken of the Temple before and
after the defacement on the afternoon of March 25, 2015. The photographs taken after the
defacement show stains on the poles of the Temple. In addition, Narita-san Shinsho-ji Temple
received a quote from the Kongo Gumi Co., Ltd., a company that has experience with temple
construction, estimating that it would cost approximately 120,500 yen to repair the damage to the
Temple. With respect to the Katori Jingu Shrine, the defacement of poles, stairs, and an
offertory box was discovered in the evening of March 25, 2015, and early the next morning on
March 26, 2015. The Katori Jingu Shrine received a quote from Konishi Decorative Arts &
Crafts Co., Ltd., a company that has experience with temple restoration, estimating that it would
cost approximately 2,423,248 yen to repair damage to the Shrine.

   The evidence also easily establishes probable cause that Kanayama was the one who
caused the damage to the Narita-san Shinsho-ji Temple and Katori Jingu Shrine. Among other
things, a review of video surveillance from the Narita-san Shinsho Temple and Katori Jingu
Shrine on the date and during the timeframe that the vandalism occurred showed what
reasonably appears to be the same individual touching the damaged sites at issue. A review of
surveillance images and toll tickets collected at tollstops between the Narita-san Shinsho Temple
and the Katori Jingu Shrine during the relevant timeframe revealed a gray Toyota Prius that
authorities conclusively determined was rented by Kanayama. Authorities learned that
Kanayama presented his passport to make that rental, and that information enabled them to pull
Kanayama's official passport record, showing an individual resembling the person depicted in
the video surveillance images captured from the Temple and Shrine. Based on an analysis of
facial and morphological features, an expert concluded that there was a very high likelihood that

14

the person depicted in the passport is the same person depicted in the surveillance images of the Narita-san Shinsho Temple and Katori Jingu Shrine. Further, there are YouTube videos of lectures presented by Kanayama on November 3, 2012, and December 31, 2012, in which he states that he poured oil onto various shrines for religious purposes.

6.   The Evidence Japan Presents to Satisfy Its Burden of Proof Is Admissible

Neither the Federal Rules of Criminal Procedure nor the Federal Rules of Evidence apply to extradition hearings. *See* Fed. R. Crim. P. 1(a)(5) (stating that "extradition and rendition of a fugitive" are not governed by rules); Fed. R. Evid. 1101(d)(3) (evidence rules are inapplicable to "miscellaneous proceedings such as . . . extradition or rendition"); *Melia* v. *United States*, 667 F.2d 300, 302 (2d Cir. 1981). Rather, "unique rules of wide latitude govern reception of evidence" in extradition hearings. *Sayne* v. *Shipley*, 418 F.2d 679, 685 (5th Cir. 1969) (citation and internal quotation marks omitted). Among these rules are the following:

**a.  No Live Witnesses**

Extradition treaties do not contemplate the introduction of live witness testimony at extradition proceedings because to do so "would defeat the whole object of the treaty." *Bingham* v. *Bradley*, 241 U.S. 511, 517 (1916 ). Thus, hearsay evidence is admissible at extradition hearings and may support a finding of extraditability. *See id.* (rejecting fugitive's claim that *ex parte* witness affidavits submitted in support of his extradition to Canada should not be considered because he had not had the opportunity to cross-examine those witnesses); *see also Collins*, 259 U.S. at 317; *In re Ryan*, 360 F. Supp. 270, 273 (E.D.N.Y.), *aff'd*, 478 F.2d 1397 (2d Cir. 1973) ("A determination of probable cause in an extradition proceeding may rest entirely upon hearsay."); *see also United States* v. *Zanazanian*, 729 F.2d 624, 626-27 (9th Cir. 1980) (unsworn written statements may properly form the basis for extradition); *Simmons* v. *Braun*,

15

627 F.2d 635, 636 (2d Cir. 1980) (same). Accordingly, a finding of extraditability may be, and typically is, based entirely on documentary evidence. *See, e.g., Shapiro*, 478 F.2d at 902-03.

### b. Certification of Documents

The certification of documents introduced during an extradition hearing is governed by the Treaty and by 18 U.S.C. § 3190. The Extradition Treaty here provides that documents submitted by the requesting party, (here, Japan) be "duly certified as required by the laws of the requested Party, and accompanied by a duly certified translation in the language of the requested Party." Extradition Treaty Art. VIII. Section 3190 similarly provides that "depositions, warrants, or other papers or copies thereof offered in evidence upon the hearing of any extradition case shall be received and admitted as evidence" so long as they are "properly and legally authenticated," that is, accompanied by "the certificate of the principal diplomatic or consular officer of the United States resident in such foreign country." 18 U.S.C. § 3190; *see Zanazanian*, 729 F.2d at 627 ("United States law requires only that the submitted documents be properly authenticated. . . ."); *Skaftouros*, 667 F.3d at 161. The documents presented by the Government of Japan in this case are accordingly accompanied by the certification of Jason P. Hyland, Charge d'Affaires ad interim, affirming that the documents "properly and legally authenticated so as to entitle them to be received in evidence for similar purposes by the tribunals of Japan as required by Title 18, United States Code, Section 3190."

### c. Limitations on the Fugitive's Evidence

The fugitive's grounds for opposing an extradition request are heavily circumscribed. The fugitive is not entitled to introduce evidence that contradicts the evidence submitted by the requesting state, attempts to establish an alibi, or presents a defense. *See Charlton* v. *Kelly*, 229 U.S. 447, 461 (1913); *see also Collins*, 259 U.S. at 316 (permitting the introduction of defense

16

evidence "would be in plain contravention of the intent and meaning of the extradition treaties");

*Hu Yau-Leung*, 649 F.2d at 917 (alibi evidence is inadmissible); *Shapiro*, 478 F.2d at 901;

*Matter of Locatelli*, 468 F. Supp. 568, 573-74 (S.D.N.Y. 1979) (attempt to impeach credibility of

requesting country's witnesses not permitted). Moreover, procedural defenses are not permitted.

*See Bingham*, 241 U.S. at 517; *Glucksman* v. *Henkel*, 221 U.S. 508, 513-14 (1911) (variance

between charges pending in the foreign country and the complaint filed in federal court is not a

valid defense to surrender).

Instead, a fugitive's right to controvert the evidence introduced against him is "limited to

testimony which explains rather than contradicts the demanding country's proof." *United States*

*ex rel. Petrushansky* v. *Marasco*, 325 F.2d 562, 567 (2d Cir. 1963); *see also Collins*, 259 U.S. at

315-17; *accord Hooker* v. *Klein*, 573 F.2d 1360, 1368 (9th Cir. 1978) (describing a fugitive's

participation at an extradition proceeding as "limited"). Such explanatory evidence is admissible

only so as to afford a fugitive

> the opportunity to present reasonably clear-cut proof which would
> be of limited scope and having some reasonable chance of negating
> a showing of probable cause. The scope of this evidence is restricted
> to what is appropriate to an extradition hearing. The decisions are
> emphatic that the extraditee cannot be allowed to turn the extradition
> hearing into a full trial on the merits.

*Matter of Sindona*, 450 F. Supp. 672, 685 (S.D.N.Y. 1978), *aff'd sub nom Sindona* v. *Grant*, 619

F.2d 167 (2d Cir. 1980). Hence, the extradition magistrate judge may not weigh conflicting

evidence and determine what to credit, "but, rather, determines only whether there is competent

evidence to support the belief that the accused has committed the charged offense." *Quinn* v.

*Robinson*, 783 F.2d 776, 815 (9th Cir. 1986). Here, the evidence submitted by Japan is more

than ample to support a certification of extraditability.

## CONCLUSION

WHEREFORE, the United States requests that the Court determine, pursuant to Title 18, United States Code, Section 3184, that the submission on behalf of Japan is sufficient to sustain each of the charges under the provisions of the applicable treaty and to certify the extradition of Kanayama for each of those charges to the Secretary of State for possible surrender to Japan.

Dated: New York, New York
      August 22, 2017

                            Respectfully submitted,

                            JOON H. KIM
                            Acting United States Attorney for the
                            Southern District of New York

                            TARA M. La MORTE
                            Assistant United States Attorney
                            (212) 637-1041
                            tara.lamorte2@usdoj.gov

cc (via email): Patrick Joyce, Esq.

18

A0273

# Exhibit 9

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                              :
IN THE MATTER OF THE EXTRADITION              :
OF MASAHIDE KANAYAMA                          :      17 Crim. Misc. 1 Page 003 (ER)
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X      **NOTICE OF MOTION**

      PLEASE TAKE NOTICE that, upon the accompanying (1) Memorandum of Law of the

United States of America in Support of Extradition; (2) Declaration of Elizabeth M.M.

O'Connor, dated February 28, 2017, and all attachments thereto (filed in this matter on or about

May 30, 2017); (3) documents in support of the Extradition Request submitted by the Embassy

of Japan and certified on November 25, 2016, by Jason P. Hyland, Charge d'Affaires ad interim

at the United States Embassy in Tokyo (filed in this matter on or about May 30, 2017); and (4)

all prior pleadings herein, the United States of America, by and through its attorney, Joon H.

Kim, Acting United States Attorney for the Southern District of New York, will move this Court

for a certification of extraditability pursuant to Title 18, United States Code, Section 3184.

PLEASE TAKE FURTHER NOTICE that, pursuant to the Court's Order dated July 11, 2017, opposition papers are to be served by September 29, 2017, and reply papers are to be served by October 20, 2017.

DATED: New York, New York
       August 22, 2017

                                              JOON H. KIM
                                              Acting United States Attorney for the
                                              Southern District of New York

                                  By:         _____
                                              TARA M. La MORTE
                                              Assistant United States Attorney
                                              1 St. Andrews Plaza
                                              New York, NY 10007
                                              (212) 637-1041
                                              tara.lamorte2@usdoj.gov

cc (via email): Patrick Joyce, Esq.

A0276

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                           :
IN THE MATTER OF THE EXTRADITION   :
OF MASAHIDE KANAYAMA            :     17 Crim. Misc. 1 Page 003 (ER)
                           :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

# MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN SUPPORT OF EXTRADITION

JOON H. KIM
Acting United States Attorney for the
Southern District of New York
1 St. Andrews Plaza
New York, NY 10007

Tara M. La Morte
Assistant United States Attorney
-Of Counsel-

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................... 1

BACKGROUND ................................................................................................. 2

DISCUSSION ................................................................................................... 6

A.   General Principles of Extradition ........................................................ 6

B.   Japan's Extradition Request Satisfies the Test for Certifying the Fugitive as Extraditable.... 9

    1. This Court Has Authority Over the Proceedings ................................. 9

    2. This Court Has Jurisdiction Over Kanayama ..................................... 10

    3. The Applicable Extradition Treaty Is in Full Force and Effect. ........... 10

    4. The Alleged Crimes Are Encompassed by the Extradition Treaty. ...... 11

    5. There Is Probable Cause That the Fugitive Has Committed the Offenses Charged. ......... 13

    6. The Evidence Japan Presents to Satisfy Its Burden of Proof Is Admissible ...................... 15

        a.   No Live Witnesses ................................................................ 15

        b.   Certification of Documents ..................................................... 16

        c.   Limitations on the Fugitive's Evidence .................................... 16

CONCLUSION ................................................................................................. 18

### PRELIMINARY STATEMENT

On or about May 30, 2017, the United States filed a complaint (the "Complaint") for the extradition of Masahide Kanayama, at the request of the Government of Japan pursuant to the Treaty on Extradition Between the United States and Japan, U.S.-Japan, Mar. 26, 1980, 31 U.S.T. 892 (the "Extradition Treaty").

Japan has submitted a formal request for Kanayama's arrest, extradition, and surrender, supported by appropriate documents, to the United States Department of State. By statute, this Court must consider the evidence of criminality presented by Japan to determine whether it is "sufficient to sustain the charge under the provisions of the proper treaty or convention." 18 U.S.C. § 3184. If the Court finds the evidence sufficient to sustain the charges against Kanayama, the Court must "certify the same" to the Secretary of State, who decides whether to surrender the fugitive "according to the stipulations of the treaty or convention." *Id.*

As summarized in the Complaint, Kanayama is wanted by Japan on two counts of damaging religious and historical shrines, in violation of Article 260 of the Japanese Criminal Code. These offenses correspond to violations of various United States statutes, including, for example, New York Penal Law section 145.10 (criminal mischief in the second degree), and section 145.05 (criminal mischief in the third degree), both felony crimes. In particular, the Government of Japan alleges that on March 25, 2015, Kanayama used an oily liquid to deface the main gate of the Narita-san Shinsho-ji Temple in Narita, Japan, and to deface various portions of the Katori Jingu Shrine in Katori, Japan, collectively causing damages of approximately $21,300. Japan issued arrest warrants for Kanayama on or about December 8, 2015, and April 4, 2015, respectively, and those warrants have since been renewed.

The United States respectfully submits this memorandum to set forth the factual background of this case; to set forth the legal standards and protocols that govern extradition proceedings under 18 U.S.C. § 3184; and to discuss the application of those standards to the facts of this case. As discussed below, the Government of Japan engaged in a thorough investigation of this matter, and has demonstrated more than sufficient evidence to sustain the charges against Kanayama.

## BACKGROUND

The Government of Japan formally requested the extradition of Kanayama through a diplomatic note dated December 12, 2016 (the "Extradition Request"). *See* Declaration of Elizabeth M. M. O'Connor dated February 28, 2017, attachment (filed on or about May 30, 2017). Based upon the information provided by the Government of Japan in support of its Extradition Request,[1] the facts underlying Japan's charges against Kanayama are as follows:

In April 2015, Japanese police received separate complaints of damage from the Narita-san Shinsho-ji Temple in Narita, Japan, and the Katori Jingu Shrine in Katori Japan. In response to those complaints, Japanese police obtained videofootage from the security cameras installed at both sites. (Rec. Ex. 5; *see also id.* Ex. 16 (containing still shots)). Videofootage obtained from the Narita-san Shinsho-ji Temple revealed that on March 25, 2015, a man wearing a black long-sleeved and streaked windbreaker with a hood, a grey jacket, a whitish collared shirt, dark-blue jeans, and black shoes, carrying a camera, and with black thinning hair, was roaming around the Narita-san Shinsho-ji Temple, and between 3:37 p.m. and 4:06 p.m., around *Nio-mon* (gate), *Komyo-do* (hall), *Okuno-in* (inner sanctuary), and *Somon* (main gate), was touching poles. (Rec.

---

[1] The Government manually filed these documents, along with the Complaint, on or about May 30, 2017. The documents are organized as tabbed exhibits, and will be referenced herein as "Rec. Ex. ___."

2

Ex. 5; *see also id.* Exs. 12, 16 (containing still shots)). These were among the locations that were the subject of the complaint to the Japanese police. (Rec. Ex. 11; *see also id.* Ex. 12). A review of photographs taken of the *Somon* by a tourist and an employee of the shrine at approximately 2:24 p.m. and 4:07 p.m., respectively, showed that the oil defacement occurred between 3:30 p.m. and 4:07 p.m. (*see* Rec. Ex. 6), and the videofootage showed the man, now suspect, touching the poles on the east side of *Somon* at around 4:06 p.m (*see id.*). The surveillance footage did not reveal any other persons actually touching the poles in this timeframe. (*Id.*). A company with experience in temple construction provided a quotation of approximately 120,500 yen of damage, which is about $1,008.00. (Rec. Ex. 10; *see also id.* Ex. 12).

Similarly, videofootage obtained from the Katori Jingu Shrine showed a man closely resembling the individual who was seen on surveillance video touching the aforementioned sites at the Narita-san Shinsho-ji Temple. Specifically, footage from March 25, 2015—the same date that the man vandalized portions of the Narita-san Shinsho-ji Temple—revealed the man touching a black pole located in the west front of the Hall of Worship, another black pole in the east front of the Hall of Worship, and swinging up his right hand in a manner suggesting spraying some kind of liquid towards the offertory box of the front of the Hall of Worship at approximately 5:02 p.m. (Rec. Ex. 7). These locations were among the same locations that were the subject of the complaint to the Japanese police and determined to be damaged with an oily liquid. (Rec. Ex. 9; *see also id.* Ex. 13). An interview of staff members of the Katori Jingu Shrine revealed that staff did not notice any stains at the offertory box in connection with a collection at 4:48 p.m., did not notice any stains in the Hall of Worship at around 4:52 p.m., but noticed that some kind of liquid had been sprayed on the offertory box and nearby poles at around 9:36 p.m., in connection with patrol duty. (Rec. Ex. 7). At 5:13 p.m. on March 26, 2015,

a priest who opened the front door of the Hall of Worship discovered an oil-like liquid sprayed over the stairs in front. (*Id.*). A company experienced with temple restoration provided a quotation of 2,423,248 yen of damage, which is approximately $20,282.00 (Rec. Ex. 11; *see also id.* Ex. 13).

As the security footage last showed the man at the Narita-san Shinsho-ji Temple at around 4:06 p.m., and then at the Katori Jingu Shrine approximately 51 minutes later, around 4:57 p.m., Japanese investigators determined that the suspect may have used a car to travel from one location to the other. Investigators test-drove various routes from the Narita-san Shinsho-ji Temple to the Katori Jingu Shrine, and determined that one could travel from one shrine to another within that timeframe using one particular route – the Higashikanto Expressway. (Rec. Ex. 5).

Japanese investigators next examined surveillance images from two tollgates along the Higashikanto Expressway: (1) the Narita tollgate, near the Narita-san Shinsho Temple; and (2) the Sawara-Katori tollgate, near the Katori Jingu Shrine. That examination revealed that on March 25, 2015, at around 4:30 p.m.—after the suspect was last captured on surveillance at the Narita-san Shinsho Temple—a gray Toyota Prius entered Higashikanto Expressway at the Narita tollgate, and at around 4:41 p.m.—before the suspect was captured on surveillance at the Katori Jinjgu Shrine—a gray Toyota Prius exited the Higashikanto Expressway via the Sawara-Katori tollgate. (Rec. Ex. 5). The surveillance footage from the Sawara-Katori tollgate revealed that the driver of the Toyota Prius resembled the suspect, in that he had black hair and was wearing a dark long-sleeved jacket with a white hood. (Rec. Ex. 5). In addition, expressway tickets collected at each of the tollgates at the relevant times were observed to be issued to a car with a license plate ending in "14." (Rec. Ex. 5).

4

A0282

From inquiries to car rental shops in the vicinity of Narita City and the Narita International Airport, investigators learned that a gray Toyota Prius with license plate number "Narita 300Wa414" was rented from Orix Rent-A-Car at the Narita International Airport terminal. (Rec. Ex. 14). The renter was determined to be Masahide Kanayama, who had presented his passport and international driver's license with face photo for the purposes of renting the car. (*Id.*). An employee from the car rental shop stated that the renter, Kanayama, left the shop with the car at approximately 2:33 p.m. on March 25, 2015, and returned the car on March 26 at 10:19 a.m. (*Id.*). The photograph resembled the individual on the security footage from the shrines. (*Id.*; *see also* Ex. 15).

Once Kanayama surfaced as the suspect, investigators determined through online searches that he is the founder and director of the International Marketplace Ministry ("IMM"), a non-profit organization he established in Japan in 2013. (Rec. Exs. 17, 18). Through IMM, Kanayama has engaged in Christian missionary activities in Japan and other countries throughout the world. IMM's website contained two YouTube videos of lectures presented by Kanayama on November 3, 2012, and December 31, 2012, during which he states that he poured oil onto various shrines for religious purposes. (Rec. Exs. 17, 18). Investigators also learned from their searches that Kanayama was a practicing ob-gyn who traveled to the United States to practice medicine. (Rec. Ex. 3).

Using Kanayama's passport information, investigators then obtained and reviewed Kanayama's flight records. Those records revealed that Kanayama was in Japan at the time of the vandalism. Specifically, flight records revealed that Kanayama departed JFK International Airport on March 20, 2015, and entered Japan via the Narita International Airport on March 21. On April 1, 2015, Kanayama departed Japan through the Narita International Airport and arrived

in India that same day. He departed India on April 7, touched down through the Narita International Airport, and departed from there back to JFK International Airport. (Rec. Ex. 19).

The Japanese investigators retained an expert in forensic odontology and anthropology, Professor Masatsugu Hashimoto, to analyze the photographs of the individual depicted in the passport photograph as compared to the individual captured in the video footage from the Narita-san Shinsho Temple and Katori Jingu Shrine. Examining, among other things, facial and morphologic features, the expert concluded that there is a "very high possibility" that the individual depicted in the footage obtained from the Narita-san Shinsho Temple and Katori Jingu Shrine, and Kanayama's passport, are the same person. (Rec. Ex 16; *see also id*, Ex. 15). He also observed the colors of the suspect's jacket, shirt, pants, and shoes in the Narita-san Shinsho Temple footage are identical to those captured in the video surveillance from the Katori Jingu Shrine. (Rec. Ex 16).

In light of this information, Japan's Sakura Summary Court issued arrest warrants for Kanayama. (Rec. Exs. 1, 2).[2]

Kanayama was arrested in New York, New York, on June 2, 2017, and is currently released with bail conditions.

## DISCUSSION

### A.    General Principles of Extradition

An extradition hearing is not a criminal or civil proceeding, but is *sui generis*. Extradition is primarily an executive responsibility with a specially defined role for a judicial officer, who determines only whether to certify to the Secretary of State that the submitted evidence is "sufficient to sustain the charge," *i.e.*, whether there is probable cause. 18 U.S.C. §

---

[2] These arrest warrants have since been renewed; the United States is awaiting receipt via formal diplomatic channels.

6

3184. The Secretary of State makes the ultimate decision regarding whether the fugitive should be surrendered to the requesting country. *See id.*; *id.* § 3186; *Lo Duca* v. *United States*, 93 F.3d 1100, 1103-04 (2d Cir. 1996). It is well-established that "the function of the extraditing magistrate is not to decide guilt or innocence but merely to determine whether there is 'competent legal evidence which . . . would justify his apprehension and commitment for trial if the crime had been committed in that state.'" *Shapiro* v. *Ferrandina*, 478 F.2d 894, 900-91 (2d Cir. 1973) (quoting *Collins* v. *Loisel*, 259 U.S. 309, 315 (1922)); *see also Prasoprat* v. *Benov*, 421 F.3d 1009, 1014 (9th Cir. 2005) (finding that the court's inquiry is limited to "whether the crime is extraditable and whether there is probable cause to support the charge" and that "the judicial officer *must* certify the individual as extraditable to the Secretary of State" if those requirements are met) (emphasis in original).

At the hearing held pursuant to 18 U.S.C. § 3184 on the question of extraditability, the Court should consider the evidence presented on behalf of the requesting country and determine whether the legal requirements for certification, as defined in the applicable treaty, statutes, and case law, have been established. If any evidence is offered by the fugitive, the Court rules on its admissibility. Once the evidentiary record is complete, the Court should make written findings of fact and conclusions of law as to each of the elements for certification, including separate findings for each offense as to which extradition is sought. *See* 18 U.S.C. § 3184; *Shapiro*, 478 F.2d at 905-06. If the Court certifies the evidence to the Secretary of State, the Court must commit the fugitive to the custody of the United States Marshal to await the further determination by the Secretary regarding surrender of the fugitive to the representatives of the requesting state. The Court provides its certification to the Secretary of State together with a

A0285

copy of the evidence and a transcript of any testimony presented at the hearing. *See* 18 U.S.C. § 3184; *Cheung* v. *United States*, 213 F.3d 82, 88 (2d Cir. 2000).

An extradition hearing is unique in nature. *See, e.g., Martin* v. *Warden, Atlanta Pen*, 993 F.2d 824, 828 (11th Cir. 1993); *Jhirad* v. *Ferrandina*, 536 F.2d 478, 482 (2d Cir. 1976) (extradition is *sui generis*). It is not a criminal proceeding, as its purpose is to decide probable cause under the treaty, and not guilt or innocence—that being reserved for the foreign court. *Neely* v. *Henkel*, 180 U.S. 109, 123 (1901); *Benson* v. *McMahon*, 127 U.S. 457, 463 (1888); *Simmons* v. *Braun*, 627 F.2d 635, 636 (2d Cir. 1980). Accordingly, a fugitive is not entitled to the rights available in a criminal trial. *Neely*, 180 U.S. at 122 (rights available to one charged with a criminal offense in this country not applicable to offenses committed outside the United States against the laws of another country); *accord Charlton v. Kelly*, 229 U.S. 447, 461 (1913); *Martin*, 993 F.2d at 829. For example, a person whose extradition is sought has no right to discovery, *Prasoprat*, 421 F.3d at 1014; *Messina* v. *United States*, 728 F.2d 77, 80 (2d Cir. 1984); no right to cross-examine witnesses who might testify at the hearing, *Oen Yin-Choy* v. *Robinson*, 858 F.2d 1400, 1407 (9th Cir. 1988); *Messina*, 728 F.2d at 80; a severely limited right to present evidence, *Messina*, 728 F.2d at 80; and no Sixth Amendment right to a speedy trial, *Jhirad*, 536 F.2d at 485 n.9.

In fulfilling its function under section 3184, the Court should liberally construe the applicable extradition treaty in order to effect its purpose, namely, the surrender of fugitives to the requesting country. *See, e.g., Valentine* v. *United States ex rel. Neidecker*, 299 U.S. 5, 14 (1936). Accordingly, the Supreme Court has made clear that an extradition treaty "should be construed more liberally than a criminal statute or the technical requirements of criminal procedure." *Factor* v. *Laubenheimer*, 290 U.S. 276, 298 (1933). Foreign governments are not

8

expected to be well versed in our criminal laws and procedures. *Grin* v. *Shine*, 187 U.S. 181, 184 (1902). Thus, "[f]orm is not to be insisted upon beyond the requirements of safety and justice." *Skaftouros* v. *United States*, 667 F.3d 144, 156 (2d Cir. 2011) (quoting *Fernandez* v. *Phillips*, 268 U.S. 311, 312 (1925)).

Statements by the United States Department of State as to the force and interpretation of treaties should be given great weight by the Court. *El Al Israel Airlines, Ltd.* v. *Tseng*, 525 U.S. 155, 168 (1999); *Sumitomo Shoji America, Inc.* v. *Avagliano*, 457 U.S. 176, 184-85 (1982) ("Although not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight."); *Ahmad* v. *Wigen*, 726 F. Supp. 389, 402 (E.D.N.Y. 1989), *aff'd*, 910 F.2d 1063 (2d Cir. 1990) ("The State Department's view deserves deference, unless it represents a substantial departure from national or international norms.").

**B.    Japan's Extradition Request Satisfies the Test for Certifying the Fugitive as Extraditable**

An extradition certification is in order where: (1) the judicial officer is authorized to conduct the extradition proceeding; (2) the court has jurisdiction over the fugitive; (3) the applicable treaty is in full force and effect; (4) the crimes for which surrender is requested are covered by the applicable treaty; and (5) there is sufficient evidence to support a finding of probable cause as to each charge for which extradition is sought. *Fernandez*, 268 U.S. at 312; *Murphy* v. *United States*, 199 F.3d 599, 601 (2d Cir. 1999); *Austin* v. *Healey*, 5 F.3d 598, 600-02 (2d Cir. 1993).

1.    This Court Has Authority Over the Proceedings

9

The extradition statute authorizes proceedings to be conducted by "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State." Consequently, both magistrate judges and district judges may render a "certification" under seection 3184. See Austin, 5 F.3d at 601-02 (magistrate judge had authorization to conduct the extradition hearing without specific delegation of authority).

2. This Court Has Jurisdiction Over Kanayama

This Court has personal jurisdiction over a fugitive found within its jurisdictional boundaries. 18 U.S.C. § 3184 (establishing that magistrate judge "may, upon complaint made under oath, charging any person found within his jurisdiction, . . . issue his warrant for the apprehension of the person so charged"); Pettit v. Walshe, 194 U.S. 205, 219 (1904) ("The commissioner or judicial officer here referred to is necessarily one acting as such within the state in which the accused was arrested and found."); In re Pazienza, 619 F. Supp. 611, 616 (S.D.N.Y. 1985). This Court has personal jurisdiction over Kanayama, as he was located and arrested in the Southern District of New York.

3. The Applicable Extradition Treaty Is in Full Force and Effect.

The extradition statute, 18 U.S.C. § 3184, provides for extradition in instances in which a treaty or convention is in force between the requesting state and the United States. The courts generally defer to the executive branch on the question of whether a treaty is in force. Terlinden v. Ames, 184 U.S. 270, 288 (1902); see also NY Chinese TV Programs, Inc. v. U.E. Enterprises, Inc., 954 F.2d 847, 852 (2d Cir. 1992).

Here, the United States has submitted a declaration from Elizabeth M.M. O'Connor, an attorney in the Office of the Legal Adviser for the Department of State, attesting that there is a

10

A0288

treaty in full force and effect between the United States and Japan. *See* O'Connor Decl. ¶¶ 2-3. This Court should defer to the Department of State in this regard. *See Terlinden*, 184 U.S. at 288.

    4.  <u>The Alleged Crimes Are Encompassed by the Extradition Treaty.</u>

An extradition treaty obliges the United States to surrender fugitives under the circumstances defined in the treaty. Article 1 of the Extradition Treaty applicable in this case provides for the return of fugitives charged with, or convicted of certain extraditable offenses as defined in Article 2. As relevant here, Article 2 of the Extradition Treaty defines offenses as extraditable if they are among those listed in the Schedule annexed to the Treaty, which is an integral part of the treaty, if the offense is punishable by the laws of both the United States and Japan by a deprivation of liberty for a maximum term of not less than one year. *See* O'Connor Decl. (attaching Extradition Treaty, 31 U.S.T. 892).

The documents submitted by the Government of Japan establish that Kanayama has been charged in Japan with two counts of damage or destruction of structure (vandalism), in violation of Article 260 of the Japanese Penal Code. (Rec. Exs. 1, 2, 22). That crime is incorporated in the Extradition Treaty's Schedule, *see* Extradition Treaty, Schedule at 19 ("An offense relating to damage of property, documents, or facilities."), and a violation of Article 260 is punishable in Japan by imprisonment for more than one year (*see* Rec. Ex. 22).

The Court must further determine whether the crime for which extradition is sought is also a crime in the United States, a requirement known as dual criminality. When considering whether the offenses at issue here are dually criminal in both the United States and Japan, the Court should examine the description of the alleged misconduct provided by Japan in support of its charges and decide whether that conduct would have been criminal if it had been perpetrated

A0289

in the United States. Significantly, however, a requesting country is not obliged to produce evidence on all elements of a criminal offense or to establish that its crimes are identical to ours. *Kelly* v. *Griffin*, 241 U.S. 6, 15 (1916); *Shapiro*, 478 F.2d at 908 (dual criminality is satisfied if "the laws of both the requesting and the requested party appear to be directed to the same basic evil"). The Supreme Court noted in *Collins* v. *Loisel*, 259 U.S. 309 (1922), that dual criminality is not a technical concept involving a comparison of the elements of the two countries' offenses:

> The law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries. It is enough if the *particular* act charged is criminal in both jurisdictions.

*Id.* at 312 (emphasis added); *see also Lo Duca*, 93 F.3d at 1111-12 ("[I]n applying the dual criminality requirement . . . we have never considered only the statutory text. Rather, we have looked towards the conduct of the accused to see if it falls within the proscription of American criminal law.").

Dual criminality is established if the conduct underlying the foreign offense would be criminal under U.S. federal law, the law of the state in which the extradition hearing is held (here, New York), or the law of a preponderance of the states. *Hu Yau-Leung* v. *Soscia*, 649 F.2d 914, 918 n.4 (2d Cir. 1981). Kanayama's alleged criminal activity in Japan, had it occurred in the United States, could be prosecuted, for example, as a felony in violation of several New York statutes. In particular, Kanayama's conduct, if committed here, would violate New York Penal Law § 145.05, a felony crime, which provides that one is guilty of criminal mischief in the third degree if, with the intent to damage the property of another and having no right to do so nor any reasonable ground to believe that such a right exists, he or she "damages property of another person in an amount exceeding two hundred fifty dollars." Similarly, New York Penal Law

§ 145.10, criminal mischief in the second degree, prohibits the same conduct if the damage is "an amount exceeding one thousand five hundred dollars." As noted above, the total damages caused by Kanayama's crimes in Japan exceeds $20,000. As felonies, these offenses are punishable in New York by more than one year imprisonment.

    5.  <u>There Is Probable Cause That the Fugitive Has Committed the Offenses Charged.</u>

    The standard of proof to find the evidence "sufficient to sustain the charge" pursuant to 18 U.S.C. § 3184 is the familiar domestic requirement of probable cause. The Court must conclude there is probable cause to believe that the crimes charged by Kanayama were committed and that the person before the Court committed them. *See Ahmad*, 910 F.2d at 1065-66. The evidence is sufficient and probable cause is established if a person of ordinary prudence and caution can conscientiously entertain a reasonable belief in the probable guilt of the accused. *Gerstein* v. *Pugh*, 420 U.S. 103, 111 (1975). As the Supreme Court stated in *Benson* v. *McMahon*:

> [T]he proceeding before the commissioner is not to be regarded as in the nature of a final trial by which the prisoner could be convicted or acquitted of the crime charged against him, but rather of the character of those preliminary examinations which take place every day in this country before an examining or committing magistrate for the purpose of determining whether a case is made out which will justify the holding of the accused, either by imprisonment or under bail, to ultimately answer to an indictment, or other proceeding, in which he shall be finally tried upon the charge made against him.

127 U.S. at 463; *see also Collins*, 259 U.S. at 316 ("The function of the committing magistrate is to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction.").

    Here, the evidence described above more than establishes probable cause that Kanayama committed the crimes for which Japan seeks extradition. As an initial matter, the evidence

A0291

Dated:     March 24, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of March 2025, a copy of the foregoing accompanying Appendix Volume I of VIII was filed via ACMS. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties on the electronic filing receipt, including:

**Tara Marie La Morte, Esq.**
**DOJ-USAO**
**1 St. Andrews Plaza**
**New York, NY 10017**
**212-637-1041**
**Email: tara.lamorte2@usdoj.gov**

*Counsel for Appellee*

David Dudley, Esq.