# 24-1340

## United States Court of Appeals
### For the
## Second Circuit

———————

MASAHIDE KANAYAMA,

*Appellant,*

v.

SCOTT KOWAL, CHIEF OF U.S. PRE-TRIAL SERVICES SDNY,

*Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
District Court Case No. 23-cv-03469 (Hon. Colleen McMahon)

## APPENDIX
## (Vol. II of VIII)

**David Dudley, Esq.**
Law Offices of David M. Dudley
3415 South Sepulveda Blvd
Suite 1100
Los Angeles, CA 90034-1509
310-772-8400
Fax: 310-772-8404
Email: fedcrimlaw@hotmail.com

*Counsel for Appellant Masahide Kanayama*

## TABLE OF CONTENTS

### VOLUME II OF VIII

### APPENDIX

| S.D.N.Y Dkt. Ent. | Description | Appx. Page |
|---|---|---|
| 4-12 | Exhibit Exhibits Part 12 | A0296 |
| 4-13 | Exhibit Exhibits Part 13 | A0320 |
| 4-14 | Exhibit Exhibits Part 14 | A0353 |
| 4-15 | Exhibit Exhibits Part 15 | A0365 |
| 4-16 | Exhibit Exhibits Part 16 | A0369 |
| 4-17 | Exhibit Exhibits Part 17 | A0373 |
| 4-18 | Exhibit Exhibits Part 18 | A0377 |
| 4-19 | Exhibit Exhibits Part 19 | A0385 |
| 4-20 | Exhibit Exhibits Part 20 | A0455 |
| 4-21 | Exhibit Exhibits Part 21 | A0465 |
| 4-22 | Exhibit Exhibits Part 22 | A0469 |
| 4-23 | Exhibit Exhibits Part 23 | A0485 |
| 4-24 | Exhibit Exhibits Part 24 | A0524 |
| 4-25 | Exhibit Exhibits Part 25 | A0544 |

establishes probable cause that there was damage to a structure. With respect to the Narita-san

Shinsho-ji Temple, Japanese authorities obtained photographs taken of the Temple before and

after the defacement on the afternoon of March 25, 2015. The photographs taken after the

defacement show stains on the poles of the Temple. In addition, Narita-san Shinsho-ji Temple

received a quote from the Kongo Gumi Co., Ltd., a company that has experience with temple

construction, estimating that it would cost approximately 120,500 yen to repair the damage to the

Temple. With respect to the Katori Jingu Shrine, the defacement of poles, stairs, and an

offertory box was discovered in the evening of March 25, 2015, and early the next morning on

March 26, 2015. The Katori Jingu Shrine received a quote from Konishi Decorative Arts &

Crafts Co., Ltd., a company that has experience with temple restoration, estimating that it would

cost approximately 2,423,248 yen to repair damage to the Shrine.

   The evidence also easily establishes probable cause that Kanayama was the one who

caused the damage to the Narita-san Shinsho-ji Temple and Katori Jingu Shrine. Among other

things, a review of video surveillance from the Narita-san Shinsho Temple and Katori Jingu

Shrine on the date and during the timeframe that the vandalism occurred showed what

reasonably appears to be the same individual touching the damaged sites at issue. A review of

surveillance images and toll tickets collected at tollstops between the Narita-san Shinsho Temple

and the Katori Jingu Shrine during the relevant timeframe revealed a gray Toyota Prius that

authorities conclusively determined was rented by Kanayama. Authorities learned that

Kanayama presented his passport to make that rental, and that information enabled them to pull

Kanayama's official passport record, showing an individual resembling the person depicted in

the video surveillance images captured from the Temple and Shrine. Based on an analysis of

facial and morphological features, an expert concluded that there was a very high likelihood that

14

A0292

the person depicted in the passport is the same person depicted in the surveillance images of the Narita-san Shinsho Temple and Katori Jingu Shrine. Further, there are YouTube videos of lectures presented by Kanayama on November 3, 2012, and December 31, 2012, in which he states that he poured oil onto various shrines for religious purposes.

6.   <u>The Evidence Japan Presents to Satisfy Its Burden of Proof Is Admissible</u>

Neither the Federal Rules of Criminal Procedure nor the Federal Rules of Evidence apply to extradition hearings. *See* Fed. R. Crim. P. 1(a)(5) (stating that "extradition and rendition of a fugitive" are not governed by rules); Fed. R. Evid. 1101(d)(3) (evidence rules are inapplicable to "miscellaneous proceedings such as . . . extradition or rendition"); *Melia* v. *United States*, 667 F.2d 300, 302 (2d Cir. 1981). Rather, "unique rules of wide latitude govern reception of evidence" in extradition hearings. *Sayne* v. *Shipley*, 418 F.2d 679, 685 (5th Cir. 1969) (citation and internal quotation marks omitted). Among these rules are the following:

**a. No Live Witnesses**

Extradition treaties do not contemplate the introduction of live witness testimony at extradition proceedings because to do so "would defeat the whole object of the treaty." *Bingham* v. *Bradley*, 241 U.S. 511, 517 (1916 ). Thus, hearsay evidence is admissible at extradition hearings and may support a finding of extraditability. *See id.* (rejecting fugitive's claim that *ex parte* witness affidavits submitted in support of his extradition to Canada should not be considered because he had not had the opportunity to cross-examine those witnesses); *see also Collins*, 259 U.S. at 317; *In re Ryan*, 360 F. Supp. 270, 273 (E.D.N.Y.), *aff'd*, 478 F.2d 1397 (2d Cir. 1973) ("A determination of probable cause in an extradition proceeding may rest entirely upon hearsay."); *see also United States* v. *Zanazanian*, 729 F.2d 624, 626-27 (9th Cir. 1980) (unsworn written statements may properly form the basis for extradition); *Simmons* v. *Braun*,

15

627 F.2d 635, 636 (2d Cir. 1980) (same). Accordingly, a finding of extraditability may be, and typically is, based entirely on documentary evidence. *See, e.g.*, *Shapiro*, 478 F.2d at 902-03.

### b. Certification of Documents

The certification of documents introduced during an extradition hearing is governed by the Treaty and by 18 U.S.C. § 3190. The Extradition Treaty here provides that documents submitted by the requesting party, (here, Japan) be "duly certified as required by the laws of the requested Party, and accompanied by a duly certified translation in the language of the requested Party." Extradition Treaty Art. VIII. Section 3190 similarly provides that "depositions, warrants, or other papers or copies thereof offered in evidence upon the hearing of any extradition case shall be received and admitted as evidence" so long as they are "properly and legally authenticated," that is, accompanied by "the certificate of the principal diplomatic or consular officer of the United States resident in such foreign country." 18 U.S.C. § 3190; *see Zanazanian*, 729 F.2d at 627 ("United States law requires only that the submitted documents be properly authenticated. . . ."); *Skaftouros*, 667 F.3d at 161. The documents presented by the Government of Japan in this case are accordingly accompanied by the certification of Jason P. Hyland, Charge d'Affaires ad interim, affirming that the documents "properly and legally authenticated so as to entitle them to be received in evidence for similar purposes by the tribunals of Japan as required by Title 18, United States Code, Section 3190."

### c. Limitations on the Fugitive's Evidence

The fugitive's grounds for opposing an extradition request are heavily circumscribed. The fugitive is not entitled to introduce evidence that contradicts the evidence submitted by the requesting state, attempts to establish an alibi, or presents a defense. *See Charlton* v. *Kelly*, 229 U.S. 447, 461 (1913); *see also Collins*, 259 U.S. at 316 (permitting the introduction of defense

evidence "would be in plain contravention of the intent and meaning of the extradition treaties");

*Hu Yau-Leung*, 649 F.2d at 917 (alibi evidence is inadmissible); *Shapiro*, 478 F.2d at 901;

*Matter of Locatelli*, 468 F. Supp. 568, 573-74 (S.D.N.Y. 1979) (attempt to impeach credibility of

requesting country's witnesses not permitted). Moreover, procedural defenses are not permitted.

*See Bingham*, 241 U.S. at 517; *Glucksman v. Henkel*, 221 U.S. 508, 513-14 (1911) (variance

between charges pending in the foreign country and the complaint filed in federal court is not a

valid defense to surrender).

Instead, a fugitive's right to controvert the evidence introduced against him is "limited to

testimony which explains rather than contradicts the demanding country's proof." *United States*

*ex rel. Petrushansky v. Marasco*, 325 F.2d 562, 567 (2d Cir. 1963); *see also Collins*, 259 U.S. at

315-17; *accord Hooker v. Klein*, 573 F.2d 1360, 1368 (9th Cir. 1978) (describing a fugitive's

participation at an extradition proceeding as "limited"). Such explanatory evidence is admissible

only so as to afford a fugitive

> the opportunity to present reasonably clear-cut proof which would
> be of limited scope and having some reasonable chance of negating
> a showing of probable cause. The scope of this evidence is restricted
> to what is appropriate to an extradition hearing. The decisions are
> emphatic that the extraditee cannot be allowed to turn the extradition
> hearing into a full trial on the merits.

*Matter of Sindona*, 450 F. Supp. 672, 685 (S.D.N.Y. 1978), *aff'd sub nom Sindona v. Grant*, 619

F.2d 167 (2d Cir. 1980). Hence, the extradition magistrate judge may not weigh conflicting

evidence and determine what to credit, "but, rather, determines only whether there is competent

evidence to support the belief that the accused has committed the charged offense." *Quinn v.*

*Robinson*, 783 F.2d 776, 815 (9th Cir. 1986). Here, the evidence submitted by Japan is more

than ample to support a certification of extraditability.

17

## CONCLUSION

WHEREFORE, the United States requests that the Court determine, pursuant to Title 18, United States Code, Section 3184, that the submission on behalf of Japan is sufficient to sustain each of the charges under the provisions of the applicable treaty and to certify the extradition of Kanayama for each of those charges to the Secretary of State for possible surrender to Japan.

Dated: New York, New York
August 22, 2017

Respectfully submitted,

JOON H. KIM
Acting United States Attorney for the
Southern District of New York

TARA M. La MORTE
Assistant United States Attorney
(212) 637-1041
tara.lamorte2@usdoj.gov

cc (via email): Patrick Joyce, Esq.

18

# Exhibit 10

A0297

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
                                 :

IN THE MATTER OF THE EXTRADITION          17 Crim. Misc. 1 Page 003 (ER)
OF MASAHIDE KANAYAMA             :

-----------------------------------------------------------------X


## **OPPOSITION TO THE GOVERNMENT'S EXTRADITION REQUEST**


LAW OFFICES OF JEFFREY LICHTMAN
11 East 44th Street
Suite 501
New York, New York 10017
Ph:  (212) 581-1001
Fax: (212) 581-4999


LAW OFFICES OF DAVID M. DUDLEY
3415 South Sepulveda Boulevard
Suite 560
Los Angeles, California 90034
Ph:  (310) 772-8400
Fax: (310) 772-8404

*Attorneys for Masahide Kanayama*

A0298

## INTRODUCTION

This memorandum of law is submitted in opposition to the government's request that Dr. Masahide Kanayama, a practicing surgeon and permanent resident of the United States,[1] be extradited to Japan to face charges relating to the alleged defacement in 2015 of the Narita-san Shinsho-ji Temple in Narita, Japan ("Narita Temple") and the Katori Jingu Shrine in Katori, Japan ("Katori Shrine") with "an oily liquid." See Government's August 22, 2017 Memorandum of Law in Support of Extradition (hereafter, "Govt. Mem.") at p. 1. As examined herein, the government's extradition request cannot be certified as a matter of law.

First, the government has failed to satisfy the doctrine of dual criminality, which would permit extradition under the applicable treaty between the United States and Japan. Specifically, they have failed to demonstrate that Dr. Kanayama's alleged conduct in Japan would have violated either of the two New York statutes cited in their motion: Criminal Mischief in the Second and Third Degrees, PL §§145.05, 145.10. Simply put, both of these statutes require the intentional infliction of damage to property, and because: i) no repairs were ever made at the Narita Temple or the Katori Shrine; ii) no loss of use ever occurred at either location; and iii) the oil stains have since "faded away naturally," no damage to property occurred as a matter of New York law. See September 15, 2017 Affidavit of Toshimitsu Takaesu ("Takaesu Aff.") attached as Exhibit B, at ¶¶ 9-12. Further, the government's own submission intimates that Dr. Kanayama's pouring of oil onto these shrines was done for religious purposes, and therefore, he could not have had the specific intent – as required by these statutes – to cause damage to any property. Govt. Mem. at p. 1.

---

[1] A biography of Dr. Kanayama ("Kanayama Biography") containing his personal history and background, including letters from the myriad patients he has assisted, is appended to this submission at Exhibit A.

A0299

Second, the government's probable cause argument fails because: i) Article 260 of the Japanese Penal Code cannot be violated where there was no damage to a *structure*, a term of art defined by Japanese law; ii) the government's identification of Dr. Kanayama – using grainy video surveillance and a passport photograph by an "expert in forensic odontology and anthropology" – was based on wholly unreliable and inadmissible science; iii) the translations of Dr. Kanayama's ministerial YouTube videos, during which the government claims he admitted to "pour[ing] oil onto various shrines for religious purposes," contains a significant error in that the word anoint was repeatedly replaced by the word "pour," (Govt. Mem. at p. 5); and iv) Dr. Kanayama's March 25, 2015 use of a Japanese toll road that lies between the Narita Temple and Katori Shrine while driving a rented Toyota Prius is easily and innocently explained – it was the fastest way to get from his hotel to the airport on that date.

Third, if returned to Japan via extradition, Dr. Kanayama would face persecution for his Christian religious beliefs and his Zainichi Korean ethnic heritage. Therefore, pursuant to the doctrine of non-refoulement, as formally set forth in the 1951 Convention and Protocol Relating to the Status of Refugees – and which applies to extradition proceedings such as the present one – this Court should deny the government's motion for certification.

## ARGUMENT

### POINT I

### THE ALLEGED CRIMES ARE NOT EXTRADITABLE BECAUSE THEY FAIL THE TEST OF DUAL CRIMINALITY

In an extradition proceeding, the Court's role is largely limited to a two-part inquiry: "whether the crime is extraditable," and "whether there is probable cause to support the charge." Prasoprat v. Benov, 421 F.3d 1009, 1014 (9th Cir. 2005). In order to satisfy the former, the

2

alleged offense conduct must satisfy the test of dual criminality, that is, "[t]he Court must ...

determine whether the crime for which extradition is sought is also a crime in the United States,"

(Govt. Mem. at p. 11) and under the treaty at issue, that crime must also constitute a felony in

both the United States and Japan.[2] Here, while the government insists that Dr. Kanayama's

alleged conduct satisfies this requirement and would constitute the offenses of Criminal Mischief

in the Second or Third Degree, in violation of New York Penal Law ¶¶ 145.05 and 145.10, it is

clear that because no repair was ever effectuated at either the Narita Temple or Katori Shrine –

instead, the stains caused by the "oily liquid"[3] disappeared on their own – he could not be

charged or convicted of such crimes because no damage occurred as a matter of New York law.

See United States v. Murtari, No. 7 CR 387, 2007 WL 3046746, at *4-5 (N.D.N.Y. October 16,

2017); e.g., In re H., 32 A.D.2d 932, 932, 303 N.Y.S.2d 823 (App. Div. 2nd Dept. 1969).

Further, even if the government could satisfy the damage requirements of PL §§ 145.05

and 145.10, which they cannot, Dr. Kanayama still could not be prosecuted under either statute

as he would lack the requisite *mens rea*. In this manner, the government's own brief undermines

any argument that he had the required specific intent to damage any property – asserting in

support of their probable cause demonstration that, during his YouTube video lectures from

2012, the doctor admitted to "pour[ing][4] oil onto various shrines for religious purposes." Govt.

---

[2] See Article II, Treaty on Extradition between the United States and Japan, March 26, 1980, 31 U.S.T. 892 (the "Extradition Treaty") ("Extradition shall be granted ... for any offense listed in the Schedule annexed to this Treaty ... when such an offense is punishable by the laws of both Contracting Parties by death, by life imprisonment, or by deprivation of liberty for a period of more than one year") (emphasis supplied).

[3] Govt. Mem. at p. 1.

[4] As described, supra, at POINT II, this is a mistranslation. Dr. Kanayama's lecture videos describe the Christian practice of anointing with oil, wherein a "very small quantity" of olive oil [is placed] on the fingertips and dabb[ed] on the ... object to be ritually sanctified." Kanayama

3

Mem. at p 15. There simply can be no question that the intent to anoint and sanctify for religious reasons (Kanayama Biography, Ex. A) is not the same as the specific intent to damage property. See, e.g., People v. Roberts, 140 A.D.2d 961, 961, 529 N.Y.S.2d 636 (4th Dept. 1988) ("An intent to injure ... does not satisfy the *mens rea* requirement of intent to damage property"). Furthermore, given that religious shrines in Japan are ritually and permissibly desecrated with sake and salt – indeed, this is why employees of the Katori Shrine did not immediately report the oil stains[5] – it would have been "reasonable" (PL §§ 145.05; 145.10) for him to believe that he had a right to sprinkle oil thereon as well, which likewise prevents any conviction pursuant to the New York statutes at issue.

Accordingly, Dr. Kanayama could not have been charged in the United States with any crime – let alone a felony – and the government cannot meet the dual criminality requirement.

## A. The Conduct Alleged to Have Been Committed by Dr. Kanayama and Resulting Damage

As presented in the Government's Memorandum, the government of Japan requests the extradition of Dr. Masahide Kanayama based on allegations that he "used an oily liquid to deface the main gate of the Narita-san Shinsho-jo Temple in Narita, Japan, and to deface various portions of the Katori Jingu Shrine in Katori, Japan," and consequently, he has been charged in Japan with "two counts of damaging religious and historical shrines, in violation of Article 260 of the Japanese Criminal Code." Govt. Mem. at pp. 1, 11. Despite the government's claims that

---

Biography, Ex. A, at p. 17; e.g., E.E.O.C. v. Preferred Management Corp., 216 F. Supp.2d 763, 773 (S.D. Indiana 2002) (observing employee's religious practice of anointing office buildings with oil).

[5] See April 10, 2015 Victim's Report, Rec. Ex. 9, at p. 1 ("we initially thought some worship visitors sprinkled salt or sake for a religious ritual").

4

Dr. Kanayama caused some $21,300 in damage,[6] interviews with staff of both the Katori Temple and Narita Shrine have revealed that no repairs were ever effectuated at either location and the stains caused by liquid have since vanished on their own. Takaesu Aff. at ¶¶ 9-12.

Specifically, on July 11, 2017, attorney Toshimitsu Takaesu interviewed Kiyosu Youchi and Isamu Terauchi, the general affairs and property managers, respectively, of the Shinsho-jo Temple in Narita, Japan. Takaesu Aff. at ¶ 9. According to Youchi, he had "no idea that any oil had been sprinkled anywhere," until he was notified by police some two weeks after the alleged incident. Id. Although he had "not previously noticed the stains, even though [he] had walked by th[e] pillars [in question] on many occasions for weeks," he did acknowledge their existence upon being pointed out by police, and at their request "obtained a professional estimate [for] the cost of cleaning [them] ...." Id. According to Youchi, "the [oil] stains only darkened the brown color of the pillars without changing their shape or damaging them," and as their "appearance" was otherwise "unaltered," the temple was displayed "to the public without interruption." Id. To be clear, "[n]either [Youchi] nor anyone else at the Temple[] ever ordered any repairs to the pillars," and "the stains faded away naturally, without any cleaning whatsoever." Id. (emphasis supplied). Accordingly, the temple "never ordered the repairs for which the estimate had been given," (id.) and "suffered no financial loss," or "loss of use or revenue" as a result of the "sprinkling of the pillars [with oil]." Id. at ¶ 10.

On July 11, 2017, Mr. Takaesu also interviewed Kazuhiro Sagawa, a worker at the Katori Shrine. Takaesu Aff. at ¶ 11. Mr. Sagawa did not recall the exact date when one of his cleaners found the stains at the shrine – but as they did not cause any "physical changes," i.e.,

---

[6] Govt. Mem. at p. 1.

5

physical damage, Mr. Sagawa "continued to display the entire shrine to the public as usual without repairs or interruption," and accordingly "did not feel the need to contact the police." Id. As with the Narita Temple, officials of the Katori Shrine did not summon the police – the police came to them and asked that a estimate for repairs be generated. Id. at ¶¶ 11-12. And again to be clear, the Katori Shrine "did not undertake any cleaning or repairs of the affected areas at any time," and have "no intention to do so in the future." Further, they "suffered neither a financial loss, nor a loss of usage or revenue as a result o[f] the staining incident." Id. at ¶ 13 (emphasis supplied).

During these interview sessions, Takaesu had photographs taken of the areas where the alleged oil staining occurred some two years earlier. See July 11, 2017 Photographs of Takashi Uchida, attached as Exhibit C. As the attached photographs confirm, the stains – without any cleaning or restoration – completely disappeared on their own. Id.

**B.    Criminal Mischief in the Second and Third Degrees**

As noted above, in order for Dr. Kanayama's extradition to be certified by the Court, the burden remains on the government to demonstrate that his conduct would be punishable by more than one year in prison pursuant to "U.S. federal law, the law of the state in which the extradition hearing is held (here, New York) or the law of a preponderance of the states." Govt. Mem. at p. 12 citing Ha Yau-Leung v. Sosci, 649 F.2d 914, 918 n.4 (2d Cir. 1981). Here, the government singles out two New York statutes which they claim would be used to punish Dr. Kanayama had his alleged conduct occurred domestically, therefore satisfying the doctrine of dual criminality: Criminal Mischief in the Third Degree, in violation of PL § 145.05, and Criminal Mischief in the Second Degree, in violation of PL § 145.10. Govt. Mem. at pp. 12-13. Neither apply, and accordingly, the government's motion must be denied.

6

A0304

In relevant part, pursuant to PL § 145.05, a person is guilty of Criminal Mischief in the Third Degree when, "with intent to damage property of another person, and having no right to do so nor any reasonable ground to believe that he ... has such right, he ... damages property of another person in an amount exceeding two hundred fifty dollars."  Similarly, a person is guilty of Criminal Mischief in the Second Degree when, "with intent to damage property of another person, and having no right to do so nor any reasonable ground to believe that he has such right, he damages property of another person in an amount exceeding one thousand five hundred dollars."  PL § 145.10.  Aside from the amount of damages necessary to sustain a conviction, the elements between the two crimes are common: "(1) intent to damage ... property; (2) actual damage to tangible property of another person; (3) no reasonable ground for belief of a right to damage the property; and (4) damage to the property in excess of $1,500 [or $250]."  People v. Simpson, 132 A.D.2d 894, 895, 518 N.Y.S.2d 453 (3rd Dept. 1987).[7]

     i.    Intent to Damage

As applied to both statutes, the term "intentionally" (Penal Law § 15.05(1)), requires that the defendant's conscious objective must be to cause damage to the property of another person. See People v. Summer, 64 A.D.2d 658, 659, 407 N.Y.S.2d 53 (2nd Dept. 1978) (analyzing substantially similar crime of Criminal Mischief in the Fourth Degree).  This is a necessary element and the failure of a prosecutor to demonstrate the willfulness of the destruction of property will lead to the dismissal of the charge.  See, e.g., People v. Callahan, 19 A.D.2d 889,

---

[7] Although not mentioned in the Government's Memorandum, the offense of Criminal Mischief in the Fourth Degree, a misdemeanor in violation of PL § 145.00, occurs when, *inter alia*, the defendant "intentionally damages the property of another" in any amount, or "[r]ecklessly damages property of another person in an amount exceeding two hundred fifty dollars."

7

Case 1:23-cv-03469-CM    Document 4-12    Filed 04/28/23    Page 15 of 28

890, 244 N.Y.S.2d 766 (2nd Dept. 1963) ("mischief conviction could not stand in absence of evidence that injury to property was wilful").

Here, even if the government could demonstrate that Dr. Kanayama was present at both the Katori Temple and Narita Shrine, it would not be possible to prove that he had the specific intent to damage any property as required by both Criminal Mischief in the Second and Third Degrees. At most, the government could prove only an intent to perform the religious act of "ritually sanctify[ing]" an object. See Kanayama Biography, Ex. A, at p. 17. Indeed, even the government's brief supports this claim in discussing his engagement with "Christian missionary activities in Japan" and recalling his 2012 lectures on YouTube wherein Dr. Kanayama "state[d] that he poured oil onto various shrines for religious purposes." Govt. Memo at p. 5 (emphasis supplied).[8] The defendant's intent, therefore – even according to the government – could not have been to damage the property, as required by the statute, but to perform a religious ritual, and as a result, the offense of Criminal Mischief in the Second or Third Degree cannot be used to satisfy the dual criminality requirement. See, e.g., People v. Bryant, 85 A.D.2d 575, 576, 445 N.Y.S.2d 711 (1st Dept. 1981) (analyzing identical specific intent required for Criminal Mischief in the Fourth Degree).[9]

---

[8] As addressed at POINT II, there is significant mistranslation with regard to Dr. Kanayama's YouTube videos. He does not acknowledge "pour[ing] oil" on to shrines, but instead, anointing them and other items, including snakes and mountains, with oil. Govt. Mem. at p. 5.

[9] Additionally, in order to be charged with either Criminal Mischief in the Second or Third Degree, the defendant must not have had a "reasonable ground [to] belie[ve] [he had] a right to damage the property." Simpson, 132 A.D.2d at 895, 518 N.Y.S.2d 453. This element creates another problem for the government's dual criminality argument, as the pouring of sake and salt on shrines is a common ritual in Japan. Indeed, staff at the Katori Shrine did not immediately report the stains upon their detection because they "initially thought some worship visitors sprinkled sake or salt for a religious ritual." April 10, 2015 Victim's Report, Rec. Ex. 9, at p. 1; see also Shinto Shrine's Recommendation, available at: http://jinjakannushi.blog89.fc2.com /blog-entry-1023.html (last viewed October 20, 2017) ("it is ... common to sprinkle alcohol and

8

A0306

ii.     Actual Damage to Property

Additionally, in order to secure a conviction in New York for a violation of either PL

§§ 145.05 or 145.10, there must have been some "actual damage" in the statutorily proscribed

amounts. Simpson, 132 A.D.2d at 895, 518 N.Y.S.2d 453. For this reason – based on the

evidence adduced by the government – Dr. Kanayama's alleged conduct could not support a

conviction for Criminal Mischief in the Second or Third Degree. Simply put, there was no

quantifiable damage to the property at either location: no repairs of any kind were ever

undertaken and the affected areas were never even cleaned. The repair estimates referenced by

the government were just that – estimates – and the temple and shrine sought them weeks after

the events at issue and only at the behest of the police. See Takaesu Aff. at ¶¶ 9, 13.

Additionally, the Narita Temple and Katori Shrine suffered no financial loss due to these

incidents and they acknowledged that they had no intention to make any repairs in the future

because the stains disappeared on their own. Id.

The law is clear: damage under the criminal mischief statutes is "generally established by

the reasonable cost of repairing the property," and "[w]here the property is not repairable ... the

replacement cost is an appropriate measure of the damage." People v. Shannon, 57 A.D.3d

1016, 1016, 868 N.Y.S.2d 377 (3rd Dept. 2008). A conviction pursuant to these statutes is

contingent upon proof that the statutory damage threshold has been met. See, e.g., People v.

Smeraldo, 242 A.D.2d 886, 886, 662 N.Y.S.2d 883 (4th Dept. 1997) (expert testimony deemed

sufficient to support conviction). And where the proof of the loss amount has been deemed

insufficient, courts have modified convictions accordingly. See, e.g., People v. Jackson, 168

A.D.2d 633, 633, 563 N.Y.S.2d 468 (2nd Dept. 1990) (reducing conviction for Criminal Mischief

_____

rice" at the shrine).

9

in the Second Degree to Criminal Mischief in the Fourth Degree – a misdemeanor – due to insufficient evidence concerning the "reasonable cost of ... repairs"); People v. Williams, 89 A.D.2d 834, 835, 454 N.Y.S.2d 2 (1st Dept. 1982) (reducing third degree conviction to fourth degree).

While no statutory definition of "damages" is provided by New York Penal Law, courts have commonly recognized that the term contemplates "injury or harm to property that lowers its value or involves loss of efficiency ...." People v. Collins 288 A.D.2d 756, 758 (2001). Where no repair or replacement is necessary – as here – it is impossible to demonstrate that there exists any damage, and no conviction may occur. People v. Hills, 95 N.Y.2d 947, 948 (2000) ("In order for a defendant to be found guilty of criminal mischief ... the People must prove that defendant intentionally damaged the property of another person .... *some amount of damage is required*) (emphasis supplied). Notably, in Hills, which involved a property dispute between neighbors, the defendant picked up a property stake and threw it several feet back at his neighbor's property. The New York Court of Appeals determined that because there was no evidence that the stake or the property it landed on was damaged, a conviction for criminal mischief could not stand. Id.

As with the defendant in Hills, given the lack of any quantifiable damage, or indeed, any injury that "lowered the value" or caused some other financial hardship to the Narita Temple or the Katori Shrine, Dr. Kanayama could not be charged with Criminal Mischief in either the Second or Third Degree. 95 N.Y.2d at 948. In this manner, the holding in In re H. is particularly instructive. See 32 A.D.2d at 932, 303 N.Y.S.2d 823. There, the Appellate Division of the Second Judicial Department found that a defendant's use of chalk to write obscenities on the victim's driveway did not cause "actual damage" within the meaning of the criminal

mischief statutes. Id. Similarly, the United States District Court for the Northern District of New York came to an identical conclusion in United States v. Murtari, where the defendant was charged with defacing a federal plaza with chalk. 2007 WL 3046746, at *4-5. While the court in Murtari found proof of the defendant's acts "overwhelming," it likewise was constrained to find that, "[b]ased on a comparison to New York Law," the defendant did not "damage[] the property, even though ... [it] was defaced by the use of chalk." Id. at *5 (internal quotation marks omitted); see also People v. Stockwell, 18 Misc.3d 1145(A), 859 N.Y.S.2d 898 (table), at *5 (City Court, Watertown, New York 2008) (painting neighbor's fence did not constitute damage to property as a matter of New York law); cf. Collins, 288 A.D.2d at 758, 733 N.Y.S.2d 289 (defendant's spraying of chicken excrement on the Court of Appeals building, which "required extensive cleaning and destroyed the Court's commemorative banner," constituted damage within the meaning of PL § 145.10).

## C.    Conclusion

There are several reasons why the New York Criminal Mischief Statutes to which the government refers in its effort to establish dual criminality would not apply to the acts that Dr. Kanayama allegedly committed on March 25, 2015. First, according to the government itself, Dr. Kanayama's purported conduct appears to have been motivated by his "Christian missionary activities," wherein oil is placed on "shrines for religious purposes." Govt. Mem. at p. 5. Therefore, if we accept the government allegations as true, Dr. Kanayama lacked the specific intent to cause any damage in the first instance. E.g., Callahan, 19 A.D.2d at 890, 244 N.Y.S.2d 766. Second, Dr. Kanayama's alleged acts caused no damage as a matter of New York law – no financial loss or use of the facilities occurred and the stains abated naturally – much like chalk writings. In re H., 32 A.D.2d at 932, 303 N.Y.S.2d 823; see also Murtari, 2007 WL 3046746, at

11

*4-5. And third, even if the Court was to find that some damage actually did occur, the lack of any repair to, or replacement of, the affected areas would prevent Dr. Kanayama from being charged with a felony. As the statutory threshold amounts could not be demonstrated, he could only be charged with Criminal Mischief in the Fourth Degree, a misdemeanor (see, e.g., Jackson, 168 A.D.2d at 633, 563 N.Y.S.2d 468; Williams, 89 A.D.2d at 835, 454 N.Y.S.2d 2) and the applicable treaty does not permit extradition for offenses of this level. Extradition Treaty, Article II. Accordingly, the government's request for extradition cannot be certified.

### POINT II

### NO PROBABLE CAUSE EXISTS TO BELIEVE THAT DR. KANAYAMA VIOLATED ARTICLE 260 OF THE JAPANESE CRIMINAL CODE

As identified in the bilateral extradition treaty between the United States and Japan: "Extradition shall be granted only if there is sufficient evidence to prove either that there is probable cause to suspect, according to the laws of the requested party[,] that the person sought has committed the offense for which extradition is requested ...." Extradition Treaty, Article III (emphasis supplied). While the government claims that the "evidence easily establishes probable cause to believe that [Dr.] Kanayama caused the damage [to the Narita Temple and Katori Shrine]," (Govt. Mem. at pp. 13-14) and therefore violated Article 260 of the Japanese Penal Code, a review of this claim finds that it rings hollow.

First, an examination of the crime with which Dr. Kanayama is charged, Article 260, reveals that: i) it could only be employed with regard to the damage to the two of the pillars that were integral to the structure at the Katori Shrine, and not to the artifacts contained therein or to the poles of main gate at the Narita Temple; and ii) because the stains on these two pillars – and all the other objects supposedly affected by the oil incident – disappeared on their own, no

12

A0310

damage occurred as a matter of Japanese law. <u>Second</u>, the government's supposed identification of Dr. Kanayama, using grainy video surveillance and a passport photograph by an "expert in forensic odontology and anthropology," was based on unreliable and inadmissible forensic analysis. <u>Id.</u> at p. 6. <u>Third</u>, the translation of Dr. Kanayama's ministerial YouTube videos offered by the Japanese government – during which the government claims the doctor admitted to "pour[ing] oil onto various shrines for religious purposes," <u>over two years before the incident in question</u>, contains a significant error in that the word "anoint" – for which no Japanese character exists[10] – was replaced with the word "pour[]." Govt. Mem. at p. 5. And <u>fourth</u>, the government's evidence concerning the defendant's use of the highway between the Narita Temple and Katori Shrine is easily "explained" – it was the fastest way to get from Narita Airport to the resort he stayed at on the evening of March 25, 2015. <u>Collins v. Loisel</u>, 259 U.S. 309, 315 (1922).

Lacking probable cause to believe Dr. Kanayama violated Article 260 of the Japanese Penal Code, the government's motion for certification of the defendant's extradition must be denied.

## A.    <u>Relevant Law</u>

Pursuant to 18 U.S.C. § 3184, "the decision to extradite ... must be based on competent evidence that would suffice under United States law to hold a defendant for trial, that is, establishing probable cause to believe that the accused committed the crime charged[.]" <u>Matter of Extradition of Platko</u>, 213 F.Supp.2d 1229,1238 (S.D. Cal. 2002) <u>citing</u> <u>Zanazanian v. United States</u>, 729 F.2d 624, 625 (9th Cir. 1984); <u>see</u> <u>also</u> <u>In re Extradition of Skaftouros</u>, 643 F. Supp.2d 535, 542 (S.D.N.Y. 2009) ("the task for the Court is to 'analyze if there is probable

---

[10] <u>See</u> Kanayama Biography, Ex. A at p. 16-19.

A0311

cause to believe that the individual committed acts alleged in the extradition request'") quoting Spatola v. United States, 925 F.2d 615, 618 (2d Cir. 1991). The probable cause standard used for extradition hearings is "identical to that used by courts in federal criminal preliminary hearings," and the burden remains on the party requesting extradition to produce evidence sufficient to give the magistrate "reasonable ground to believe the accused [is] guilty" of the charged offense. Barapind, 360 F.3d at 1069; Skaftouros, 643 F. Supp.2d at 542 (the probable cause determination is made according to the laws of the United States, and "by the same standards used in federal preliminary hearings").

A determination that probable cause exists must rest on "knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." United States v. Howard, 489 F.3d 484, 491 (2d Cir. 2007). Further, because the Federal Rules of Evidence and Federal Rules of Criminal Procedure do not apply to extradition proceedings – and therefore, hearsay evidence may be admitted – "court[s] must 'closely examine the requesting country's submissions to ensure that any hearsay bears sufficient indicia of reliability to establish probable cause.'"[11] Skaftouros, 643 F. Supp.2d at 543 quoting In re Extradition of Ben–Dak, No. 06 Mag. 1540 (GWG), 2008 WL 1307816, at *4 (S.D.N.Y. April 11, 2008); see also United States v. Kin-Hong, 110 F.3d 103, 120 (1st Cir. 1997) ("Inherent in the probable cause standard is the necessity of a determination that the evidence is both sufficiently reliable and of sufficient weight to warrant the conclusion").

---

[11] See 18 U.S.C. § 3190 ("Depositions, warrants, or other papers or copies thereof offered in evidence upon the hearing ... shall be received and admitted as evidence ... if they shall be properly and legally authenticated ....").

14

The subject of an extradition hearing is generally prohibited from presenting a defense, however, evidence that "explains" the government's evidence or "obliterate[s]" its probable cause argument is permissible. Sandhu v. Burke, No. 97 CV 4608 (JGK), 2000 WL 191707, at *6 (S.D.N.Y. April 17, 2012) ("what tends to obliterate probable cause may be considered by the extradition court but not what merely contradicts it") (alternations and internal quotation marks omitted); see also Collins, 259 U.S. at 315 ("The distinction between evidence properly admitted in behalf of the defendant and that improperly admitted is drawn [] between evidence rebutting probable cause and evidence in defense"); Mainero v. Gregg, 164 F.3d 1199, 1207, n.7 (9th Cir. 1999) (noting that evidence that explains away or completely obliterates probable cause is generally admissible at an extradition hearing, whereas evidence that merely controverts the existence of probable cause, or raises a defense, is not admissible).

"The task of defining the precise boundary between admissible explanatory evidence and inadmissible contradictory evidence is entrusted to the sound discretion of the extradition judge." Sandhu, 2000 WL 191707, at *6; see also Shapiro v. Ferrandina, 478 F.2d 894, 904 (2d Cir. 1973); United States ex rel. Petrushansky v. Marasco, 325 F.2d 562, 567 (2d Cir. 1963); Republic of France v. Moghadam, 617 F. Supp. 777, 781 (N.D. Cal. 1985) ("the scope of evidence admitted is left to the sound discretion of the [extradition] court guided by the distinction between contradictory and explanatory evidence"); In re Extradition of Sindona, 450 F.Supp. 672, 685 (S.D.N.Y. 1978) ("The extent of ... explanatory evidence to be received is largely in the discretion of the judge ruling on the extradition request"). Notably, in Collins, the Supreme Court observed that the defendant was "was allowed to testify ... to things which might have explained ambiguities or doubtful elements in the prima facie case made against him," and

15

additionally, was "permitted to introduce evidence bearing upon the issue of probable cause."

Collins, 259 U.S. at 315-316.

Additionally, "[a]lthough [simple] contradictory evidence is not to be considered, the extradition judge makes credibility determinations as to the competence of the evidence supporting probable cause." In re Extradition of Singh, 170 F.Supp.2d 982, 1023 (C.D. Cal. 2001). "[T]he weight to be accorded [such] is solely within the province of the extradition magistrate," (Quinn v. Robinson, 783 F.2d 776, 815 (9th Cir. 1986) citing Garcia-Guillen v. United States, 450 F.2d 1189, 1192 (5th Cir. 1971)) and "[t]he improbability or the vagueness of [a witness'] testimony may destroy the probability of guilt ...." Matter of Mainero, 990 F. Supp. 1208, 1219 (S.D. Cal. Dececmber 19, 1997). Finally, "the magistrate may take the circumstances of an identification into account in assessing its reliability [as] there is no per se rule that specifies which identification procedures are competent for probable cause purposes." Quinn, 783 F.2d at 815 (internal quotation marks omitted).

**B.**    **Discussion**

Here, there can be no doubt that the proof adduced by the government that Dr. Kanayama is properly "held for trial" in Japan is lacking. Cf. In re Extradition of Batchelder, 494 F. Supp.2d 1302, 1305 (N.D. Fl. 2007). More particularly, the government has failed to demonstrate that there was both actual "damage to a structure" as defined by Japanese law, and that the defendant was responsible for such damage. Govt. Mem. at p. 14. In this manner, the discussion below both "explain[s]" the government's allegations and "obliterate[s]" probable cause to believe that Dr. Kanayama violated Article 260 of the Japanese Penal Code. See United States v. Samuels, No. 08 MJ 445 (RLM), 2009 WL 367578, at *6, 8 (E.D.N.Y. February 10, 2009).

i.    The Government's Probable Cause Argument

The government's argument that probable cause exists is principally supported by four claims. First, there was damage to the "structure[s]" of the Narita Temple and Katori Shrine in the amounts of 120,500 yen, and 2,423,248 yen, respectively. Govt. Mem. at p. 14. Second, the government claims to have identified Dr. Kanayama at each crime scene by referencing grainy surveillance videos and the opinion of an "expert in forensic odontology and anthropology." Id. at p. 6. Third, the government points to the defendant's YouTube videos, during which Dr. Kanayama preaches in 2012 on the use of "pour[ing] oil" for "religious purposes." Id. at p. 5. Fourth, the government points to Dr. Kanayama's use of a rented Toyota Prius in March 2015, which traveled between Narita and Katori during "the relevant timeframe." Id. at p. 14. Each of these claims are reviewed below.

ii.    No Violation of Article 260 Occurred

The government of Japan requests the extradition of Dr. Masahide Kanayama based on allegations that he "used an oily liquid to deface the main gate of the Narita-san Shinsho-jo Temple in Narita, Japan, and to deface various portions of the Katori Jingu Shrine in Katori, Japan," and accordingly, he has been charged with "two counts of damaging religious and historical shrines, in violation of Article 260 of the Japanese Criminal Code." Govt. Mem. at pp. 1, 11 ("Kanayama has been charged in Japan with two counts of damage or destruction of [a] structure (vandalism), in violation of Article 260 of the Japanese Penal Code"). In order to satisfy the requirements of the Extradition Treaty, the burden rests on the government to supply a "statement of the facts of the case," and "the texts of the laws describing the essential elements and the designation of the offense for which extradition is requested." Extradition Treaty, Article VIII. Here, the facts supplied by the government do not establish that, as a matter of

17

Japanese law, damage occurred and, save two poles at the Katori Temple, that any structure was affected by the alleged crime.

At the Katori Shrine, Dr. Kanayama is alleged to have defaced two black poles in the worship hall, a black ceremonial staircase, and a black offertory box; at the Narita Temple, he is alleged to have defaced three poles that were part of the main gate.  See Govt. Memo, Rec. Ex. 1, Attachments 1 and 2.  Article 260 of the Japanese Penal Code, however, only proscribes damage to a house or building – a term of art that does not include objects inside a home, i.e., an offertory box and ceremonial stairs, and does not encompass a gate.  Consequently, despite the government's claim that Dr. Kanayama is "wanted by Japan on two counts of damaging religious and historical shrines," (Govt. Mem. at p. 1) – an incorrect translation of the statute's title – the only acts which theoretically support his arrest pursuant to Article 260 are the two poles in the worship hall of the Katori Shrine, on which no damage occurred because the stains "faded away naturally," and are "no longer visible."  Takaesu Aff., Ex. B, at ¶ 12.

Article 260 of the Japanese Penal Code – which is correctly titled: "Damage to Buildings; Causing Death or Injury" and not as the government incorrectly indicates, "[D]amage or [D]estruction of [S]tructure ([V]andalism)"[12] is defined as follows:

> A person who damages a building or vessel of another shall be punished by imprisonment with work for not more than 5 years.  If such person thereby causes the death or injury of another, the person shall be dealt with by the punishment prescribed for the crimes of injury or the preceding paragraph, whichever is greater.

See Cabinet Secretariat of Japan, Penal Code, Act. 45 of 1907, at p. 54, available at: http://www. cas.go.jp/jp/seisaku/hourei/data/PC.pdf (last viewed October 18, 2017).

---

[12] Govt. Mem. at p. 11.

A0316

Further, pursuant to Japanese law, there is a difference between a prosecution for general vandalism and one based on damage to a building or structure. Only the latter is proscribed by Article 260; the former is proscribed by Article 261, entitled "Damage to Property."[13] Specifically, as the Dai Shin In (Imperial Japanese Supreme Court) found in 1914 in examining these terms: a structure refers to a house, or similar structure or building. It has a roof and is supported by a wall or pillar, fixed to the land, and requires at the least, comings and goings of a person. See June 20, 1914 Decision of the Dai Shin In, Criminal Record, Vol. 20, Page 1300, attached as Exhibit D.[14] Further, the Dai Shin In found that if the main gate of a residence is part of a fence and is opened or closed to only allow passage and does not have an internal chamber for people to enter or exit, then it is not considered a building. Id. This definition excludes from prosecution the alleged defacement at the Narita Temple which occurred with regard to three poles at the main gate, which have no walls or interior rooms (Govt. Rec. Ex. 1, Attachment 2), and the black ceremonial stairs and offertory box at the Katori Shrine (Govt. Rec. Ex. 1, Attachment 1). Id.

Furthermore, none of the items in question – whether they fall under the definition of a structure or not – were damaged as defined by Japanese Law. Specifically, on March 7, 1921, the Dai Shin In found that the term damage encompasses the changing of form or completely destroying the property, as well as making the property physically unable able to be used for its original purposes. See March 7, 1921 Decision of the Dai Shin In, attached as Exhibit E.

---

[13] See Cabinet Secretariat of Japan, Penal Code, Act. 45 of 1907, at p. 55, available at: http://www.cas.go.jp/jp/seisaku/hourei/data/PC.pdf (last viewed October 18, 2017).

[14] The opinions of each of the Japanese court opinions cited herein are reproduced in full and attached as exhibits hereto. English translations of these opinions are forthcoming and will be provided to the Court and government under separate cover.

19

Similarly, on March 7, 1951, the Tokyo High Court observed in the case of an individual cutting a roof for the installation of a chimney that no damage had occurred because the building had not become unusable. See March 7, 1951 Decision of the Tokyo High Court Ex. F. Because the stains at issue in this case disappeared on their own, and all items remained useable, no damage therefore occurred pursuant to Japanese law. Takaesu Aff. at ¶¶ 9-13.

Based on above-cited authority, considered together with the interviews of staff at both locations which confirmed that: i) no repairs had been, or would be made; ii) neither the temple or shrine suffered any financial hardship or loss of usability as a result of the incident; and iii) the stains naturally disappeared on their own, probable cause cannot exist to believe that Dr. Kanayama violated Article 260 of the Japanese Penal Code. See Takaesu Aff. at ¶¶ 9-13.

iii.    The Faulty Identification of Dr. Kanayama

The government relies heavily on the identification analysis report authored by Japanese Professor Masatsugu Hashimoto[15] to prove that Dr. Kanayama was the individual recorded via grainy security camera footage on March 25, 2015 at both the Katori Shrine and Narita Temple. Despite this expert's use of so-called "facial and morphologic features," (Govt. Mem. at p. 6) as confirmed by Dr. Benjamin Bavarian, an expert in biometric analysis, there can be no doubt that Professor Hashimoto's identification is fundamentally flawed – and that his report is "biased towards conclusions and would fail any Daubert inquiry.[16] See October 17, 2017 Report of Benjamin Bavarian, Ph.D., attached as Exhibit G, at p. 2.

---

[15] As noted in his April 25, 2015 Report, Hashimoto is a professor in the Department of Forensic Odontology and Anthropology in the Tokyo Dental College. See Govt. Rec. Ex. 16, at p. 6.

[16] Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).

20

A0318

Specifically, upon reviewing Professor Hashimoto's report, Dr. Bavarian came to the following pertinent conclusions: i) "the expert opinion has been biased toward the conclusions .... us[ing] circumstantial information" concerning the suspect; ii) the expert failed to "consider[] the multitude of variables and uncertainties inherent to surveillance vide [of] such low resolution"; iii) "the features used by [Professor Hashimoto] are not accepted as reliable landmarks as defined in the Biometrics Data International Standards"; and iv) the expert opinion does not meet the standards of Daubert[17] and the "best acceptable conclusion is that based on the data presented the result is inconclusive." Id. (emphasis supplied).  Finally, while an independent examination of the footage conducted by Dr. Bavarian would certainly prove helpful in further analyzing and explaining Professor Hashimoto's report, Dr. Bavarian concluded that "the data provided in the submitted report is practically useless for the purpose [of] any observational []or analytical study." Id. The supposed identification by Professor Hashimoto of the Tokyo Dental College therefore offers no support for the argument that Dr. Kanayama was present at the Narita Temple and Katori Shrine.  Instead, it is precisely the form of "junk science," to which Daubert instructs we keep "the courtroom doors ... closed." Amorgianos v. National R.R. Passenger Corp., 303 F.3d 256, 267 (2d Cir. 2002).

Finally, detracting from the likelihood that Dr. Kanayama was correctly identified by Professor Hashimoto as the culprit, other oil splashing incidents at shrines and temples are being reported in Japan as late as October 17, 2017, all while the defendant remains firmly planted in the United States. See Continuous Damage on 'World Heritage' for 2 Consecutive Days at Shrine on Liquid Uji, Yahoo News, October 17, 2017, attached as Exhibit H.

---

[17] Even if it were deemed admissible pursuant to Daubert, this Court has discretion to assign the value of Dr. Kanayama's supposed identification through the expert in determining if probable cause exists. See Quinn, 783 F.2d at 815; Mainero, 990 F. Supp. at 1219.

21

iv.    The Mistranslation of the Defendant's YouTube Videos

The YouTube videos referenced by the government likewise introduce another red herring, and require some "explan[ation]" in order to determine that they do not support the argument that probable cause exists. Sindona, 450 F.Supp. at 685. Specifically, in the exhibits appended to the Government's Memorandum concerning Dr. Kanayama's International Marketplace Ministry ("IMM") lectures, the defendant appears as a cult leader, exhorting his followers to desecrate shrines and temples throughout Japan. See Govt. Rec. Ex. 17, at p. 1 ("suspect said in the lecture that he had vandalized historic sites with oil," and "while displaying the images that appear like a mountain and the shrine ... the suspect said: Jesus commanded me to climb Mount Tateyama") (internal quotation marks omitted). This portrait is utterly inaccurate and the translations contained therein – especially those concerning the "pour[ing] [of] oil onto various shrines"– are faulty. Govt. Mem. at p. 15.

First, Dr. Kanayama is not some crazed cult leader. Instead, as thoroughly detailed in his biography, he is a highly respected obstetrician and gynecologist in the United States – and the director of the New York Endometriosis Institute. Ex. A at pp. 7-14. Through the modern surgical procedures he has "pioneered" in the United States, he has helped "reverse the effects of advanced stage endometriosis, a disease in which tissue that normally lines the inside of the uterus ... grows outside ... causing pain, scar tissue, adhesions, and leading potentially to infertility and other complications." Id. at p. 2. In addition to maintaining his own practice, Dr. Kanayama is a clinical assistant professor at the in the Mount Sinai School of Medicine, and a visiting scientist and investigator in the Department of Cancer Immunology and Gynecologic Pathology at the Johns Hopkins University School of Medicine. Id. at p. 10. His record is "unblemished." Id. at p. 2.

22

A0320

Second, the translations of the videos supporting and incorporated into the government's extradition request are rife with errors – most importantly, those relating to alleged admissions that the doctor had previously "poured" oil onto various shrines and temples in Japan. Govt. Mem. at p. 15. A professional translation of these videos, attached hereto, reveals these startling inaccuracies, sampled below:

- Government translation: "I climbed Mount Tateyama and received the oil for pouring over it." May 19, 2015 Police Report, Govt. Rec. Ex.17, at p. 2.

- Correct translation: "I climbed Mt. Tate and anointed it with [the] chrism I had received." Translation of November 3, 2012 Lecture, attached as Exhibit I, at p. 27.

- Government translation: "So, I poured the oil over the roof from the bottle of oil in the shape of cross and declared Mount Tateyama as a belonging of Jesus Christ." May 19, 2015 Police Report, Govt. Rec. Ex. 17, at p. 2.

- Correct translation: "The Holy Spirit's mission for me was to ... anoint the roof of the shrine with the chrism. He ordered me to make the anointing and claim the mountain for Jesus Christ." Translation of November 3, 2012 Lecture, Ex. I, at p. 27.

- Government translation: "The Holy Spirit told me to make the sign of the cross. So, I poured oil over the shrine in such a posture and made a declaration saying: 'Now I declare this Mount Ishizuchi-yama as belonging of Jesus Christ eternally from today, away from Satan, the devil.'" May 19, 2015 Police Report, Govt. Rec. Ex. 17, at p. 2.

- Correct translation: "I climbed on, and was told to stand in the form of a cross. I did so. Then I anointed it and declared, 'Now and forever this mountain of Ishitsuchi is no longer the property of evil spirits or of Satan. I declare it for Jesus Christ!'" Translation of November 3, 2012 Lecture, Ex. I, at p. 32.

- Government translation: "The Holy Spirit said, 'There are three white snakes in this mountain.' I found the snakes on the way, so I disabled

23

them by pouring oil over them." May 19, 2015 Police Report, Govt. Rec. Ex. 17, at p. 2.

· Correct translation: "Then the Holy Spirit spoke to me again and told me there were three white snakes on the mountain. I really thought that this was a spiritual metaphor, but I came across three white snakes during my climb and anointed, rendering them impotent." Translation of November 3, 2012 Lecture, Ex. I, at p. 33.[18]

Clearly, the most significant issue with the translation completed by the Narita Police Department, as appended to the government's submission, is the use of the word "pour," instead of the correct translation, "anoint" – unsurprising given that only 1% of the population of Japan is Christian and no Japanese character exists for the word "anoint." See Kanayama Biography, Ex. A, at p. 17 ("There is no native Japanese word for anoint and so the concept is typically conveyed with the words abura sosogi ... which literally mean[s] to pour oil") (internal quotation marks omitted). In this manner, it is highly relevant to the determination of probable cause that the incidents in Narita and Katori were more in line with some sort of oil "pouring" rather than the "dabbing" used in this "Christian ritualistic practice as described by Dr. Kanayama." Id. When translated accurately, Kanayama's statements in the videos do not support the government's presentation of probable cause, instead they strongly undermine it.

v.    Dr. Kanayama's Journey Between Narita and Katori

In its Memorandum of Law, the government also urges that probable cause exists to believe that Dr. Kanayama was responsible for the oil splashings at issue based on an analysis of tollway gate records through which a Toyota Prius rented by him traveled on March 25, 2015. Govt. Mem. at p. 14. That Dr. Kanayama was in Japan on March 25, 2015, rented the Toyota

---

[18] The complete translation of Dr. Kanayama's December 31, 2012 YouTube video is attached as Exhibit J.

24

Prius, and traveled on the toll roads in question is indisputable. Nevertheless, a simple

"expla[nation]" exists which undercuts the government's probable cause argument: to travel

between the Narita Airport and his hotel in the Chiba prefecture most expeditiously, the doctor

would have needed to use the toll road and tollgates in question. Shapiro, 478 F.2d at 904; Map

of Defendant Masahide Kanayama's March 25, 2015 Travel, attached as Exhibit K.

Specifically, in its probable cause presentation, the government claims that "[a] review of

surveillance images and toll tickets collected at tollstops between the Narita-san Shinsho Temple

and the Katori Jingu Shrine during the relevant time revealed a gray Toyota Prius that authorities

conclusively determined was rented by Kanayama." Govt. Memo. at p. 14. This information

permitted authorities to determine that Dr. Kanayama's rented Prius entered the Higashikanto

Expressway through the Narita tollgate at about 4:30 p.m. and left the Expressway through the

Sakuma-Katori tollgate around 4:41 p.m. Id. Defendant Kanayama, however, does not dispute

that he was in Japan between March 21 and April 1, 2015. He stayed in the greater Tokyo area

for a Christian evangelical mission and for some time off during a long international trip,

including a stay at a spa. And as confirmed by the Japanese government, he rented a Toyota

Prius at Narita Airport on the afternoon of March 25, 2015 and returned it to that airport the

following morning. As further confirmed by the police in Japan, he spent the night of March 25

at a spa hotel in the area of Inubosaki, which is located on the Pacific Ocean in Choshi City and

which is known for its hot springs.

The attached map depicting the location of Narita Airport and the Inubosaki resort

makes clear, however, that to access the Expressway from Narita Airport, one has to use the

Narita tollgate – the same tollgate used for the Narita Temple. See Ex. K. And to exit the

Expressway in route to the Inubidaki resort, one has to travel through the Sawara-Katori tollgate

25

– the same tollgate used for the Katori Shrine. Id. The fastest route from the airport to the Inubidaki spa involves the use of both the Expressway and the two tollgates at issue.

The tollway analysis presented by the Japanese authorities, therefore, is completely consistent with innocent travel between Narita Airport and the Inubosaki hotel. As such, it in no way supports the government's claim that probable cause exists.

### POINT III

### CERTIFICATION OF THE GOVERNMENT'S EXTRADITION REQUEST WOULD SUBJECT THE DEFENDANT TO PERSECUTION FOR HIS CHRISTIAN BELIEFS AND ZAINICHI KOREAN ETHNICITY

The internationally accepted principle of non-refoulement prohibits the removal or return of refugees to a country where they would face the risk of persecution. Article 33(1) of the 1951 Convention and Protocol Relating to the Status of Refugees provides that: "No contracting State shall expel or return ("refouler") a refugee in any manner whatsoever to the frontiers of territories where his or her life or freedom would be threatened on the account of his or her race, religion, nationality, membership of a particular social group or political obligation." Id. The United Nations High Commissioner for Refugees has indicated, through a guidance note, that Article 33(1) and the principle of non-refoulement set forth on this provision are fully applicable to extradition proceedings as the plain language of the article states that a refugee shall not be returned "in any matter whatsoever" to a country where he or she will face the risk of persecution based on protected grounds. Guidance Note on Extradition and International Refugee Protection, United Nations High Commissioner for Refugees, April 2008 (hereinafter "UNHCR Guidance"). While the principle of non-refoulement applies to those who meet the inclusion criteria or definition of a refugee in Article 1 of the Convention, the principle also

26

applies to asylum-seekers who have not yet had their cases determined and protects them from being returned during the prescribed process, including the pendency of any appellate proceedings. See UNHCR Guidance at 7.

While Dr. Kanayama has not officially been designated a refugee, the defense would assert that he, in fact, meets the criteria for such designation as set forth in Article 1(A)(2) of the 1951 Convention in that "owing to well-founded fear of persecution for reasons of race, religion, nationality, membership of a particular social group or political opinion, [he] is outside the country of his nationality ...[and] is unwilling to avail himself of the protection of that country ...." Id. Although the defendant is a permanent resident of the United States, he is a citizen of Japan, and Japan only. See Declaration of Masahide Kanayama, attached as Exhibit L. From the very commencement of this extradition action, Dr. Kanayama could have voluntarily traveled to Japan and availed himself of that country's presumed protections. But because he has denied culpability for the actions alleged against him in his nation of origin, and because he fears being persecuted in Japan for his Christian ministry and beliefs, along with his Zainichi Korean heritage, the defendant is unwilling to submit voluntarily to the jurisdiction of Japan's criminal justice system. Id. Therefore, as long as his fear of persecution in Japan is "well-founded," the doctor indisputably meets the criteria for non-refoulement defined in Article 1(A)(2).

The question of whether an alien's fear of persecution is well-founded has been addressed by federal courts of appeal in the context of deportation proceedings under immigration law. According to the Ninth Circuit, the "well-founded fear" standard includes both a subjective and an objective component. Hernandez-Ortiz v. INS, 777 F.2d 509, 513 (9th Cir. 1985).

A0325

An alien satisfies the subjective component if he shows that his fear is genuine. Diaz-Escobar v. INS, 782 F.2d 1488, 1492 (9th Cir. 1986). The subjective component is satisfied if persecution is a "reasonable possibility." Hernandez-Ortiz, 777 F.2d at 513. "The objective component requires a showing, by credible, direct, and specific evidence in the record, of facts that would support a reasonable fear that the petitioner faces persecution." Diaz-Escobar, 782 F.2d 1492. Additionally, the evidence should be specific enough to indicate that the alien's predicament is appreciably different from the dangers faced by the alien's fellow citizens. See Zepeda-Melendez v. INS, 741 F.2d at 290. As the Second Circuit has held, a "well-founded fear" may be established in various ways. Carcamo-Flores v. Immigration and Naturalization Service, 805 F.2d 60, 64 (2d Cir. 1986). That standard for political asylum status is a flexible one; no one type of evidence, and no one kind of persecution, will apply to all cases. Id.

Here, the defense would offer the same – evidence of both the historical persecution of Christians in Japan and evidence of perpetual discrimination against Zainichi Koreans in that country – as corroborative of both the genuineness of Dr. Kanayama's fear of persecution and the reasonableness of that fear. That evidence is discussed in the personal and social profile of Dr. Kanayama previously referenced in this brief as the "Kanayama Biography" and attached hereto as Exhibit A. The profile also discusses how the doctor experienced these two brands of prejudice in Japan, even before the present vandalism charges were filed. Further, as detailed therein: "[a]pproximately one million people in Japan, representing roughly one percent of the population, are Christian. The religion was first brought to Japan in the mid-16th century by Roman Catholic missionaries, then was banned in 1587. Those who continued to practice Christianity, called 'kakure kirishitans' meaning 'hidden Christians,' were persecuted and even

crucified if caught. Christianity remained banned in Japan until the country opened to world

trade in 1853." Ex. A, at p. 19.

"Officially sanctioned animus towards Christians reached high levels [again] as recently

as World War II when state-sponsored Shintoism elevated the Emperor to the status of a God

and insisted that the Japanese were a divine race, the Yamato; with all other races and cultures

considered inferior. In present day Japan, the government is strongly influenced by Nippon

Kaigi (Japan Conference), a conservative Shinto organization whose adherents ... [are] widely

regarded to be pursuing a policy intended to revise Japan's post-war pacifist constitution, end

sexual equality, get rid of foreigners, void pesky 'human rights' laws, and return Japan to its

Imperial Glory." Ex. A, at p. 19.

Moreover, there has been a long history of discrimination against Zainichi Koreans,

which include Japanese nationals of Korean descent such as Dr. Kanayama, in Japan. As also

detailed in the Profile:

> Japanese of Korean ancestry are subject to various forms of
> persecution and harassment in Japan. Dr. Kanayama's father was a
> Korean national who came to Japan during the period when Korea
> was under Japanese colonial rule. The name 'Kanayama' is the
> Korean surname Kim combined with the Japanese word for
> 'mountain' – a formulation which clearly identifies Dr. Kanayama
> as having Korean ethnicity.

Ex. A, at pp. 19-20.

The profile cites from the report of the Lawyer's Association of Zainichi Koreans to the

85th Session on the Elimination of Racial Discrimination in 2014:

> Zainichi Koreans have been subject to deportation like other
> foreign nationals, and the government of Japan has added
> nationality requirements to social security and welfare provisions
> and excluded Zainichi Koreans from public office. Such measures

A0327

of exclusion employed by the Japanese government have only encouraged discrimination based on nationality and ethnicity in the private sector. .... In addition to the existing discriminatory sentiment, in recent years there has been an increasing number of discriminatory practices in the face of Japan's deteriorating relationship with [North and South Korea]. Specifically, the Japanese government has excluded chosen gakko ("Korean schools") from the newly instituted high school tuition waiver program. Hate crimes and hate speech targeted toward Zainichi Koreans by xenophobic groups are also becoming a serious issue.

Id.

During his early years, Kanayama "experienced discrimination and persecution because of his status as a minority Christian. On at least three occasions he was taunted and beaten by classmates. The school did not intervene or support him. He also faced discrimination due to his father having been born in Korea." Ex. A, at p. 5.

As noted several times earlier in this memorandum, the Japanese government has acknowledged that, if Kanayama was the individual who placed oil at the Buddhist temple and the Shinto shrine, he did so for "religious purposes." Govt. Mem. at p. 5. Yet, despite that acknowledgment, it is still seeking to prosecute him for felony offenses. Thus, by pursuing this prosecution, the requesting government is stating that it finds unacceptable the "religious purposes" that motivated the defendant's alleged actions. Govt. Mem. at p. 5. Through its legal actions and its statements in support of its extradition request, the Japanese authorities have provided unambiguous evidence that their prosecution of the defendant is based, in whole or in part, upon his religious intent as a Christian.

On its face, the Japanese government's prosecution of Dr. Kanayama, along with the personal and historical circumstances cited above, verify the genuineness of the defendant's non-refoulement claim. Diaz-Escobar, 782 F.2d at 1492. That very prosecution also "support[s] a

30

A0328

reasonable fear that the [defendant] faces persecution." Id.  Furthermore, given that Christians represent just one percent of the Japanese population and have been subjected to historical discrimination in the requesting country, the doctor's predicament is appreciably different from that which would be faced by the overwhelming majority of his fellow citizens if subjected to similar extradition proceedings. Zepeda-Melendez, 741 F.2d at 290.

The defense would acknowledge that there is a significant exception to the principle of non-refoulement.  That exception is set out in Article 33(2) of the 1951 Convention, which provides that "[t]he benefit of the present provision may not, however, be claimed by a refugee whom there are reasonable grounds for regarding as a danger to the security of the country in which he is, or who, having been convicted by a final judgement of a particularly serious crime, constitutes a danger to the community of that country."  Presently, that exception would not apply because there are no grounds to believe that Dr. Kanayama poses a danger to the security of the United States and he has not even been charged--let alone convicted--by final judgment of a particularly serious crime.

The prosecution of Dr. Kanayama is predicated on his religious beliefs – beliefs that are unacceptable to Japanese authorities.  Returning him to Japan via the extradition process would "threaten[] his ... freedom ... on the account of his ... [Christian] religion," and probably on account of his Zainichi Korean ethnicity as well.  Article 33(1) of the 1951 Convention.  Under the principle of non-refoulement standing alone, the Court should deny the government's request for certification.

## CONCLUSION

For the reasons stated herein, the government's request for the certification of Dr.

Masahide Kanayama's extradition must be denied.


Dated:        New York, New York
              October 20, 2017

                                   Respectfully submitted,


                                   _____
                                   **JEFFREY LICHTMAN, ESQ. (JL6328)**
                                   **LAW OFFICES OF JEFFREY LICHTMAN**
                                   11 East 44th Street, Suite 501
                                   New York, NY 10017
                                   (212) 581-1001
                                   jhl@jeffreylichtman.com


                                   _____
                                   **DAVID M. DUDLEY, ESQ. (PHV)**
                                   **LAW OFFICES OF DAVID M. DUDLEY**
                                   3415 South Sepulveda Boulevard
                                   Suite 560
                                   Los Angeles, California 90034
                                   (310) 772-8400
                                   fedcrimlaw@hotmail.com


                                   Attorneys for Masahide Kanayama

32

A0330

# Exhibit 11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                                    :
IN THE MATTER OF THE EXTRADITION                    :
OF MASAHIDE KANAYAMA                                :17 Crim. Misc. 1 Page 003 (ER)
                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


# REPLY MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN SUPPORT OF EXTRADITION


JOON H. KIM
Acting United States Attorney for the
Southern District of New York
1 St. Andrews Plaza
New York, NY 10007


Tara M. La Morte
Assistant United States Attorney
-Of Counsel-

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ...................................................................................................... 3
    A.    Narita-san Shinsho-ji Temple ................................................................. 3

1. Historical Background and Structure of the Narita-san Shinsho-ji Temple ............... 3

2. Recent Observations and Estimates of the Damage Sustained at the Narita Temple ......... 4
    B.    Katori Jingu Shrine ................................................................................ 5

1. Historical Background and Structure of the Katori Jingu Shrine ......................... 5

2. Recent Observations and Estimates of the Damage Sustained at the Katori Shrine ......... 6
    C.    Kanayama's Path of Travel at the Times the Crimes Allegedly Were Committed ...... 7
    D.    Analysis of Article 260 of Japanese Penal Law ................................... 8

DISCUSSION .......................................................................................................... 9
    A.    Kanayama's Crimes Meet the Test of Dual Criminality and Are Covered By the Extradition Treaty .............................................................................. 9

1. The Damages Elements of New York Criminal Mischief in the Second Degree and Third Degree Are Met ............................................................................... 10

2. The Intent Element of New York's Criminal Mischief Statutes Is Met ................... 15
    B.    The Evidence Submitted by Japan More Than Suffices to Establish Probable Cause that Kanayama Violated Article 260 of the Japanese Penal Code ............. 18

1. Japan Has Made a Strong Probable Cause Showing that Kanayama Is Responsible for Damaging the Narita Temple and Katori Shrine .......................................... 18

2. Kanayama's Claim that Probable Cause Is Lacking Based on His Interpretation of Japanese Law Fails .......................................................................... 22
    C.    Kanayama's Persecution Claim Must Be Directed to the Secretary of State ......... 24

CONCLUSION ........................................................................................................ 26

i

A0333

## PRELIMINARY STATEMENT

As set forth in the Government's opening memorandum, the evidence provided by Japan is more than sufficient for this Court to find probable cause to believe Kanayama intentionally damaged Japanese structures of historic, religious, and cultural significance by applying oil to them—conduct that renders him extraditable to Japan. Nothing Kanayama says in his response negates the existence of probable cause or otherwise precludes this Court from certifying him as extraditable. Rather, Kanayama improperly seeks to introduce inadmissible contradictory evidence and turn the Court's narrow probable cause inquiry into a merits trial. But the law is clear: this is beyond the scope of an extradition hearing. In an extradition proceeding, a court is not permitted to choose between competing narratives, weigh contradictory evidence, or independently assess the correctness of a foreign government's interpretation of its own laws.

Kanayama does not contest that the Court is authorized to conduct the extradition hearing, that it has jurisdiction over the fugitive, or that the applicable treaty is in force. Instead, Kanayama argues that he is not extraditable because the crimes at issue are not covered by the applicable treaty, and because Japan has not supplied sufficient evidence to support a finding of probable cause on each charge. He is wrong on both counts.

First, as discussed below, Kanayama contends that the applicable treaty, the Treaty on Extradition Between the United States and Japan, U.S.-Japan, Mar. 26, 1980, 31 U.S.T. 892 (the "Extradition Treaty"), does not cover the crimes which he is alleged to have committed—damaging sites of historic, religious and cultural significance in Japan. But Kanayama ignores that the Treaty explicitly includes "damage of property" in its enumerated list of extraditable offenses. Moreover, his alleged crimes could be prosecuted as felonies in the United States if they had been committed here, including, for example, under New York's criminal mischief laws. Kanayama's arguments to the contrary rest upon an errant interpretation of New York law and inadmissible

1

contradictory evidence. While Kanayama emphasizes that the damaged shrines have not paid out-of-pocket to undertake repairs and have not shuttered their doors to the public, those facts are apropos of nothing, as the relevant statutes contain no such requirements. Relatedly, Kanayama's claim that the stains inflicted on the shrines are now gone and therefore the statutory damage requirements have not been met, is belied by recent independent repair estimates, police reports, and staff witness statements obtained by Japan just last month. Finally, as to his claim that he could not have intended to damage the shrines if, as certain evidence uncovered by Japan indicates, he was religiously motivated to commit such crimes, the case law is clear that religious motivations do not nullify the presence of intent, which in any event, is an element that must be adjudicated at the merits trial and not in an extradition proceeding.

Kanayama's probable cause arguments fare no better. As a threshold matter, they rest on evidence that purports to contradict the evidence submitted by Japan, and it is well-established that such contradictory evidence is inadmissible in an extradition proceeding. But even if the Court was to consider the evidence Kanayama has proffered, nothing therein negates probable cause to believe he is the one who damaged the shrines. There simply is no way to avoid the fact that a person appearing to be Kanayama is captured on security cameras at the shrines making gestures towards and touching the areas where oil stains were subsequently discovered. In addition to the security cameras at the shrines, there is uncontroverted evidence that a vehicle he rented traveled between the two sites in the relevant timeframe, and was captured on surveillance cameras entering and exiting the parking lot of one of the shrines. As a result, Kanayama is reduced to quibbling over the accuracy of the Government's translations of his YouTube videos, specifically whether he advocates "pouring" oil on shrines (as the Government interpreted), versus "anointing" them with oil (as he interpreted). Of course, both interpretations involve the application of oil to the

2

sites, *i.e.*, the crimes charged here. And Kanayama's effort to show his conduct is not proscribed by the Japanese criminal statute runs headlong into principles of international comity pursuant to which extradition courts give substantial deference to a foreign government's interpretation of its own laws, which are set forth in the supplemental material provided by Japan.

Finally, controlling precedent requires Kanayama to direct any concerns about being persecuted in Japan to the Secretary of State, not this Court.

## BACKGROUND

In response to Kanayama's submission, Japan has provided supplemental materials underscoring the historic, religious, and cultural importance of the Narita Temple and Katori Shrine, as well as additional, recent evidence of the extent of the damage that Kanayama is alleged to have caused to those sites. Japan has also provided supplemental materials in response to Kanayama's alibi defense and an analysis of Article 260 of the Japanese Penal Code and its application to the crimes alleged to have been committed by Kanayama.

### A. Narita-san Shinsho-ji Temple

#### 1. Historical Background and Structure of the Narita-san Shinsho-ji Temple

The Narita-san Shinsho-ji Temple ("Narita Temple") is a Buddhist temple containing a number of nationally designated cultural properties. (Supp. Exs. 1, 3).[1] The Narita Temple attracts approximately 10 million worshippers every year. (Supp. Ex. 1). To enter the Temple's sanctuary, each worshipper must pass through the *So-mon* (Main Gate)—which includes the three poles on which the vandalism occurred. (Supp. Ex. 3). Accordingly, as explained in a signed statement by the General Affairs Section Chief of the Narita Temple, the *So-mon* was built in a traditional

---

[1] "Rec. Ex. __" refers to Exhibits filed with the Government's moving papers. "Supp. Ex. __" refers to supplemental exhibits filed with this reply memorandum. "Opp. Ex. __" refers to exhibits filed with Mr. Kanayama's opposition papers.

A0336

Japanese architectural style, serves as an important boundary for the sanctuary, and is itself an object of worship. (Supp. Ex. 3). Specifically, the *So-mon* is comprised of a two-story building with a width of five bays (approximately 9.09 meters), three passageways, and a roof on top. (Supp. Ex. 3). It is supported by walls and poles and has an interior space through which worshippers can enter and exit. (Supp. Ex. 3). The *So-mon* took three years and eight months to construct, and was funded by the donations of Temple followers at a cost of about two billion yen (approximately $17.6 million). (Supp. Ex. 3).

### 2. Recent Observations and Estimates of the Damage Sustained at the Narita Temple

As set forth in the Government's opening memorandum, three poles on the east side of the *So-mon* were vandalized with an oily liquid at approximately 4:06 p.m. on March 25, 2015.

According to the General Affairs Section Chief of the Narita Temple, when the oily liquid was first discovered on the three east poles of the *So-mon*, the poles looked wet with oil. (Supp. Ex. 3). As of October 18, 2017, the oil has appeared to dry, having been absorbed in part by the unvarnished wood. The oily liquid has left black stains which are smaller than the original stains, but still visible on the poles. (Supp. Ex. 3).

On or about October 6, 2017, at the request of the Japanese police, the Narita Temple obtained an updated estimate to repair the damages to the *So-mon* caused by the oily liquid. (Supp. Ex. 7). The estimate was performed by Kongo Gumi Co., Ltd., a company specializing in the construction of restoration of cultural properties, historic buildings, and fine arts and crafts. (Supp. Ex. 7). On October 24, 2017, an investigating Japanese police officer measured the damaged portions of the *So-mon*. (Supp. Ex. 7). Notwithstanding that the stains caused by the oily liquid may have become less prominent in the past two and a half years since the crime was committed, Kongo Gumi Company estimated the repairs to be 120,500 JPY, the same as originally assessed.

4

A0337

(Supp. Ex. 7; *see also* Rec. Ex. 10). As the Kongo Gumi Company explained to the Japanese police, the repair estimate is the same because the same treatment plan applies—use of chemicals on the stains, which had absorbed into the wood. (Supp. Ex. 7). The other option—wholesale replacement of the poles—would be significantly more expensive and would detrimentally affect the appearance of the *So-mon*, as the poles would appear newer than the remainder of the gate. (Supp. Ex. 7). While it would be more affordable to wash the stains with chemicals, that treatment might be unsuccessful or even exacerbate the stains, because the exact nature of the oily substance is unknown. (Supp. Exs. 3, 7). In any event, undertaking any restoration activity would require the Narita Temple to close to worshippers and tourists for the duration of the work. (Supp. Ex. 3). In light of the costs involved, the Narita Temple had not begun restoration work as of October 2017. (Supp. Ex. 3).

### B. Katori Jingu Shrine

#### 1. Historical Background and Structure of the Katori Jingu Shrine

The Katori Jingu Shrine ("Katori Shrine") is one of the few historic shrines in Japan connected with the Imperial Family. (Supp. Ex. 4). It was founded during the reign of the Japan's first Emperor. (Supp. Ex. 4). It contains a number of nationally designated cultural properties and attracts as many as two million worshippers a year. (Supp. Ex. 4).

The *Haiden*—the vandalized area of the Shrine—translates to Hall of Worship. (Supp. Ex. 4). It is where worship is offered to the deity, and consists of two spaces for worshipping. (Supp. Ex. 4). According to the General Affairs Division Director of the Katori Shrine, the *Haiden* is analogous to a sacred room of Christian churches where prayers are offered. Physically, the *Haiden* is a wooden one-story structure that has a roof, it is supported by walls and poles, and it is fixed to the ground. Worshippers can physically enter and exit the *Haiden*. The inside of the

*Haiden* includes stairs and an offertory box. The offertory box is located in the center of the stairs facing the front of the *Haiden*. The offertory box is used by worshippers to make donations to express appreciation for the deity's protection, and it was specially designed to fit the stairs as part of the *Haiden*. (Supp. Ex. 4).

### 2.  Recent Observations and Estimates of the Damage Sustained at the Katori Shrine

As set forth in the Government's opening memorandum, the poles, stairs, and offertory box of the *Haiden* were vandalized with an oily liquid at approximately 5:02 p.m. on March 25, 2015. The oil stains now look dry, and while faded, can still be seen at close range. (Supp. Exs. 4, 6, 8).

On or about October 6, 2017, the Katori Shrine obtained a second estimate of cost of restoration work from the Konishi Decorative Arts & Crafts Co., Ltd., a company specializing in the restoration of shrines and temples. (Supp. Ex. 8; *see also* Supp. Ex. 6). The estimate of restoration was the same as that originally obtained, that is, approximately 2,423,000 JPY. (Supp. Ex. 8; *see* Rec. Ex. 11). The the Konishi Decorative Arts & Crafts Co explained that the repair work would necessitate the overcoating of lacquer over the damaged portions of the Shrine. (Supp. Ex. 8). This process would require removing the current lacquer, performing undercoating, and then applying a new coating of lacquer. (Supp. Ex. 8). Restoring only the damaged portions of the *Haiden* would result in a noticeable difference between those portions and the remaining portions, which could infringe on laws restricting changes to designated cultural properties. (Supp. Ex. 4). Visitors would need to be restricted during any restoration work, resulting in an additional loss of revenue beyond the funds necessary for repairs. (Supp. Ex. 4).

A0339

### C. Kanayama's Path of Travel at the Times the Crimes Allegedly Were Committed

The Japanese police compiled the following timeline from when Kanayama admittedly rented the vehicle with license plate number Narita 300Wa.44 on March 25, 2015, (Opp. Ex. 24-25), to when he checked into the then-named Spa & Resort Inubosaki Taiyonosato (Rec. Ex. 5).

- 2:33 p.m.: Kanayama leaves parking lot of Narita Airport in rental car.

- 3:37-4:06 p.m.: Individual believed to be Kanayama captured in a security camera at the Narita Temple.

- 4:30 p.m.: Kanayama's rental vehicle entered Higashikanto Expressway through the Narita Tollgate.

- 4:41 p.m.: Kanayama's rental vehicle exited Higashikanto Expressway through Sawara-Katori Tollgate.

- 4:47-5:10 p.m.: Individual believed to be Kanayama captured by a security camera at the Katori Shrine.

- 6:47 p.m.: Kanayama checks into the then-named Spa & Resort Inubosaki Taiyonosato.

(Supp. Ex. 9). While it took close to two hours for Kanayama to arrive at the Narita Tollgate from the Narita Airport parking lot, internet searching revealed the ordinary travel time to be eight minutes. (Supp. Ex. 9). And while Internet searching revealed the ordinary travel time between the Sawara-Katori Tollgate and the Spa & Resort to be approximately one hour and four minutes, this drive took Kanayama approximately two hours and six minutes. (Supp. Ex. 9). Indeed, Kanayama's own submissions reflect that the total travel time from the airport to the spa should have been approximately one hour and seven minutes (see Opp. Ex. K), whereas Japan's evidence shows it took Kanayama more than four hours to make this trip. Finally, and significantly, Kanayama's rental car was captured by surveillance cameras entering and leaving the parking lot in the vicinity of the Narita Temple. (Rec. Ex. 6).

7

A0340

### D. Analysis of Article 260 of the Japanese Penal Code

As explained by the Japanese public prosecutor in the supplemental materials provided by Japan in further support of its extradition request, Article 260 of the Penal Code of Japan punishes a person who "damages a building or vessel of another." (Supp. Exs, 1, 2; Rec. Ex. 22). According to the *Daishin-in*, the former Japanese Supreme Court, the term "building" is defined as "a thing that has a roof and is fixed to the ground by the support of walls and/or poles, and that people can go into and out of its inside." (Supp. Exs. 1, 2). Any structure falling within this definition qualifies as a "building" under Japanese law. Things that are attached to a building and cannot be detached without causing damage are treated as part of the "building," such that intentional damage to those items are proscribed by this law. (Supp. Exs. 1, 2). The Japanese public prosecutor has provided a detailed explanation as to why the sites that Kanayama allegedly vandalized constitute "buildings" under Article 260 of the Japanese Penal Code. (Supp. Exs, 1, 2). In short, the prosecutor confirms that the damaged *So-mon* and *Haiden* fall within Article 260 because they are structures that have roofs, are supported by walls and poles, are fixed to the ground, and have an interior space for a person to enter and exit. (Supp. Exs. 1, 2).

As used in Article 260 of the Japanese Penal Code, the term "damage" encompasses not just physical damage, but also damage to a structure's "function." "Function," in turn, includes the original purpose for which the structure was intended, as well as "auxiliary function" such as aesthetic appearance and exterior appearance that augments the original function. (Supp. Exs. 1, 2). According to the Japanese Supreme Court, damage to a building means "not only altering its physical form or destroying it totally but also render[ing] it unusable virtually or emotionally for the intended use." (Supp. Exs. 1, 2). In order to cause "damage" to a building "it is not necessary to totally incapacitate its function, and the damaged part of a building is not necessarily a major

part of the building." (Supp. Exs. 1, 2). Applying this law to the facts of this case, the public prosecutor confirms that oil stains on sites of historic, cultural, and religious value constitute damage under Article 260 of the Japanese Penal Code. (Supp. Exs, 1, 2).

Finally, in the context of Article 260 of the Japanese Penal Code, "mens rea" means "damaging an object physically by a wrongful conduct or understanding/acknowledging that the function of an object would be damaged." (Supp. Ex. 1). Religious inspiration does not negate mens rea under Japanese law. (Supp. Ex. 1). Applying this law to the facts of this case, the public prosecutor confirms that the "facts are sufficient to find that the suspect had mens rea." (Supp. Ex. 1, 2).

## DISCUSSION

As detailed herein, Kanayama's intentional damage of the Narita Temple and Katori Shrine, which in Japan are of significant historic, religious, and culutural importance, are extraditable offenses under the Extradition Treaty. Moreover, the evidence provided by Japan is more than sufficient to establish probable cause to believe Kanayama committed the crimes. Kanayama's arguments to the contrary lack merit.

### A.   Kanayama's Crimes Meet the Test of Dual Criminality and Are Covered By the Extradition Treaty

As the Government explained in its moving papers, the crimes for which extradition is sought are covered under the Treaty. The Treaty explicitly includes "[a]n offense relating to damage of property" as an extraditable offense and thus by its plain terms covers Kanayama's alleged vandalism of the Narita Temple and Katori Shrine. *See* Treaty, Schedule No. 19. Moreover, the "dual criminality" test imposed by the Treaty is met because if Kanayama had vandalized sites of historic, religious, and cultural value in the United States his conduct would be punishable under our laws, including, for example, New York Penal Law § 145.05 (criminal

9

mischief in the third degree) and/or New York Penal Law § 145.10 (criminal mischief in the second degree), each of which carry a maximum punishment of more than one year imprisonment.

The elements of the foregoing New York criminal mischief statutes are: (1) the defendant intended to damage the property; (2) there was actual damage to tangible property of another person; (3) the defendant had no reasonable ground for believing he had a right to damage the property; and (4) the damage to the property exceeded a certain amount. *See People v. Simpson,* 132 A.D.2d 894, 895, 518 N.Y.S.2d 453 (3d Dept. 1987). For criminal mischief in the third degree, the amount of damage must exceed only $250. For criminal mischief in the second degree the damage threshold is $1,500. *See* N.Y.P.L. §§ 145.05, 145.10. As described below, each of these elements is easily satisfied in this case.

### 1. The Damages Elements of New York Criminal Mischief in the Second Degree and Third Degree Are Met

Kanayama argues that he could not be prosecuted under New York's criminal mischief statutes (second or third degree) if the alleged crimes had taken place here because the stains caused by the oily liquid have naturally vanished over time, no repairs were made at either location, and no loss of use occurred. (Opp. Br. at 5-6). Accepting these arguments, however, would require the Court to discount the ample evidence submitted by Japan confirming that significant damage to the shrines remains and to instead improperly credit contradictory and unreliable statements made by Kanayama's Japanese attorney, all the while engrafting elements onto the criminal mischief statutes that simply do not exist. None of these measures are permitted in this extradition proceeding, where the function of the Court is narrowly confined to verifying there is "competent legal evidence" that "would justify [Kanayama's] apprehension and commitment for trial." *Collins* v. *Loisel*, 259 U.S. 309, 315 (1922).

Japan's allegations regarding the damage to the Narita Temple and Katori Shrine satisfy the damages elements of the applicable criminal mischief statutes. Japan's allegations are well supported. As discussed in the Government's opening memorandum, Japan initially supported its extradition request with evidence from multiple sources chronicling the extent of the damage to the shrines. The evidence included interviews with staff members who observed the stains, photographs of the stains taken by Japanese police investigators, and independent estimates of the cost to repair the damage obtained from reputable companies. Those companies concluded that the damage to the Narita Temple and Katori Shrine far exceeded the thresholds for Kanayama to be convicted of criminal mischief in the third degree or second degree. (Rec. Exs. 10-13). This evidence alone is sufficient to sustain the charge.

Further, as discussed *supra* Background, in response to Kanayama's claims that any damage has disappeared, Japan has provided additional evidence that significant damage remains. This evidence includes recent interviews with staff members at the shrines, measurements of the stains taken by a Japanese police investigator and the investigator's personal observations of those stains, and updated repair estimates from the companies that provided the initial estimates. (Supp. Exs. 3-8). The updated estimates from the independent companies were the same as the initial estimates and well exceed the required thresholds. This remains true even if the visible damages may have lessened in the two and a half years since the crimes occurred. As the restoration companies explained, in certain cases the oily liquid has been absorbed by the damaged structures, making the process of restoration no different than originally anticipated. (Supp. Exs. 7, 8).

The evidence provided by Japan regarding Kanayama's alleged conduct and the damage to the shrines is admissible under 18 U.S.C. § 3190 and must be deemed truthful for purposes of this extradition proceeding. *See e.g. Ahmad v. Wigen,* 726 F. Supp. 389, 399-400 (E.D.N.Y. 1989)

11

A0344

("The primary source of evidence for the probable cause determination is the extradition request, and any evidence submitted in it is deemed truthful for purposes of this determination.") (citing *Collins,* 259 U.S. at 315–16); *see also Matter of Extradition of Atta*, 706 F. Supp. 1032, 1050-51 (E.D.N.Y. 1989) (same). Further, as conceded by Kanayama (*see* Opp. Br. at 9), New York law is clear and consistent that a repair company's independent damage estimates may be used to satisfy the damage elements of criminal mischief in the second or third degree. *See, e.g.*, *People v. Garcia*, 29 A.D. 3d 255, 263, 812 N.Y.S.2d 66 (1st Dept. 2006) ("In a criminal mischief case, the amount of damage is generally measured by the reasonable cost of repairing the damaged property, provided it can be repaired . . . The repair cost may be established by expert testimony."); *People v. Smeraldo*, 242 A.D.2d 886, 886, 662 N.Y.S.2d 883 (4th Dept. 1997) (affirming conviction of criminal mischief in second degree where "[c]omplainant testified that she observed defendant spraying a liquid on her car, and the operator of a collision shop testified that, in his expert opinion, the cost of repairing the vehicle would be $1,963.93").

While Kanayama is correct that neither the Narita Temple nor the Katori Shrine have spent money out-of-pocket to undertake the necessary repairs, this simply is not required under the relevant statutes, nor is it a requirement otherwise imposed by caselaw. To the contrary, New York courts have held that actual repair is not required to establish damage. *See, e.g.*, *People v. Fancher*, 116 A.D.3d 1084, 1088, 984 N.Y.S.2d 174 (3d Dept. 2014) ("[A]n auto body shop owner's estimate of the cost of repairing a vandalized pickup truck provided legally sufficient evidence that the damage exceeded $250, even though the repairs were never performed."). Similarly absent from the statutes is any requirement that the Narita Temple and Katori Shrine suffered a "loss of use" as a result of the damage, as asserted by Kanayama. That too constitutes an effort to impose an element onto the statutes that simply is not there.

A0345

As to the factual issue of damage, Kanayama's contention that there is no present damage to the Narita Temple and Katori Shrine rests on inadmissible and unreliable contradictory evidence, and even so, such evidence does not obliterate Japan's evidence that significant damage to the shrines remain.

Kanayama's argument that the stains have disappeared is based on a declaration submitted by his Japanese attorney purporting to summarize interviews he conducted with staff at the shrines and photographs he attaches purporting to show there is no visible damage to the shrines. However, controlling precedent makes clear that such evidence is inadmissible in this extradition proceeding because it unambiguously contradicts the substantial evidence provided by Japan confirming significant damage to the shrines exists. *See, e.g., Collins*, 259 U.S. at 316 (permitting the introduction of defense evidence "would be in plain contravention of the intent and meaning of the extradition treaties") (internal quotation marks and citation omitted); *Messina v. United States*, 728 F.2d 77, 80 (2d Cir. 1984) ("[A] fugitive may be permitted to offer explanatory testimony, but may not offer proof which contradicts that of the demanding country."); *United States ex rel. Petrushansky v. Marasco*, 325 F.2d 562, 567 (2d Cir. 1963) (fugitive's right to controvert the evidence introduced against him is "limited to testimony which explains rather than contradicts the demanding country's proof"); *In re Pena-Bencosme*, No. 08-1990-pr, 2009 WL 2030129, at *1 (2d Cir. July 9, 2009) ("the existence of evidence contradicting or calling into question the requesting state's primary evidence ordinarily has no import as it does not vitiate or obliterate probable cause, but rather merely 'pose[s] a conflict of credibility' that generally "should properly await trial in [the requesting country].");

Contradictory evidence is excluded from extradition hearings because, among other reasons, admitting such evidence threatens to expand the scope of such hearings from a probable

13

A0346

cause determination to a trial on the merits. *See, e.g., Jhirad v. Ferrandina*, 536 F.2d 478, 484 (2d Cir. 1976) (citing "well-entrenched rule that extradition proceedings are not to be converted into a dress rehearsal trial."); *Shapiro v. Ferrandina*, 478 F.2d 894, 900-901 (2d Cir. 1973) ("[T]he function of the extraditing magistrate is not to decide guilt or innocence but merely to determine whether there is 'competent legal evidence which . . . would justify his apprehension and commitment for trial . . . . .") (quoting *Collins*, 259 U.S. at 315)); *Lo Duca v. United States*, 93 F.3d 1100, 1104 (2d Cir. 1996) (an extradition hearing is "essentially a preliminary examination to determine whether a case is made out which will justify the holding of the accused and his surrender to the demanding nation.") (citation and quotation omitted); *Matter of Sindona*, 450 F. Supp. 672, 685 (S.D.N.Y. 1978) ("The decisions are emphatic that the extraditee cannot be allowed to turn the extradition hearing into a full trial on the merits.").

Likewise, New York courts have held that the issue Kanayama asks the Court to resolve at this extradition hearing—the amount and extent of damage caused to the shrines—is an issue for the trier of fact. *See People v. Torres*, 708 N.Y.S.2d 578, 582 (Crim. Ct. N.Y. Cty. 2000) ("While the defendants assert that the glue was 'water soluble,' the intent to damage and the question of actual damage is an issue for the trier of fact. At this stage of the proceedings, the accusatory instrument provides 'reasonable cause' to believe that the scaffolding at issue was 'damaged' by virtue of the application of glue, a foreign substance, and paper.") (internal citations omitted); *People v. Vinolas*, 667 N.Y.S.2d 198, 200 n.1 (Crim. Ct. N.Y. Cty. 1997) ("It is reasonable to assume that the restoration of the property to its original state, no matter how slight the damage, will have a cost in effort and/or money.").

Moreover, even if the Court were to admit the declaration of Kanayama's Japanese attorney and the attached photographs (which it should not), such evidence still does not obliterate the

14

A0347

substantial evidence provided by Japan showing that damage to the shrines remains. To the contrary, the declaration is unreliable because, as discussed *supra* at 15, it is based in substantial part on statements attributed to staff at the shrines who have since said many of those statements are inaccurate. (Supp. Exs. 5, 6). Similarly, the photographs attached to the declaration, which were admittedly taken at the direction of Kanayama's Japanese attorney, may not depict the precise sites where the oil was applied, and the resolution and angles may not capture the damage that employees of the shrines recently reported remains visible, that has recently been observed and measured by the Japanese investigating officer, and for which reputable repair companies have provided updated estimates on the cost to repair.[2]

The evidence submitted by the Government of Japan is more than sufficient to establish for purposes of this extradition proceeding that the amount of damage to the shrines exceeds the monetary thresholds set forth in New York Penal Law § 145.05 (criminal mischief in the third degree) and New York Penal Law § 145.10 (criminal mischief in the second degree).

### 2. The Intent Element of New York's Criminal Mischief Statutes Is Met

Kanayama's argument that he lacked the requisite intent to violate New York's criminal mischief statutes fares no better. As an initial matter, Japan's submissions provide ample support for the fact that the damage Kanayama caused to the Narita Temple and the Katori Shrine was not inadvertent but rather intentional. (*See generally* Gov. Op. Br. at 2-6). Further, contrary to Kanayama's assertion, the fact that evidence uncovered by Japan also indicates that he may have been motivated to damage the sites for religious purposes does not defeat intent. Kanayama's alleged conduct still meets the dual criminality requirement even if his religious beliefs motivated him to inflict the damage, as motivation and intent are distinct issues. *See, e.g., People ex rel.*

---

[2] The Government further notes that Kanayama has not cited any precedent for the proposition that damages should be measured now rather than at the time the crimes occurred.

A0348

*Hegeman v. Corrigan*, 87 N.E. 792, 796 (N.Y. 1909) ("It is no defense to a charge of intentionally committing an act prohibited by law even that the dictates of his religious belief require one to do the act."); *People v. Assi*, 928 N.E.2d 388, 390-91 (N.Y. 2010) (affirming conviction for, *inter alia*, criminal mischief in the third degree (as a hate crime) where evidence established the defendant damaged a synagogue because of his anger toward individuals of Jewish faith).[3]

Moreover, at least for purposes of this extradition hearing, Kanayama may be presumed to have intended to damage the properties based on his intentionally pouring oil on them. *See, e.g.*, *Reynolds v. United States*, 98 U.S. 145, 167 (1878) ("A criminal intent is generally an element of crime, but every man is presumed to intend the necessary and legitimate consequences of what he knowingly does."); *People v. Addison*, 94 A.D.3d 1539, 1540, 943 N.Y.S.2d 359 (4th Dept. 2012) (holding in criminal mischief case that "[a] defendant may be presumed to intend the natural and probable consequences of his actions."); *Vinolas*, 667 N.Y.S.2d at 200 (at the pleading stage of a criminal mischief prosecution, "defendant's act of applying glue to the wall and covering the wall with advertisements tends to support the allegation that defendant intended to damage that wall" for purposes of the criminal mischief charge, notwithstanding defendant's argument that his sole intent was to place advertisements on the wall).

Of course, consistent with how issues of intent are ordinarily treated in criminal prosecutions, intent is an issue for the trier of fact in Japan in the context of a criminal trial, not for

---

[3] *See also People v. Ivanov*, No. 772-08, 2008 WL 6125444, *1 (Sup. Ct., Kings Cty. Sept. 12, 2008) (denying motion to dismiss charge of criminal mischief and other charges where defendant claimed his acts of vandalism were "only attempting to draw attention to the lack of police presence in Brooklyn Heights."); *see also, e.g.*, *United States v. Ahmad*, No. 98-1480, 1999 U.S.App. LEXIS 6113, at *4 (2d Cir. Mar. 31, 1999) ("the innocent motive [the defendant] proffers does not negate either his intent nor his knowledge"); *United States v. Platte*, 401 F.3d 1176, 1181 (10th Cir.2005) ("The high-minded motives of Defendants do not negate their intent. . . . [I]f the law being violated is constitutional, the worthiness of one's motives cannot excuse the violation in the eyes of the law.").

this Court to decide in an extradition proceeding.  *See, e.g., United States v. Case*, 180 F.3d 464,

467 (2d Cir. 1999) ("intent is a question of fact"); *Torres*, 708 N.Y.S.2d at 582 (denying motion

to dismiss criminal mischief charge because, among other things, "intent to damage . . . is an issue

for the trier of fact."); *Vinolas*, 667 N.Y.S.2d at 200 (merits of defendant's argument that he lacked

the requisite intent to be convicted of criminal mischief should be decided at trial).  Kanayama's

alleged conduct fulfills the dual criminality requirement, and resolving the issue of Kanayama's

intent would, in effect, require this Court to hold a trial.  Yet the case law is clear and uniform that

the extradition hearing is not the appropriate vehicle to resolve a fugitive's guilt or innocence.  *See,*

*e.g., Collins*, 259 U.S. at 314–15; *Austin v. Healey*, 5 F.3d 598, 603 (2d Cir.1993).

　　　The cases that Kanayama cites are inapposite because they involve circumstances in which

the defendant's actions were not purposefully directed at the property that was damaged, but rather

the property was damaged inadvertently.  *See People v. Roberts*, 140 A.D.2d 961, 961, 529

N.Y.S.2d 636 (4th Dept. 1988) (coffee table broken in the course of a physical assault); *People v.*

*Bryant*, 85 A.D.2d 575, 576, 445 N.Y.S.2d 711 (1st Dept. 1981) (eyeglasses broken in the course

of a physical assault); *People v. Callahan*, 19 A.D.2d 889, 890, 244 N.Y.S.2d 766 (2d Dept. 1963)

(no evidence that injury to property was willful); *People v. Summer*, 64 A.D.2d 658, 659, 407

N.Y.S.2d 53 (2d Dept. 1978) (holding intoxication could potentially negate defendant's intent).[4]

　　　　　　　　　*　　　*　　　*

---

[4] Relatedly, Kanayama speculates in a footnote that he could have believed he had a right
to pour oil on the Narita Temple and Katori Shrine because Japanese custom permits the
sprinkling of sake and salt.  (Opp. Br. at 8 n.9).  As a threshold matter, Kanayama does not
actually assert that he labored under this misconception.  In any event, for the reasons set forth
by Japan, such a misconception would be unreasonable.  (Supp. Exs. 5, 6).  At a minimum, the
question of whether Kanayama had a reasonable ground for believing he was entitled to pour oil
on the Narita Temple and Katori Shrine is a question of fact that should be resolved in the
Japanese courts. *See People v. Kheyfets*, 174 Misc. 2d 516, 521, 665 N.Y.S. 2d 802 (Sup. Ct.
Kings Cty. 1997) ("While the People have the burden of proving that a defendant's belief was
not reasonable, this is a question of fact for the jury to decide.").

17

For all these reasons, the crimes for which Japan seeks Kanayama's extradition are covered by the Extradition Treaty.

**B.     The Evidence Submitted by Japan More Than Suffices to Establish Probable Cause that Kanayama Violated Article 260 of the Japanese Penal Code**

Kanayama next argues that Japan has failed to demonstrate probable cause that he is responsible for damaging the Narita Temple and Katori Shrine, and has failed to demonstrate that the vandalism at issue occurred to a "structure" as defined by Japanese law. He is wrong on both counts. As described below, Japan has provided more than sufficient evidence to establish probable cause, as well as a cogent explanation of Japanese law and its application to Kanayama's conduct that should be accorded substantial deference.

**1.    Japan Has Made a Strong Probable Cause Showing that Kanayama Is Responsible for Damaging the Narita Temple and Katori Shrine**

Japan has provided extensive evidence that amply supports a finding of probable cause that Kanayama damaged the Narita Temple and Katori Shrine. To summarize, that evidence includes (1) airplane, car rental, toll booth, and hotel records establishing that Kanayama was in the vicinity of the Narita Temple and Katori Shrine on the date and times the properties were vandalized; (2) surveillance footage capturing the car admittedly rented by Kanayama entering and leaving the parking lot of the Narita Temple on the date and within the timeframe the property was vandalized; (3) surveillance footage capturing an individual resembling Kanayama touching and/or gesturing towards the affected structures in the Narita Temple and Katori Shrine around the times the vandalism occurred; (4) an expert identification report concluding there is an "extremely high possibility" that the individual depicted in the above-described surveillance and Kanayama's passport are the same person; (5) statements by employees of the Narita Temple and Katori Shrine describing their observations of the damages at each site; (6) estimates from companies

18

specializing in the repair, restoration, and construction of cultural properties for the restoration of the Narita Temple and Katori Shrine to their original condition; and (7) YouTube videos of lectures by Kanayama during which he states that he poured oil onto various shrines for religious purposes. (*See generally* Gov. Opening Br. at 2-6). And in response to Kanayama's claims in opposition, Japan has submitted additional evidence in further support of its extradition request, including (8) updated estimates from the repair companies regarding the cost to restore the properties to their original condition; (9) investigation reports filed by Japanese police containing current observations and physical measurements of the damages to the properties; (10) statements by employees of the Narita Temple and Katori Shrines describing the properties in more detail and their observations of the current damages; and (11) a timeline of Kanayama's travel on March 25, 2015, from the Narita Airport to the spa where he stayed, and a comparison of that time with the expected travel time, as determined by internet searching. (*See generally supra*, Background). Kanayama attempts to introduce evidence that contradicts the evidence submitted by Japan, but such evidence is inadmissible in this extradition hearing and, in any event, does not negate probable cause.

*First*, in an effort to rebut the identification analysis report submitted by Japan, Kanayama seeks to introduce his own expert report. (Opp. Ex. G). However, Kanayama's expert report plainly constitutes inadmissible contradictory evidence and should not be considered. The Second Circuit case *Kapoor v. Dunne*, No. 14–1699–pr, 606 Fed. Appx. 11, at *13 (2d Cir. June 2, 2015) (Summary Order), is directly on point:

> Kapoor argues that this [handwriting] report is 'explanatory evidence' that demonstrates that the signature that appears on documents she allegedly forged is not, in fact, hers. In its extradition materials, however, India offered a contradictory report from a bank official, V.K. Mohan Das, in which he asserts—based on bank records—that the signature that appears on allegedly forged documents he reviewed is Kapoor's. Kapoor challenges Mohan Das's qualifications to make this

A0352

assessment. This is precisely the type of credibility contest that the rule against contradictory evidence is intended to avoid.

*See also, e.g.*, *Shapiro v. Ferrandina*, 478 F.2d 894, 905 (2d Cir.1973) ("The judge's refusal to examine the credibility of the testimony and statements included in the translated material was clearly proper, since the declarants were not before him."); *In re Extradition of Glantz*, 94 Crim.Misc. 1 P. 25, 1995 WL 495644, at *13 (S.D.N.Y. Aug. 21, 1995) ("In an extradition proceeding the defendant may not proffer evidence to contradict the showing of the requesting state. He is thus limited to attempting to offer a benign explanation of the evidence presented against him.").[5]

Second, Kanayama contends that there were inaccuracies in Japan's translation of his lectures that appear on YouTube videos. Specifically, Kanayama seeks to draw a distinction between the terms "anoint" and "pour." Like his proffered expert testimony, however, Kanayama's disputes about the translation of certain words in his lectures fall outside the scope of this extradition hearing. *See, e.g.*, *Tang Yee-Chun v. Immundi*, 686 F.Supp. 1004, 1009 (S.D.N.Y.1987) ("There is nothing in the Treaty or the applicable statute requiring the Court to undertake an independent inquiry into the accuracy of any translations submitted with a formal request for extradition. Such a requirement would place an unbearable burden upon extradition courts and seriously impair the extradition process."); *Ntakirutimana v. Reno*, 184 F.3d 419, 430

---

[5] Moreover, Kanayama's contention that the expert identification analysis submitted by Japan would fail a *Daubert* inquiry misses the mark because evidence supporting probable cause is "not subject to the standards for admissibility of expert testimony under [*Daubert*]." *Harmon v. Marshal*, 08-56057, 2010 WL 3069884, at *1 (9th Cir. Aug. 5, 2010); *see also, e.g.*, *United States v. Sassani*, No. 97-4011, 1998 WL 89875, at *3 (4th Cir. Mar. 4, 1998) ("The defendant does not present the court with support for his assertion that the profile [used to establish probable cause] was required to meet the standards of [*Daubert*], nor can this court find any such requirement."). In any event, that the man captured in the still images of the properties' surveillance footage appears similar to the images of Kanayama as reflected in his passport is evident even from a layperson perspective.

A0353

(5th Cir.1999) ("We agree with the district court that we can presume that the translations are correct."). In any event, the distinction Kanayama seeks to draw between the term "anoint" and "pour" is a sideshow, as both interpretations countenance the intentional application of oil to Japanese shrines—the very conduct charged here. *See, e.g., Marzook v. Christopher,* No. 96 Civ. 4107 (KMW), 1996 WL 583378, at *5 n.8 (S.D.N.Y. Oct. 10, 1996) ("Dr. Abu Marzook has questioned the accuracy of the translation of the press interviews provided by the Israeli government. However, even if his corrections are accepted, they do not alter the gist of the interviews.").

*Third,* Kanayama's attempt to assert an alibi defense that he was at a hotel spa rather than the Narita Temple and Katori Shrine on the day the crimes occurred is similarly outside the scope of an extradition hearing. *See, e.g., Shapiro,* 478 F.2d at 901 ("evidence of alibi . . . may properly be excluded from the Magistrate's hearing"); *In Re Pineda Lara,* No. 97 CR. MISC. 1, 1998 WL 67656, at *9 n.6 (S.D.N.Y. Feb. 18, 1998) (same); *United States v. Amailable,* No. 14 M 1043, 2015 WL 4478466, at *8 (E.D.N.Y. July 16, 2015) ("in challenging an extradition request, the extraditee may not present evidence . . . to establish an alibi"); *Hooker v. Klein,* 573 F.2d 1360, 1368 (9th Cir. 1978); *In Re Luna,* No. 16-xr-90095, 2017 WL 1036732, at *3 (N.D. Cal. Mar. 17, 2017). Further, Kanayama's purported alibi does not "obliterate" probable cause or explain his whereabouts because he could have gone to the Narita Temple and Katori Shrine and then later checked into the resort. In fact, the timeline included in the April 25, 2015, police investigation report (Rec. Ex. 5; *see also* Rec. Ex. 14), and the October 31, 2017, supplemental police investigation report (Supp. Ex. 9), show that Kanayama took significantly more time than would be expected to travel from the Narita Airport to the spa, and had ample time to visit the damages sites before checking into the spa. In addition, Kanayama fails to address the significant fact that

his rental car was captured by a security camera entering and exiting the parking lot of the Narita Temple. (Rec. Ex. 6).

In short, Japan has made a strong showing of probable cause that has not been negated, let alone obliterated, by anything in Kanayama's opposition.

**2. Kanayama's Claim that Probable Cause Is Lacking Based on His Interpretation of Japanese Law Fails**

Kanayama argues that Article 260 of the Japanese Penal Code applies only to damages on the two poles of the Katori Shrine, as such poles are the only structural items falling within the meaning of Article 260. This argument, however, is directly refuted by Japan. As the Japanese public prosecutor explains, the three damaged poles of the Narita Temple *So-mon* constitute a building within the meaning of Article 260 because, among other things, the *So-mon* is part of a two-story building that has a roof on top, has an interior space through which people can enter and exit, is supported by walls and poles, and is fixed to the ground. (Supp. Ex. 1). With respect to the Katori Shrine, as the public prosecutor explains, the damaged stairs and offertory box qualify as objects under Article 260 (in addition to the poles) because they are part of the structure of the *Haiden*, which has a roof, is supported by walls and poles, is fixed to the ground, and has an interior space through which one can enter and exit. (Supp Ex. 2).

Japan also refutes Kanayama's claim that no "damage" occurred as a matter of Japanese law. As explained by the public prosecutor, total damage or destruction to a building is not required in order to satisfy the damages element of Article 260; partial damage will suffice, as will damage to a minor portion of the building. (Supp. Exs. 1, 2). Moreover, in the context of Japanese law, the term damage includes not merely physical damage to the building, but damage to its function, which includes damage to aesthetic appearance, imposing appearance, and exterior appearance to augment the original use of the building. (Supp. Exs. 1, 2). According to the former

22

A0355

Japanese Supreme Court, the term includes rendering the building "virtually or emotionally" unusable for the intended use. In other words, the damage need not render the building unusable from a physical perspective. (Supp. Exs. 1, 2). As applied to the Narita Temple, the damage to the *So-mon* in the form of oil stains represents not only physical damage that will cost money to repair, but also damage to a historic, religious, and cultural symbol important to Japan's national heritage, which has degraded the *So-mon*'s dignity and appearance within the meaning of Article 260. (Supp. Ex. 1). The same legal analysis applies to the damages inflicted on the Katori Shine. (Supp. Ex. 2).

More importantly, perhaps, this Court should accord substantial deference to the Government of Japan on issues of Japanese law. Such deference is rooted in general notions of international comity and respect for foreign nations' sovereignty. *See, e.g. Skaftouros v. United States*, 667 F.3d 144, 156 (2d Cir. 2011) ("[I]t has long been recognized that an extradition judge should avoid making determinations regarding foreign law."); *Melia* v. *United States*, 667 F.2d 300, 303 (2d Cir. 1981) ("We are not expected to become experts in the laws of foreign nations." (citations and internal alterations omitted)); *In Matter of Extradition of Pineda Lara*, 1998 WL 67656, at *6 ("A foreign government's determination and/or documentary evidence that a defendant's conduct constitutes a crime under its laws carries significant weight."); *Marzook*, 1996 WL 583378, at *5 n.4 ("In the context of extradition proceedings, it would be inappropriate for a court to review the demanding state's analysis of its own law.").[6]

---

[6] *See also In re Assarsson*, 635 F.2d 1237, 1244 (7th Cir. 1980) ("We often have difficulty discerning the laws of neighboring States, which operate under the same legal system as we do; the chance of error is much greater when we try to construe the law of a country whose legal system is much different from our own. The possibility of error warns us to be even more cautious of expanding judicial power over extradition matters."); *In re Extradition of Martinelli*, 17-cv-22197, 2017 WL 3776953, at *23 (S.D. Fla. Aug. 31, 2017) ("[W]e agree with the Government that it is not the role of U.S. judges presiding over extradition proceedings to opine on, or worse challenge, a foreign government's interpretation of its own law.").

### C.    Kanayama's Persecution Claim Must Be Directed to the Secretary of State

Kanayama's claim that he will suffer persecution if he is returned to Japan must be directed to the Executive Branch and is not subject to judicial review in this extradition proceeding. *See, e.g., Ahmad v. Wigen*, 910 F.2d 1063, 1067 (2d Cir. 1990) ("It is the function of the Secretary of State to determine whether extradition should be denied on humanitarian grounds."); *Martin v. Warden, Atlanta Pen.*, 993 F.2d 824, 830 n.10 (11th Cir. 1993) ("We explicitly held that judicial intervention in extradition proceedings based on humanitarian considerations is inappropriate.") (citing *Escobedo v. United States*, 623 F.2d 1098, 1107 (5th Cir. 1980)); *Hoxha v. Levi*, 465 F.3d 554, 563 (3d Cir. 2006) (under rule of non-inquiry, "humanitarian considerations are within the purview of the executive branch and generally should not be addressed by the courts in deciding whether a petitioner is extraditable").

Similarly, Kanayama's claim that the charges against him reflect an anti-Christian bias must be reserved to the Secretary of State. *Jhirad*, 536 F.2d at 484-85 ("It is not the business of our courts to assume the responsibility for supervising the integrity of the judicial system of another sovereign nation. Such an assumption would directly conflict with the principle of comity upon which extradition is based."); *Ahmad*, 910 F.2d at 1067 ("The interests of international comity are ill-served by requiring a foreign nation . . . to satisfy a United States district judge concerning the fairness of its laws and the manner in which they are enforced."); *Ordinola v. Hackman*, 478 F.3d 588, 604-05 (4th Cir. 2007) (holding that "the motives of the requesting government are irrelevant" to a judge's decision on a fugitive's extraditability, and "must be addressed solely to the Secretary of State").

Kanayama's citation to Article 33(1) of the 1951 Convention and Protocol Relating to the Status of Refugees (the "1951 Convention") is inapposite. As a threshold matter, as Kanayama

24

himself concedes, he has not been designated as a refugee, and this Court lacks the authority to designate him as such. *See, e.g., In re Extradition of Singh*, Nos. 87–6160G–01, 87–6161G–01, 1988 WL 151438, at *1 (D.N.J. Feb. 17, 1988) ("Nothing in the extradition treaty, 18 U.S.C. § 3184 or the General Rules vests the Court with jurisdiction to determine whether defendants are refugees."). Moreover, even if Kanayama had applied for asylum based on his fear of persecution, that would not preclude this Court from certifying him extraditable. *See, e.g., Barapind v. Reno*, 225 F.3d 1100, 1109 (9th Cir. 2000) (extradition proceedings are "separate and independent" from asylum proceedings); *see also Masopust v. Fitzgerald*, 2:09-cv-1495, 2010 WL 324378, at *2 (W.D. Pa. Jan. 21, 2010) ("At the outset, the Court notes that the Petitioner has not cited—and the Court has not found—any authority for the proposition that this Court may order a halt to an ongoing extradition proceeding in order to accommodate the Petitioner's preference that his [Convention Against Torture] claim be adjudicated by the Immigration Court.") (emphasis in original).

Further, Kanayama has not cited any cases—and the Fovernment is aware of none—where a court has declined to find a fugitive extraditable based on the 1951 Convention. To the contrary, claims asserted by fugitives in extradition proceedings under the Convention have been rejected. *See, e.g., Sindona v. Grant*, 619 F.2d 167, 174 (2d Cir. 1980); *In re Extradition of Sandhu*, 886 F. Supp. 318, 324 (S.D.N.Y. 1993); *In re Extradition of Singh*, 1988 WL 151438, at *1.[7]

---

[7] Moreover, as a factual matter, Kanayama's fear of persecution is belied by his frequent, voluntary travel back to Japan. According to the information contained in Kanayama's passport, it appears that Kanayama made a number of trips to Japan until March 2015, when he is alleged to have damaged the Narita Temple and the Katori Shrine. Notably, Kanayama admitted traveling to Japan in March 2015 for the purpose of partaking in a Christian evangelical mission. (Opp. Br. at 25).

## CONCLUSION

For the reasons set forth above and in the Government's opening memorandum of law in support of extradition, the Government respectfully submits that Japan has provided more than sufficient evidence to sustain the charges against Kanayama in accordance with 18 U.S.C. § 3184 and the provisions of the applicable treaty. Accordingly, the Government respectfully requests that the Court hold an extradition hearing as expeditiously as practicable and then certify to the Secretary of State that Kanayama is extraditable, so that the Secretary may determine whether to surrender him to Japan.

Dated: New York, New York
November 17, 2017

Respectfully submitted,

JOON H. KIM
Acting United States Attorney for the
Southern District of New York

TARA M. La MORTE
Assistant United States Attorney
(212) 637-1041
tara.lamorte2@usdoj.gov

cc (via email): Jeffrey Einhorn, Esq.

26

A0359

# Exhibit 12

A0360

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                                                  :
IN THE MATTER OF THE EXTRADITION           17 Crim. Misc. 1 Page 003 (ER)
OF MASAHIDE KANAYAMA                                :

-------------------------------------------------------------------X


### SUR-REPLY TO THE GOVERNMENT'S EXTRADITION REQUEST

LAW OFFICES OF JEFFREY LICHTMAN
11 East 44th Street, Suite 501
New York, New York 10017
Ph:  (212) 581-1001
Fax: (212) 581-4999

LAW OFFICES OF DAVID M. DUDLEY
3415 South Sepulveda Boulevard, Suite 560
Los Angeles, California 90034
Ph:  (310) 772-8400
Fax:  (310) 772-8404

LAW OFFICES OF
LAWRENCE SCHOENBACH
111 Broadway, Suite 901
New York, New York 10006
Ph: (212) 346-2400


*Attorneys for Masahide Kanayama*

## PRELIMINARY STATEMENT

Defendant Dr. Masahide Kanayama respectfully submits this Sur-Reply[1] in response to select arguments raised in the government's November 17, 2017 Reply Memorandum ("Govt. Reply") and in opposition to the government's August 22, 2017 Memorandum of Law ("Govt. Mem.") in support of Japan's request he be extradited to face criminal charges relating to the alleged 2015 defacement of the Narita-san Shinsho-ji Temple in Narita, Japan ("Narita Temple") and the Katori Jingu Shrine in Katori, Japan ("Katori Shrine"). As demonstrated below, the supplemental evidence put forth by the Japanese government and appended to the government's reply brief alleging that the oily stains at issue are still present at both the Katori Shrine and the Narita Temple is undeniably false. Indeed, we have included with this submission recent photographic and video evidence that confirms that no stains currently exist, together with the declarations of Messrs. Mochizuki, Suzuki, Uchida, and Hisao, who each visited the Narita Temple and Katori Shrine in December 2017 and observed no damage, whatsoever.

And because absolutely no stains remain at the sites claimed to have been damaged – they disappeared naturally, and as conceded by the government, neither location conducted any repairs[2] – probable cause to believe that Dr. Kanayama committed any crime has been "obliterated." *See Shapiro v. Ferrandina*, 355 F. Supp. 563, 572 (S.D.N.Y. 1973) ("what tends to obliterate probable cause may be considered [at an extradition hearing]"). Further, without evidence of any damage, the government cannot demonstrate that an analogous *felony* offense

---

[1] By Order of this Court dated November 28, 2017, Your Honor granted Dr. Kanayama the right to file a Sur-Reply on or before January 5, 2018. The date of the response was subsequently extended to January 12, 2018.

[2] *See* Govt. Reply at 12 ("Kanayama is correct that neither the Narita Temple nor the Katori Shrine have spent money out-of-pocket to undertake . . . repairs").

2

A0362

exists in the United States as required by the treaty and, therefore, the government cannot satisfy its burden of establishing dual criminality. *See Collins v. Loisel*, 259 U.S. 309, 311 (1922) ("an offense is extraditable only if the acts charged are criminal by the laws of both countries").

Additionally, even if the government could establish that *some* damage occurred, albeit temporarily, the supplemental evidence put forth in its reply, including its updated timeline, still fails to demonstrate that probable cause exists to believe that Dr. Kanayama was the culprit. The so-called expert identification evidence offered by the Japanese authorities that Dr. Kanayama is the person that committed these alleged offenses is wholly inadmissible and highly inaccurate.[3] *See Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); *cf. Shapiro*, 355 F. Supp. at 570-71 ("evidence produced by the United States on behalf of [the requesting state] satisfied the treaty requirement because it was taken … in a manner acceptable under New York's standards"). The identification evidence submitted here – a supposed match using grainy surveillance footage by a professor at the Tokyo Dental College – fails to meet any standard for admissibility or reliability and must be rejected as explained in Dr. Kanayama's October 20, 2017 Opposition ("Kanayama Opp."). And without a proper identification of Dr. Kanayama as the perpetrator, the government cannot establish probable cause to believe that he is the person who committed the charged crimes at these popular tourist destinations.

Finally, there can be no question that the evidence submit herewith – specifically, photographs, video and declarations – is readily admissible at an extradition hearing at the Court's discretion, and should be admitted given that this evidence: i) "obliterate[es]" probable

---

[3] The need to utilize a purported "facial recognition" expert to attempt to identify the perpetrator of the alleged offenses is understood in light of the defense's investigation in Japan, which revealed that the security camera used to identify the individual at the Narita Temple was some 120 feet away from the location of the alleged incident, which explains the grainy and overall poor quality of the prosecution's photographs.

3

cause (*see Shapiro*, 355 F. Supp. at 572); and ii) informs the Court's determination on the issue of dual criminality.

## POINT I

### THERE IS NO DAMAGE TO EITHER THE NARITA TEMPLE OR KATORI SHRINE

In its reply papers and "in response to [Dr.] Kanayama's [opposition brief]," the government of Japan submitted "investigation reports by . . . police containing current observations and physical measurements of the damages to the properties." Govt. Reply at p. 19. These reports contained multiple witness statements and observations that purport to be taken as recently as November 2017 and affirmatively note the existence of the oil stains, albeit smaller than the stains observed in 2015.

More specifically, the government referred to three specific new categories of evidence that the Japanese government sourced in response to Dr. Kanayama's claim that the stains caused by the alleged incidents had disappeared naturally: 1) updated repair estimates; 2) new police reports regarding observations at the shrine and temple; and 3) statements from employees concerning the present state of the alleged damage. *See* Govt. Reply at p. 19. Notably, the Japanese authorities offered no photographs or video in support of their claimed observations.

Surprised, if not shocked, to learn that the stains had somehow reappeared after previously documenting their disappearance, the defense conducted new on-site investigations in December 2017 at both locations. As verified by the declarations, videos, and photographs appended to this submissions, *no evidence whatsoever* remains of any staining at either site. Moreover, because no repairs were undertaken at either facility, it is beyond dispute that the stains disappeared naturally over time and, from all we know, perhaps a very short time.

### A. The Video, Photographic and Documentary Evidence Submitted by the Defense Obliterates Probable Cause

As presented in Dr. Kanayama's Opposition to the Government's Extradition Request, on July 11, 2017, Attorney Toshimitsu Takaesu and Koji Uchida visited the Narita Temple and the Katori Shrine. At both locations, Takaesu observed that the stains attributed to the defendant's alleged conduct had completely disappeared. Exhibit B to Kanayama Opp. at ¶¶ 2-15; December 31, 2017 Affirmation of Toshimitsu Takaesu, attached hereto as Exhibit A, at ¶¶ 5, 8-10. So that this Court would not simply have take his word on what he had seen, Takaesu directed Mr. Uchida to take photographs of the three pillars in question at the Temple, as well as those areas of the Shrine that the defendant had supposedly stained in 2015. December 30, 2017 Declaration of Koji Uchida, attached as Exhibit B, at ¶¶ 3-6. In taking these photographs, Mr. Uchida carefully observed those pillars at the Narita Temple and the offering box, the stairs, and the pillars at the Katori Shrine. As verified by the pictures previously presented to the Court, (*see* July 11, 2017 Photographs, attached as Exhibit C to the Kanayama Opp.) Mr. Uchida saw that there were no stains on those objects. Ex. B. at ¶¶ 5-6.

While at the Temple, Takaesu interviewed the property and general affairs managers of that facility. The property manager told him that the stains on the pillars had disappeared naturally without the need for any repairs and that the Temple had suffered no loss of use or revenue due to the temporary "darken[ing] of the brown color of the pillars." Ex. B. to Kanayama Opp. at ¶ 9

While at the Shrine, Takaesu interviewed a worker there who indicated the staining incident did not cause any "physical changes" to the Shrine and, therefore, no repairs were ever undertaken. *Id.* at ¶ 11. Furthermore, the worker stated that the facility experienced no financial or usage loss as a result of that incident. *Id.* at ¶ 13.

5

A0365

In its reply brief, the government presented statements from multiple witnesses in which they all disputed parts of Takaesu's declaration, most significantly his claim that the stains supposedly effected by Dr. Kanayama had disappeared completely. None of them disputed, however, that neither the Temple nor the Shrine had spent any money to repair the stained areas. Govt. Reply at pp 4, 6. Those witnesses described with precise measurements the stains that remained at the Temple and the Shrine. *Id.* According to the November 2, 2017 Investigation Report cited by the government, one stain was still present on each of the three eastward pillars at the gate of the Narita Temple. Govt. Reply at pp. 4-5. Further, according to the same report, one stain remained on the pillars to each side of the offering box at the Katori Shrine, one remained on the box itself, and one remained on the stairs behind the box. *Id.* at p. 6; Govt. Supp. Exs. 4, 6, 8. Despite these claims, neither the Chiba police nor any other witnesses provided updated photographs of the purported stains.

Surprised to learn that certain stains had re-appeared at the Temple and the Shrine *months after* Messrs. Takaesu and Uchida's visit, the defense conducted further investigation in Japan. On December 18, 2017, Attorney David Dudley visited the Narita Temple and Katori Shrine with Messrs. Takaesu and Uchida, as well as Otsuka Hisao, a videographer. *See* January 8, 2018 Affirmation of David Dudley ("Dudley Aff."), attached as Exhibit C, at ¶ 4. According to Mr. Uchida, the Shrine appeared to be in the same condition as it had been on July 11, 2017 and the Temple gate also appeared to be the same, other than some netting on the second floor of the gate and some fencing on the first floor. Ex. B. at ¶¶ 10-13. Messrs. Takaesu, Uchida, and Hisao all thoroughly examined the pillars at the Temple gate – and none of them saw any stains whatsoever on the pillars. *See* Uchida Declaration, Ex. B, at ¶¶ 8-13; December 26, 2017 Declaration of Otsuka Hisao, attached as Exhibit D, at ¶¶ 5-6. Attorneys Dudley and Takaesu

6

then directed Mr. Uchida to take photographs of the three eastward pillars. Ex. B. at ¶¶ 4-5.
Those photographs clearly show that the pillars were free of stains. See Supplemental
Photographs of Alleged Damage, attached as Exhibit E.

At the Narita Temple, counsel for the defendant also measured the distance from the
pillars to the security camera that purportedly captured images of Dr. Kanayama in March of
2015. The camera was approximately 120 feet away from, and 40 feet higher than, the floor of
the gate where the alleged staining took place. Dudley Aff., Ex. C, at ¶ 7. Additionally, defense
counsel directed Mr. Hisao to take video footage of the Temple and its surroundings. That
footage reflects that, rather being an isolated area of quiet spiritual reflection, the Temple is a
massive complex geared towards tourist visitation and sits in the middle of Narita, a large
Japanese city. See DVD Video Footage of Narita Temple and Katori Shrine, attached as Exhibit
F. There are hundreds of shops and restaurants at, or near, the Temple (id.) and the closest
parking lot to the Temple's main gate offers close access to all of these commercial
establishments.

Messrs. Uchida and Hisao also both carefully examined the offering box, the stairs
behind the offering box, and the pillars to either side of the offering box at the Katori Shrine.
Once again, neither of them observed any stains on those objects. Ex. B, Uchida Declaration, at
¶¶ 12-13; Ex. D, Hisao Declaration, at ¶ 6. They did note that the condition of that portion of the
Shrine, particularly the offering box, is not pristine; considerable wear and tear is evident at the
top of the box. Id. At the direction of Attorneys Dudley and Takaesu, Uchida then took
photographs of the offering box and its surroundings, focusing on those areas still afflicted by
stains, according to the Japanese government. Ex. E. Those photographs indisputably
demonstrate that no such stains currently exist. Id.

7

A0367

On December 23, 2017, Attorneys Takashi Mochizuki and Takahiro Suzuki, two of Dr. Kanayama's lawyers in Japan, went to the Temple and the Shrine. Both of them thoroughly examined the pillars at the Narita Temple and the pillars, offering box, and stairs at the Katori Shrine. *See* December 28, 2017 Opinion Letter of Takashi Mochizuki, attached as Exhibit G, at ¶¶ 3-7; January 4, 2018 Opinion Letter of Takahiro Suzuki, attached as Exhibit H, at ¶ 4.[4] Both agreed that there were no stains to be found on any of those objects (*id.*) and to corroborate their findings, the lawyers took photographs at the two facilities. Those photographs inarguably demonstrate again that the Japanese government's claim of residual staining was false. *See* Ex. H at pp. 8-12.

Further, on December 30, 2017, Lawrence Schoenbach, another counsel of record for Dr. Kanayama in this case, visited the Narita Temple. See January 10, 2018 Affirmation of Lawrence Schoenbach, Esq., attached as Exhibit I, at ¶ 4. He was looking carefully for the specific stains referenced in the government's reply brief, Schoenbach found none at the Temple gate pillars. *Id.* at ¶¶ 5-8. Schoenbach also took video of his observations at the scene and that video again shows the pillars as unstained. *Id.* at ¶¶ 5-6; Video Footage, Ex. F.

While in Japan, Schoenbach also interviewed Attorney Takaesu. *See generally* Ex. A, December 31, 2017 Takaesu Aff. In that interview, Takaesu re-affirmed those portions of his initial affidavit that the government has disputed, including his July 2015 observations of no staining at the Temple and the Shrine. *Id.* at ¶ 4. Further, he reiterated that officials at those facilities had told him that the stains had faded away naturally with no need for repairs and that the facilities had not suffered any loss of use or revenue due to the temporary staining. *Id.* at ¶¶

---

[4] Suzuki also rebuts the government's claim that Article 260 of the Japanese Penal code is appropriately charged in this case. Ex. H at ¶ 5. His arguments are incorporated by reference herein.

8-12. Takaesu also denied making any statements to officials at the Shrine or Temple that Dr.

Kanayama was involved in the staining incidents.  *Id.* at ¶ 7.

### B.  The Documentary, Video and Photographic Evidence is Admissible at an Extradition Hearing

As discussed more fully, *infra*, at POINT III, the powerful video, photographic and

documentary evidence submitted by the defense is readily admissible – and the government is

wrong in unconditionally claiming that the evidence submitted by Japan "<u>must</u> be deemed

truthful for the purposes of this extradition hearing," (Govt. Reply at p. 11) (emphasis supplied)

and is therefore not subject to any discussion or interpretation.  Indeed, to hold as the

government would suggest would render the Court a rubber-stamp in the determination of

whether probable cause exists – and Dr. Kanayama without the ability explain the evidence

against him or "obliterate probable cause"[5] – and would deprive the Court of its discretion to find

the evidence submitted by the requesting country to be "unreliable," based on the totality of the

circumstances.  *See e.g., In re Surrender of Ntakirutimana*, 988 F. Supp. 1038, 1042 (S.D. TX

1997) (observing that "the Court is free to exercise its discretion in judging the credibility of the

evidence presented as in any other domestic case where the Court be required to make a

determination of probable cause"); *see also In re Extradition of Garcia*, 825 F. Supp.2d 810, 830

(S.D. Tex. 2011) ("[w]hen a court in an extradition proceeding is presented with evidence

through affidavits, the court may conclude, on a review of the affidavits submitted, that there are

insufficient [or sufficient] indicia of reliability or credibility to establish probable cause")

---

[5] *See Hoxhav. Levi*, 456 F.3d 554, 561 (3d Cir. 2006) (observing that a defendant in an extradition hearing has the ability "'to present reasonably clear-cut proof . . . of limited scope that has some reasonable chance of negating a showing of probable cause. . . . '") <u>quoting</u> *Koskotas v. Roche*, 931 F.2d 169, 175 (1st Cir.1991); *see also Collins v. Loisel*, 259 U.S. 309, 315-16 (1922) (observing that the extradition magistrate had permitted the defendant to testify on his own behalf and "was permitted to introduce evidence bearing upon the issue of probable cause").

(internal quotation marks omitted); *In re Extradition of Gonzalez*, 52 F. Supp.2d 725, 738 (W.D. LA 1999).

## POINT II

### BECAUSE THERE IS NO DAMAGE TO EITHER THE NARITA TEMPLE OR KATORI SHRINE, THE EXTRADITION REQUEST MUST BE DENIED

As noted in Dr. Kanayama's October 20, 2017 Opposition, two significant elements remain for the government to establish in order for their extradition request to be certified by this Court. Kanayama Opp. at p. 2. First, they must demonstrate that "the crime is extraditable," and specifically, that it satisfies the test of dual criminality; and second, that there exists "probable cause to support the charge." *Prasoprat v. Benov*, 421 F.3d 1009, 1014 (9th Cir. 2005). Despite the supplemental evidence sourced by the Japanese government following the defendant's October 20, 2017 filing, both of these elements remain unproven.

### A. The Government Cannot Demonstrate that the Charged Conduct Satisfies the Required Element of Dual Criminality

In order to satisfy the Treaty of Extradition between the United States and Japan ("the Extradition Treaty" or "the Treaty") the government "must establish" that "the facts alleged" do not merely constitute a crime in Japan, but "would also constitute an offense in the United States," an element known as dual criminality. *See Petition of France for Extradition of Sauvage*, 819 F. Supp. 896, 901 (S.D. Cal. 1993); *Collins*, 259 U.S. at 311. Further, the Treaty requires that both the Japanese and corollary United States crimes be felonies, *i.e.*, offenses punishable by more than one year imprisonment.[6] Given that that the stains have naturally disappeared without any intervention (*see, supra*, at POINT I) and notwithstanding the

---

[6] See Article II, Treaty on Extradition between the United States and Japan, March 26, 1980, 31 U.S.T. 892 ("Extradition shall be granted . . . for any offense listed in the Schedule annexed to this Treaty . . . when such an offense is punishable by the laws of both Contracting Parties by death, by life imprisonment, or by deprivation of liberty for a period of more than one year").

10

A0370

government's protestations to the contrary, this element cannot be proven. *See also* Kanayama Opp. at p. 10. Simply put, because the stains dissipated naturally, no damage occurred as a matter of law. *See, e.g., People v. Hills*, 95 N.Y.2d 756, 758 (2000) ("In order for a defendant to be found guilty of criminal mischief . . . the People must prove that *some amount of damage is required*") (emphasis supplied); *People v. Collins*, 288 A.D.2d 756, 758, 733 N.Y.S.2d 289 (3rd Dept. 2001) ("damage" contemplates "injury or harm to property that lowers its value or involves loss of efficiency").

In this manner, this case is very similar to that of *In re H*. 32 A.D.2d 932, 932, 303 N.Y.S.2d 823 (App. Div. 2nd Dept. 1969) wherein New York's Appellate Division found that the use of chalk to write obscenities on the property of another individual did <u>not</u> constitute "actual damage" as was required to prove the offense of criminal mischief. The same "chalk" analysis must be used here to defeat the government's attempt to establish dual criminality. *See* Govt. Mem. at pp. 12-13; Kanayama Opp. at pp. 10-11. Further, the United States District Court for the Northern District of New York came to same conclusion in 2007, determining that "deface[ment] by the use of chalk" does not constitute "damage" to "property," even where there exists "overwhelming" proof that the defendant was responsible for the act itself. *United States v. Murtari*, No. 7 CR 387, 2007 WL 3046746, at *4-5 (N.D.N.Y. October 16, 2017).

The cases cited by the government in response to this argument clearly miss the mark. Those two cases, *People v. Torres* and *People v. Vinolas*,[7] both involved the use of glue to adhere posters and advertisements to public and private property, resulting in charges of criminal mischief and the making of graffiti. Because the "damage" could not disappear without the aid

---

[7] *See People v. Torres*, 184 Misc.2d 429, 708 N.Y.S.2d 578 (Crim. Ct. N.Y. Co. 2000); *People v. Vinolas*, 174 Misc.2d 740, 667 N.Y.S.2d 198 (Crim. Ct. 1997); Govt. Reply at p. 14.

11

A0371

or intervention of some party, the charge of Criminal Mischief was sustained. Govt. Reply at p. 14.

In light of the Dr. Kanayama's supplemental materials submitted herewith (*see, supra*, at POINT I) showing that the "damaged" areas have disappeared naturally, it is clear that this case clearly resembles *In re H.*, and *Murtari*. Like the chalk in those cases, the alleged oily stains are gone and the sites remain unaffected. The government's argument that its "additional evidence" establishes that "significant damage remains" is simply not true. Govt. Reply at pp. 10-11. There are no stains, and there has been no repair effort, undoubtedly because no repairs needed to be made. *See* Govt. Reply at p. 12 (acknowledging that the locations have experienced no "out of pocket" expenses). Like a Grand Juror sitting in determination whether probable cause exists that a crime occurred, this Court has the absolute right to review and consider such evidence to determine independently whether the stains currently exist.

The government's additional argument, that "the amount and extent of damage . . . is an issue for the trier of fact," fares no better (Govt. Reply at p. 14) as both the existence of damage and the amount thereof are essential elements of the crime Criminal Mischief in the Second and Third Degrees (PL §§ 145.05, 145.10) and as such, there must be evidence of damage in order to establish probable cause. *Oen Yin–Choy v. Robinson*, 858 F.2d 1400, 1407, 08 (9th Cir. 1988) (the probable cause standard applies to each essential element of the crimes for which extradition is sought).[8] While the "amount and extent of damage" may also be an issue for the eventual trial of fact, it is clearly an issue now as well. Govt. Reply at p. 14. Further, while damage estimates may be used to satisfy this element, the Court is free to discount and deem the proffered

---

[8] Even *Vinolas*, a case cited by the government, affirmatively supports this argument requiring that the prosecutor maintains a duty "at the pleading stage" to establish the element of damage in order to maintain charges of criminal mischief. 174 Misc.2d 740, 745, 667 N.Y.S.2d 198; Govt. Reply at p. 14.

A0372

materials unreliable in the context of an extradition hearing. *See Ntakirutimana*, 988 F. Supp. at 1042. We submit that, in the light of Japan's overblown repair estimates regarding these centimeter-sized stains that apparently never needed to be repaired, but more importantly, in light of the photographic and video evidence demonstrating the absence of any damage whatsoever, that these estimates are, in fact, unreliable.

Finally, in arguing that no loss of use or other financial harm has occurred, the defense was hardly attempting to "engaft[] elements onto the criminal mischief statutes that . . . do not exist." Govt. Reply at pp. 10, 12 (alleging "an effort to impose an element onto the statutes that is simply not there"). To the contrary, because no physical damage occurred at either location as a matter of law, and as "neither the Narita Temple nor the Katori Shrine . . . spent money out-of-pocket to undertake . . . repairs," (*id.* at p. 12) the point was merely to demonstrate that other financial harms that traditionally might be considered do not exist in this case. *See* Kanayama Opp. at pp. 5, 6. Regardless of that point, the government's claims are legally incorrect: "loss of use" is a common method for determining if damage occurred, even in cases charging criminal mischief. *See, e.g., People v. Choo*, 152 Misc.2d 324, 576 N.Y.S.2d 486 (Crim. Ct. N.Y. Co., 1991) ("damage to property occurs even if the harm caused is a loss of the use or effectiveness of the property").

Accordingly, without reliable evidence of property damage in any quantifiable amount, the best parallel charge the government can muster is Criminal Mischief in the Fourth Degree, in violation of New York Penal Law § 145.00 – a misdemeanor that is not subject to extradition.

**B. The Government Cannot Prove that Dr. Kanayama Is the Person Who Committed the Charged Offenses**

A determination of probable cause has two elements: that a crime occurred <u>and</u> that the person charged is, in fact, the person who committed the charged offense. In addition to failing

13

A0373

to prove the former (*see, supra*, at POINT IIA), the government has failed to prove this second critical element.

Conceding, as it must, that there is no eyewitness to either alleged crime, the Japanese authorities submitted to this Court alleged "expert" evidence identifying Dr. Kanayama as the culprit. It is the <u>only</u> evidence identifying Dr. Kanayama as the person committing these two alleged crimes. Federal law and the Rules of Evidence require that this "expert" identification evidence be rejected. *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).

As a precondition to the admission of expert testimony, the Court must first make a determination that the proposed testimony by an expert will be both reliable and relevant. *Daubert, supra.* For purposes of this argument, it is conceded that identification of the perpetrator of the offense is relevant; it is submitted, however, that the method of that identification is unreliable

The reliability component of the *Daubert* test is buttressed by the Federal Rules of Evidence's requirement that an expert's testimony pertain to "scientific knowledge." *See* Fed. R. Evid. 702. In *Daubert*, the Court acknowledged that Rule 702 also applies to "technical or other specialized knowledge," *Daubert*, 509 U.S., at 590, FN. 8, later expanding the *Daubert* analysis to apply to other "non-scientific" areas of technical expertise. *Kumho Tire Co., Ltd v. Carmichael*, 520, 526 U. S. 137 (1998). "Scientific knowledge implies a grounding in the methods and procedures of science," *Daubert*, 509 U.S., at 590, a fact completely omitted from the government's proffered evidence in this case. Further, the Court also held that "knowledge" (*id.*) is more than a subjective belief or unsupported speculation, an argument equally appropriate here regarding Professor Masatsugu Hashimoto's *expert* opinion.

14

A0374

The evidence submitted by the government of Dr. Kanayama's identification is, at its core, "subjective belief [and] unsupported speculation," (*id.*) suggesting that a professor of dentistry, is somehow also an expert in facial recognition. The government submits no evidence of the so-called "expert's" credentials (*id.*), his prior writings on the subject (if any) or the basis of his expertise, any prior findings by a court (or other authority) of him as an expert in the field or any other recognition of him as someone uniquely qualified to render his opinion.

The best that one can say of this individual is that he is a dentist who also happens to be a Professor in the Department of Forensic Odontology and Anthropology at the Tokyo Dental College. There is not a shred of evidence offered to inform this Court as to why it should accept Professor Hashimoto as an expert in the field of "facial" recognition. Govt. Mem. at pp. 14-15. The fact that the Japanese government deemed it necessary to utilize an unqualified forensic "expert" to identify the perpetrator of the alleged crime is a clear admission that, contrary to the government's suggestion in its reply brief, one cannot identify Dr. Kanayama as the perpetrator by merely looking at the surveillance video. That is most likely the reason why the Japanese authorities have chosen not to present that video, if it even still exists, to this Court.

Furthermore, given that approximately ten million visitors pass through the gate of the Narita Temple each year (*see* Gov't Reply at p. 2), one can extrapolate that approximately 27,000 people enter the Temple grounds each day. Given that there are hundreds of shops and restaurants in the immediate vicinity of the Temple, one can imagine than far more than that number of people visit the area of the Temple on a daily basis. Even if the Court were to accept the balance of the government's submission regarding identification, *i.e.,* toll records, car rental records, and estimates of time between the Temple and the Shrine, the best conclusion one could draw is that Dr. Kanayama *may have been* at or near the site, along with 27,000 or more other

15

people, on the day the claimed oil splashing occurred.  As this Court is well aware, mere presence at the scene of a crime (assuming a crime even occurred) is not evidence that a person committed the crime.

Because Professor Hashimoto has offered nothing to this Court of his "scientific, technical, or other specialized knowledge" or his "skill, experience, training or education" (Fed. R. Evid. 702) allowing the Court to determine his claimed expertise on the subject of identification by facial recognition, it must be rejected.  None of these foundational requirements have been proffered to this Court so that your Honor can reliably test the proffered evidence.

## C. The Government's Own Filings Negate the Required Element of Intent

Even if the government could establish for the purposes of the probable cause determination that Dr. Kanayama was the individual responsible for causing the disappearing (and now disappeared) stains at the Narita Temple and Katori Shrine, their own extradition filing precludes a finding that he specifically intended to damage any property.  The government's inference that Dr. Kanayama's conduct was related to his "Christian missionary activities in Japan" is based on a mistranslated 2012 lecture in which he purportedly "state[d] that he poured oil[9] on various shrines for religious purposes."  Govt. Memo at p. 5; Kanayama Opp. at p. 8. Moreover, even if true, and we suggest that it is not, Dr. Kanayama's statements three years prior to the alleged offense have little if any bearing on the issue of probable cause that Dr. Kanayama committed the offense charged here.

The government argues that even if his "religious beliefs *motivated* him to inflict . . . damage," (Govt. Reply at p. 15) (emphasis supplied) this is "distinct" (*id.*) from an *intent* to

---

[9] As addressed at POINT II of Dr. Kanayama's October 20, 2017 Opposition, the government mistranslated portions of the submitted lectures, using the word "pour" instead of "anoint," to describe his activities.  Kanayama Opp. at pp. 23-24.

16

"inflict damage," and cite by way of example, *People v. Assi*, a case of no relevance here. In *Assi*, the New York Court of Appeals affirmed a conviction for an individual's attempted arson of a synagogue, which was "motivated" by the defendant's hatred towards Jews. *Assi*, 14 N.Y.3d 335, 340-41 (2010). In *Assi*, however, the defendant *intended* the consequences of his actions, *i.e.*, he formed the specific intent to burn down a synagogue, borne out of his desire to "make a statement that would stop the violence in the Middle East," and his hatred towards a religious group. *Id.* at 339.[10] Dr. Kanayama's *specific purpose and intent* as the government itself infers – and not just his motivation as in *Assi* (as we noted in our October 20, 2017 filing) – would have been to "ritually sanctify," items at the Narita Temple and Katori Shrine. Kanayama Opp. at p. 8; Ex. A to Kanayama Opp. at p. 17. Put simply, in *Assi*, the defendant admittedly formed the specific intent to commit arson (*see* 14 N.Y.3d at 339); here, if he was actually the perpetrator, Dr. Kanayama would only have formed the specific intent to sanctify, and not to damage, as required by the relevant statutes. *See, e.g., People v. Bryant*, 85 A.D.2d 575, 576, 445 (N.Y.S.2d 711 (1st Dept. 1981) (analyzing identical specific intent required for Criminal Mischief in the Fourth Degree).

---

[10] The second case cited by the government for this proposition, *People ex rel. Hegeman v. Corrigan*, 195 N.Y. 1, 13 (1909) similarly fails. In that case, the New York Court of Appeals, in *dicta*, observed that "it is no defense to a charge of intentionally committing an act prohibited by law, even [if] the dictates of his religious beliefs requires one to do the act." *Id.* Our argument – if he committed these acts – was not that Dr. Kanayama was compelled by his religion to temporarily stain these locations, but that his intent as ascribed to him in the government's own filing in performing these acts, could not have been to damage, as required by PL §§ 145.05 and 145.10. Further, the cases cited by the government by footnote fail on identical grounds: all miss the point that Dr. Kanayama's *intent* and not just his *motivation* would have been to sanctify and not damage according to their own papers. Govt. Reply at p. 16 & FN 3.

17

### POINT III

### THE EVIDENCE SUBMITTED ON BEHALF OF DR. KANAYAMA IS ADMISSIBLE IN AN EXTRADITION HEARING

The evidence we seek to admit at this proceeding – photographs, video, and witness declarations that conclusively document the lack of any damage at the Narita Temple and Katori Shrine – make clear that there is no probable cause to believe that a crime occurred or that Dr. Kanayama was the perpetrator of any oil splashing. *See* Exs. A-I. Instead, those materials suggest that Dr Kanayama, a devout Christian in a largely Buddhist and Shinto society, has been targeted for what appears to be ongoing splashing incidents at shrines and temples throughout Japan, with incidents publicized as recently as last month. *See, e.g.*, Yomiuri Online, Saga Castle, Gate of Fate Liquid Trace on Pillar, available at: http://www.yomiuri.co.jp/kyushu/news/20171230-OYS1T50000.html (last viewed January 4, 2017), attached as Exhibit J.

Against this backdrop is the effect that extraditing Dr. Kanayama would have by shuttering one of the top endometriosis clinics in the United States, leaving hundreds, if not thousands, of women in peril and awaiting treatment.[11] *See generally* Ex. A. to Kanayama Opp. These "harsh results of an erroneous extradition based on untrustworthy accusations militate against th[e] [C]ourt's applying too lenient a standard of review in determining probable cause."[12] And because the government was able to supplement its original filing with "recent" interviews and measurements of the alleged oil stains (Govt. Reply at p. 11) so too should Dr. Kanayama be allowed to show the deficiencies of that proffered evidence – particularly when, in

---

[11] Dr. Kanayama was recently appointed as a trustee of Women With Endometriosis, a London based charitable organization.

[12] *Republic of France v. Moghadam*, 617 F.Supp. 777, 784 (N.D. Cal. 1985).

18

A0378

the case of video and photographs, there can be no claim of bias or prejudice in the manner they were taken.

Accordingly, Dr. Kanayama asks the Court to exercise its discretion and review the materials submitted herewith, evidence that "negates" and "obliterates" probable cause by demonstrating that the alleged stains have disappeared naturally. *Gonzalez*, 52 F. Supp.2d 725, 738 (W.D. LA 1999); *Matter of Extradition of Contreras*, 800 F. Supp. 1462, 1469 (S.D. Tex. 1992) (permitting the introduction of recantation evidence to controvert government produced confessions).

Respectfully, therefore, we urge the Court to review the declarations of Messrs. Mochizuki, Suzuki, Uchida, Hisao and Takaesu, and the video and photographic evidence of the Narita Temple and Katori Shrine, all of which is submitted to assist the Court's procedurally necessary determination of probable cause. *See, generally,* Exs. A-I. And while the government rails that such material is "inadmissible," (Govt. Reply at p. 1) the truth is that the scope of evidence permitted to be introduced in an extradition hearing lies solely within the discretion of the Court. *Moghadam*, 617 F. Supp. at 781 ("There is no uniform rule by which to determine how much evidence the court should hear"); *see also Koskotas v. Roche*, 931 F.2d 169, 176 (1st Cir. 1991) ("contradictory evidence ... *may* be excluded) (emphasis supplied); *United States ex rel. Petrushansky v. Marasco*, 325 F.2d 562, 567 (2d Cir. 1963) ("precise scope" of evidence to be admitted is "largely in the [Court's] discretion"). Further, the nature of our claims – that certain evidence put forth by the Japanese government is legally and factually unreliable -- only heightens the need for the court to review all available materials. *See Matter of Extradition of Singh*, 124 F.R.D. 571, 575 (D. N.J. 1987) (observing that "heightened judicial scrutiny" may be warranted in extradition cases involving "apparent Government misconduct").

19

Further, the evidence we seek to admit is not merely "contradictory evidence," (Govt. Reply at p. 13) but instead, demolishes the government's proof in its entirety by demonstrating, conclusively, that the stains have disappeared naturally, and therefore, that no crime has occurred. *Cf. Shapiro v. Ferrandina*, 478 F.2d 894, 905 (2d Cir. 1973); *Sandhu v. Burke*, No. 97 CV 4608 (JGK), 2000 WL 191707, at*6 (S.D.N.Y. February 10, 2000) ("evidence that would completely negate probable cause is admissible in an extradition hearing"). Further, this material is "clear cut" and of "limited scope," addressing, for the most part, a single factual issue. *Matter of Extradition of Schweidenback*, 3 F. Supp.2d 113, 117 (D. Mass. 1998); *Matter of Sindona*, 450 F. Supp. 672, 685 (S.D.N.Y. 1978).

Finally, in order to determine if probable cause exists under United States law (Govt. Mem. at p. 13)[13] the defendant's guilt must be determined based on the "totality of the circumstances," and it is difficult to ascertain how this decision could be made without considering the exhibits that we have submitted, exhibits which conclusively establish that no stains remain at either location, and therefore undoubtedly bear on the question of whether a crime actually occurred. *In re Extradition of Okeke*, No. 96–7019P–01, 1996 WL 622213, at *5 (D. N.J. September 5, 1996); *see also In re Rodriguez Ortiz*, 444 F. Supp.2d 876, 884 (N.D. Ill. 2006). Accordingly, it is respectfully requested that the Court exercise its discretion and review the materials submitted by Dr. Kanayama, along with the October 20, 2017 Memorandum in Opposition, and this Sur-Reply.

---

[13] *See, also, In re Extradition of Sacirbegovic*, No. 03 CR. MISC. 01, 2005 WL 107094, at *18 (S.D.N.Y. January 19, 2005) ("In an extradition proceeding, probable cause is measured by the standards used in federal preliminary proceedings") (internal quotation marks omitted).

## CONCLUSION

For the reasons stated in our October 20, 2017 Opposition Brief and herein, the

government's request for Dr. Masahide Kanayama's extradition must be denied.

Dated:        New York, New York
              January 12, 2018

                              Respectfully submitted,


                              JEFFREY LICHTMAN, ESQ. (JL6328)
                              LAW OFFICES OF JEFFREY LICHTMAN
                              11 East 44th Street, Suite 501
                              New York, NY 10017
                              Ph: (212) 581-1001
                              jhl@jeffreylichtman.com


                              DAVID M. DUDLEY, ESQ.
                              LAW OFFICES OF DAVID M. DUDLEY
                              3415 South Sepulveda Boulevard, Suite 560
                              Los Angeles, California 90034
                              Ph: (310) 772-8400
                              fedcrimlaw@hotmail.com


                              LAWRENCE SCHOENBACH, ESQ.
                              (LS8497)
                              LAW OFFICES OF
                              LAWRENCE H. SCHOENBACH
                              111 Broadway, Suite 901
                              New York, New York 10006
                              Ph: (212) 346-2400
                              schoenbachlawoffice@att.net

                              Attorneys for Dr. Masahide Kanayama

21

A0381

# Exhibit 13

Case 1:23-cv-03469-CM    Document 4-18    Filed 04/28/23    Page 7 of 8    1

MC6KKANH

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   In the Matter of the
     Extradition of Masahide
 4   Kanayama,                        17 CR Misc. 1 page 003 (ER)

 5   ------------------------------x

 6                                    New York, N.Y.
                                      December 6, 2022
 7                                    9:30 a.m.
     Before:
 8
                         HON. EDGARDO RAMOS,
 9
                                         District Judge
10
                              APPEARANCES
11

12   DAMIAN WILLIAMS
          United States Attorney for the
13        Southern District of New York
     TARA La MORTE
14        Assistant United States Attorney

15   U.S. Department of Justice, Criminal Division
     Office of International Affairs
16   BY:  AMY WEINER

17   JEFFREY H. LICHTMAN
     JEFFREY B. EINHORN
18   DAVID M. DUDLEY
          Attorneys for Defendant
19

20

21

22

23

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A0383

MC6KKANH

1          (Case called)

2          MS. La MORTE:  Good morning, your Honor.  Tara

3    La Morte, for the government, and with me at counsel table is

4    Amy Weiner, from the Department of Justice, Office of

5    International Affairs.

6          MS. WEINER:  Good morning, your Honor.

7          THE COURT:  Good morning.

8          MR. LICHTMAN:  Good morning, your Honor.  Jeffrey

9    Lichtman, Jeffrey Einhorn, and David Dudley, for Dr. Kanayama.

10          COUNSEL:  Good morning.

11          THE COURT:  Good morning to you all.

12          This matter is on for extradition hearing.

13          Before we begin, let's go off the record so that we

14    can talk about how this will proceed.

15          (Discussion off the record)

16          THE COURT:  Let's go on the record.

17          Good morning again.  We're back on the record.  I've

18    had a discussion with counsel concerning how we might proceed

19    this morning on this extradition hearing.

20          I understand that Mr. Kanayama -- am I pronouncing

21    that right?

22          THE DEFENDANT:  Yes.

23          THE COURT:  Mr. Kanayama has several witnesses.  Why

24    don't you tell me who those witnesses are, Mr. Lichtman.

25          MR. LICHTMAN:  I'll let Mr. Dudley handle that part of

MC6KKANH

1    it.

2    THE COURT:  Okay.

3    MR. DUDLEY:  We have two witnesses present, Toshi

4    Takaesu — I'm not pronouncing his last name correctly —

5    Takaesu -- I can't pronounce it correctly — he prefers to be

6    called Mr. Toshi in English, and we also have Ben Bavarian.

7    Both of these individuals -- Mr. Toshi has -- we have submitted

8    two affidavits as part of our filings, one in the original

9    opposition of the government's request for certification, and,

10   two, in the surreply to the government's reply to our

11   opposition.  Mr. Bavarian has submitted a declaration along

12   with a report that was included as an exhibit to our original

13   opposition.  Those are the two witnesses we have present.

14   We would also ask the Court to consider other evidence

15   in the form of affidavits.  We don't have those witnesses here

16   because they were unavailable to come from Japan, and so we are

17   asking the Court to consider those affidavits.  One would be

18   from Mr. Uchida, and I can't remember the name of the other

19   gentleman, but they were present at scenes in Japan.  There are

20   actually two affidavits from lawyers, Mr. Suzuki and a

21   Mr. Mochizuki, who are both lawyers in Tokyo.  I have met both

22   of them in person, but they were unavailable to come to the

23   United States for this proceeding.

24   THE COURT:  And Mr. Takaesu, I take it, is also an

25   attorney for --

MC6KKANH

1       MR. DUDLEY:  He is an attorney.  He has represented

2  Dr. Kanayama in Japan, yes.  He's not from Tokyo, though, your

3  Honor; he's from Okinawa.

4       THE COURT:  Very well.  So why don't we begin with the

5  government.

6       Ms. La Morte.

7       MS. La MORTE:  Yes, your Honor.

8       Your Honor, the government of Japan seeks to extradite

9  Mr. Kanayama for defacing two historical religious and

10  culturally significant Japanese sites — the Narita Shinsho

11  Temple and the Katori Jingu Shrine.  These shrines are

12  extraordinarily important to the people of Japan and to Japan,

13  and that is why we are here today.

14       I don't know if it appears -- your Honor, is there

15  anything appearing on your screen?

16       THE COURT:  I see what appears to be the opening page

17  of a PowerPoint.

18       MS. La MORTE:  So, what you have here is a picture of

19  the Narita Temple, and this is from the exhibits, which I will

20  get to in a moment, but the Narita Temple is a Buddhist temple

21  containing a number of nationally designated cultural

22  properties.  It attracts approximately 10 million worshipers a

23  year.

24       Next is the Katori Jingu Shrine.  This is one of the

25  few historical shrines in Japan that's connected with the

MC6KKANH

1   Imperial Family.  It was founded during the rein of Japan's

2   first emperor, and it contains a number of naturally designated

3   cultural properties as well and attracts as many as 2 million

4   worshipers a year.  So, specifically, the Government of Japan

5   has alleged that Kanayama defaced the temple and the shrine

6   using an oily liquid, in violation of Article 260 of the

7   Japanese Criminal Code.  In particular, Kanayama is accused of

8   damaging three poles in what's called the So-mon or the main

9   gates of the Narita Temple, and he's also accused of damaging

10  holes, a staircase, and an offertory box at the Katori Shrine

11  in its hall of worship, also called the Haiden.  And as we're

12  going to walk through today, the Government of Japan has put

13  forward abundant evidence that these crimes occurred and that

14  Kanayama is the person who committed the crimes, indeed, far

15  more than probable cause, which is the low standard that needs

16  to be met here.

17           THE COURT:  You used the term culturally designated

18  properties.  What legal significance does that designation

19  have?

20           MS. La MORTE:  Well, I think the significance is just

21  one to show the importance of the shrines and the temple to the

22  Country of Japan and the people of Japan.  The other part of

23  that, also, is just that with respect to what constitutes

24  damage under Article 260 of the Japanese code, it's not just

25  physical damage, but it's also altering an external appearance

A0387

MC6KKANH

1    or structure, and that's found in the exhibits, which I will

2    get to, Exhibit 3 in particular.  And so, insofar as the

3    application of this oily liquid either changed the external

4    appearance of one of the portions of these shrines or otherwise

5    seeped into the material compromising the shrine, which would

6    require repair to rectify that, it would constitute damage

7    under Article 260 of the Japanese code.

8           THE COURT:  But there's no heightened punishment for

9    harming culturally designated properties?

10          MS. La MORTE:  Correct, there's no heightened

11   punishment.  Article 260, which is in this PowerPoint, is about

12   damaging a structure or a building, and there's a certain

13   definition of what counts as a structure or a building, and the

14   temple and the shrine would qualify, but there's no additional

15   punishment or -- as far as we're aware, that's associated with

16   damaging a shrine of historical importance or anything like

17   that.

18          THE COURT:  Do we know how old these structures are?

19          MS. La MORTE:  I would have to look.  As I said, the

20   Katori Shrine was associated with the first emperor, and so we

21   can probably easily figure out the first imperial emperor.  So

22   we can probably figure out when that is.

23          And I believe if your Honor can give me a few minutes,

24   I'll continue, but I can get back to you on that question.

25          THE COURT:  Sure.  Go ahead.

A0388

1          MS. La MORTE:  Okay.

2          So, before we launch in, I'd like to do the following:

3     One is just a brief refresh on the extradition process and how

4     it works; second is to formally introduce the exhibits that we

5     are relying upon in support of extradition; and then, finally,

6     to show the Court how the requirements of dual criminality and

7     probable cause are amply met here.

8          So, as far as the extradition process:  This is

9     explained in the briefing to the Court, but just to briefly

10    recap, extradition is a two-stage process.  So, stage one is

11    the stage that we're at now.  It has a very limited hearing of

12    limited scope in front of the federal court to determine

13    whether the requirements of the applicable treaty are met,

14    here, that's the treaty between the United States and Japan.

15    If those treaty requirements are met, then the Court will

16    certify to the Secretary of State that the fugitive is

17    extraditable.  So all the Court is certifying is that this

18    person, this fugitive, qualifies under the treaty for

19    extradition.

20          The ultimate decision as to whether to actually

21    extradite the fugitive and return the fugitive to the home

22    country lies with the Secretary of State.  So, that is stage

23    two.  So, if the Court certifies to the Secretary of State that

24    the fugitive is extraditable, the Secretary of State will then

25    make a determination as to whether to actually extradite.  And

MC6KKANH

1    there have been certain arguments that have been raised in the

2    course of briefing in this case that are arguments that are

3    actually not -- and, to be fair, they have not been the focus

4    of the fugitive's briefs, but they have appeared, and there are

5    arguments concerning possible persecution, religious

6    persecution, for example, and those are the types of arguments

7    that would be directed towards the Secretary of State and one

8    of the factors that he or she would consider in making that

9    ultimate determination.

10          So, that is the two-stage process.

11          So, we are at stage one, like I said, and for the

12   Court to certify Mr. Kanayama as extraditable, there are five

13   findings that the Court has to make, and they're on the slide.

14          So, the first is whether the Court is authorized to

15   conduct an extradition proceeding.  That's easy.  Under

16   18 U.S.C. 3184, any judge or justice of the United States is

17   authorized to conduct a proceeding, and there's no dispute here

18   that you are.

19          Second is whether the Court has jurisdiction over

20   Mr. Kanayama.  Again, that's something that hasn't been

21   disputed.  He was located in the jurisdiction of the Southern

22   District of New York, and that is sufficient for jurisdiction.

23          THE COURT:  And he lives and works in the Southern

24   District of New York?

25          MS. La MORTE:  I believe he works in Manhattan.

A0390

MC6KKANH

1         THE COURT:  Okay.

2         MS. La MORTE:  Third is whether the extradition treaty

3    between the United States and Japan is in full force and

4    effect.  And, here, when we get to the exhibits, there is a

5    declaration of Elizabeth O'Connor, from the State Department's

6    Office of Legal Adviser, that attests that the extradition is

7    still in full force and effect.  Again, that's not disputed

8    here.  What's disputed here are elements 4 and 5.

9         4 is whether the treaty covers crimes for which

10   extradition is requested, and then 5 is whether there is

11   probable cause that Kanayama committed the two violations of

12   Article 260 of the Japanese Criminal Code.

13        THE COURT:  I'll leave it up to him, but as far as I

14   understand, Mr. Kanayama's counsel, they're not contesting 4.

15   I think they're contesting whether 4 was ever violated.

16        MS. La MORTE:  I'm sorry, I may not understand the

17   distinction your Honor is drawing.  It blends -- when I read

18   the arguments, I thought it was framed as to 4, but the way

19   that I actually viewed it is whether -- if you're talking

20   about -- their main argument that I had put under 4 was

21   whether, in fact, damage occurred to the shrine.  I actually

22   sort of see that bleeding into 5 as well.

23        THE COURT:  Okay.

24        MR. DUDLEY:  Your Honor, we are contesting 4 and 5.

25        THE COURT:  So, you are contesting that the crime for

A0391

MC6KKANH

1    which Japan is seeking Mr. Kanayama is not a felony offense?

2         MR. DUDLEY:  Yes, it is not a felony offense under the

3    applicable law here in the United States, particularly here in

4    the State of New York.  That is our position.

5         THE COURT:  That's your position, that even if it's

6    true that Mr. Kanayama put the oil on the two locations, and

7    even if the damage was above $1,000 and $20,000 respectively,

8    that that is not a felony offense?

9         MR. DUDLEY:  Our position is that even if it's true

10   that he was the perpetrator, which we don't agree with, but

11   even if that's true, there was no damage, and that the amounts

12   that have been presented were estimates.  No repairs were ever

13   conducted at either the shrine or the temple, your Honor.  So,

14   our position is that the government has not provided evidence

15   of a felony offense here.

16        THE COURT:  Okay.  Perhaps I'm being dense, but as I

17   see number 4, number 4 means that there is a defined crime in

18   Japan, which is a felony, which is also a defined crime in the

19   U.S., which is a felony.

20        Now, whether or not he committed that crime is another

21   issue, but that's how I see number 4.

22        MR. DUDLEY:  Your Honor, we would argue that the

23   defined crime, which would be a felony under Article 260 of the

24   Japanese code — and Mr. Lichtman can speak to this because he's

25   a New York State practitioner here — is not a felony crime.

A0392

MC6KKANH

1  The same actions would not be a felony crime here.

2      MR. LICHTMAN:  I think if I can cut to the chase, is

3  that we don't disagree that had the crimes, as charged in

4  Japan, yes, that's a crime in New York, as well, but in New

5  York, you have to show the damages, and there are two different

6  statutes that are mentioned here, and it's different amounts of

7  damage for each statute.  I think one is 500 and one is -- 1500

8  is the other one?

9      MS. La MORTE:  250.

10     MR. LICHTMAN:  Our claim is that, as charged, based on

11 the facts alleged, that there were no actual -- that prong of

12 the crime, that there was no actual damage.  So the allegation,

13 the claim, of a number damage to the shrine and to the temple

14 are not accurate based on case law and based on the facts that

15 we're prepared to proffer, and we have already in our papers.

16 So we're not claiming that there's not the analogue crime in

17 New York that there is in Japan; we're just saying that one

18 prong of the New York statute is not met based on the facts

19 here.

20     THE COURT:  Okay.

21     So, based on all this, my bottom line is that 4 is

22 met.  But go ahead.

23     MS. La MORTE:  Okay.

24     And then point 5 is whether there's probable cause he

25 committed the two violations of Article 260 of the Japanese

A0393

MC6KKANH

1   Criminal Code.

2           So, as I'm going to go over today, the answer as to

3   whether there is probable cause here is an easy yes.  And, as a

4   result, the Court should certify to the Secretary of State.

5           So, now I'm going to turn to the exhibits.  The

6   government is offering four exhibits here.  Exhibit 1 is the

7   declaration I alluded to earlier, prepared by Elizabeth

8   O'Connor, who is an attorney with the State Department Office

9   of Legal Advisers.  It attaches a copy of the extradition

10  treaty between the United States and Japan, and it also

11  attaches the diplomatic note from Japan that requests

12  Kanayama's extradition, and it makes clear that the extradition

13  request was properly authenticated pursuant to 18 U.S.C. 3190.

14  That's important because that authentication is what's

15  necessary for the documents to be admissible in evidence.

16          So, again, this declaration, the point is to show that

17  this treaty is still in full force and effect, that the offense

18  for which Japan has requested extradition is covered, and that

19  it's authenticated.  So that's Exhibit 1.

20          Exhibit 2 is the actual Japan's request for

21  Mr. Kanayama's extradition.  The cover page — and I have a

22  binder which I'll pass up to the Court — has a certification

23  dated November 25, 2016, by James Hyland who was the interim

24  chargé d'affaires, if I'm pronouncing that right, it has

25  exhibits supporting Japan's issuance of the warrants, a

MC6KKANH

1   certification attesting to the authenticity of the documents so

2   as to make that admissible under 18 U.S.C. 3190, and then,

3   again, because the request to certify is authentic under that

4   statute, it's admissible as evidence.

5        Exhibit 3, Japan had provided supplemental evidence in

6   support of its extradition request.  So that's what is in

7   Exhibit 3.

8        Again, we have a certification that accompanies

9   Exhibit 3, this one by Stuart Hatcher on November 14, 2017,

10  who's the Consul General, along with the exhibits.

11       THE COURT:  These are the exhibits that came in

12  response to Mr. Kanayama's response to the memo in support

13  of --

14       MS. La MORTE:  Yes, this is in response.  So these

15  were in 2017, the supplemental package.

16       And then, finally, Exhibit 4 are renewed arrest

17  warrants.  So, with the original package in Exhibit 1, the

18  Japanese court had issued arrest warrants for Mr. Kanayama's

19  arrest for violating Article 260.  Every year, those have been

20  renewed, and Exhibit 4 is the most recent renewed arrest

21  warrants from June 20th of 2022.

22       Now, I have a binder here that has those exhibits.

23  Each of these exhibits, your Honor, they're already part of the

24  official case record, I already filed them, and so what I have

25  here are copies, which I'm happy to pass up.

A0395

MC6KKANH

```
 1              THE COURT:  Please.
 2              And, Ms. Wiener, as a matter of practice, should I
 3     admit these into evidence, or are they already part of the
 4     official record?
 5              MS. WEINER:  Typically, the Court would admit these
 6     into evidence, assuming it finds that they're admissible.
 7              THE COURT:  Very well.
 8              Any objection to these exhibits, Mr. Lichtman?
 9              MR. LICHTMAN:  No, your Honor.
10              THE COURT:  They will be received.
11              (Government's Exhibits 1 through 4 received in
12     evidence)
13              THE COURT:  Right now, they're Exhibits 1 through 4?
14              MS. La MORTE:  Yes, your Honor, Government Exhibits 1,
15     2, 3, and 4.
16              So, I understand that the Court has already determined
17     that prong 4 is met.  So I'm going to go through this quickly,
18     but the defense has an argument, as they raise in their papers
19     and again just now, that Mr. Kanayama did not, in fact, cause
20     damage.  They had argued that under prong 4., so I address it
21     here under prong 4, but I understand — I think we all
22     understand — this is really more of a prong 5 issue, but I'm
23     just letting you know because the slide is entitled "Kanayama's
24     Offenses are Encompassed by The Extradition Treaty."
25              So what we have here is just excerpts from the
```

1   extradition treaty from Government Exhibit 1, and, obviously,

2   you see there, on the lower right, point 19 of the treaty, an

3   offense relating to damage of property, documents, or

4   facilities.  So, that's what we are focused on here.

5           And this is Article 260.  Again, this is contained in

6   Government Exhibits 2 and 3, a copy of Article 260 and the text

7   of it.  And it basically states, "A person who damages a

8   building or vessel of another shall be punished by imprisonment

9   with work for not more than five years."

10          So that's the statute that he is charged with

11  violating.

12          Now, we have the New York statutes, right?  Because

13  one of the elements here is dual criminality.  So, what you're

14  looking at is whether the act charged is criminal in both

15  jurisdictions.  So, the statutes that we're focusing on here

16  are New York Penal Law Statutes 145.05, criminal mischief in

17  the third degree, and 145.10, criminal mischief in the second

18  degree.  What I have listed here are the elements of the

19  criminal mischief statutes, and there's no dispute that these

20  are the elements of the statute.  So, intent to damage, actual

21  damage, no reasonable grounds to believe that you had the right

22  to damage, and then that the amount exceeds either $250 for a

23  third degree criminal mischief or $1,500 for a second degree

24  criminal mischief.

25          Again, this is a felony crime.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A0397

MC6KKANH

1          It is not disputed or is not really disputed that the

2     Narita Temple and Katori Shrine were defaced with oil on

3     March 25, 2015.  So what you see here are pictures that are

4     part of Exhibit 2, the Government Exhibit 2.  The picture on

5     the left is a picture of the So-mon, or the main gate of the

6     Narita Temple, and the pictures at the right are just cut out

7     and show the little spots of oil.  These pictures were taken, I

8     think, fairly close in time to March 25th.  They were taken

9     sometime in April, I believe.

10          And then here we have a picture, and this is just

11     another example that's contained in the Exhibit 2, of the

12     Romon, which is the tower gate.  So the picture to the left is

13     the overall structure, and then the picture to the right shows

14     the oil stains that were on as of 2015 when these photographs

15     were taken.

16          This is the Katori Shrine.  The picture on the left is

17     the one that we looked at earlier, and I will get back to the

18     Court on the age of this structure.  And then the picture on

19     the right is just one of the examples of damage that was caused

20     by the application of the oil.  And this, in particular, is

21     called a Haiden, or the hall of worship.

22          So, in addition to the photographs that we have, we

23     have witnesses that were interviewed, and their statements are

24     part of the record, the exhibits that the government submitted

25     here.  This particular individual was interviewed twice.  So,

MC6KKANH

1   he was interviewed in 2015, and he was interviewed again in

2   2017, and what I have on slide 12 are excerpts from his

3   interview from 2017.  The reason he was reinterviewed, as the

4   Court understands, is in response to Mr. Kanayama's opposition

5   papers, where he notes his Japanese attorney had visited Japan,

6   took his own statements, and then also, along with a

7   photographer, indicated that there is no more damage there

8   anymore.  So, these are statements from October 18th of 2017.

9           THE COURT:  Can I ask, in connection with that --

10  because reading Mr. Kanayama's papers, it appears as though no

11  one noticed the damage until the police showed up at the

12  temple.

13          Do you know what --

14          MS. La MORTE:  That's not correct, your Honor.  If you

15  look at -- just give me a minute.

16          THE COURT:  By the way, I don't mean to characterize

17  the papers.  That's what I'm recalling.

18          MS. La MORTE:  Your Honor, if you look at Exhibit 3,

19  tabs 5 and 6, Exhibit 3 at tab 5 is a statement, and the

20  statement states that the stains — this is Mr. Kyosu — that the

21  statement -- I'm sorry, let me actually turn to it -- that at

22  the Narita Temple, the damage was discovered on March 25th at

23  around 6:44 p.m.

24          This is an interview with Mr. Kyosu, who is the same

25  person that I have up here on the slide now.  He says on --

A0399

MC6KKANH

1   this is Bates stamp USA0292, so it's like the second page of

2   tab 5 towards the top, and I will read it into the record.  He

3   states:  "At 6:44 p.m., on March 25th, 2015," so that's the

4   date in question, "one of our security guards deployed at the

5   entrance of the Korin-kaku" — I'm sure I'm butchering that —

6   "the Aureole House, stepped on oil spread over the floor, and

7   that was the damage first found.  Before long, we gradually

8   found out that oil-like liquid was sprayed on several spots of

9   the structures in our premises."  And then it goes on.  Anyway,

10  we are sure we had not given the lawyer such a detailed

11  account.

12          So, that's for the temple, the Narita Temple.  And

13  then -- again, that's March 25th, a couple of hours later.

14          And then if you go to tab 6, this is an interview with

15  a deputy priest at the Katori Shrine, and he says, "Our priest

16  on night duty was the first to find oil-like liquid stains on

17  the stairs in the offering box when he opened the front door of

18  the hall of worship around 5:00 p.m. on March 26th."  So the

19  following day was when the employee reported it.  So it was not

20  in response to the police.  This was discovered shortly after

21  the incident occurred.

22          THE COURT:  Did they make a complaint to the police

23  right away?

24          MS. La MORTE:  Yes.  I'm not sure if they made the

25  complaint right away, but in these declarations, including the

A0400

MC6KKANH

1    one I have up on the screen, I don't have that particular

2    excerpt, but they talk about how they made complaints to the

3    police about this.

4                MR. EINHORN:  Judge, we contest -- I'm sorry,

5    Ms. La Morte.

6                MS. La MORTE:  I'm sorry.

7                MR. EINHORN:  That's okay.

8                MS. La MORTE:  If you look at tab 5 — this is the

9    individual who was interviewed in connection with the Narita

10   Temple — he says, "Back then, the damages done to our

11   properties remind us of the vandalism cases reported in the

12   media" --

13               THE COURT:  Can you slow down and tell me where you

14   are?

15               MS. La MORTE:  I'm sorry, yes.

16               I am at tab 5 of Exhibit 3, second page.  If you look

17   in the middle, do you see where it says answer 3?

18               THE COURT:  Yes.

19               MS. La MORTE:  Okay.  I'm reading right below that.

20               "Back then, the damages done to our properties remind

21   us of the vandalism cases reported in the media, and we

22   strongly suspect that we also fell victim to the same crime.

23   When we were trying to get the full extent of damages and

24   discuss whether to report the incident to the police, Narita

25   police station warned us to look out for similar instances as

MC6KKANH

1    those reported in the media.  This is how we decided to file

2    the report."

3          So that's for the Narita Temple.

4          Then I believe — I'll just check — the Katori

5    Shrine —

6          THE COURT:  By the way, when he says there that "it

7    reminded us of vandalism cases reported in the media," I know

8    that Mr. Kanayama's lawyers have advised that there were

9    similar incidents of application of oil at other shrines, both

10   before and after the March 2015 —

11         MS. La MORTE:  That's correct, your Honor.  And I

12   believe that this is one of the reasons why this case is of

13   particular significance to the Country of Japan, because

14   they're finding instances around the country where these

15   historic — it's interesting because we were trying to think of

16   what if someone did something to a building in New York City.

17   This doesn't hold the same cultural significance as I think

18   some of these properties and shrines do in Japan, but it is an

19   issue in the country, and it is why it's important to Japan to

20   figure out why it's happening and who is doing it.

21         So, the same thing with the Katori shrine.  If you

22   look at tab 6, page 2, the priest that was interviewed there,

23   if you look at the middle of page 2, it says answer 2, and he

24   says, "I never said such a thing as we did not feel the need to

25   contact the police about the oil sprinkling.  The police came

A0402

MC6KKANH

1   because we reported it.  And so it is natural that we explained

2   the damages to the police.  It is also natural that we filed

3   the victim's report afterwards.  We would never have contacted

4   the police without intending to file a victim's report."

5           So, these employees of the shrine and the temple are

6   saying that, no, no, no, we are the ones that decided to report

7   this, we didn't do this at the behest of the police.

8           So, what I have here now is an excerpt from an

9   interview of one of the employees in the Narita Temple.  This

10  is Mr. Kyosu.  This is found at Exhibit 3, tab 3 — I just have

11  excerpts here.  This person is the general affairs section

12  chief of the temple, so he is in charge of temple security,

13  cleaning, and things of that nature, and he describes how the

14  stains looked when they were originally found.  He said they

15  looked really wet with oil, and they are dried now with black

16  stains left.  And, again, this is in October of 2017.

17          And then, last, he says, "The poles of the So-mon gate

18  of the Narita Temple have been exposed to direct sunlight on

19  sunny days and wind and rain on rainy days.  Indeed, natural

20  deterioration changed the texture of the poles made of

21  unvarnished wood.  However, when the wood grain absorbs other

22  substances like oil, the substance will remain in the wood, as

23  indicated by the visible stains."  He says, "When you look at

24  the sprayed portions in close range, you can easily see

25  unnatural black stains obviously different from normal changes

A0403

MC6KKANH

1   by sunlight, rain, or wind."

2        Then we have these repair estimates.  So, in addition

3   to the interviews of the employees at the shrine and temple —

4   and, again, I'm still right now focused on the Narita Temple —

5   they obtained independent repair estimates.  Again, if you look

6   at the statements, this was not done -- the police -- the

7   Japanese police did not go out to the repair company.  The

8   Narita Temple and the Katori Shrine went to repair companies to

9   obtain these estimates.  These are third-party repair

10  companies.

11       At the top here, the one the Narita Temple contacted,

12  was Kongo Gumi Company.  There's like a little snippet at the

13  top of the slide that this is a company that specializes in

14  cultural properties, historic buildings, and restoring and

15  repairing them.  On the left, they have this estimate.  Again,

16  this is 2017, so after Mr. Kanayama's opposition comes in

17  claiming that there's no damage, they have updated repair

18  estimates.

19       THE COURT:  When it says it was established in 578,

20  that's the year 578?

21       MS. La MORTE:  I think it's the year, your Honor.

22  That was a little confusing to me, too, actually.

23       THE COURT:  Okay.

24       MS. La MORTE:  So, on the left is the estimate.  It's

25  prepared October 6, 2017, and it's about 120,000 yen.

1          On the right, there's a description of why the cost is

2    remaining the same, and he states here:  It's been a long time.

3    The wood is sunburned.  To remove the stains can make them

4    conspicuous and not all the oily substance can be removed or

5    may not be removed.  It's a little small on my screen.

6          And then, here, the police interviewed the person at

7    the repair shop about the $120,000 repair and, again, this is

8    in 2017, and this person in the interview explains — and this

9    is in the red — "Oil has penetrated into wood grains.  It is

10   therefore impossible to restore completely.  If we should give

11   it a try, we will use chemicals, but we cannot predict exactly

12   what will happen as a result of the work because the

13   ingredients of the oil used are unknown."

14         Now, here, I have –– this is now the Katori Shrine,

15   and this is an interview of a priest that worked at the Katori

16   Shrine, and, again, this is an interview that occurred in 2017.

17   This is the general affairs division director of the Katori

18   Shrine.  And then he explains here — and, again, these are

19   excerpts from Exhibit 3, tab 4 — here's my account of the

20   damages on the Haiden, hall of worship.  Then he says in that

21   second paragraph:  "When the incident was detected, the damaged

22   portions were noticeably stained with oil.  The oil sprayed

23   over the poles, appeared to have dripped downward along them,

24   while countless oval-shaped oily stains were found all over the

25   stairs and the offertory box."

MC6KKANH

1          Then he talks about the stains as they looked a little

2     bit later.  So now we're in 2017.  "When about a year passed

3     after the incident, the sprayed portions began to look dried.

4     About half a year ago from now, their colors came close to the

5     color of the lacquer, and the stains were almost invisible

6     unless observing at close range."

7          So, again, there's no dispute that the stains sort of,

8     like, diminished, but these individuals, these employees, are

9     testifying that they're still there, you need to see them at

10    close range.

11         He also stated at Exhibit 3, tab 6, that — and I think

12    that's on the next slide — some of the stains were visible and

13    some of them were not.

14         So, again, in 2017, another repair estimate was

15    obtained in light of the stains as they appear in 2017.  This

16    is from a different company, so it's not the same company that

17    was used by the Narita Temple.  The Katori Shrine used Konishi

18    Decorative Arts & Crafts Company, again specializing in

19    restoration.  This is a repair estimate from 2017, and they

20    arrive at a repair cost of 2,423,000 Japanese yen.

21         THE COURT:  Which is how much?

22         MS. La MORTE:  Roughly $20,000.

23         THE COURT:  Yes.  But this company was established

24    1500 years later.

25         MS. La MORTE:  Yes, your Honor, I don't know what to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A0406

MC6KKANH

1    tell you about the date.

2         So, then, again, an interview was conducted with the

3    person at the repair shop, and they explained what needs to be

4    done: "We will remove the current coating or lacquer, do the

5    undercoating again, and give a new coating of lacquer.  This is

6    because the ingredients of the oil used are still unknown."

7    And then he says below: "It appears the affected areas changed

8    in color and size, but, actually, the underlying damage from

9    the oil has not disappeared.  We have to remove the current

10   lacquer, which appears to contain any oil, do the undercoating

11   again, and give a new coating of lacquer."

12        And this appears at Exhibit 3, tab 8.

13        So, your Honor, I submit that there is ample evidence

14   here, certainly more than probable cause, that damage was

15   caused to the Narita Temple and the Katori Shrine.

16        The other thing that I will note for the Court with

17   regard to damage is that even the defense admits in their

18   briefing papers that repair estimates under New York law are

19   acceptable evidence of damage and the amount of damage, right,

20   like that's one piece of proof.  There is no requirement — and

21   they admit this, too — there is no requirement that repairs

22   actually have to be taken.

23        And there are a number of reasons why an entity or

24   person may not choose to make repairs.  Here, we have the

25   repair company saying that they don't even know if they would

A0407

MC6KKANH

```
 1    be able to repair it with the chemicals.  In one of these, they
 2    list alternatives of replacing the pole in part or sort of like
 3    redoing the entire pole as the repair, which would be cost
 4    prohibitive, and then sort of change the whole look of the
 5    shrine in light of having holes of different colors from
 6    different ages.
 7            So, the other argument raised was that Mr. Kanayama
 8    did not intend to damage the properties, but, instead, this was
 9    a religious endeavor.  I think this is easily dispensed with
10    under Japanese law and under U.S. law.  Your motivation is not
11    relevant here.  Just because he had religious motivations for
12    putting oil on shrines does not negate his intent.  There are a
13    number of cases that we cite in our papers to this effect for
14    U.S. law, and then it's on our reply brief, at pages 15 to 16.
15    And then we also submitted, or Japan submitted, I should say,
16    statements by Japanese prosecutors that talk about mens rea.
17    Those are found at Exhibit 3, tabs 1 and 2.  And they state
18    that under Japanese law, mens rea means damaging an object
19    physically by wrongful conduct or understanding and
20    acknowledging that the function of an object would be damaged,
21    and, also, that religious inspiration does not negate mens rea.
22    If you intentionally took the substance, and you intentionally
23    put it on the object knowing that it was somehow going to
24    change the object, that is intent.  It does not matter what you
25    were inspired by or why, I should say, the motivation.  I think
```

A0408

MC6KKANH

1   that's a common concept in American jurisprudence, and it also

2   holds true in Japan.

3           THE COURT:  So long as you intended to apply the oil,

4   that is the *mens rea* that was required?

5           MS. La MORTE:  Yes.

6           THE COURT:  Assuming the other elements are met?

7           MS. La MORTE:  Assuming the other elements are met,

8   yes.

9           THE COURT:  Okay.

10          MS. La MORTE:  So, now, again, that sort of all went

11  to probable cause.  This is just a statement that was from our

12  brief on probable cause.  And that is that extradition

13  proceedings are sui generis, right?  It's not criminal, it's

14  not civil, the rules of evidence don't apply, but the idea,

15  again, is that the Court's role is to determine probable cause.

16  It's a very low standard, the Court is well aware of it, it is

17  less than a preponderance of the evidence, it's just a

18  reasonable likelihood that a crime was committed and that the

19  person committed it.

20          In connection with making this determination, the

21  Court is not permitted to choose between competing narratives.

22  I think that's important here because what I know that the

23  fugitive will do is stand up and put forward testimony and

24  affidavits to the effect that we traveled to Japan, here are

25  our pictures, look, there's no damage, right?  That implicates

A0409

```
1    a credibility dispute here because we have employees of the
2    shrine saying that there was damage, and we have the repair
3    company saying there was damage and that it would cost X amount
4    to fix that damage.
5            So, that is a factual dispute.  And it's a factual
6    dispute that should be resolved by tribunals in Japan, not by
7    this Court.  It certainly does not defeat the Government of
8    Japan's evidence, or at least probable cause, based on the
9    statements and repair estimates that damage would cause to
10   these shrines.
11           THE COURT:  I guess, Ms. La Morte, the question is,
12   and I'm sure what I'm going to hear from Mr. Kanayama's lawyers
13   is, what are the limits of this?  Because if this means what it
14   says, then I play no role here, right?
15           MS. La MORTE:  No, that's not true, your Honor, you do
16   have to make a determination of probable cause.  It is not this
17   case, but there may be cases where the submitting government's
18   evidence just does not arise to probable cause.
19           The other --
20           THE COURT:  How is that tested, if not by receiving
21   competent evidence or contrary evidence?
22           MS. La MORTE:  You are allowed to make a determination
23   about whether the evidence is competent, like that is for sure.
24   But just like whenever we submit affidavits to the Court,
25   right, for warrants, it's the same probable cause
```

A0410

MC6KKANH

1    determination.  We have an affidavit that spells out, and we

2    have warrants that are rejected by this Court and the

3    magistrate judges because they don't think it arises to the

4    level of probable cause.  So, it's that same standard that

5    applies here.

6         Now, a very easy example that's not the example in

7    this case, but, for example, if there were admissions, that we

8    say a fugitive -- we're putting forward this evidence of

9    admissions, but then there's evidence that the fugitive was

10   beaten in order to obtain those admissions or that they were

11   coerced, that would mean that the admission is not really

12   competent evidence and you would have a role to deduce that

13   there.

14        But the standard -- like the idea is the overall

15   thrust of this is to give effect to the treaty, and so that's

16   why the Court's role, while it has discretion in terms of what

17   evidence it could consider, for sure, the standard is really

18   whether the evidence that the fugitive submits obliterates —

19   obliterates, that is the word used in the case law —

20   obliterates probable cause.  That's a very high standard.  Or,

21   like I said, if you have a piece of evidence that shows that

22   the government's evidence is not competent such as the

23   confession being coerced, but, again, since we're dealing with

24   matters of international comity in foreign relations, the idea

25   is for this Court to try and give effect to the treaty.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A0411

MC6KKANH

```
 1          So, that is the Court's role.  It is certainly more
 2    limited than --
 3          THE COURT:  So, if I determine, based solely on the
 4    evidence presented by Japan, that they have established
 5    probable cause, or that Mr. Kanayama violated that statute,
 6    that essentially ends the inquiry?
 7          MS. La MORTE:  Yes, because our position is that the
 8    evidence that has been submitted by Kanayama does not
 9    obliterate that probable cause, nor is there anything in there
10    that I would say explains the evidence in a way that I had just
11    described.
12          THE COURT:  Okay.
13          MS. La MORTE:  So, one of the arguments that was
14    raised by Mr. Kanayama as to why there's no probable cause is
15    that he did not damage a building — quote building — within the
16    meaning of Article 260.
17          On this slide here, which is slide 20, I have, again,
18    pictures we've seen before of the Narita Temple and the Katori
19    Shrine.  And then in Exhibit 3, at tabs 1 and 2, there are
20    opinions by Japanese prosecutors as to why the shrine and the
21    temple qualify as buildings.  And they explain that they're
22    structures, they have roofs supported by walls and poles, are
23    fixed to the ground, have an interior space for a person to
24    exit and enter, and, therefore, they qualify as buildings.
25          Now, again, I alluded to this before, but principles
```

A0412

MC6KKANH

```
 1    of international comity require this Court to give substantial

 2    deference to Japan's interpretation of its own laws.  This

 3    Court should avoid wading into disputes about what Japanese law

 4    means, and I think it's not only countenanced by the case law,

 5    but it actually is a matter of common sense this Court is not

 6    well equipped to make determinations of Japanese law,

 7    obviously.  And, here, like I said, we submitted detailed legal

 8    opinions by Japanese prosecutors as to why these qualify as

 9    buildings.

10          THE COURT:  Question:  I take it that one of the

11    structures that was damaged was part of an outside gate; is

12    that right?

13          MS. La MORTE:  The So-mon is called the main gate, and

14    if you look at the picture on the left, that is the So-mon, and

15    I think it's the poles in the front.  This picture is small,

16    I'm sorry, but the poles in the front that had oil stains on

17    them.

18          THE COURT:  I'm forgetting whether Mr. Kanayama's

19    lawyers provided American case law or Japanese case law tending

20    to show that a gate or an outside perimeter fence is not part

21    of a structure.

22          MS. La MORTE:  They provided Japanese law, and the

23    Japanese prosecutors, in reaching this conclusion, also cited

24    to Japanese law, case law.

25          THE COURT:  So we have conflicting case law from
```

A0413

MC6KKANH

1     Japan.

2              MS. La MORTE:  Again, I'm having —— it's hard for me

3     to say it's conflicting case law from Japan because I am not

4     well versed in Japanese law at all, but, certainly, the

5     prosecutors have cited cases that support their view.  It may

6     be that defense found some cases that tend to undermine that,

7     but the reality is we have legal opinions citing Japanese law

8     that support this interpretation, and, therefore, the Court

9     should defer to that.

10             And then the other point on probable cause that the

11    defense makes is that the act of applying oil to a building,

12    does that constitute, quote-unquote, damage within the meaning

13    of Article 260.  So, in these opinion letters from the Japanese

14    prosecutors — and, again, they are Exhibit 3, tabs 1 and 2 —

15    the Japanese prosecutors confirm that applying oil on a shrine

16    or temple like this constitutes damage within the meaning of

17    the code.  And so, on the left here, these are, again, just

18    excerpts, and they define what damage means under Japanese law.

19    Interestingly —— there's physical damage, right, like there's a

20    physical damage component, and so, for example, like applying

21    the oil and seepage into the wood might qualify as a physical

22    damage, but then there is something more than that, and that's

23    sort of changing the external appearance of the structure even

24    if it's not, like, physically damaged in the sort of way that

25    we tend to think about physical damage and renders it somehow

MC6KKANH

```
 1    emotionally or virtually unusable.  Under Japanese law, that
 2    also constitutes damage within the meaning of Article 260.
 3            And looking at all these principles and sort of
 4    analyzing whether application of oil on a religious or
 5    historical structure would qualify, two different Japanese
 6    prosecutors, one for the Narita Temple and the other for the
 7    Katori Shrine, concluded this would constitute damage within
 8    the meaning of the code.
 9            So what I have here now is a timeline of what happened
10    on March 25th, 2015, and I believe that this goes to probable
11    cause as well.  And I will say about this slide — and,
12    obviously, the defense can chime in if they disagree — by and
13    large, what is on the slide is undisputed.  This is not what
14    they're disputing.
15            So, here's the sequence of events, and I think the
16    sequence of events is relevant and telling here.  On March 21,
17    2015, we have travel records that are in Government Exhibit 2,
18    and it shows that on March 21st, that Kanayama flies into
19    Narita International Airport.  Four days later, on March 25th,
20    he goes back to Narita International Airport, but he's not
21    going there to fly anywhere, he's going there now to rent a
22    car, which he does at 2:33 p.m.
23            And then at 3:01 p.m., Kanayama is in the rental car,
24    and the car enters the Narita Temple parking lot.  So, that's
25    at 3:01.  So he's there.
```

A0415

MC6KKANH

1          3:37 to 4:07:  A man resembling Kanayama — and I know

2     there are issues with the identification, which I'll put a pin

3     in in a minute — but I don't think you can dispute that the man

4     resembles Kanayama, whether you can make that confirmatory ID

5     or not.  But the man resembling Kanayama, seen on video footage

6     at the Narita Temple, touching the poles.

7          Now, interestingly, they looked at the footage during

8     this period of time.  There's no one else touching the poles.

9     There's one individual that that they see touching the poles,

10    and that is an individual who resembles Kanayama.

11         4:21 p.m.:  Again, this rental car, indisputably

12    Kanayama's rental car that he rented, leaves the Narita Temple

13    parking lot.

14         Then 4:30, he --

15         THE COURT:  Well, I think they do dispute that because

16    what you have is evidence that a car with the last two digits

17    1-4 left the parking lot, right?

18         MS. La MORTE:  My understanding is that they are not

19    disputing that Kanayama rented that car, but they could speak

20    to that.

21         THE COURT:  That he rented the car, but that he didn't

22    go to either one of these temples.

23         MR. EINHORN:  That's correct, Judge.

24         MR. DUDLEY:  That's correct, your Honor.

25         MR. EINHORN:  That's what we were discussing.

MC6KKANH

```
1              MS. La MORTE:  They do admit that he was on the
2     Higash --
3              THE COURT:  On the highway?
4              MS. La MORTE:  On the highway, yes.
5              MR. EINHORN:  Yes, Judge.
6              MS. La MORTE:  But I think what cannot be disputed --
7     they disputed that he actually went to the shrines, but what
8     I'm saying here is that what can't be disputed -- or what
9     they're not disputing is he rented this rental car; this rental
10    car is seen entering this parking lot at the Narita Temple.
11    That's his rental car.  The rental car enters the expressway
12    via the Narita tollgate, and then also in the evidence is that
13    the usual time it would take to go from the airport to the
14    tollgate is eight minutes.  Here, it took two hours and
15    six minutes.
16             So, then 4:41 — this is about 11 minutes later — the
17    car, his rental car, exits the expressway, through the
18    Sawara-Katori tollgate.
19             4:57:  A man that resembles Kanayama is seen on
20    footage entering the Katori Shrine.
21             5:02:  The video shows a man resembling Kanayama is
22    seen touching poles and swinging his hand towards the offertory
23    box.
24             And then, finally, at 6:47 p.m., Kanayama checks into
25    a particular spa.  Again, notably, while they're disputing that
```

A0417

MC6KKANH

1    he went to the temple and shrine and did this, the normal time

2    to travel from the airport to the spa should be one hour and

3    seven minutes. Here, it took more than four hours.

4         And then, finally, on March -- so, the very day after,

5    after March 25th, the following day, Kanayama returns the

6    rental car, and then he does not fly, though, out of Narita

7    International Airport until several days later, so he goes back

8    on April 1st, 2015, to depart Japan.

9         So, I know that there has been a lot made out of the

10   expert that identifies, like, it's very possible that this is

11   Kanayama. Whether or not you credit that expert report — and I

12   submit that you should, your Honor — first of all, *Daubert* does

13   not apply at this stage, *Daubert* does not apply at all.

14   Second, it is plausible that a person that is a dental

15   professor would be able to look at features and make a

16   determination. But third of all, your Honor, in his exhibit,

17   which is Exhibit 2, tab 16, there are photographs. And what

18   can't be disputed here are two things: One is that the man

19   depicted in these photographs resembles Kanayama — even if one

20   would not make a conclusive ID, he does — and second, your

21   Honor, is that the clothing matches.

22        So, the description of the man at the shrine and the

23   temple that is seen sort of like touching the poles and

24   swinging his hand up is a man wearing a black long-sleeved and

25   streaked windbreaker with a hood, right?

A0418

MC6KKANH

```
 1              They also took video footage at one of the tollgates —
 2      I think it was the Katori tollgate — and, again, they see the
 3      man there, the same individual with the black long -- wearing
 4      the same clothing, your Honor.  So, it is the same individual.
 5              I submit that when you put this all together, it is
 6      probable cause that Kanayama is the person who defaced these
 7      shrines.
 8              There's one other point I wanted to make, and that is
 9      I believe in their papers, the defense says that the reason
10      that he was on the expressway that day is because — and this is
11      in their papers — it was the quickest way from the airport to
12      the spa.  But I'll just note here, your Honor, that that was
13      supposed to take one hour and seven minutes, and this whole
14      trip, in this rental car, took over four hours.  So, I believe
15      that's a post hoc made-up execution.  I believe it's just
16      consciousness of guilt.
17              THE COURT:  Or it explains why he was on the highway.
18              MS. La MORTE:  Well, I don't think it does because if
19      you're saying that the reason you took the highway is because
20      it was the quickest way to get to the spa, but that was a trip
21      that should have taken one hour, a little over an hour, and,
22      instead, it's a four-hour trip, I mean, there's no
23      explanation -- that explanation does not add up, your Honor.
24      It doesn't make sense.
25              Now, there are a couple of other pieces of evidence
```

A0419

MC6KKANH

1   that I will point the Court to.  One is the YouTube videos, and

2   that's in Exhibit 2.  In those videos, Kanayama is preaching or

3   speaking, and he is speaking about -- and I will even take

4   their word, there was some dispute with the translation, but I

5   will take their word — anointing holy sites with oil, your

6   Honor.  This is from 2012, a couple of years before this

7   incident, and I think it's telling.  I think this is evidence,

8   your Honor, of intent and motivation, this individual,

9   Mr. Kanayama, talking about anointing holy shrines with oil as

10  part of his Christian missionary activities.

11          So, I think that's telling evidence.

12          And then I believe that is it in terms of the other

13  defense arguments I wanted to address.

14          Your Honor, I think this is simple and

15  straightforward.  Probable cause, as the Court is aware, is an

16  extraordinarily low standard, and, here, Japan met probable

17  cause, Japan met that standard.  There is a lot of disputes

18  with the evidence.  Kanayama put forward a lot of evidence

19  disputing whether there's damage, whether there are stains,

20  what have you, but these are factual disputes that are for

21  Japan to resolve, not for this Court to resolve.

22          And unless the Court's has questions for me -- may I

23  have a moment, your Honor?

24          THE COURT:  Sure.

25          (Pause)

A0420

MC6KKANH

1          MS. La MORTE:  Ms. Wiener has some information about

2     how old the temples were.

3          THE COURT:  I was just curious.

4          MS. WEINER:  With the caveat that I don't have any

5     personal information about whether this is true, and the actual

6     temple sites are in Japanese, which I don't speak, I did hop

7     onto a few Japanese tourism websites, and the overall consensus

8     appears to be that the Katori Shrine, in its original form,

9     dates back to the 7th Century BC, that it was rebuilt in 1607

10    and again in 1700, and that --

11         THE COURT:  7th Century B.C.?

12         MS. WEINER:  Yes, 643 BC, to show respect to a warrior

13    deity, but that since that time, the main building and the gate

14    that we are discussing here, they were rebuilt in the

15    18th Century C, so over 200 years old, but that the origins of

16    the temple are reportedly over 2,000 years old.  That's the

17    Katori Shrine.

18         And the Narita Temple was built in the 10th Century AD

19    by Kancho Daisojo around a main sacred area of worship.  So,

20    that temple is a little over a thousand years old.

21         THE COURT:  How far away from each other are they?

22         MS. La MORTE:  Well, I would say probably, roughly --

23    if you look here at the timeline, he leaves, or the rental car

24    leaves, at 4:21, entering the expressway at 4:30, and then is

25    through the Katori tollgate at 4:41.  So, I think they're

A0421

MC6KKANH

1    pretty close together.

2            THE COURT:  Okay.

3            MS. La MORTE:  So, your Honor, I don't know if you

4    want it, I have a copy.  I also have a copy for the defense.

5            THE COURT:  Please.  And if you have one for

6    Mr. Troncoso.

7            MS. La MORTE:  Thank you, your Honor.

8            THE COURT:  Okay.

9            Mr. Lichtman.

10           MR. LICHTMAN:  Judge, we're going to take this in

11   various parts, the three of us, basically, because we want to

12   respond to what the government said and also present some

13   thoughts.

14           To begin, as your Honor knows, this is a highly

15   unusual extradition case, and, as I said before, we've read

16   dozens, if not hundreds, of cases going back to the early 1800s

17   on extradition.  And you've read about crimes, we've read about

18   crimes, such as murder, fraud, embezzlement, narcotrafficking,

19   child molestation, other violent acts that have been alleged to

20   have occurred in a foreign country.  In not one of these cases

21   that we read — and we've read them from across the country —

22   did we find a case which had as its American analogue felony

23   charges that are so weak, criminal mischief, that had they been

24   charged in a New York State court, if I had the case, we'd walk

25   in, we'd caucus with the prosecutor, and in 15 seconds, the

MC6KKANH

1    case would either be reduced to a violation or dismissed with

2    an ACD, not even a question.

3            Now, compounding the relative insignificance of the

4    allegations here compared to all the reported cases is that the

5    accused is a world-renowned OB-GYN who has pioneered the

6    endometriosis laser technique and helped thousands of women

7    globally.  Frankly, it's our position that this is a grotesque

8    abuse of the extradition treaty.

9            THE COURT:  Let me stop you there for just a second,

10   Mr. Lichtman.  Let's say that I agree with you in the sense

11   that it seems a relatively minor offense to seek extradition

12   for.  So what?  There's a treaty, the treaty says to the extent

13   that there's dual crimes in both jurisdictions — and there

14   are — then it's an extraditable offense.

15           MR. LICHTMAN:  Well, I'll respond to that.

16           The point is the reason that they're going after him

17   the way they are — and the prosecutor confirmed it — this is a

18   political case, it's designed to stop what they believe

19   Christians from anointing purifying religious objects in Japan,

20   and that's why we're here, is to make a statement, to make an

21   example of him, to stop what they believe to be the desecration

22   of holy sites.

23           THE COURT:  Okay, so let me stop you again.  So what?

24           MR. LICHTMAN:  I'm getting to it, Judge.

25           The point that I'm making is that it affects the

1    credibility of the allegations.  I'm not suggesting that you

2    should toss this because of the fact that this is a

3    world-renowned doctor who's helped so many people, and Japan is

4    looking to bring him back to put him in jail for hard labor and

5    end his career over a political reason.  I'm not asking you to

6    do it for that reason, to stop this extradition.  What I'm

7    saying is that it impacts the evidence that they've submitted

8    here.  It clearly shows a bias, and we're going to go into it

9    in a bit, we don't have the ability to get discovery in this

10   type of case, as you know.

11            So when your Honor asked the prosecutor, well, isn't

12   it true that the people in the shrine, the staff, weren't aware

13   of this damage, and the prosecutor came back and said, no, I've

14   got these statements here — you're looking at us like, you

15   know, we've got three heads, like how could you possibly have

16   submitted this material when it's completely counter to what

17   the government proffered.  Well, I'll tell you why.  It's

18   because we sent people over there, and we sent people to

19   interview them, and we sent people to take pictures of the

20   poles.  And the interviews were legion — is that we were not

21   aware of what occurred, we were not aware that we needed to get

22   repair estimates.  We were told by the police to do it, we were

23   told that these things happened.  So now your Honor is saying,

24   well, this is not the proceeding, this is not a mini trial, and

25   I get it, because we've got such competing explanations as to

MC6KKANH

1    what occurred.

2            What you caught on at the beginning is that you're not

3    a rubber stamp, and the cases are all over the place in terms

4    of what you're allowed to consider and how much discretion

5    you're allowed to have.  And I talk about the Southern District

6    of Texas case, the matter of the surrender of — I cannot

7    possibly pronounce this name, but it's *Ntakirutimana*, it's a

8    Southern District of Texas case.  It says:  "In making this

9    determination, the Court is free to exercise its discretion in

10   judging the credibility of the evidence presented as in any

11   other domestic case where the Court would be required to make a

12   determination of probable cause."

13           In addition —

14           THE COURT:  But doesn't the case law, the weight of

15   the case law, also suggest that I am to assume the truthfulness

16   of the submission by the foreign state?

17           MR. LICHTMAN:  Judge, some of the cases say that;

18   other of the cases talk about the fact that the accused can

19   introduce explanatory evidence, not contradictory evidence,

20   evidence that can obliterate probable cause.  A Southern

21   District case from New York, *Sindona*, says that that in

22   admitting explanatory evidence, the intention is to afford an

23   accused person the opportunity to present reasonably clearcut

24   proof, which would be of limited scope and have some reasonable

25   chance of negating a showing of probable cause.  In the *Ameen*

A0425

MC6KKANH

1     case, a California case, Eastern District of California from

2     just last year, they refused to certify extradition based on

3     the government's dubious account.

4            So --

5            THE COURT:   What government?

6            MR. LICHTMAN:   The federal government in seeking --

7     the government's proffer here in seeking the extradition which

8     took the facts from the country seeking extradition.

9            The point is that, yes, some cases will say that

10    you're a rubber stamp; other cases will say of course you're

11    not a rubber stamp and you're allowed to judge what's in front

12    of you, and that's as close as the Southern District of New

13    York.  And based on the fact that this is clearly a political

14    extradition, it's clearly based on the hundreds of cases that

15    we've read, it's the least amount of harm from any case that

16    we've read from a crime that's occurred in a separate country,

17    we're just asking you to use all of that to understand that

18    some of these allegations are dubious, and perhaps when we have

19    witnesses that interviewed their witnesses over there, and they

20    came with completely opposing statements, perhaps not knowing

21    that it was going to end up their answers in a submission to a

22    federal judge in New York, they answered honestly.

23            When --

24            THE COURT:   Let me just briefly ask you about the

25    political aspect of this prosecution.

MC6KKANH

1          Ms. La Morte tells me that even assuming you're right,

2     even assuming there is some political motivation by the

3     Government of Japan, that's not a determination for me to make,

4     that's a determination for Secretary Blinken to make.

5          MR. LICHTMAN:  No question.  I don't disagree that

6     these are arguments.  They're arguments to the Secretary of

7     State.  The reason I'm bringing them up here is to guide you

8     with regard to your determination of probable cause and to the

9     evidence that's put before you.

10          What I'm saying is that these are dubious accounts.

11     The fact we initially put in our papers in response, we showed

12     pictures of the poles.  There was no picture of any stains on

13     the poles.  Now, granted it was in 2017, as opposed to 2015,

14     I'll give the government that.  After we put those pictures in,

15     including we had video, as well, taken of the poles of the

16     shrine, of the temple, the government came back with their new

17     estimates, and there's allegations that the stains are still

18     there, but you know what was missing?  Pictures.  Pictures were

19     missing of the poles in 2017.  Why?  Because there are no

20     stains there.  We then went back a few months later, took

21     pictures of the spot, the same lack of stains that occurred

22     six months earlier, after the government claimed the stains

23     were still there, they're not there.  They want him badly,

24     Judge.

25          Think about this:  This country, Japan, wants this

MC6KKANH

1    world-renowned doctor to end his career and undergo hard labor

2    in Japan over some stains that no longer exist, of which there

3    was no repairs undertaken, of which there was no loss of use of

4    either facility. Think how bizarre that is. We're still on

5    Planet Earth here, and this is an incredible request here.

6         So, all I'm asking is that it should color perhaps

7    your determination of probable cause, it should color perhaps

8    your determination of whether the proffered materials by the

9    Japanese Government are accurate. We had witnesses that saw

10   these poles. Their witnesses are the Japanese Government and

11   people that the Japanese people interviewed. We interviewed

12   these people, and they said, no, we never even knew that this

13   existed, this damage.

14        THE COURT: I actually never compared the names of the

15   people that the government submits witness statements for, the

16   same people that you submit witness statements for. Are they

17   different people?

18        MR. LICHTMAN: I think --

19        MR. EINHORN: Judge, for the temple, it's the same,

20   and that's addressed in our affidavit from Toshi, who we have

21   here. And in that situation, that person claimed that he

22   signed the initial police investigatory report and didn't see

23   any stains whatsoever and was actually approached by the

24   police.

25        And I think some of that is actually borne out by the

MC6KKANH

1   fact that in the — and I'm looking at tab 6, at Exhibit 3 of

2   the government — they claim that for the temple -- I'm sorry,

3   tab 7, for the shrine, they actually provide an exact timeline

4   as to when the stains were located.  It was that day, there was

5   someone who was emptying an offertory box, saw the stains,

6   reported them.  There's no timeline with regard to when the

7   stains were located in the investigatory report of the temple.

8   It just doesn't exist.

9          THE COURT:  I seem to recall that there was a window

10  of time that was provided for both.  Am I wrong, Ms. La Morte?

11         MS. La MORTE:  No, that's correct.  I read off

12  statements showing when initial oil stains were discovered, and

13  that led to the discovery of additional stains.  And one was

14  the evening of March 25th for one of the sites, and then the

15  other one was the morning of March 26th.

16         THE COURT:  Okay.

17         MR. EINHORN:  This is something, I think, that

18  actually came out in response to our opposition papers after we

19  had submitted the affirmation of this Toshi individual, that

20  that's when they came back and said, no, no, no, we actually

21  found it the next day.  Again, it --

22         THE COURT:  What's the theory, though, there?  That

23  caretakers of these shrines — and I don't mean that term to be

24  people of less authority — that know that the shrine or the

25  shrines had been defaced, and the police just showed up and

MC6KKANH

1    said, look, you've got oil at these spots?

2                MR. EINHORN:  It's our contention the police told them

3    to look for oil, and the oil was found afterwards.  And it goes

4    to Mr. Lichtman's point that this is a prosecution that's being

5    pushed very heavily by the Japanese Government for political

6    reasons.

7                MR. LICHTMAN:  And they told our interviewers that

8    they were told to get estimates for repair.  Clearly, they had

9    no need to, because it's borne out by the fact that there was

10   no loss of use, there was no effort to repair these pillars and

11   other areas, nothing was done.  This happens all the time,

12   Judge, apparently, and there's no repairs that are done.

13   There's sake that's thrown on it, there's rice that's thrown on

14   it.  There's never been any repairs, according to what we've

15   learned, and, all of a sudden, we find out that there's this

16   massive repair bill, and, yet, somehow, what a coincidence, no

17   repairs were ever made.

18               THE COURT:  But I take it you're not — maybe you are —

19   you are not disputing the authenticity of the repair bills or

20   the estimates?

21               MR. LICHTMAN:  You know, it's hard for me to dispute

22   it because I'm just given a bill.  I don't have the ability to

23   get somebody over there to go in there and do the necessary

24   work to determine what an estimate would be.  I don't think

25   that's the tail that wags the dog, Judge.  I think there could

1   certainly have been legitimate bills for estimates of damage,

2   but, clearly, there was no effort.  They say that to replace

3   the poles would be an exorbitant cost.  There was not even an

4   attempt to repair these poles, not even an attempt.

5           THE COURT:  Well, let's explore that a little bit.

6           I don't know whether you have a car in New York City,

7   whether you park on the street, but it's not unusual for cars

8   parked in New York City to have their bumpers tapped by other

9   drivers.  Clearly, there's damage, but very frequently, unless

10  you buy one of those rubber skirt things, that people don't

11  take the time out to go and fix the bumper because it's just

12  not worth their time, their effort, et cetera.

13          So, there could be damage that people just choose not

14  to fix.

15          MR. LICHTMAN:  Two responses -- three, actually,

16  because that black rubber thing on the back is so ugly, I'd

17  rather have a dent.

18          THE COURT:  Agreed.

19          MR. LICHTMAN:  But I digress.

20          The first point is that if this is such an important

21  religious, these two important religious shrines and temples,

22  they don't treat it like some junker car that gets smacked in

23  the back and they leave the dent.  That's the first thing.

24          Second of all, the case law in New York is clear, and

25  I will bring you to the chalk cases, in which chalk was --

MC6KKANH

1    obscenities were written at a court and in a neighbor's

2    driveway, and the neighbor even was required to get down on his

3    knees and scrub the chalk away.  The courts found, no, those

4    were temporary damages, and, therefore, there's not a criminal

5    mischief conviction here.  And it's the same thing here.  This

6    was oil.  It came, it was sprayed away.  It wasn't like the

7    glue posters where people put up posters, and you needed some

8    real intervention by getting off the glue.  This stuff

9    disappeared, and we can prove it with our pictures.

10            THE COURT:  We don't need to get into physics here,

11    but I do see a distinction between chalk and oil.  According to

12    the estimates that were provided, the subsequent estimates that

13    were provided, the oil was absorbed into the wood.  Chalk does

14    not get absorbed.  Again, maybe it does, I don't know, but I

15    don't think we need to get into the physics of this to make a

16    distinction between those two substances.

17            MR. LICHTMAN:  The similarity is that whether it's

18    chalk or whether it's oil, they're both temporary.

19            THE COURT:  Both?

20            MR. LICHTMAN:   Temporary.

21            THE COURT:  Unless it gets absorbed, right?

22            MR. LICHTMAN:  Well, if it gets absorbed, it's not

23    temporary?

24            THE COURT:  Is it not damage?

25            MR. LICHTMAN:  I don't believe it's damage because

A0432

MC6KKANH

```
1     we've got pictures.  It doesn't even exist.  If a tree falls in
2     the forest, does it make any noise?  Judge, if there's oil
3     placed on a pole, and it's no longer seen, what's the damage?
4               THE COURT:  Okay.
5               MR. LICHTMAN:  That's our point.  That's why we
6     brought up — and I'm going to briefly go into some of the New
7     York cases, very briefly, because I just went into the chalk
8     cases.
9               And this is different, obviously, than I think one of
10    the cases where somebody sprayed some foul-smelling liquid into
11    a courthouse, and although it was temporary, it prevented the
12    court from being used for some period of time.  That's
13    different.  There was a loss of use.  There was no loss of use
14    here, even according to the Japanese authorities.
15              With regard to intent to damage:  Judge, there's one
16    case that I cited where somebody kicked a driver in the face
17    and broke his glasses.  And the charge of criminal mischief or
18    damaging the glasses was dismissed because the person sought to
19    kick the person in the face and not to damage his glasses.  The
20    cases that the government cites, Judge, you've got somebody who
21    tried to burn down a synagogue because he hated Jews, and he
22    said, well, this is my firmly held belief.  And the courts say,
23    look, that, obviously, is a low-minded reason to cause the
24    damage, but if even if there's a high-minded reason, I need to
25    damage this building because of my religious belief?  We
```

MC6KKANH

1    understand that that's a crime.  The difference here is that

2    there was no intent to damage.  There was an intent -- assuming

3    this is all true and that Dr. Kanayama was the one who did

4    this, there was never any intent to damage for religious

5    purposes; there was an intent to purify, not to damage.

6    There's no allegation that he sought to damage.

7         THE COURT:  So, you dispute the concept that the

8    intent that is required is simply the intent to apply the oil,

9    whether you do it for purposes of religious sanctification or

10   for purposes of vandalism, so long as you purposely, knowingly,

11   apply the oil, that's the intent that's required?

12        MR. LICHTMAN:  If he is looking to not damage.  If he

13   was looking to paint his name on the front of the shrine and

14   say this is done for religious purposes, you know, you've got

15   permanent damage, or at least damage that requires

16   intervention, and it's not exactly a highly held religious

17   belief.

18        There was never any intent here for him to damage

19   anything.  There was never any intent.  If he was going there

20   to damage it because he believed that Christianity is superior

21   to Buddhism, different story.  He was there to purify, if

22   that's all true that he was there, and not to damage, just to

23   anoint.

24        And by the fact that these stains disappeared multiple

25   times that we went to visit, and the stains didn't exist?  You

A0434

MC6KKANH

```
 1    know, I think it's sort of borne out there was no effort here
 2    to damage.  And, Judge, again, I have to say, we went there
 3    both times with a videographer with cameras and took photos of
 4    everything.  We submitted all of that.  It's impossible to
 5    claim, because we've got the videos, that these are different
 6    areas than what was damaged.  The government comes back and has
 7    affidavits saying, no, the damage is still there, you can still
 8    see it.  How do you not put pictures in, Judge?  How do you not
 9    submit a picture to show, after we've shown pictures and video
10    that the stains are gone?  It smacks of the fact that this is a
11    political persecution/prosecution endeavor against a tiny
12    minority in the country, not just his Christian faith, but also
13    the fact that he's of Korean heritage, and they're coming back.
14    How do you not come back with a photo to show, no, here is the
15    damage.  We're telling you that there is no damage here.  How
16    do you not show it?  It's too obvious that it's necessary.
17              THE COURT:  Okay.
18              MR. LICHTMAN:  So, Judge, that's -- in terms of actual
19    damage and intent, those are the two prongs I want to touch on.
20    Obviously, we've got a ton of material in our papers.  I want
21    to have Mr. Dudley go into the probable cause issue as to
22    whether or not even Dr. Kanayama was the one who did apply the
23    oil, or whatever anointing, whatever they say.  In addition,
24    after that, we'll talk about the exhibits that we want to
25    formally move in, if that's how we do it, or your Honor can
```

A0435

MC6KKANH

```
 1    simply take what we've got attached to our numerous submissions
 2    as exhibits to be submitted and make a determination down the
 3    road whether or not your Honor wants to rely on them.
 4              THE COURT:  Very well.
 5              Mr. Dudley.
 6              MR. DUDLEY:  Thank you, your Honor.
 7              Your Honor, may I just simply add, before talking
 8    about probable cause, with specific with respect to
 9    Dr. Kanayama, that multiple lawyers of the United States and
10    multiple lawyers from Japan, in affidavits that have been
11    presented to the Court, went to the shrine and the temple in
12    July of 2017 and December of 2017 and specifically looked at
13    those areas of the Narita Temple and the Katori Shrine where it
14    was said -- were the Japanese government claimed the stains
15    still existed and were still visible, and each of those
16    individuals, both from the American side and the Japanese side,
17    saw no such stains, and we have presented to the Court
18    photographs and videos that support those statements, and I
19    doubt that any lawyer here in this country or in Japan would
20    lie to say they didn't see something that was actually there.
21              So, I just wanted to add that to what Mr. Lichtman
22    stated.
23              The primary evidence that the Japanese Government has
24    presented to the Justice Department here that Dr. Kanayama was,
25    in fact, the person who poured oil on these pillars, these
```

```
 1    offering boxes, and the stairs is, essentially, biometric

 2    facial recognition evidence.  It's, here is a series of still

 3    photos taken from videos — they didn't, for some reason,

 4    present the videos themselves, they presented still photos of

 5    the videos — and the court can judge for itself the quality of

 6    those still photos.  It's not very good, it's grainy, it's

 7    really hard to make out any facial features.  We have submitted

 8    the affidavit, and he's prepared to testify outside, and the

 9    Court can address this in a moment, but he's prepared to

10    testify.  He's already presented an affidavit that this

11    evidence is essentially worthless.

12          Whether it meets Daubert or not -- well, it does not

13    meet Daubert.  What the government is saying is that that's

14    irrelevant here because there are no rules of evidence that

15    would apply, but it certainly would affect the weight that the

16    government said the Court should give that specific evidence in

17    addressing whether there's probable cause to believe if there

18    was a crime committed, that our client, Dr. Kanayama, committed

19    that crime.

20          I would further proffer, beyond that affidavit, that

21    Mr. Bavarian, the expert whose affidavit and report we have

22    presented, has continued his participation in organizations, in

23    lectures and articles, in advising law enforcement agencies, in

24    constructing biometric databases and ways of evaluating those

25    databases for various law enforcement agencies, including the
```

A0437

1   FBI here in the United States, including the -- essentially

2   what the state polices of the Netherlands and in other

3   countries, that he would submit that as discussions have

4   continued over the last five years since he wrote this report,

5   that there is a firm conclusion that one cannot make an

6   identification with any degree of certainty from facial

7   recognition technology or biometric facial recognition

8   technology at all.  It can be a tool in investigation, but can

9   never, according to the present science — and he believes

10  there's agreement among all experts in this field — you cannot

11  rely on an identification made based upon facial recognition

12  opinions.

13          THE COURT:  I'm sorry, so I haven't had to deal with

14  this issue either.  So you're saying that facial recognition

15  technology is not currently at a point where, pursuant to

16  *Daubert*, it would be admissible in a federal court?

17          MR. DUDLEY:  That is correct.  That's our position,

18  your Honor.  I believe Mr. Bavarian would testify to that

19  effect.  He believes it can be used to eliminate, in some

20  cases, certain suspects in an investigation.  To confirm the

21  identity of somebody, there is not the type of experience and

22  experimentation that has occurred with, for example,

23  fingerprint evidence, which has been around for well over a

24  hundred years.  So, his testimony, I would proffer, would state

25  that we're not at a stage where identification testimony based

A0438

MC6KKANH

1   on the type of so-called facial recognition offered by the

2   so-called expert from Japan would, under any circumstances, be

3   a definitive and scientifically accepted way of identifying a

4   suspect in a crime or in any other event.

5        He specifically -- first of all, the government

6   submits no credentials for this professor of dentistry from

7   Japan, no --

8        THE COURT:  Yes, they do.  They say he's a professor

9   of dentistry in Japan.

10       MR. DUDLEY:  Yes, but nothing about whether he has any

11  experience in facial recognition biometrics, nothing about

12  whether he has ever conducted this type of analysis under any

13  circumstances other than the one for which he was asked to do

14  by the Narita Police.

15       Beyond that, Mr. Bavarian, who would point out that he

16  himself having expertise in this area, could not even begin to

17  do an analysis based upon the photographs presented by the

18  Japanese Government through the Justice Department because the

19  photographs are of such poor quality, that the underlying data

20  is so bad, that no person, with any degree of expertise in

21  facial recognition biometrics, could even claim that they could

22  conduct the type of analysis that was done by this dentistry

23  professor in Japan.

24       He would further state that there is — and I'm sure

25  the Court's familiar with the term, probably knows a lot more

A0439

1    about it than I do — confirmation bias inherent in the way that

2    this professor was asked to do the facial comparison.  In other

3    words, he wasn't given a series of photographs or a series of

4    videos from what we've seen from the evidence the government's

5    presented to compare; he was given a passport photograph of

6    Dr. Kanayama and these grainy photographs, with basically an

7    all or nothing, it's either him or it's not him.  According to

8    Mr. Bavarian, this would be a classic case of confirmation

9    bias, where the presentation of the Narita Police of just these

10   very low-quality photographs along with Dr. Kanayama's passport

11   picture would create a bias towards confirming the opinion of

12   the Narita Police by this dentistry professor in Japan.

13        At the end of the day, Mr. Bavarian would again state

14   that there is nothing -- if the Court even admits this facial

15   recognition opinion, there's very little weight that it should

16   give that, because the scientific community would give it

17   little, or probably no, weight whatsoever, and that any expert

18   would not be able to actually do the kind of analysis that this

19   dentistry professor from Japan claims to have done.

20        This also affects, in light of what also Mr. Lichtman

21   has stated, the -- so, there are no eyewitnesses here, and

22   there's no weight that the Court should accord the still

23   pictures from the videos, based upon what we know about facial

24   biometrics through the opinion of Dr. Bavarian.  Again, I can

25   put him on the stand to further elaborate what he stated in his

A0440

MC6KKANH

1    affidavit and report, but this affects the date of this

2    incident, this March 25th date, because the directors of the

3    shrine and the directors of the temple both stated they did not

4    know exactly what date this occurred.  Well, the Japanese

5    police, evidently, decided that if must have been on a date

6    where Dr. Kanayama was at least in the general vicinity of the

7    temple and the shrine, and then went to those directors of the

8    shrine and the temple and said -- got some video, and then

9    said, oh, this is the date that it happened.  And then they got

10   the video.

11         So, not only does the failure of the dentistry

12   professor's opinion affect the fact that Dr. Kanayama could not

13   be described as the culprit with any degree of certainty from

14   those photos, it also affects the dates, because it was

15   predecided -- it was predecided by the Japanese police that

16   this was the date because of the fact that Dr. Kanayama could

17   be shown to be in the general area of both the temple and the

18   shrine on that particular date.  And they're not that far

19   apart, so being near one is kind of like being near the one.

20         That leaves just -- so, if we now question the date --

21   and I want to add further to that — according to the

22   government's evidence, as I recall, a million visitors go to

23   the Narita Temple --

24         THE COURT:  I think it was 2 million and 10 million.

25         MR. DUDLEY:  It was several million.

A0441

MC6KKANH

1          We calculated that to be somewhere on the order of 25

2     or 30,000 people a day, maybe more.  These people would all

3     have to go through the same tollgate.  Also, if you're going to

4     the airport from Japan from that tollway, if you're going to

5     the Narita airport -- there are two airports in Tokyo, the

6     Narita airport being the more busy one, and I don't have any

7     statistics as to how many people go into that airport every

8     day — I'm sure we could find them — but they have to go through

9     that tollway if they're driving to the airport; if they're not

10    taking the train, they have to go through that tollway.  And

11    the temple itself, if you look at the video that we presented,

12    and I've been there, the temple itself is not some pristine

13    little quiet place of worship, which I thought it might be when

14    I went there, it's a huge commercial area that's filled with

15    hundreds of shops and restaurants.

16          THE COURT:  The temple?

17          MR. DUDLEY:  The temple, yes.  The temple is in the

18    middle of this whole area.

19          When you say the temple parking lot, there are

20    multiple parking lots, and you can see some of that in the

21    video we presented, and we can present more evidence, should

22    the Court desire, that there are multiple parking lots in this

23    area, and those parking lots serve not only the temple, they

24    serve this entire commercial area of restaurants — there's

25    actually some good restaurants there — and it's a lot of very

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 1:23-cv-03469-CM    Document 4-19    Filed 04/28/23    Page 59 of 70    61
MC6KKANH

1     touristy places as well.

2          So, the idea that you're going through this tollway —
3     you can be going to the airport, you can be coming from the
4     airport, you could be going to the temple, there's also
5     hundreds of restaurants, shops, and other tourist attractions
6     in that general vicinity — it adds very little weight to any
7     presentation of probable cause.

8          The last thing I want to focus on is what the
9     government also mentioned here and has mentioned in its
10    paperwork, this idea of anointment.  We hired a professional
11    translator, not under the pay of the Japanese Government, but
12    somebody who has worked in Los Angeles, other cities in the
13    United States and in Tokyo.  We offered in our opposition the
14    translator's opinion as to the Japanese interpretation of
15    certain comments that Dr. Kanayama had made in his evangelical
16    videos, and it focuses primarily on -- and I can read them
17    directly, if you want me to, but the Court has them — the
18    Japanese, because there is no word in Japan that is similar to
19    our word for anointment.  This is a Buddhist/Shinto country
20    with only a minimal Judeo-Christian background, and anointment,
21    as the Court probably knows already, is a word that comes out
22    of a Judeo-Christian background.  So in the English language,
23    there is literally centuries, maybe millennia, of this word
24    being used.  Japan, no history, so they interpret it
25    everywhere, not surprisingly, as pouring oil — as pouring oil.

A0443

MC6KKANH

```
 1              THE COURT:  Well, now, Mr. Dudley, it's your turn to
 2    answer the question.  So what, whether you call it anointment
 3    or whether you call it application or whether you call it
 4    pouring or whether you call it spraying?
 5              MR. DUDLEY:  How about blessing?
 6              THE COURT:  How about blessing?  It's still the
 7    physical application of the oil.
 8              MR. DUDLEY:  Is that an admission by Dr. Kanayama,
 9    your Honor, that he's blessed certain sites in Japan?
10    Dr. Kanayama's blessed many sites in Japan.  That doesn't mean
11    he's poured oil on them — it's a blessing.  And --
12              THE COURT:  Actually, I'm not that familiar with the
13    term anointment in the Judeo-Christian tradition, but I know
14    that anointment means an actual physical touching of oil to a
15    person, generally.
16              MR. DUDLEY:  That's where the word flows from,
17    correct.  Historically, that is absolutely correct.
18              To anoint something does not necessarily mean that you
19    apply oil to it.  You can anoint a person without applying oil
20    to them.  To say Jesus was the anointed one in the Christian
21    tradition does not necessarily refer to him having oil placed
22    on him.
23              THE COURT:  Now we're going a little bit afield.
24              MR. DUDLEY:  I'm just saying it could be used
25    figuratively.
```

A0444

MC6KKANH

1         So, for the Japanese Government to claim that these

2    videos, interpreted incorrectly by them, that this is some sort

3    of admission by Dr. Kanayama that he committed these acts is

4    far afield.  So, what that leaves, and the Court can look

5    for -- I'm sure the Court will review the law for itself.

6    Mr. Lichtman has stated correctly that the — and it's in our

7    paperwork — that the standard the Court would apply here would

8    be what it would apply in a preliminary hearing in a case that

9    was brought in the Southern District of New York.  I would

10   submit that this literally worthless video recognition

11   testimony, combined with the tollway evidence and the

12   statements of Mr. Kanayama, of Dr. Kanayama, anointing certain

13   areas in Japan, simply does not add up.  Probable cause is not

14   a high standard, but it's also not a nonexistent standard.

15   Would the Court sign a search warrant that would allow the

16   authorities to go into Dr. Kanayama's office or his house based

17   on this kind of evidence?  I will defer to the Court on that,

18   but I don't think so.  I don't think the Court would issue an

19   arrest warrant for Dr. Kanayama if the case was one that was

20   sought in the Southern District of New York based upon this.

21        Mr. Lichtman has stated — and he practices in the

22   state courts of New York, I do not — but he stated this case

23   would not go further than an initial appearance with charges

24   not being filed, at least not serious charges being filed, in

25   the state courts over here.

A0445

MC6KKANH

1          At the end of the day, this Court does have the

2    ability to judge the credibility of witnesses as it would at a

3    preliminary hearing in this district or a federal judge in any

4    district.  We ask this Court to use its discretion to address

5    those credibility issues and to hold the government to the

6    standard the cases say it should hold the government to, the

7    same standard of probable cause we apply here in the United

8    States.

9          THE COURT:  Thank you, Mr. Dudley.

10          Mr. Dudley, let's say that I agree with you to the

11    extent that the facial recognition evidence is weak.  Do we

12    need expert testimony?

13          MR. DUDLEY:  Do we need --

14          THE COURT:  Let me tell you what I'm referring to.

15          MR. DUDLEY:  Okay.

16          THE COURT:  I'm looking at Government Exhibit, I

17    think, 2, tab 16, at pages 9 and 10, and they are two pages

18    filled with still photographs from the video and Dr. Kanayama's

19    passport.

20          MR. EINHORN:  Your Honor, we don't have tabs.  Would

21    you mind telling us the Bates number?

22          THE COURT:  Actually, these don't have Bates numbers.

23          MS. La MORTE:  Here, I can help you.  Do you know

24    where the expert report is?

25          MR. EINHORN:  It's over here.  I just don't know which

1   page.

2        MS. La MORTE:  Yes, hold on.

3        (Pause)

4        MR. EINHORN:  We've got it, Judge.

5        THE COURT:  Okay.  So, on each of page 9 and 10, on

6   the left side, the photograph just below the top photograph,

7   all the way on the left, I look at that photo, and I look at

8   the photo of Dr. Kanayama, and I say to myself, yeah, that

9   could be him.  Do I need anything more than that?

10       MR. DUDLEY:  I don't believe that expert testimony can

11  resolve this issue.  The point of our introduction of

12  Dr. Bavarian's report and affidavit was to show that facial

13  recognition biometric opinions such as that claimed to have

14  been made by the dentistry professor are not sufficient, are

15  actually of almost no weight.

16       The Court can conduct its own comparison.  We would

17  say, yes, that could be Dr. Kanayama, but it could be a lot of

18  other people, too.  There's just not a definitive amount, even

19  for a layperson, to make that decision.

20       THE COURT:  Right.  But compared with other factors,

21  that plays into the analysis, correct?

22       MR. DUDLEY:  Well, yes, the other factors are

23  affected, at least the timeline is affected, by these videos --

24  by these still pictures from videos.  And as we've shown, also,

25  that the tollway evidence is really of minimal value in

1   identifying whether there's probable cause to believe that

2   Dr. Kanayama was the culprit here, and that the statements he

3   made in the videos are low, if any, consequence whatsoever.

4           THE COURT:  Okay.  We'll take ten minutes and get back

5   together at 11:30.

6           COUNSEL:  Thank you, your Honor.

7           (Recess)

8           THE COURT:  Mr. Einhorn, are you next?  Are you up?

9           MR. LICHTMAN:  I had a couple of quick points to make.

10          MR. EINHORN:  I think the first thing to do would be

11  to address whether or not we were going to call Dr. Bavarian.

12          MR. DUDLEY:  Yes, I don't think we need to call

13  Dr. Bavarian in light of the Court's comments, but we have him

14  ready and available, if the Court would like.

15          THE COURT:  No, no need to call Dr. Bavarian.

16          MR. EINHORN:  Judge, there was just one thing we

17  wanted to address from the government's timeline, and I think

18  it was page 22 of their presentation where they talk about

19  Dr. Kanayama's car arriving at a parking lot at 3:01 of the

20  Narita Temple and then leaving somewhere around 4:00.  That

21  appears to come from, I think it's, record Exhibit 6, but we

22  just wanted to point out, there's no photograph of him coming

23  or leaving from that parking lot, and as Mr. Dudley pointed

24  out, it's not like a lot of these places in the United States

25  where you come, and there's an official parking lot designated

MC6KKANH

```
1    for a site.  This is a town, and he could have parked in any

2    lot.  There's no description whatsoever.  It just says coming

3    and leaving.  That's all.  If we're looking at probable cause,

4    and we're saying, well, there was this car, a photograph of

5    this car, with this license plate, going to this place, where

6    there was damage found, that's not what occurred here.  There

7    is just an offhand statement in a report saying that this

8    happened with no photograph.

9            THE COURT:  Okay.

10           MR. LICHTMAN:  Judge, for a last comment to wrap

11   things up:  As Mr. Dudley showed, this was junk science, at

12   best, with regard to identifying Dr. Kanayama.  And the

13   interviews, the exhibits, that we're offering, subject to your

14   Honor's determination on admissibility, they do obliterate

15   probable cause.  They're completely opposite to what the

16   government says.  And unlike the government's exhibits, ours

17   comes with pictures and show there is no damage to the shrine

18   or the temple.

19           THE COURT:  I guess your pictures go to the amount of

20   damage, if any, correct, not anything else?

21           MR. DUDLEY:  That the damage is temporary.

22           MR. LICHTMAN:  It's temporary, and there's no

23   permanent damage, much like the chalk cases — I understand your

24   Honor's decision, which is certainly a favorable one — but the

25   bottom line is the same, these are temporary stains at best.
```

A0449

MC6KKANH

1    Our pictures show it; the government's do not.

2            THE COURT:  What if he had been prosecuted in April of

3    2015?  The stains would have been there still.

4            MR. LICHTMAN:  In New York, you're talking about,

5    Judge, if this was a New York case?

6            THE COURT:  No, if he was in Japan.

7            MR. LICHTMAN:  I think he would have been prosecuted

8    in 2015, I think he would have been prosecuted in 2014, Judge,

9    before he is alleged to have anointed the shrines.  I think

10   that he certainly was not somebody who was thought of favorably

11   by the government, which is why we're here for a case normally

12   reserved for murderers, con men, and narcotraffickers.  We're

13   here for someone who's alleged to have sprinkled some oil that

14   made some temporary marks on wood.  So, in New York, frankly,

15   do I think they would have arrested him, I think it's probably

16   a coin flip, but I can tell you, with utmost absolute

17   certainty, this is a case that if somehow someone would have

18   convinced me to go to court on, would have been dismissed as

19   I'm standing up walking up to a prosecutor over the velvet rope

20   in 100 Centre Street nextdoor.

21           THE COURT:  Well, I am surprised that there is not a

22   scheme in Japan for greater protection for these arguably

23   historical sites, except I think if you go to Dinosaur State

24   Park here in the U.S., you can't pick up a rock and walk off

25   with it, I think.

A0450

MC6KKANH

```
 1              MR. DUDLEY:  Your Honor, I think, in part, the Katori
 2     Shrine, in particular, it's normal for people, they want people
 3     to be able to throw sake and various substances onto the
 4     offering box and onto the pillars of the stairs.  It's a normal
 5     activity.  We presented evidence of that --
 6              THE COURT:  People are tossing sake?  Regularly?
 7              MR. DUDLEY:  Oh, absolutely.
 8              THE COURT:  That explains the 10 million a year.
 9              MR. EINHORN:  Judge, it's sake and salt.  And then,
10     also, in the affidavit of Lawrence Schoenbach, he tried to
11     visit the shrine, and they were putting sheeting over it
12     because people were throwing stones for so long, and they were
13     allowed to, and those stones were for casting off sins from
14     prior years.  So this is a tradition in Japan.  It's not as if
15     they're so protected, that nobody touches these things.
16              THE COURT:  Except they were putting up sheeting,
17     okay.
18              Ms. La Morte?
19              MS. La MORTE:  Just a couple of things, your Honor.
20              One is there have been attacks on the credibility of
21     the witnesses, witness statements, witnesses, that we put
22     forward.  They said one thing on one occasion, one thing on
23     another occasion.  According to the fugitive's attorneys, it's
24     exactly the kind of credibility dispute this Court is not
25     equipped to make a determination on.  It's exactly the type of
```

A0451

1    credibility dispute that needs to go to the Government of

2    Japan.

3                One thing is — and I believe counsel said this — they

4    can't explain the repair estimates, the updated repair

5    estimates.  There is a lot that has been said about the fact

6    that Japan did not submit photographs of 2017, but what Japan

7    did submit are these repair estimates by independent

8    third-party companies that have talked about, or at least one

9    of them talked about, the oil being absorbed, which is what we

10   have been talking about here today.

11               So, that is a powerful piece of evidence, and under

12   New York law, as cited in our reply brief, repair estimates are

13   sufficient evidence for damages.

14               Now, it appears that the defense is sort of talking

15   out of both sides of their mouth.  On the one hand, they

16   acknowledge that under a law, any sort of arguments pertaining

17   to the political persecution are directed to the Secretary of

18   State.  However, they're asking you to look at this evidence in

19   the lens of political persecution and basically asking you to

20   assume that this was a preordained thing, that the police are

21   up to no good, that they're corrupt, that they were targeting

22   him no matter what.  That is certainly not the role of this

23   Court, nor does the Court have the evidence to be able to make

24   an assessment of that, which is exactly why that type of

25   argument is better directed towards the Government of Japan.

MC6KKANH

```
 1              Now, I said Government of Japan, but I meant Secretary
 2    of State.
 3              As far as the argument there was no intent to damage,
 4    there was intent to purify, that's obviously like -- intent is
 5    a factual dispute that's normally resolved, again, at a trial.
 6    It's not appropriate here to make a determination of intent on
 7    a probable-cause finding.
 8              I think when you combine the fact that putting -- and
 9    you had acceded this, that the dentist's analysis was weak, but
10    even if you put together the fact that the pictures do look
11    similar, you put together that with the timeline, and you put
12    together the fact that the individual that was seen at the
13    tollgate was wearing the same clothes as the individual that
14    was in the shrines, that is more than enough for probable
15    cause.  And there was a warrant issued in this case, your
16    Honor.  Magistrate Judge Moses issued an arrest warrant for
17    Mr. Kanayama based on this record.
18              So, there is already a judge that made a
19    probable-cause determination, again, without the benefit of
20    full-on briefing, just based on the government's submissions,
21    that this was probable cause that there was a violation of
22    Article 260.  That's why those arrest warrants were issued by
23    Judge Moses.
24              I think those are all the points I wanted to make,
25    your Honor, in response.
```

MC6KKANH

1        THE COURT:  Okay.

2        I will take these matters on submission.  I don't also

3   want to hear the testimony of the other gentlemen -- yes, sir.

4        MR. EINHORN:  Just one thing, Judge.  We wanted to

5   offer a courtesy copy of the exhibits, subject to the Court's

6   admissibility determination.

7        THE COURT:  Absolutely.

8        MR. DUDLEY:  Your Honor, just to clarify, if we were

9   calling the Japanese lawyer, Toshi, to the stand, it would be

10  primarily at this point for authentication of photos and videos

11  we presented.  Can I assume the Court has received sufficient

12  authentication from the various affidavits of the lawyers --

13       THE COURT:  Yes, absolutely.

14       MR. DUDLEY:  Thank you, your Honor.

15       THE COURT:  Absolutely.

16       And I won't require the submission of proposed

17  findings of fact and conclusions of law.

18       But, Ms. Wiener, let me ask you:  So what I issue,

19  will that be a memorandum, an order, certifying, or not, the

20  extradition of Dr. Kanayama?

21       MS. WEINER:  That's correct, your Honor.  I'm sorry, I

22  keep standing.  Bad habit.

23       There are courts that will issue a memorandum and

24  order where they elaborate on the reasons for their findings,

25  and there are courts that adhere to a more sort of formulaic

MC6KKANH

1    two- to three-page certification and committal order.  If it

2    would be useful, we could certainly provide you with a template

3    of like that sort of two- to three-page certification and order

4    that's issued --

5              THE COURT:  Sure.

6         MS. WEINER:  -- in other cases in this district or

7    E.D.N.Y.  That's, obviously, subject to the Court's discretion,

8    but that would only apply if the Court chooses to certify the

9    case.

10             THE COURT:  Why don't you submit something for me to

11   consider.  Again, I will take it under submission.

12        For what it's worth, I do note that, again, I don't

13   have a whole lot of experience with extraditions.  I was a

14   prosecutor; I was involved in requesting the extradition of an

15   individual who was a Colombian cartel leader; when I was on the

16   CJA panel, I was appointed to represent an individual who was

17   extradited from Sweden, I believe, on terrorism charges.

18   That's typically the type of extradition that I'm familiar

19   with.  This is very, very different, and there are substantial

20   issues that have been raised concerning not just the facts, but

21   the law.

22        Yes, sir?

23             MR. EINHORN:  Judge, just one thing.  Obviously, we

24   don't have a lot of experience with this either — no one

25   apparently does — but one of the things we've read about in a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A0455

MC6KKANH

1    lot of the cases is staying the certification so that the

2    fugitive can seek habeas review, if possible.  Most courts

3    appear to do it for 30 days.  I think the idea — and perhaps

4    the government can speak to this — is that we get a heads-up if

5    that's going to occur so that we can begin work on the habeas

6    petition, which I suspect would go back to your Honor.

7            THE COURT:  Ms. Wiener?

8            MS. WEINER:  So, a couple of things.  One is that this

9    fugitive, rather unusually, is not in custody.  The second is

10   that there is sort of a standard letter that the government

11   will provide in any case where a court certifies that a

12   fugitive is extraditable.  The government provides like a

13   postcertification letter that sets forth what the next steps

14   are.  One of the things --

15           THE COURT:  The government issues that letter.

16           MS. WEINER:  The government, yes.

17           And one of the things the government explains in that

18   letter is that if the fugitive files a habeas petition within

19   14 days, no surrender warrant will issue from the State

20   Department, and that if the fugitive would like more time to

21   prepare a habeas petition challenging the certification, the

22   fugitive -- it provides a contact person at the State

23   Department to request more time.

24           THE COURT:  Who is that petition addressed to?

25           MS. WEINER:  A habeas petition?  It would be addressed

A0456

MC6KKANH

1    to the habeas court, so it would most likely be addressed to a

2    district judge in this district --

3              THE COURT:  So it would be rolled --

4              MS. WEINER:  Randomly assigned, most likely.

5              -- and that district judge would review the case under

6    the standard of review that applies in habeas petitions.

7              MR. LICHTMAN:  Use of discretion, I believe, and then

8    I think there would potentially be an appeal.

9              MR. DUDLEY:  I think a separate habeas would be filed

10   in the Second Circuit, I think, would be the procedure, as I

11   understand it, your Honor.

12             THE COURT:  If there's a certification, it goes -- the

13   habeas goes directly to the Second Circuit?

14             MS. WEINER:  No.

15             MR. DUDLEY:  Not directly.  It would first go to the

16   district court, and then another habeas -- because there's no

17   direct appeal, I don't believe, but I can be corrected by

18   Ms. Wiener.

19             MS. WEINER:  No, Mr. Dudley is correct — the habeas

20   petition would be adjudicated before a district judge most

21   likely.  Occasionally, you'll see those referred to a

22   magistrate judge — sometimes for recommendation, sometimes for

23   decision, but usually it's a district judge — and then if the

24   fugitive's habeas petition is denied, that denial of habeas is

25   appealable to the Second Circuit.

A0457

MC6KKANH

1          MR. DUDLEY:  To the Second Circuit, but your ruling,

2    one way or the other, is not directly appealable.

3          THE COURT:  Okay.  Very well.

4          Okay.  Very interesting, folks.  Happy holidays.

5          MS. La MORTE:  Thank you, your Honor.

6          COUNSEL:  You too, your Honor.

7                              *  *  *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit 14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN THE MATTER OF THE EXTRADITION OF MASAHIDE KANAYAMA | **ORDER** |
| | 17 Crim. Misc. 1 Page 003 (ER) |

Ramos, D.J.:

    The Government of Japan formally requested the extradition of Masahide Kanayama, a Japanese national living in New York, on December 12, 2016, through a diplomatic note (the "Extradition Request") in connection to two incidents of vandalism at two historic and culturally significant sites in Japan: the Narita-san Shinsho-ji Temple and Katori Jingu Shrine. GX-2 at 21–29.[1] Before the Court is the motion of the United States Government for certification of the Extradition Request.[2] For the reasons set forth below, the Government's request is GRANTED.

## I.   THE EXTRADITION REQUEST

    On April 9, 2015, Japanese police officials commenced an investigation into two reported instances of vandalism that occurred on March 25, 2015 at the Narita-san Shinsho-ji Temple in Narita City (the "Temple") and the Katori Jingu Shrine in Katori City (the "Shrine"). Both the Temple and the Shrine bear significant historical, religious, and cultural value. Founded in 940, the Temple is a Buddhist place of worship that attracts approximately 10 million visitors each year. Supp. at Ex. 3. The Shrine was founded during the reign of Japan's first emperor and is

---

[1] Citations to "GX" documents refer to the government exhibits filed with the Court in advance of the December 6, 2022 extradition hearing. Citations to "Gov. Supp." refer to the supplemental exhibits filed with the Court in response to Kanayama's opposition memorandum.

[2] In accordance with Article XIV of the March 3, 1978 Treaty on Extradition between Japan and the United States (the "Treaty"), the United States provides Japan legal representation in U.S. courts in Japan's extradition requests. *See* GX-1 at 15.

one of the few remaining Shinto places of worship connected with the Japanese Imperial Family; it attracts approximately two million worshippers per year. *Id.* at Ex. 4.

On March 25, 2015, at approximately 4:06 p.m., surveillance cameras installed at the Temple filmed a man suspiciously roaming the premises and touching three wooden poles on the east side of the *So-mon* (the "Main Gate"). *Id.* at 52, 62. The man had black, thinning hair and wore the following: a gray jacket; black, hooded, long-sleeved windbreaker; white, collared undershirt; dark blue jeans; and black shoes. *Id.* Security footage did not show any other persons touching the wooden poles in this timeframe. *Id.* Photographs taken of the Main Gate by a tourist at approximately 2:24 p.m. showed the cite free of oil stains; another taken by an employee of the Temple at 4:07 p.m. showed poles on the east side of the Main Gate defaced with an oily substance.[3] *Id.* at 62–64.

That same day—at 4:57 p.m., approximately 51 minutes later—surveillance cameras installed at the Shrine filmed a man dressed in the same clothes, with similar physical characteristics, touching the right and left wooden poles of the *Hoden* (the "Main Hall") and splashing liquid on an offertory box, the wooden stairs in front of it, and adjacent poles.[4] *Id.* at 26–27, 52. Japanese officials reviewed the security footage from both locations and concluded that the same person appeared to have committed both acts of vandalism. *Id.* at 52.

After conducting simulation tests for three different routes from the Temple to the Shrine, which are located approximately 17 miles apart, the police investigators concluded that it was possible for the same person to commit the offenses at both locations during the 51-minute

---

[3] In 2017, a restoration company specializing in the restoration of temples and shrines, estimated that the cost to restore the Temple would total 120,500 yen. 120,500 yen converts to approximately $932 U.S. currency. GX-3 at 299–304.

[4] In 2017, a restoration company specializing in the restoration of temples and shrines, estimated that the cost to restore the Shrine would total 2,423,248 yen. 2,423,248 yen converts to approximately $18,747 U.S. currency. *Id.* at 305–310.

2

timeframe using a car. *Id.* at 53. Based on the characteristics of the suspect captured by the security cameras at the Temple and Shrine, investigators reviewed footage recorded by a security camera installed at the Sawara-Katori Tollgate—an expressway tollgate near the Shrine. *Id.* The investigation revealed that a man resembling the suspect, who drove a gray Toyota Prius, paid the toll on March 25, 2015 at 4:41 p.m., approximately 35 minutes after the Temple was defaced, and 15 minutes before the Shrine was defaced. *Id.* At that point, the investigators did not know the license plate number of the car. *Id.*

The authorities thereafter obtained and examined 36 expressway tickets collected at the Sawara-Katori Tollgate around 4:41 p.m. *Id.* Their review of the expressway ticket issued to the gray Prius revealed that the vehicle had a license plate number ending in "14" and that the driver first collected the ticket when passing through the Narita Tollgate—an expressway tollgate located near the Temple—at 4:30 p.m,. approximately twenty minutes after the Temple was defaced. *Id.* The officials then examined images captured by a security camera at the Narita Tollgate and identified a person resembling the suspect driving a gray Prius through the gate at 4:30 p.m. *Id.* at 53–54.

In furtherance of their investigation into the gray Prius, the investigators made inquiries with car rental companies in the vicinity of the Narita International Airport and ultimately identified a gray Prius with the license plate number "Narita300Wa414." *Id.* at 54. Upon reviewing the records of the rental company, the police learned that an individual named Masahide Kanayama rented the vehicle from 2:30 p.m. on March 25 to 9:30 a.m. on March 26, 2015. *Id.* at 54. To obtain the rental car, Kanayama provided the agency a copy of his Japanese passport. *Id.* at 54–55. The investigators determined that the man in the passport photo resembled the suspect shown in the surveillance footage at the Temple and Shrine. *Id.* at 55.

3

To pay for the rental car, Kanayama used an American Express card. *Id.* at 57. After contacting the credit card company and obtaining the billing records, the investigators further found that from March 21 to April 7, 2015, Kanayama made 24 purchases across seven Japanese prefectures, including the prefectures where the Temple and Shrine are located. *Id.*

The Japanese officials thereafter contacted hotels located near the Shrine to see if Kanayama stayed at one overnight on March 25, 2015. A register of the Spa & Resort Inubosaki Taiyonosato, revealed that Kanayama checked into the hotel on March 25, 2015 at 6:47 p.m. *Id.* Security cameras at the hotel also captured video of a man checking into the hotel at 6:47 p.m. who looked similar to the suspect recorded at the Temple and Shrine. *Id.* The hotel's employees further confirmed that Kanayama's car was a gray Toyota Prius. *Id.*

The Japanese authorities, working with the Customer Service Department of the Narita International Airport, also procured Kanayama's flight records for the relevant period. *Id.* at 56. The records showed that Kanayama departed John F. Kennedy International Airport in New York on March 20, 2016 and entered Japan via the Narita International Airport on March 21, 2015. *Id.* at 56. On April 1, 2015, Kanayama departed Japan through Narita Airport and arrived in Delhi, India that same day. *Id.* He departed India on April 7, 2015, had a brief layover at the Narita Airport, and then returned to the United States. *Id.*

The investigators further retained Professor Masatsugu Hashimoto of Tokyo Dental College to perform a facial comparison between Kanayama's passport photo and the suspect's images taken by the security cameras at the Temple and Shrine. *Id.* at 233–253. Examining, among other things, facial and morphologic features, Hashimoto concluded in an April 25, 2015 report that there was a "very high possibility" that the individual depicted in the footage obtained from the Narita Temple and Katori Shrine and in Kanayama's passport were the same person.

A0463

*Id.* Hashimoto also observed that the colors of the suspect's jacket, shirt, pants, and shoes in the Narita Temple footage were identical to those captured in the video surveillance from the Katori Shrine. *See id.*

Online investigation into Kanayama showed that he lived in New York, where he worked as a board-certified obstetrician-gynecologist, but that he was permanently domiciled in Tokyo, Japan. *Id.* at 55–56. Kanayama regularly traveled from the United States to Japan and other countries, giving lectures and engaging in missionary activities through the Christian non-profit organization that he founded, the International Marketplace Ministry ("IMM"). *Id.* at 28, 55–56. Two YouTube videos posted on IMMs website feature Kanayama presenting lectures on November 3 and December 31, 2012, wherein he admits to having "anointed" other Japanese shrines with oil for religious purposes. *See id.* at Exs. 17–19.

In connection with the March 25, 2015 acts of vandalism, on April 28, 2015 and December 8, 2015, the Sakura Summary Court issued arrest warrants for Kanayama for two counts of damage of a structure in violation of Article 260 of the Japanese Penal Code, an offense punishable by more than one year in prison. The warrants have since been renewed on a yearly basis. *Id.* at 26; *see also* 2022 Warrant Renewals.

According to the General Affairs Section Chief of the Temple, as of October 18, 2017, the oil on the three east poles of the Main Gate of the Temple has been absorbed by the unvarnished wood. The stains, however, remain visible but are less prominent than at the time the vandalism occurred. *See* Supp. at Ex. 3. Similarly, as of November 17, 2017, the oil stains on the poles, stairs, and offertory box of the Shrine have faded but can still be seen at close range. *See id.* at Exs. 4, 6, 8.

## II.    PROCEDURAL HISTORY

On December 12, 2016, the Government of Japan formally requested the extradition of Masahide Kanayama. *See* GX-2 at 21–29. On May 30, 2017, the United States filed a complaint for the extradition of Kanayama at the request of the Government of Japan pursuant to the Treaty on Extradition Between the United States and Japan, U.S.-Japan, Mar. 26, 1980, 31 U.S.T. 892 (the "Treaty"). On June 2, 2017, U.S. authorities arrested Kanayama in New York City. He is currently released with bail conditions. *See* Memo in Support at 6, n. 2. On August 17, 2022, the Government filed notice of its intention to move to certify the extraditability of Kanayama, pursuant to 18 U.S.C. § 3184, which is currently before the Court. On December 6, 2022, the Court held an extradition hearing.

### III.   GENERAL PRINCIPLES OF EXTRADITION

Upon the filing of a formal complaint, the federal extradition statute allows an extradition officer—who can be any judge of the United States—to hear and consider the "evidence of criminality" of an accused individual. 18 U.S.C. § 3184; *see Skaftouros v. United States*, 667 F.3d 144, 154 (2d Cir. 2011). The presiding Court must also hold personal jurisdiction over the accused person. *Pettit v. Walshe*, 194 U.S. 205, 219 (1904). The role of the judicial officer is limited to determining whether to certify to the U.S. Secretary of State that the accused person is extraditable. 18 U.S.C. § 3184. The judicial officer must certify extraditability if he finds the following to be true: (1) a valid treaty exists; (2) the crime charged is covered by the relevant treaty; and (3) the evidence marshaled in support of the complaint for extradition is sufficient to sustain the charge. *Id.*; *see Skaftouros*, 667 F.3d at 154–55 (citing *Cheung v. United States*, 213 F.3d 82, 88 (2d Cir. 2000)). This analysis is exceedingly narrow; the court does not decide guilt or innocence, as that question is reserved for the foreign court. *See In re Extradition of Ernst*, No. 97 Crim. Misc. 1, 1998 WL 395267, at *4 (S.D.N.Y. July 14, 1998).

6

As to the second element, in deciding whether a treaty covers the crime charged, the presiding court should liberally construe the treaty. *See Factor v. Laubenheimer*, 290 U.S. 276, 298 (1933) (An extradition treaty "should be construed more liberally than a criminal statute or the technical requirements of criminal procedure."). Moreover, the court should award "great weight" to "the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement." *Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 184–85 (1982).

As to the third element, evidence in support of extradition is "sufficient" so long as the court finds probable cause. *Illinois v. Gates*, 462 U.S. 213, 235 (1983) (A § 3184 motion to extradite must establish "only the probability, and not a prima facie showing, of criminal activity."); *see also Lo Duca v. United States*, 93 F.3d 1100, 1102–04 (2d Cir. 1996). In determining probable cause, courts primarily rely on the extradition request. *Ahmad v. Wigen*, 726 F. Supp. 389, 399–400 (E.D.N.Y. 1989) (citation omitted), *aff'd*, 910 F.2d 1063 (2d Cir. 1990). A court must further "accept as true all of the statements and offers of proof by the demanding state[.]" *In re Extradition of Marzook*, 924 F. Supp. 565, 592 (S.D.N.Y. 1996); *see also In re Extradition of Atta*, 706 F. Supp. 1032, 1050–51 (E.D.N.Y. 1989) ("The primary source of evidence for the probable cause determination is the extradition request, and any evidence submitted in it is deemed truthful for the purposes of this determination."). And the Government may rely upon hearsay evidence. 18 U.S.C. § 3184.

At an extradition hearing, the accused individual is not entitled to the rights available to a defendant at criminal trial pursuant to the Federal Rules of Criminal Procedure or Federal Rules of Evidence. *See* Fed. R. Crim. P. 1(a)(5); Fed. R. Evid. 1101(d)(3). Additionally, the accused person has no right to discovery, to cross-examine witnesses, or to speedy trial. *Messina v.*

7

*United States*, 728 F.2d 77, 80 (2d Cir. 1984). "Evidence that explains away or completely obliterates probable cause is the only evidence admissible at an extradition hearing[.]" *United States v. Amabile*, No. 14 M 1043 (VMS), 2015 WL 4478466, at *8 (E.D.N.Y. July 16, 2015). Evidence that merely raises doubts about the reliability of the government's proof is insufficient to defeat an extradition request." *United States v. Pena-Bencosme*, 2006 U.S. Dist. LEXIS 82579, *35 (E.D.N.Y. Oct. 30, 2007).

If a judicial officer certifies that an accused person is extraditable, he must commit the individual to the custody of the United States Marshal to await further determination by the Secretary regarding his surrender to the requesting state. *Cheung*, 213 F.3d at 88 (citing 18 U.S.C. § 3184). This Order constitutes the written findings of fact and conclusions of law as to the extraditability of Kanayama.

IV.    **DISCUSSION**

   *This Case is Properly Before This Court.*

As a preliminary matter, the extradition statute authorizes this Court to preside over this matter as a court of the United States. 18 U.S.C. § 3184. Furthermore, this Court has jurisdiction over Kanayama, as he was located and arrested in the Southern District of New York.

   *A Treaty in Effect Encompasses the Alleged Crimes.*

Section 3184 provides for extradition when a treaty is in force between the requesting state and the United States. *Id.* Courts generally defer to the executive branch on whether a treaty is in force. *See NY Chinese TV Programs, Inc. v. U.E. Enterprises Inc.*, 954 F.2 847, 852 (2d Cir. 1992). Here, the Government has submitted the declaration of Elizabeth M. M.

8

A0467

O'Connor, an attorney in the Office of the Legal Advisor for the Department of State, attesting to the fact the Treaty between Japan and the United States is in full force and effect. GX-1 at 2.

The Treaty allows extradition for offenses relating to the damage of property, so long as the offense would constitute a crime in both Japan and the United States, and is a felony, *i.e.*, punishable by more than one year of imprisonment. *See id.* at 8, Art. II ¶ 1; 17, App'x Sched. 19. Kanayama has been charged in Japan with two counts of damage or destruction of structure (vandalism) in violation of Article 260 of the Japanese Penal Code. *See* GX-1 at Ex. 20, Testimony of Director of the Criminal Affairs Burau of the Ministry of Justice of Japan. Under Japanese law, violating Article 260 is an offense relating to the damage of property punishable by more than one year in prison. *Id.* Accordingly, with respect to Japanese law, the alleged crimes fall within the scope of the Treaty.[5]

The next question is whether the alleged conduct would constitute a felony in the United States or New York. *See Hu Yau-Leung v. Soscia*, 649 F.2d 914, 918 n.4 (2d Cir. 1981) (noting that dual criminality is established if the conduct underlying the foreign offense would be criminal under federal law, the law of the state in which the extradition hearing is held, or the

---

[5] Kanayama claims that the Government has failed to demonstrate that the acts of vandalism occurred to a *structure* as defined by Japanese law, since merely poles, stairs, and an offertory box were damaged. With respect to the Temple, the Government of Japan asserts that poles of the Main Gate constitute buildings within the meaning of Article 260 since they are part of a grounded two-story building and create interior space enforced by walls into which individuals can enter and exit. *See* Supp. Ex. 1. With respect to the Katori Shrine, the Government of Japan similarly contends that the damaged stairs and offertory box qualify as objects under Article 260 because they are part of the structure with a roof, supported by walls and poles, fixed to the ground, and with an interior space into which individuals can enter and exit. *See* Supp. Ex. 2. The Court defers to the Japanese Government's interpretation of Article 260. *See Skaftouros*, 667 F.3d at 156 ("[I]t has long been recognized that an extradition judge should avoid making determinations regarding foreign law."); *see also Marzook v. Christopher*, No. 96 Civ. 4107 (KMW), 1996 WL 583378, at *5 n. 4 (S.D.N.Y. Oct. 10, 1996) ("In the context of extradition proceedings, it would be inappropriate for a court to review the demanding state's analysis of its own law.").

Kanayama also claims that no "damage" occurred as a matter of Japanese law. Again, the Government of Japan has explained that total damage or destruction to a building is not required in order to satisfy the damages element of Article 260. Partial damage, like that perpetrated on March 25, 2015 against the Temple and Shrine, suffices. *See* Supp. Exs. 1, 2. The Court, again, defers to the Japanese Government's interpretation of Japanese law for purposes of the instant proceedings.

law of a preponderance of the states). The alleged conduct, if committed here, would violate New York Penal law § 145.05, a felony. Section 145.05 criminalizes intentionally damaging the property of another person in an amount exceeding $250 as criminal mischief in the third degree. N.Y. Pen. Law § 145.05. The total damages caused by the alleged vandalism amount to approximately $20,000. And the video surveillance footage—which shows an individual touching and gesturing towards the affected sites—would enable a reasonable trier of fact to determine that the damage was done not by mistake, but with intent. Hence, the element of dual criminality is satisfied.[6]

### *Probable Cause is Established.*

As noted, the standard of proof to find evidence "sufficient to sustain the charge" pursuant to § 3184 is probable cause. *See, e.g., Ahmad v. Wigen*, 399–400. There is probable cause to extradite if a person ordinarily prudence and caution can conscientiously entertain a reasonable belief that the accused is guilty. *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975). Here, the evidence set forth by the Government that Katayama has committed the charged offense is substantial.

The Government has produced video evidence obtained at both the Temple and Shrine, showing the same man, bearing similar physical attributes as Kanayama, touching or throwing

---

[6] Kanayama argues that the stains to both the Temple and the Shrine are no longer visible, and hence that no punishable felony occurred. *See* Sur-Reply at 2–3; *United States v. Murtari*, No. 7 Cr. 387, 2007 WL 3046746, at *4–5 (N.D.N.Y. Oct. 16, 2017) (finding that defacement by use of chalk does not constitute damage to property because it eventually goes away). Kanayama bases this claim on photo evidence obtained from the Temple and Shrine in December 2017, along with the testimony of his counsel, who took the photos. This evidence may call into question the conclusions reached by the Japanese authorities who revisited the Temple and Shrine in October 2017 and determined that the stains were still visible. However, "the existence of evidence contradicting or calling into question the requesting state's primary evidence ordinarily has no import as it does not vitiate or obliterate probable cause, but rather merely poses a conflict of credibility that generally should properly await trial" in the requesting country. *United States v. Pena-Bencosme*, No. 08-1990-pr, 2009 WL 2030129, at *1 (2d Cir. July 9, 2009) (internal quotation marks and citations omitted). Accordingly, Kanayama remains extraditable despite this possibility.

10

liquid towards the vandalized areas of the sites.  The Government has also proffered car rental

records, video footage, and expressway toll tickets, which show that Kanayama entered an

expressway near the Temple approximately twenty minutes *after* the first act of vandalism

occurred and exited the expressway through a toll near the Shrine approximately fifteen minutes

*before* the second act of vandalism occurred.  Working with Narita Airport, the Japanese

authorities were also able to determine the dates that Kanayama entered and left Japan, which are

consistent with the date the offenses occurred.  Additionally, the Government has provided video

and documentary evidence that Kanayama checked into a hotel near the Shrine shortly after the

Shrine was defaced.  A report by Professor Masatsugu Hashimoto of Tokyo Dental College

moreover supports the conclusion that the suspect depicted in the video footage at the Temple

and Shrine is indeed Kanayama.  Japanese officials, furthermore, have identified YouTube

videos from 2012, in which Kanayama discusses having "anointed" Japanese Shrines with oil in

connection with his Christian non-profit work.  Reports from as recent as fall 2017 show that the

damage to the Temple and Shrine is still visible and would cost approximately $20,000 to repair.

Kanayama has not set forth any evidence that "obliterates" or "explains away" a finding

of probable clause.  *Amabile*, 2015 WL 4478466, at *8.  Kanayama challenges the qualifications

of Professor Hashimoto to conclude that the person captured on the surveillance footage is

indeed Kanayama.  However, even assuming that Kanayama raises some doubt as to the

conclusions of Professor Hashimoto, the evidence proffered by the Government, taken in its

entirety, nonetheless permits a person of ordinary prudence to entertain a reasonable belief that

Kanayama is guilty of the charged offenses.[7]  Absent any other "reasonably clear-cut proof" to

---

[7] At trial, the Court did not permit Kanayama to introduce his own expert testimony to rebut the testimony offered
by the Government by Professor Masatsugu Hashimoto.  *See Kapoor v. Dunne*, No. 14 1699-pr, 606 Fed. Appx. 11,
at *13 (2d Cir. June 2, 2015); *See also Gill v. Imundi*, 747 F. Supp. 1028, 1040–41 (S.D.N.Y. 1990) (The accused
individual introducing his own handwriting expert would not serve to "explain" or "obliterate" the government's

11

negate the evidence offered by the Government, the Court concludes that there is probable cause

to extradite Kanayama for the vandalism charges.[8]  *In re Extradition of Sindona*, 450 F. Supp. 672,

685 (S.D.N.Y. 1978) (emphasis added), *aff'd*, 619 F.2d 167 (2d Cir. 1980).

## V.    CONCLUSION

Pursuant to the foregoing and in accordance with 18 U.S.C § 3184, the Court hereby

certifies the extradition of Masahide Kanayama on the offenses for which the Extradition

Request was made.  A warrant may issue for the surrender of Kanayama to the proper authorities

of Japan in accordance with the Treaty.  The Clerk of Court is respectfully directed to forward a

certified copy of this Certification and Committal for Extradition, together with a copy of the

evidence presented in this case, including the formal extradition documents received in evidence

and any testimony received in this case, to the Secretary of State.

It is SO ORDERED.

Dated:    January 26, 2023
          New York, New York

                                            _____
                                            Edgardo Ramos, U.S.D.J

---

evidence, so much as to pose a conflict in the testimony of two handwriting experts by discrediting the methodology
of the expert who had identified the accused person's authorship).

[8] As a final matter, the Court notes that the claim that Kanayama will suffer persecution due to anti-Christian bias if
he is returned to Japan is not subject to judicial review. *See Ahmad*, 910 F.2d at 1067 ("It is the function of the
Secretary of State to determine whether extradition should be denied on humanitarian grounds."); *see also Jhirad v.
Ferrandina*, 536 F.2d 478, 484–85 (2d Cir. 1976) ("It is not the business of our courts to assume the responsibility
for supervising the integrity of the judicial system of another sovereign nation.  Such an assumption would directly
conflict with the principle of comity upon which extradition is based.").

A0471

# Exhibit 15

Case 1:23-cv-03469-CM    Document 4-22    Filed 04/28/23    Page 5 of 16

## CERTIFICATE TO BE ATTACHED TO DOCUMENTARY EVIDENCE ACCOMPANYING REQUISITIONS IN THE UNITED STATES FOR EXTRADITION

### AMERICAN FOREIGN SERVICE

|  |  |
|---|---|
|  | 11-25-2016 |
|  | Place and Date *(mm-dd-yyyy)* |

I, _____ Jason P. Hyland _____ , _____ Charge d'Affaires ad interim _____

Name                                    Title

of the United States of America at    Tokyo, Japan

hereby certify that the annexed papers, being    supporting documents

proposed to be used upon an application for the extradition from the United States of America

Masahide Kanayama

charged with the crime of    vandalism

...ged to have been committed in    Japan

...erly and legally authenticated so as to entitle them to be received in evidence for similar purposes by

...s of    Japan

...l by Title 18, United States Code, Section 3190.

...witness whereof I hereunto sign my name and cause my seal of office to be affixed

this    twenty-fifth    day of    November 2016.

Month and Year

Signature    *Jason P. Hyland*

Jason P. Hyland, Charge d'Affaires ad interim

Type Name and Title of Certifying Officer
of the United States of America.

DS-0036
03-2015

Case 1:23-cv-03469-CM     Document 4-22     Filed 04/28/23     Page 6 of 16

NATIONAL POLICE AGENCY
JAPAN



1-2, 2-Chome, Kasumigaseki
Chiyoda-ku, Tokyo, 100-8974
Japan

October  7  ,2016

The Competent Authority of
    the United States of America

    Request for extradition of Masahide KANAYAMA, the suspect in the damage of
structure case

    The National Police Agency of Japan, respectfully requests the Competent
Authority of the United States of America to extradite the above-mentioned suspect
to Japan in pursuant to Article 8 of the Treaty On Extradition Between Japan and
The United States of America. Enclosed please find relevant evidence documents
as listed in the attached sheet.

    All the documents submitted herein are duly certified and authenticated together
with certified translations in English.

中 村 様

Itaru NAKAMURA
Director-General
Organized Crime Control Department
Criminal Investigation Bureau
National Police Agency of Japan

A0474

Case 1:23-cv-03469-CM    Document 4-22    Filed 04/28/23    Page 7 of 16

October        ,2016

The Competent Authority of
the United States of America

### Request for Extradition of the Suspect

Pursuant to the Treaty on Extradition between Japan and the United States of America signed on March 3, 1978 (hereinafter referred to as "Treaty"), the National Police Agency of Japan requests extradition of Masahide KANAYAMA. The case of vandalism committed by KANAMAYA has been under investigation by the Chiba Prefectural Police of Japan. The Japanese court issued two arrest warrants against KANAYAMA for vandalism.

### Procedure for Requesting Arrest Warrant for Criminal Prosecution

Article 33 of the Constitution of Japan stipulates that "No person shall be apprehended except upon warrant issued by a competent judicial officer which specifies the offense with which the person is charged, unless he is apprehended, the offense being committed." When requesting for an arrest warrant, the Japanese police identify the offense that they believe was committed by the suspect and submit the document describing the need for his arrest to a judge. If the judge deems that there is sufficient cause to believe that the suspect committed the offense, he/she issues an arrest warrant. Following the issue of the arrest warrant, if the suspect is arrested on the warrant, a Japanese prosecutor may prosecute the suspect after he/she is arrested. In the Japanese practices, prosecution is not done in the absence of the suspect. We make this request for the sole purpose of detaining, prosecuting and punishing KANAYAMA on a charge of vandalism, not for the purpose of punishing him for any offense other than the one herein specified. The Chiba District Prosecutor's Office intends to prosecute KANAYAMA after he is extradited to Japan. This request is made with a view to prosecuting and ultimately punishing him in Japan.

### 1. Suspect Requested to Be Extradited

A0475

Name: Masahide (first name) KANAYAMA (last name)

Date of birth: September 8, 1962

Nationality: Japanese

Passport number: TZ0807838

Current address on his passport: 150 E 55TH ST 5TH FLOOR NEW YORK NY
10022

Former address: Grace House 4th Floor, 4-32-6 Takadanobaba, Shinjuku-ku, Tokyo,
Japan

### 2. Summary of the Facts

(1) At around 4:06 p.m. on March 25, 2015, in the premises of Narita-san Shinsho-ji Temple located at 1 Narita, Narita City, Chiba Prefecture, the suspect defaced three poles on the east side of *So-mon* (Main Gate) under the management of the Chief Temple Manager Shodai KISHIDA with an oily liquid (causing the monetary damages 120,500 yen). In this way, the suspect destroyed the structures owned by another.

(2) At around 5:02 p.m. on March 25, 2015, in the premises of Katori Jingu Shrine located at 1697 Katori, Katori City, Chiba Prefecture, the suspect defaced a black pole located in the west front of the worship hall and another black pole located in the east front of the worship hall, and also black stairs and a black offertory box located in front of the worship hall, both under the management of Priest Shoji TAKAHASHI, with an oily liquid (causing the monetary damages 2,423,248 yen). In this way, the suspect destroyed the structures owned by another.

### 3. Elements Constituting the Offense, the Offense and the Law Applicable to the Offense pertaining to the Extradition Request

(1) Offense

Damage or destruction of structure (Vandalism)

(2) Applicable penal provision

Article 260 of the Penal Code

A person who damages a building or vessel of another shall be punished by

A0476

imprisonment with work for not more than 5 years.

## 4. Law Stipulating the Statue of Limitations for the Offense pertaining to the Extradition Request

Article 250, Paragraph 2 of the Code of Criminal Procedure

Except for offenses resulting in death of a person and punishable with imprisonment without work or a greater punishment, the statue of limitations shall be completed upon the lapse of:

(1) 25 years for offenses punishable with death;

(2) 15 years for offenses punishable with life imprisonment with or without work;

(3) 10 years for offenses punishable with imprisonment with or without work for a long term of 15 years or more;

(4) 7 years for offenses punishable with imprisonment with or without work for a long term of less than 15 years;

(5) 5 years for offenses punishable with imprisonment with or without work for a long term of less than 10 years;

(6) 3 years for offenses punishable with imprisonment with or without work for a long term of less than 5 years or with a fine; and

(7) 1 year for offenses punishable with misdemeanor imprisonment without work or with a petty fine

Article 254, Paragraph 1 of the Code of Criminal Procedure

The statute of limitations shall cease to run on the institution of prosecution against the case concerned, and shall begin to run when a decision notifying jurisdictional incompetence or dismissing the prosecution has become final.

Article 255, Paragraph 1 of the Code of Criminal Procedure

Where the offender is outside Japan or he/she conceals him/herself so that it is impossible to serve a transcript of the charging sheet or notification of the summary order, the statute of limitations shall be suspended during the period when the offender is outside Japan or conceals him/herself.

The statutory penalty for damage or destruction of structure (vandalism) is

imprisonment with or without work for a long term of 5 years, and the statute of limitations for this case runs out in 5 years. This case has not been prosecuted, but the statute of limitations for this case has ceased to run since KANAYAMA is staying outside Japan.

KANAYAMA committed the vandalism specified in Summary of the Facts on March 25, 2015, so the statute of limitations has not expired.

## 5. Arrest Warrant

(1) An arrest warrant was issued against KANAYAMA on December 8, 2015 for vandalism which occurred at Narita-san Shinsho-ji Temple. Since an arrest warrant issued by the Japanese court has a period of validity, we have kept obtaining the renewed arrest warrant. The latest arrest warrant was issued by Sakura Summary Court Judge Kazunobu YAMAZAKI on July 15, 2016 and will be valid until July 15, 2017.

(2) Another arrest warrant was issued on April 28, 2015 for vandalism which occurred at Katori Jingu Shrine. Upon request for renewal on September 2, 2016, a renewed arrest warrant was issued by Sakura Summary Court Judge Kazunobu YAMAZAKI and will be valid until September 2, 2017.

## 6. Outline of Evidential Facts Constituting Sufficient Cause to Believe that the Suspect Committed the Offenses pertaining to the Extradition Request

Since March 2015, *April* well-known historic sites across the Kinki region of Japan, including important cultural properties, have been defaced with an oily liquid. Such defacing incidents were confirmed after April 9, 2015 in the premises of Katori Jingu Shrine and Narita-san Shinsho-ji Temple located in Chiba Prefecture. The Chiba Prefectural Police received victim's reports for vandalism from Karori Jingu Shrine and Narita-san Shinsho-ji Temple on April 10, 2015 and April 13, 2015, respectively. (See Exhibit #8, #9, #10, #11, #12 and #13.)

The surveillance cameras installed at the said shrine and temple filmed on March 25, 2015 a man in a same clothes behaving in a suspicious manner:

(1) The man touching the poles on the east side of *So-mon* (Main Gate) in the premises of Narita-san Shinsho-ji Temple; and

(2) The man touching the right and left poles of *Honden* (Main Hall) in the premises of Katori Jingu Shrine, swinging up his right hand in front of the offertory box and splashing liquid over it  → *Cannot Prove*

From the information provided by the Nara Prefectural Police, it was also confirmed that the man in this case closely resembled a man captured by a security camera in the premises of Asuka Dera Temple in Nara City who splashed oily liquid over *Jizoson* (Guardian Deity of Children) on March 28, 2015. (See Exhibit #5.)

Based on the analysis of footage of security cameras in Narita-san Shinsho-ji Temple and Katori Jingu Shrine, investigators tried to identify possible transportation methods the suspect may have used and concluded it impossible for a same person to commit offenses at both locations during the time frame without using a car. The car used by the suspect was identified as a rent-a-car (License plate number: Narita300Wa414). Investigators worked to identify the car renter and found Masahide KANAYAMA who rented the car around then. He presented his passport as ID document to rent the car. As a result of comparison between a face photo on the passport and security camera images taken at the said shrine and temple, they were very much alike.

It was also found that he declared himself as a U.S. resident when he applied for a passport in 2013. (See Exhibit #5, #14 and #15.)

A review of entry/exit records for KANAYAMA has revealed that he entered Japan on March 21, 2015, left Japan for Delhi, India on April 1, 2015, and then traveled from Delhi via Japan for New York, U.S. on April 7, 2015. Based on the records, it was verified that he was staying in Japan on the incident date. (See Exhibit #5 and #19.)

Police requested Professor HASHIMOTO, Tokyo Dental College to perform comparison for identification between KANAYAMA's face photo on his passport and the suspect's image taken by security cameras in the premises of Narita-san Shinsho-ji Temple and Katori Jingu Shrine. Specifically, he did comparisons (1) between KANAYAMA's face photo on his passport and the suspect's image taken by security cameras in Narita-san Shinho-ji Temple and also (2) between the suspect's images taken by security cameras in Narita-san Shinho-ji Temple and Katori Jingu Shrine. As a result, the expert concluded with a highest degree of certainty that they were identical. Therefore, Masahide KANAYAMA was identified as the suspect in both incidents. (See Exhibit #5, #15 and #16.)

Case 1:23-cv-03469-CM   Document 4-22   Filed 04/28/23   Page 12 of 16

An online search for Masahide KANAYAMA has revealed that he is serving as a practicing obstetrician and gynecologist in New York, U.S., also operating the Christian organization named "IMM Japan" and engaging religious activities as a Christian missionary by actively organizing lecture meetings in countries around the world. Investigators checked the videos posted by him on YouTube and found he said in the lecture titled "Dr. KANAYAMA Vision School" on November 3, 2012 he had vandalized historic sites with oil in an anonymous shrine (later identified as Miho Shrine in Shimane Prefecture) to expel evil spirits. The video showed he poured oil over the poles in the said shrine in the same manner as he did in this case, which corroborated his offenses and suggested his motivation behind them. (See Exhibit #17 and #18.)

*Never said*

As described above, the Chiba Prefectural Police identified Masahide KANAYAMA as the suspect and determined vandalism at *So-mon* (Main Gate) in the premises of Narita-san Shinshoji Temple and at *Honden* (Main Hall) in the premises of Katori Jingu Shrine as the criminal facts based on the security camera footage. Accordingly, the Chiba Prefectural Police obtained arrest warrants against KANAYAMA for vandalism. (See Exhibit #1, #2, #3, #4, #5, #6 and #7.)

### 7. Locating and Identifying the Suspect

Masahide KANAYAMA was found to be formerly a Korean citizen living in Japan. He became naturalized as a Japanese national on June 19, 1979.

His registered address was "Grace House 4th Floor, 4-32-6 Takadanobaba, Shinjuku-ku, Tokyo, Japan", but the address was deleted from the record by administrative authorities on May 21, 2013.

His passport application form dated September 18, 2012 and the visitor's book of the hotel where he stayed show "150 E 55TH ST, 5TH Floor, NEW YORK, NY 10022" as his address, which suggests that he is currently living at this address.

His face photo (See Exhibit #15) and videos of his lectures can be found on the IMM website.

Based on the expert comparison for identification between KANAYAMA's face photo and the suspect's image taken by security cameras in the premises of Narita-san Shinsho-ji Temple and Katori Jingu Shrine performed by Professor HASHIMOTO, Tokyo Dental College, KANAYAMA was identified as the suspect.

Case 1:23-cv-03469-CM   Document 4-22   Filed 04/28/23   Page 13 of 16

→ how ?

Besides, anybody can reasonably say that they are a same person.

The Ministry of Foreign Affairs of Japan ordered KANAYAMA living in the U.S. to surrender his passport, but he failed to obey the order, and his passport was revoked on October 14, 2015.

## 8. Attachment

See List of Exhibits.

## 9. Conclusion

The Japanese Central Authority thanks the United States Competent Authority for its assistance so far in international law enforcement fields and also appreciates in advance its attention to this request and any assistance the United States is able to render in this matter.

A0481

List of Exhibits

Case 1:23-cv-03460-CM   Document 4-22   Filed 04/28/23   Page 14 of 16

| No. | Exhibit | Date Prepared | Prepared by | Contents |
|---|---|---|---|---|
| 1 | Warrant of Arrest (Certified Copy) | 7/15/2016 | Kazunobu YAMAZAKI | Warrant of arrest regarding the case at Narita-san Shinsho-ji Temple; Valid until July 15, 2017 |
| 2 | Warrant of Arrest (Certified Copy) | 9/2/2016 | Kazunobu YAMAZAKI | Warrant of arrest regarding the case at Katori Jingu Shrine; Valid until September 4, 2016 |
| 3 | Investigation report on the suspect's profile and need for arrest of the suspect (Certified Copy) | 12/7/2015 | Toshijiro TSUBOI | The need for arrest of the suspect involved in the case at Narita-san Shinsho-ji Temple |
| 4 | Investigation report on the suspect's profile and need for arrest of the suspect (Certified Copy) | 4/27/2015 | Ken SHINOZUKA | The need for arrest of the suspect involved in the case at Katori Jingu Shrine |
| 5 | Investigation report on identifying the suspect (Certified Copy) | 4/25/2015 | Satoshi KIMURA | Report on the process for identifying the suspect |
| 6 | Investigation report on establishing the criminal facts (Certified Copy) | 7/24/2015 | Masahiro KAMIGAKI | Report on establishing the criminal facts of the case at Narita-san Shinsho-ji Temple |
| 7 | Investigation report on establishing the criminal facts (Certified Copy) | 4/25/2015 | Toshijiro TSUBOI | Report on establishing the criminal facts of the case at Katori Jingu Shrine |
| 8 | Victim's Report (Certified Copy) | 4/13/2015 | Yoichi KYOSU | Victim's report of the case at Narita-san Shinsho-ji Temple |
| 9 | Victim's Report (Certified Copy) | 4/10/2015 | Kazuhiro SAGAWA | Victim's report of the case at Katori Jingu Shrine |
| 10 | Investigation report on the calculated total damage pertaining to the case (Certified Copy) | 7/24/2015 | Koji ZAITSU | The calculated total damage pertaining to the case at Narita-san Shinsho-ji Temple |
| 11 | Investigation report on the calculated total damage pertaining to the case (Certified Copy) | 7/4/2015 | Koji ZAITSU | The calculated total damage pertaining to the case at Katori Jingu Shrine |
| 12 | Investigation report on photographs taken pertaining to the case (Certified Copy) | 4/22/2015 | Takashi MIDORIKAWA | Photographs of damages at Narita-san Shinsho-ji Temple and the layout of the temple |
| 13 | Investigation report on photographs taken pertaining to the case (Certified Copy) | 4/22/2015 | Kuniko YODA | Photographs of damages at Katori Jingu Shrine and the layout of the shrine |
| 14 | Investigation report on checking with car-rental shops (Certified Copy) | 4/16/2015 | Koji ZAITSU | Findings from checking with car-rental shops to identify the car driven by the suspect |
| 15 | Reply to inquiry concerning passport application (Certified Copy) | 4/21/2015 | Director of Passport Division, Ministry of Foreign Affairs of Japan | A copy of passport application filed by the suspect (with his face photo) |
| 16 | Expert Opinion (Certified Copy) | 4/25/2015 | Masatsugu HASHIMOTO | Expert opinon on the indentitiy of the person by comparing the suspect's face photo attached to his passport application form and the images taken by security cameras in Narita-san Shinsho-ji Temple and Katori Jingu Shrine |
| 17 | Analysis report on the lectures by the suspect (Certified Copy) | 5/19/2015 | Atomu FUKUDA | The contents of lectures by the suspect posted on YouTube in which he said he had splashed oil in shrines, etc. |
| 18 | Analysis report on the lectures by the suspect (Certified Copy) | 5/21/2015 | Atomu FUKUDA | The contents of lectures by the suspect posted on YouTube in which he said he splashed oil |
| 19 | Reply to inquiry concerning entry/exit records (Certified Copy) | 5/29/2015 | Director of Tokyo Regional Immigration Bureau | Entry/exit records of the suspect for the last five years (as proof of his presence in Japan at the time of crime) |
| 20 | Invesigation report on photographs of the suspect (Certified Copy) | 6/8/2015 | Koji ZAITSU | the identicalness of the suspect with a man in pictures attached to pieces of evidence |
| 21 | Copy of the Suspect's Family Register and Supplementary Family Register (Certified Copy) | 5/25/2015 | Mayor of Shinjuku Ward | A copy of the suspect's family register and supplementary family register |
| 22 | Certificate of the Japanese Law application to the case of structure damage allegedly committed by KANAYAMA On Masahide | 9/15/2016 | Yoshimitsu YAMAUCHI | |
| 23 | Supplementary Explanation as to the Criminal Procedure in Japan | 9/15/2016 | Yoshimitsu YAMAUCHI | |
| 24 | Certificate | 9/15/2016 | Yoshimitsu YAMAUCHI | |

A0482

This is to certify that Kayoko ITO has translated the foregoing documents into English and it is true to the Japanese original.

*Kayoko Ito*

Kayoko ITO

Translator

International Investigative Operations Division

Organized Crime Department, Criminal Investigation Bureau

National Police Agency of Japan

This is to certify that the said officer, with sufficient ability, has translated the Japanese original into English.

*Kenta Namba*

Kenta NAMBA

Director

International Investigative Operations Division

Organized Crime Department, Criminal Investigation Bureau

National Police Agency of Japan

A0483

## WARRANT OF ARREST (NORMAL ARREST)

| | |
|---|---|
| Name of the Suspect | **Masahide KANAYAMA** |
| Address, Occupation and Age of the Suspect, Statement of Offense, Outline of Suspected Facts, Place Where the Suspect Should be Taken into Custody, Name and Official Position of the Person Who Requested the Issuance of this Warrant of Arrest | As per attached "Request for Warrant of Arrest" |
| Term of Validity | July 15, 2017 |

Arrest shall not be effected on this warrant after expiration of the term of validity. In such case, this warrant shall be returned to the court.

Even within the term of validity, this warrant shall be returned to the court without delay whenever the arresting becomes unnecessary.

I hereby authorize the arrest of the aforementioned suspect for the above-mentioned suspected facts.

July 15, 2016

**Sakura Summary Court (Seal)**

Judge: Kazunobu YAMAZAKI(Seal)

| | |
|---|---|
| Arrested By (Official position, Name and Seal) | |
| Time, Date and Place of Arrest | Time: _____ hours<br>Date: _____<br>At _____ |
| Name and Seal | |
| Time and Date When the Suspect was Taken into Custody | Time: _____ hours<br>Date: _____ |
| Name and Seal | |
| Time and Date When the Procedure for Sending the Suspect to the Prosecutor's Office was Completed | Time: _____ hours<br>Date: _____ |
| Name and Seal | |
| Time and Date When the Suspect was Received by the Prosecutor's Office | Time: _____ hours<br>Date: _____ |
| Name and Seal | |

A0484

Form No.11 (Article 199, Code of Criminal Procedure, Articles 139, 142, & 143, Criminal Procedure Regulations)

## REQUEST FOR WARRANT OF ARREST

Date: July 15, 2016

To: Judge
    Sakura Summary Court

    I hereby request that a warrant be issued for the arrest of the suspect mentioned below with regard to a suspected case of structure damage.

        Narita Police Station (Seal)
        Chief Inspector **Manabu AWANO**(Seal)
        Judicial Police Officer designated in accordance with Article 199, Paragraph 2, Code of Criminal Procedure

1. Suspect Name: **Masahide KANAYAMA**
        Age: **(Date of Birth: September 8, 1962) 53** years old
        Occupation: **Unknown**
        Present Address: **Unknown**

2. If more than seven days of validity are needed, specify the term and state the reason:
    One year
    **A considerable length of time is supposed to be needed to arrest Suspect, because he has been on the run outside Japan since he left Japan vie Narita Airport on April 1, 2015, and is now considered to be staying in the U.S., disobeying the order by the Ministry of Foreign Affairs of Japan to surrender his passport.**

3. Public office or other offices to which Suspect shall be taken:
    **Narita Police Station or a police station having jurisdiction over the place of arrest**

4. When more than one warrant is needed, specify how many and state the reason.

                  Seal

5. Reasonable ground for suspecting that the Suspect committed the offense:
    See the documents:
        (a)  **Investigation Report**
        (b)  **Victim's Report**
        (c)  **Crime Scene Inspection Report**
        (d)  **Statements**
        (e)  **Expert Opinion**
        (f)  **Other Relevant Documents**

                    (Seal) Accepted
                    Sakura Summary Court
                    July 15, 2016  No.: Ru-245
                    Seal: KOSUGE

6. Reason for which the arrest of the Suspect is required:
    **The suspect fled Japan immediately after committing the offense, and while knowing that the arrest warrant has been issued against him regarding another offense currently under investigation, he has disobeyed the order to surrender his passport. Therefore, he seems determined to remain on the run and it is quite likely he will attempt to destroy evidence through the religious organization established and operated by himself.**

7. If a warrant has been previously requested or issued for the arrest of the same suspect for the same offense or other offense currently under investigation, state the fact and reasons, as well as the reasons for requesting the reissuance of the warrant in regard to the same offense:
    **(1) We obtained a warrant for the same suspected facts of the offense issued by Judge Masao MIYAKAWA of Sakura Summery Court on December 8, 2015. We obtained a renewed warrant issued by Judge Masao MIYAKAWA of Sakura Summary Court on January 15, 2016, and the offense was under investigation. However, it is difficult to execute the warrant within the period of validity because the suspect is on the run outside Japan.**
    **(2) We obtained a warrant for suspected facts of structure damage at Katori Jingu Shrine mentioned in Attachment 1 issued by Judge Masao MIYAKAWA of Sakura Summary Court on April 28, 2015. We obtained a renewed warrant issued by Judge Kazunobu YAMAZAKI of Sakura Summary Court on September 4, 2015, and the offense is under investigation.**

8. If the offense is punishable by fine of not more than three hundred thousand yen (twenty thousand yen in case of an offense other than those stipulated in Criminal Code, Act concerning Punishment of Violent Acts, etc., and Act concerning Maintenance of Finance-Related Punishment Rules), penal detention, or minor fine, specify the grounds as stipulated in the proviso of Article 199 Paragraph 1, Criminal Procedures Act:

                    Seal

Outline of Suspected Facts:
**As per Attachment 2**

(Attachment 1)

7. Suspected facts

At around 5:02 p.m. on March 25, 2015, in the premises of Katori Jingu Shrine located at 1697 Katori, Katori City, Chiba Prefecture, the suspect defaced a black pole located in the west front of the worship hall and another black pole located in the east front of the worship hall, and also black stairs and a black offertory box located in front of the worship hall, both under the management of Priest Shoji TAKAHASHI, with an oily liquid (causing the monetary damages totaling 2,423,248 yen). In this way, the suspect destroyed the structures owned by another.

(Attachment 2)

9, Outline of suspected facts

At around 4:06 p.m. on March 25, 2015, in the premises of Narita-san Shinsho-ji Temple located at 1 Narita, Narita City, Chiba Prefecture, the suspect defaced three poles on the east side of *So-mon* (Main Gate) under the management of the Chief Temple Manager Shodai KISHIDA, with an oily liquid (the monetary damages around 120,500 yen). In this way, the suspect destroyed the structures owned by another.

A0487

2

| WARRANT OF ARREST (NORMAL ARREST) | |
|---|---|
| Name of the Suspect | Masahide KANAYAMA |
| Address, Occupation and Age of the Suspect, Statement of Offense, Outline of Suspected Facts, Place Where the Suspect Should be Taken into Custody, Name and Official Position of the Person Who Requested the Issuance of this Warrant of Arrest | As per attached "Request for Warrant of Arrest" |
| Term of Validity | September 2, 2017 |

Arrest shall not be effected on this warrant after expiration of the term of validity. In such case, this warrant shall be returned to the court.

Even within the term of validity, this warrant shall be returned to the court without delay whenever the arresting becomes unnecessary.

I hereby authorize the arrest of the aforementioned suspect for the above-mentioned suspected facts.

September 2, 2016
**Sakura Summary Court (Seal)**

Judge: Kazunobu YAMAZAKI(Seal)

| Arrested By (Official position, Name and Seal) | |
|---|---|
| Time, Date and Place of Arrest | Time: ..................................................hours<br>Date: ......................................................<br>At ......................................................... |
| Name and Seal | |
| Time and Date When the Suspect was Taken into Custody | Time: ..................................................hours<br>Date: ...................................................... |
| Name and Seal | |
| Time and Date When the Procedure for Sending the Suspect to the Prosecutor's Office was Completed | Time: ..................................................hours<br>Date: ...................................................... |
| Name and Seal | |
| Time and Date When the Suspect was Received by the Prosecutor's Office | Time: ..................................................hours<br>Date: ...................................................... |
| Name and Seal | |

A0489

Case 1:23-cv-03469-CM    Document 4-23    Filed 04/28/23    Page 6 of 39

Form No.11 (Article 199, Code of Criminal Procedure, Articles 139, 142, & 143, Criminal Procedure Regulations)

## REQUEST FOR WARRANT OF ARREST

Date: **September 2, 2016**

To: Judge
 Sakura Summary Court

 I hereby request that a warrant be issued for the arrest of the suspect mentioned below with regard to a suspected case of structure damage.

Narita Police Station (Seal)
 Chief Inspector **Manabu AWANO**(Seal)
 Judicial Police Officer designated in accordance with Article 199, Paragraph 2, Code of Criminal Procedure

1. Suspect Name: **Masahide KANAYAMA**
   Age: **(Date of Birth: September 8, 1962) 53 years old**
   Occupation: **Unknown**
   Present Address: **Unknown**

2. If more than seven days of validity are needed, specify the term and state the reason:
   **One year**
   **A considerable length of time is supposed to be needed to arrest Suspect, because he has been on the run outside Japan since he left Japan via Narita Airport on April 1, 2015, and is now considered to be staying in the U.S., disobeying the order by the Ministry of Foreign Affairs of Japan to surrender his passport.**

3. Public office or other offices to which Suspect shall be taken:
   **Narita Police Station or a police station having jurisdiction over the place of arrest**

4. When more than one warrant is needed, specify how many and state the reason.
   Seal

5. Reasonable ground for suspecting that the Suspect committed the offense:
   See the documents:

   | | | |
   |---|---|---|
   | (a) | Investigation Report | (Seal) Accepted |
   | (b) | Victim's Report | Sakura Summary Court |
   | (c) | Crime Scene Inspection Report | September 2, 2016   No.: Ru-315 |
   | (d) | Statements | Seal: KOSUGE |
   | (e) | Expert Opinion | |
   | (f) | Other Relevant Documents | |

6. Reason for which the arrest of the Suspect is required:
   **The suspect fled Japan immediately after committing the offense, and while knowing that the arrest warrant has been issued against him regarding another offense currently under investigation, he has disobeyed the order to surrender his passport.  Therefore, he seems determined to remain on the run and it is quite likely he will attempt to destroy evidence through the religious organization established and operated by himself.**

7. If a warrant has been previously requested or issued for the arrest of the same suspect for the same offense or other offense currently under investigation, state the fact and reasons, as well as the reasons for requesting the reissuance of the warrant in regard to the same offense:
   **(1) We obtained a warrant for the same suspected facts of the offense issued by Judge Masao MIYAKAWA of Sakura Summery Court on April 28, 2015. We obtained a renewed warrant issued by Judge Kazunobu YAMAZAKI of Sakura Summary Court on September 4, 2015, and the offense was under investigation. However, it is difficult to execute the warrant within the period of validity because the suspect is on the run outside Japan.**
   **(2) We obtained a warrant for suspected facts of structure damage at Narita-san Shinsho-ji Temple mentioned in Attachment 1 issued by Judge Masao MIYAKAWA of Sakura Summary Court on December 8, 2015. We obtained a renewed warrant issued by Judge Kazunobu YAMAZAKI of Sakura Summary Court on July 15, 2016, and the offense is under investigation.**

8. If the offense is punishable by fine of not more than three hundred thousand yen (twenty thousand yen in case of an offense other than those stipulated in Criminal Code, Act concerning Punishment of Violent Acts, etc., and Act concerning Maintenance of Finance-Related Punishment Rules), penal detention, or minor fine, specify the grounds as stipulated in the proviso of Article 199 Paragraph 1, Criminal Procedures Act:
   Seal

Outline of Suspected Facts:
 **As per Attachment 2**

A0490

(Attachment 1)

Suspected Facts

At around 4:06 p.m. on March 25, 2015, in the premises of Narita-san Shinsho-ji Temple located at 1 Narita, Narita City, Chiba Prefecture, the suspect defaced three poles on the east side of *So-mon* (Main Gate) under the management of the Chief Temple Manager Shodai KISHIDA, with an oily liquid (causing the monetary damages totaling 120,500 yen). In this way, the suspect destroyed the structures owned by another.

(Attachment 2)

Outline of Suspected Facts

At around 5:02 p.m. on March 25, 2015, in the premises of Katori Jingu Shrine located at 1697 Katori, Katori City, Chiba Prefecture, the suspect defaced a black pole located in the west front of the worship hall and another black pole located in the east front of the worship hall, and also black stairs and a black offertory box located in front of the worship hall, both under the management of Priest Shoji TAKAHASHI, with an oily liquid (causing the monetary damages totaling 2,423,248 yen). In this way, the suspect destroyed the structures owned by another.

A0492

# Exhibit 16

A0493

Case 1:23-cv-03469-CM   Document 4-23   Filed 04/28/23   Page 10 of 39

December 7, 2015

To: Superintendent Hideki CHAYA

Judicial Police Officer

Chief of Narita Police Station

From: Inspector Toshijiro TSUBOI

Judicial Police Officer

First Investigation Division, Criminal Investigation Department

Chiba Prefectural Police Headquarters

(Dispatched to Narita Police Station for support)

Re: Investigation report on the need for arresting the suspect involved in the case of vandalizing historic sites

Regarding the captioned case that occurred in Narita-san Shinsho-ji Temple and Katori Jingu Shrine on March 25, 2015, we have been investigating the incident in Katori Jingu Shrine with a warrant for the arrest of Suspect Masahide KANAYAMA issued by Judge Kazunobu YAMAZAKI of Sakura Summary Court. I hereby report the need for obtaining another warrant from the court for his arrest for vandalism in Narita-san Shinsho-ji Temple in order to clarify the whole picture of this incident.

I. Suspect's Identity

Permanent Domicile: 4-32 Takadanobaba, Shinjuku-ku, Tokyo

Address: Grace House 4th Floor, 4-32-6 Takadanobaba, Shinjuku-ku, Tokyo

(Deleted from the record by administrative authorities on May 16, 2013)

Residence: Unknown

Occupation: Unknown

Name: Masahide KANAYAMA

DOB: September 8, 1962      Age: 53 years old

II. Summary of the Suspected Facts

At around 4:06 p.m. on March 25, 2015, in the premises of Narita-san Shinsho-ji Temple located at 1 Narita, Narita City, Chiba Prefecture, the suspect defaced three poles

1

A0494

with an unidentified oily liquid on the east side of *So-mon* (Main Gate) under the management of the Chief Temple Manager Shodai KISHIDA (the monetary damages worth 120,500 yen). In this way, the suspect destroyed the structures owned by another.

III. Suspect's Personal Background

  A. Investigators checked with Shinjuku City Office, Tokyo having jurisdiction over the suspect's permanent domicile and confirmed his identity as follows:

    Permanent Domicile: 4-32 Takadanobaba, Shinjuku-ku, Tokyo

    Place of Birth: Koto-ku, Tokyo

    Address: Grace House 4th Floor, 4-32-6 Takadanobaba, Shinjuku-ku, Tokyo

        (Deleted from the record by administrative authorities on May 16, 2013)

    Name: Masahide KANAYAMA

    DOB: September 8, 1962        Age: 53 years old

    Our online search for Masahide KANAYAMA shows that he is mainly living in the U.S., serving as an obstetrician/gynecologist and engaging activities as a Christian missionary.

    The suspect's passport application form, the visitor's book of the hotel where he stayed and his credit card information show "150 E 55TH ST FL 5 NEW YORK NY 10022 USA" as his address, which suggests that the suspect is currently living at this address. As we have not verified if he is actually living at the address, his residence is shown as "Unknown" in I. above.

  B. The suspect gave his former address "4-32-6 Takadanobaba, Shinjuku-ku, Tokyo" on his application form for the passport that was issued to him by the Japanese government on September 18, 2012. And, he also gave the same address as his emergency contact in the application form, indicating the contact person as his sister named Rika KANAYAMA. Based on the above, it is presumed that the suspect was probably living at the address with his family before going to the U.S.

  C. I have identified Chogen KANAYAMA as the suspect's father, because his former family register before registering his domicile on June 6, 2002 indicates that Chogen KANAYAMA, address: 2-9 Shirakawa, Koto-ku, Tokyo, is his father.

  D. The elder sister of the suspect named Rika KANAYAMA said to police about the suspect's personal background as follows:

2

- The suspect had been looked after by one of his relatives from about the age of 3 until he entered an elementary school.
- He graduated from Shirakawa Elementary School located in Koto-ku, Tokyo.
- He graduated from Komaba Toho Junior High School and subsequently Komaba Toho Senior High School.
- After graduating from high school, he went to the U.S. to major in medicine both at Creighton University and Medical College of Wisconsin and became a doctor in the U.S.
  - He was trained as an intern at Mayo Clinic, and now he is a practicing obstetrician/gynecologist in New York.

IV.  Criminal Record

A review of criminal records at Crime Information Center, Data Management Division, General Affairs Department, Chiba Prefectural Police Headquarters for the suspect has revealed that he does not have any criminal records.

V.  Background Information

A. The suspect has no criminal record, and online search for him has revealed that the suspect is serving as a practicing obstetrician and gynecologist in the U.S. and also engaging religious activities as a Christian missionary in Japan and other countries around the world. However, the actual status of his activities has not been confirmed.

The homepage shows that the Christian organization named "IMM Japan" established and operated by the suspect actively organizes lecture meetings mainly in Japan, Northern Europe and Asia to attract new believers in Christianity.

B. A review of his flight records has revealed that he booked for the flights below with All Nippon Airways on February 22, 2015 on the ANA sky web:

- A flight arriving at Narita Airport, Japan on March 21, 2015 from JFK, U.S.
- A flight departing from Narita Airport, Japan on April 1, 2015 for Delhi Airport, India
- A flight arriving at Narita Airport, Japan on April 7, 2015 from Delhi Airport, India and departing for JFK, U.S. on the same day

Records show that the suspect left Japan for abroad after the offense in Japan.

C. A review of entry/exit records at the Tokyo Immigration Office for the suspect has

3

revealed that he entered Japan on March 21, 2015 and left Japan on April 1, 2015. The records are consistent with the above booking record. It is therefore apparent that the suspect is now on the run outside Japan.

VI. Need for Arrest of the Suspect

A. Investigation to date has revealed that the suspect traveled back and forth in and out of Japan frequently in an irregular manner.

The facts of advance booking for flights, hotels and cars for his stay in Japan indicate that the suspect was well-prepared for the offense. It was also found that he committed vandalism at Narita Shinshojii Temple immediately before another vandalism at Katori Jingu Shrine.

B. A review of the billing records for his credit card has revealed that his card was used in the U.S. on November 2, 2015 (JST), indicating that he is at large in the U.S.

Despite the nation-wide media coverage about his involvement in this case, he is still at large. It appears he is not remorseful for his criminal conducts, which provokes the Japanese people to anger, because temples and shrines, the symbols of the Japanese culture, have been tainted by his heinous acts.

*Not guilty*

C. On September 10, 2015, the Ministry of Foreign Affairs of Japan ordered the suspect to surrender his passport pursuant to Article 19, Paragraph 1 of the Passport Act to prompt him to return to Japan.

During the one-month notice period, the suspect failed to obey the order, and his passport was revoked on October 14, 2015.

Although he was well aware that an arrest warrant was issued against him for vandalism on structures, he did not comply with the order to avoid being arrested.

D. Although the suspect does not have any criminal records, he is single and can move around the world freely. Given the facts and risks:

- He is still at large abroad away from Japan intentionally.;

- He is likely to destroy evidence through the religious networks or organization established and operated by him.; and

- He keeps staying in the U.S. being aware that an arrest warrant was issued against him. He has been trying to hide himself to avoid being arrested.

It is therefore essential to obtain an arrest warrant from court, arrest the suspect

4

A0497

immediately upon his entry into Japan, prevent him from escaping abroad and destroying evidence, and also clarify the whole picture of this case.

VII. Reason for Requesting an Arrest Warrant Valid for One Year

The suspect is now at large in the U.S.

The Ministry of Foreign Affairs of Japan ordered the suspect to surrender his passport to prompt him to return to Japan, but he failed to obey the order, and his passport has not been returned to date.

As described above, he has been refusing to return to Japan to avoid being arrested. It is quite unlikely he will return to Japan of his own accord. It is therefore impossible to execute an arrest warrant in seven days, and it definitely requires a considerable period of time to arrest the suspect. Based on the above, it is essential to obtain an arrest warrant valid for one year.

(Seal) TSUBOI

5

A0498

Date: April 27, 2015

To: Superintendent Hideki CHAYA

Judicial Police Officer

Chief of Narita Police Station

From: Sergeant Ken SHINOZUKA

Judicial Police Officer

First Investigation Division, Criminal Investigation Department, Chiba Prefectural Police Headquarters

(Dispatched to Narita Police Station for support)

Re: Investigation report on the suspect's profile and need for arrest of the suspect pertaining to the case of vandalizing historic sites

Regarding the captioned case that occurred in Narita-san Shinsho-ji Temple and Katori Jingu Shrine on March 25, 2015, I hereby report the need for arrest of the suspect named Masahide KANAYAMA.

I. Suspect's Identity

Name: Masahide KANAYAMA

DOB: September 8, 1962     Age: 52 years old

Permanent Domicile: 4-32 Takadanobaba, Shinjuku-ku, Tokyo

Address: Grace House 4th Floor, 4-32-6 Takadanobaba, Shinjuku-ku, Tokyo

(Deleted from the record by administrative authorities on May 16, 2013)

Residence: Unknown

Occupation: Unknown

II. Case Summary

At around 5:02 p.m. on March 25, 2015, in the premises of Katori Jingu Shrine located at 1697 Katori, Katori City, Chiba Prefecture, the suspect defaced a black pole located in the west front of the worship hall and another black pole located in the east front of the worship

1

A0500

hall, and also black stairs and a black offertory box located in front of the worship hall, both under the management of Priest Shoji TAKAHASHI, with an oily liquid (the monetary damages unknown). In this way, the suspect destroyed the structures owned by another.

III. Suspect's Background

A. As a result of inquiry with Shinjuku City Office, Tokyo, supervising the place of the suspect's permanent domicile, his identity was confirmed as follows:

Name: Masahide KANAYAMA

DOB: September 8, 1962   Age: 52 years old

Permanent Domicile: 4-32 Takadanobaba, Shinjuku-ku, Tokyo

Place of Birth: Koto-ku, Tokyo

Address: Grace House 4th Floor, 4-32-6 Takadanobaba, Shinjuku-ku, Tokyo

(Deleted from the record by administrative authorities on May 16, 2013)

Marital History: None

Shinjuku City Office determined on May 16, 2015 that the suspect was actually not living at the said address and deleted the address from his family register on May 21, 2015. Although his detailed present address is unknown, online research for him has revealed that the suspect is now based in the U.S. serving as a practicing obstetrician and gynecologist and also a Christian missionary. It is therefore presumed that the suspect is living in the U.S.

The suspect registered his current permanent domicile separately from his original family register on June 6, 2002. His former family register indicates:

Chogen KANAYAMA

2-9 Shirakawa, Koto-ku, Tokyo

In the register, "Chogen KANAYAMA" is shown to be the suspect's father.

B. The suspect gave his former address "4-32-6 Takadanobaba, Shinjuku-ku, Tokyo" on his application form for the passport that was issued to him by the Japanese government on September 18, 2012. And, he also gave the same address as his emergency contact in the application form, indicating the contact person as his sister named Rika KANAYAMA. Based on the above, it is presumed that the suspect was probably living at the address with his family before going to the U.S.

2

A0501

IV.  Criminal Record

Criminal record checks were conducted for the suspect with Crime Information Center, Data Control Division, General Affairs Department, Chiba Prefectural Police Headquarters, but the result was negative.

V.  Background Information

A. The suspect has no criminal record, and online research for him has revealed that the suspect is serving as a practicing obstetrician and gynecologist in the U.S., also engaging religious activities as a Christian missionary in Japan and other countries around the world. However, the actual status of his activities has not been confirmed.

The homepage shows that the Christian organization named "IMM Japan" established and operated by the suspect actively organizes lecture meetings mainly in Japan, Northern Europe and Asia to attract new believers in Christianity.

B. A review of his flight records has revealed that he booked for the flights below with All Nippon Airways on February 22, 2015 on the ANA sky web:

A flight arriving at Narita Airport, Japan on March 21, 2015 from the U.S.

A flight departing from Narita Airport, Japan on April 1, 2015 for Delhi Airport, India

A flight arriving at Narita Airport, Japan on April 7, 2015 from Delhi Airport, India and departing for the U.S. on the same day

Records show that the suspect left Japan from Narita Airport on April 1, 2015 for India after the offense in Japan.

VI.  Need for Compulsory Investigation

A. This is an unusual and vicious case of vandalizing culturally significant historic sites in Japan, where the suspect defaced important cultural properties that should be carefully conserved for future generations with an oily liquid in Narita-san Shinsho-ji Temple and Katori Jingu Shrine.

The analysis of the crime situations and a series of the suspect's actions has found coincidences between them. This is therefore considered a wide-area serious crime.

B. Investigation to date has revealed that the suspect traveled back and forth in and out of

3

A0502

Japan frequently in an irregular manner. The facts of advance booking for flights, hotels and cars for his stay in Japan indicate that the suspect was well-prepared for the offense.

C. If the suspect detects our investigation against him, there are risks that he may keep escaping overseas and destroy evidence such as his clothes and relevant documents via his religious networks given the sensational nature of his crime. It is therefore essential to obtain an arrest warrant from court, arrest the suspect immediately upon his entry into Japan, conduct compulsory investigations to prevent damages from increasing, and also clarify the whole picture of this case to prevent the suspect from further conducting similar crimes.

4

A0503

Date: April 25, 2015

To: Superintendent Hideki CHAYA
  Judicial Police Officer
  Chief of Narita Police Station

From: Inspector Satoshi KIMURA
  Judicial Police Officer
  First Investigation Division, Criminal Investigation Department, Chiba Prefectural Police Headquarters
  (Dispatched to Narita Police Station for support)

Re: Investigation report on identifying the suspect pertaining to the case of vandalizing historic sites

Regarding the captioned case that occurred in Narita-san Shinsho-ji Temple and Katori Jingu Shrine on March 25, 2015, I hereby report that Masahide KANAYAMA was identified as the suspect as a result of analysis of images taken by security cameras installed at respective crime scenes and tollgates of Higashikanto Expressway, examination of the expressway tickets, rent-a-car investigation, and cross-checking of personal images obtained in the course of investigation.

I. Suspect
  Name: Masahide KANAYAMA
  Date of Birth: September 8, 1962 (52 years old)
  Permanent Domicile: 4-32 Takadanobaba, Shinjuku-ku, Tokyo
  Address: Grace House 4th Floor, 4-32-6 Takadanobaba, Shinjuku-ku, Tokyo
      (Deleted by administrative authorities on May 16, 2013)
  Residence: Unknown
  Occupation: Unknown

II. Process for identifying the suspect
  A. Analysis of images taken by security cameras installed at crime scenes
    1. Narita-san Shinsho-ji Temple
      a. On April 9, 2015, police recognized the case and obtained the footage of the security cameras installed in the premises of Narita-san Shinsho-ji Temple.

1

A0505

On the same day, we were informed that a similar incident occurred in Katori Jingu Shrine in the jurisdiction of neighboring Katori Police Station, and that the security cameras filmed a suspicious man roaming around in the premises and reaching out his hands near the affected structures, poles and an offertory box. The man wore a black long-sleeved and streaked windbreaker with hood (inside-collar is white), a gray jacket, and a whitish collared shirt under the windbreaker, dark-blue jeans, and black shoes, carrying a camera, with black hair (thinning on top).

b.    Based on the characteristics, investigators examined the security camera footage to trace the man and confirmed that the suspect was roaming around in the premises of Narita-san Shinsho-ji Temple and reaching out his hands and touched *Nio-mon* Gate, *Komyo-do* Hall, *Okuno-in* or Inner Sanctuary and *Somon* or Main Gate, all of which were later found defaced between 15:37:10 and 16:06:49 on March 25, 2015.

2.    Katori Jingu Shrine

a.    On April 9, 2015, we were notified of the incident and obtained the footage of security cameras installed in the premises of Katori Jingu Shrine. The analysis of the footage has confirmed a man closely resembling the suspicious man who was also filmed by security cameras in Narita-san Shinsho-ji Temple between 16:57:06 and 17:10:33 on March 25, 2015.

3.    Analysis of security camera footage and information from Nara Prefectural Police

As a result of analysis of the footage of security cameras installed in Narita-san Shinsho-ji Temple and Katori Jingu Shrine, the persons filmed were determined to be an identical man because the behaviors were quite similar.

The suspicious man was last captured by a security camera in Narita-san Shinsho-ji Temple at around 4:06 p.m. on March 25, 2015, and then about 51 minutes later, i.e., at 4:57 p.m. on March 25, 2015, he was first captured by a security camera in Karoti Jingu Shrine. It was therefore concluded that the suspicious man committed the offense in Narita-san Shinsho-ji Temple first and then in Katori Jingu Shrine.

Since we recognized similar incidents consecutively in our prefecture on April 9, 2015, we thought of the possibility that the same person was also involved in other similar offenses in Nara Prefecture and other prefectures of the Kinki Region and requested the First Investigation Division, Criminal Investigation Department of Nara Prefectural Police Headquarters for information and got photos of the suspect who

2

A0506

was involved in defacing *Jizoson* or 'Guardian Deity of Children in Asuka-dera Temple located at 682 Oaza Asuka, Asuka-mura, Takaichi-gun, Nara Prefecture, with an oily liquid, between around 7:00 a.m. on March 28, 2015 and around 7:00 a.m. on March 29, 2015.

The man in the photo looked quite similar to the man captured by security cameras in Narita-san Shinsho-ji Temple and Katori Jingu Shrine in appearance. This confirmed the suspicion that the same person repeated similar offenses across prefectures.

B.  Investigation on the transport means

Based on the analysis of footage of security cameras in Narita-san Shinsho-ji Temple and Katori Jingu Shrine, we checked the transport means that the suspect may have used and concluded it impossible for a same person to commit offenses at both locations during the time frame without using a car.

Investigators conducted simulation tests for three different routes from Narita-san Shinsho-ji Temple to Katori Jingu Shrine using three police cars on April 14, 2015. As a result, only the car on the route of using Higashikanto Expressway from Narita Tollgate to Sawara-Katori Tollgate could drive within 51 minutes. It actually took about 37 minutes in total: 27 minutes for drive and 10 minutes for walk.

C.  Investigation into Higashikanto Expressway Sawara-Katori and Narita Tollgates

1.  Analysis of images of a security camera installed at Sawara-Katori Tollgate

Based on the characteristics of the suspect captured by security cameras in Narita-san Shinsho-ji Temple and Katori Jingu Shrine, investigators checked the footage recorded by a security camera installed at Sawara-Katori Tollgate near Katori Jingu Shrine between around 4:00 p.m. and 5:00 p.m. on March 25, 2015 and found a man resembling the suspect with black hair in a dark long-sleeved jacket with white hood. He was found driving a gray Toyota Prius (license plate number unknown) and paying the toll in cash at 16:41:52 on March 25, 2015.

2.  Examination of expressway tickets collected at Sawara-Katori Tollgate

In order to corroborate the visual confirmation above, we got and checked 36 expressway tickets collected at cash payment at around 4:41 p.m. on March 25, 2015 and found the expressway ticket that was issued to the car with license plate number ending with 14 at 4:30 p.m. on March 25, 2015 at Narita Tollgate and collected at 4:41 p.m. on March 25, 2015 at cash payment at Sawara-Katori Tollgate.

3.  Analysis of images of a security camera installed at Narita Tollgate

As explained above, the footage analysis and examination of expressway

3

A0507

tickets at Sawara-Katori Tollgate identified a car driven by a person resembling the suspect as gray Toyota Prius with license plate number ending with 14. Investigators then analyzed the footage recorded by a security camera installed at Narita Tollgate between around 4:00 p.m. and around 5:00 p.m. on March 25, 2015 and found a gray Toyota Prius (license plate number unknown) getting an expressway ticket and entering Higashikanto Expressway.

4.  Result of investigation into the tollgates

As a result of analysis of the footage from security cameras at Sawara-Katori and Narita Tollgates and examination of expressway tickets collected at Sawara-Katori Tollgate, it was established that a gray Toyota Prius with license plate number ending with 14 entered Higashikanto Expressway at Narita Tollgate at 4:30 p.m. on March 25, 2015 and exited at Sawara-Katori Tollgate at 4:41 p.m. on March 25, 2015, which indicates that the said Prius could be possibly used by the suspect to commit the offense at Katori Jingu Shrine.

D.  Identifying the suspect and car through inquiries with car-rental shops

1.  Identifying the car rented by the suspect

In order to find the gray Toyota Prius with license plate number ending with 14, investigators made inquiries with car-rental shops around Narita International Airport and in Narita City and found the gray Toyota Prius with License Plate Number: Narita 300Wa・414 rented by Orix Rent-A-Car Narita Airport Office of Yuasa Co., Ltd. (Location: 1373-7 Komaino, Narita City, Chiba Prefecture) at Narita International Airport Terminal 1 Building Counter.

2.  Identifying the suspect (renter of the car)

Investigators checked the signup document and found:

Name of the renter: Masahide KANAYAMA

Address of the renter: Nomura Building 32F, Nishi-shinjuku, Shinjuku-ku

Contact: 080-5699-7733 (cell phone)

Rented car: Prius with license plate number: Narita 300Wa414

Rental period (may be changed): From 2:30 p.m. on March 25, 2015

to 9:30 a.m. on March 26, 2015

Departure from: Narita Airport Terminal 1 Building Counter

Return to: Narita Airport Shop

Investigators also confirmed copies of KANAYAMA's passport and his international driver's license with face photo (DOB: September 8, 1962) as the renter's ID documents. The man in the photo resembled the suspect captured by

4

A0508

security cameras in Narita-san Shinsho-ji Temple and Katori Jingu Shrine. It is therefore highly likely the suspect used the gray Prius with license plate number Narita300 Wa・414, and the person who rented the Prius named Masahide KANAYAMA (DOB: September 8, 1962 (52 years old)) surfaced as the suspect.

    The car-rental shop employees said to investigators that the renter went out at 2:33 p.m. on March 25, 2015 and returned at 10:19 a.m. on March 26, 2015.

E.   Investigation into Masahide KANAYAMA

1.   Christian organization founded by Masahide KANAYAMA

    Once Masahide KANAYAMA surfaced as the suspect, investigators ran online searches for "Masahide KANAYAMA" and came up with "Dr. Masahide KANAYAMA", founder of the Christian organization named "IMM Japan" with his photos (identity unknown). The "IMM Japan" was portrayed on the Internet as an NPO organization approved in the U.S. in July 2013. Dr. Masahide KANAYAMA is purportedly the Founder/Director of IMM Japan, having an office at 32F Nomura Building, Nishi-shinjuku, Shinjuku-ku, Tokyo, also serving as obstetrician and gynecologist certified by Director of New York Endometriosis Center and American board (ABOG). His profile shows that he was born in Tokyo, Japan, became Christian at the age of 17, and travelled to the U.S. to become a doctor and missionary. According to the Internet information, he is a practicing doctor in the U.S. who periodically travels in and outside Japan giving lectures and engaging missionary activities.

    The website also refers to IMM Japan Office Manager named Shozo ADACHI, who is apparently involved in IMM and was also confirmed as the subscriber to the cell phone number: 080-5699-7733, which was given on the signup document for the said rented car.

2.   Investigation into the passport

    Since investigation has found that Masahide KANAYAMA has a Japanese passport numbered TZ0230962, investigators sought and obtained pages of the original passport from the Ministry of Foreign Affairs of Japan. The passport pages show:

Passport number: TZ0807838

Date when the application was accepted: September 11, 2012

Date of issue: September 12, 2012

Date when the passport was delivered: September 18, 2012

Name: Masahide KANAYAMA

Date of birth: September 8, 1962

5

A0509

Permanent domicile: 4-32-6 Takadanobaba, Shinjuku-ku, Tokyo

Current address: 150E. 55th St. 5th floor New York NY 10022

      (as written in the passport)

Phone number: 212-421-1016

Cell phone number: 917-755-3955

Emergency contact in Japan:

  Name: Rika KANAYAMA

  Address: 4-32-6 Takadanobaba, Shinjuku-ku, Tokyo

  Relationship with applicant: Elder sister

  Phone number: 03-5331-3351

3.  Investigation into his flight records

    On April 16, 2015, investigators checked with Operations Division, Customer Service Department, Narita Airport Branch, All Nippon Airways (ANA) about Masahide KANAYAMA's flight records and found:

    (*Time of departure/arrival was verified by investigators on the Internet.)

  a.  Departure: from JFK on NH #9 at 0:15 p.m. on March 20, 2015 (US local time)

    Arrival (Entry into Japan): at NRT at 2:57 p.m. on March 21, 2015 (Japan local time)

  b.  Departure from Japan: from NRT on NH #827 at 5:55 p.m. on April 1, 2015 (Japan local time)

    Arrival: at Delhi Airport at 6:17 p.m. on April 1, 2015 (India local time)

  c.  Departure: from Delhi Airport on NH #828 at 3:55 a.m. on April 7, 2015 (India local time)

    Arrival: at NRT at 0:19 p.m. on April 7, 2015 (Japan local time)

    Departure (transit): from NRT on NH #1010 at 3:18 p.m. on April 7, 2015, for JFK (Japan local time)

4.  Investigation into the suspect's permanent domicile

    As KANAYAMA's current address given in his application form for passport was an address in the U.S., investigators checked with Shinjuku Ward Office about his registered domicile and found:

    Permanent domicile: 4-32 Takadanobaba, Shinjuku-ku, Tokyo

    Address: Grace House 4th Floor, 4-32-6 Takadanobaba, Shinjuku-ku, Tokyo

      (Deleted by administrative authorities on May 16, 2013)

5.  Investigation into the suspect's former address

    The address "Grace House 4th Floor, 4-32-6 Takadanobaba, Shinjuku-ku,

6

Tokyo" was found to be deleted from his family register, but the said address was also given by the suspect on his application form for passport as the emergency contact address where his sister named Rika KANAYAMA was living. Investigators went to the address and found a five-story concrete building there. In the building, Grace Chapel, Tokyo Megumi Kyokai had an office on the first floor, and the postbox for Room 301 showed "Chogen KANAYAMA, Diamond Denki (Electric), Address: Grace House Room #301, 4-32-6 Shinjuku-ku, Tokyo".

His family register shows that "Chogen KANAYAMA" is his father, and accordingly, that is his parents' home.

6.  Investigation into the credit card company

The suspect used an American Express card to pay for the rental. Investigators checked with the credit card company about the billing record for the period from March 21 to April 7, 2015 during which he was staying in Japan and found that he made a total of 24 purchases in seven prefectures across Japan (eight purchases in Chiba, seven purchases in Tokyo, a purchase in Tochigi, two purchases in Niigata, a purchase in Kyoto, three purchases in Nara, and two purchases in Yamagata).

The affected shrines and/or temples are located in these prefectures, so there is a possibility that the suspect committed similar offenses against shrines and/or temples other than Narita-san Shinsho-ji Temple and Katori Jingu Shrine.

F.  Investigation into hotels

On April 16, 2015, investigators checked with hotels located near Katori Jungu Shrine to see if KANAYAMA stayed after committing the offense in Katori Jingu Shrine. A hotel register shows that he checked in at the hotel named Spa & Resort Inubosaki Taiyonosato located at 10292-1 Inubosaki, Choshi City at 6:47 p.m. on March 25, 2015 and checked out at 7:51 a.m. on March 26, 2015.

The man at the time of check-in captured by a security camera in the hotel looked similar to the suspect taken by security cameras in Narita-san Shinsho-ji Temple and Katori Jingu Shrine. At the time of check-out on the following day, he changed clothes into a greyish long-sleeved down jacket and a whitish collared shirt.

The hotel employees said that his car was gray Prius with Narita license plate (number unknown). It is therefore presumed that he drove the rented car in question.

G.  Information from Kashima Police Station of Ibaraki Prefectural Police

On April 19, 2015, we obtained from Kashima Police Station of Ibaraki Prefectural Police the footage from a security camera installed at Kashima Jingu Shrine located

7

A0511

at 2306-1 Kyuchu, Kashima City, Ibaraki Prefecture which suffered similar damages. Investigators checked the images filming KANAYAMA who visited the hall of worship and the rear shrine in Kashima Jingu Shrine after 9:00 a.m. on March 26, 2015. The suspect acted in a suspicious manner at the rear shrine, swinging up his right hand towards the top of offertory box, looking around restlessly, touching the gate on the east side with his right hand, and touching the gate on the west side with his right hand. It is therefore likely KANAYAMA also committed the offense in Kashima Jingu Shrine.

H.  Investigation into Higashikanto Expressway Itako and Narita Tollgates

It was found that he returned the car at 10:19 a.m. on March 26, 2015, and it was presumed that he used Higashikanto Expressway from Itako Tollgate to Narita Tollgate to return the car. The analysis of the footage of security cameras installed at Itako and Narita Tollgates has found a car which appeared to be the gray Toyota Prius rented by KANAYAMA entering the expressway at Itako Tollgate at 9:54 a.m. on March 26, 2015 and exiting at Narita Tollgate at 10:11 a.m. on the same day.

I.  Identifying the suspect based on images

Investigators asked Professor Masatsugu HASHIMOTO, Department of Forensic Odontology and Anthropology, Tokyo Dental College located at 2-9-18 Misaki-cho, Chiyoda-ku, Tokyo to check if the man in the passport photo and the man in images taken by security cameras were identical. The professor's reply was:

- It is reasonable to conclude that the suspect is very likely to be the man in the photo attached to the application form for KANAYAMA's passport.

- It is reasonable to conclude that the suspect is very likely to be the man in the case of Katori Jingu Shrine.

- The colors of the suspect's jacket, shirt, pants and shoes in the case of Narita-san Shinsho-ji Temple are identical to those worn by the suspect in the case of Katori Jingu Shrine.

J.  Occurrence of similar cases

Similar cases have occurred in 10 prefectures including Chiba to date. In some cases, security cameras filmed a man believed to be KANAYAMA and American Express cards were used to pay for the rental of cars.

The billing records show that purchases were made with the card in prefectures where similar crimes occurred.

III. Identifying the suspect

8

As described above:

A.  Security cameras installed at Narita-san Shinsho-ji Temple and Katori Jingu Shrine filmed a man who looked similar in appearance and behaved similarly.

B.  After committing the offense at Narita-san Shinsho-ji Temple, KANAYAMA possibly drove a rented car and arrived at Katori Jingu Shrine within the time frame.

C.  All the images obtained in the course of investigation were confirmed to be the image of KANAYAMA. Besides, the professor of the Department of Forensic Odontology and Anthropology, Tokyo Dental College determined it reasonable to conclude that the men were very likely to be identical with each other.

Based on the above, Masahide KANAYAMA (52 years old) was identified as the suspect.

9

9

Case 1:23-cv-03469-CM   Document 4-23   Filed 04/28/23   Page 31 of 39

July 24, 2015

To: Superintendent Hideki CHAYA
   Judicial Police Officer
   Chief of Narita Police Station

         From: Sergeant Masahiro KAMIGAKI
               Judicial Police Officer
               First Investigation Division, Criminal Investigation Department
               Chiba Prefectural Police Headquarters
               (Dispatched to Narita Police Station for support)

Re: Investigation report on establishing the criminal facts pertaining to the case of vandalizing historic sites

    Regarding the captioned case that occurred in Narita-san Shinsho-ji Temple and Katori Jingu Shrine on March 25, 2015, I hereby report the criminal facts that have been uncovered as a result of investigation to date.

I.  Uncovered criminal facts
    At around 4:06 p.m. on March 25, 2015, in the premises of Narita-san Shinsho-ji Temple located at 1 Narita, Narita City, Chiba Prefecture, the suspect defaced three poles on the east side of *So-mon* (Main Gate) under the management of the Chief Temple Manager Shodai KISHIDA (the monetary damages around 120,500 yen). In this way, the suspect destroyed the structures owned by another.

II. Process for establishing the facts
    A.  Identification of the suspect by surveillance cameras, etc.
       1.  Identification of Suspect Masahide KANAYAMA
            Our investigation has revealed that the suspect rented a gray-colored Toyota Prius with license plate number: Narita300Wa-414 and used it for committing the offense. The footage from the surveillance and security cameras covering the area in and out of the premises of Narita-san Shinsho-ji Temple shows that the said vehicle entered and left the Kokei-kai Tsuchiya Parking Lot of Narita-san Shinsho-ji Temple. The time of entrance was identified as at around 3:01 p.m. on March 25, 2015, and the time of departure was identified as at around 4:21 p.m. on March 25, 2015.

1

A0515

The footage from the surveillance cameras installed in Narita-san Shinsho-ji Temple shows that a person who closely resembled Suspect Masahide KANAYAMA was walking around in the premises. The analysis has confirmed that the person stayed in the premises of Narita-san Shinsho-ji Temple between around 3:08 p.m. on March 25, 2015 and around 4:15 p.m. on March 25, 2015.

Investigators sought expert opinion for identification of personal images captured by the surveillance cameras and obtained a reply that the expert could reasonably conclude that the said person looked like Suspect Masahide KANAYAMA very much.

It was therefore concluded that Suspect Masahide KANAYAMA was walking around in the premises of Narita-san Shinsho-ji Temple at the time of the incident based on the following outcomes of our investigation:

- The vehicle rented in the name of Suspect Masahide KANAYAMA entered and left the parking lot in the vicinity of the temple.;
- The person captured by the surveillance cameras installed in the temple premises looked like Suspect Masahide KANAYAMA very much.; and
- An expert identified the said person captured by the surveillance cameras as Masahide KANAYAMA.

2. Confirmation of the suspect's movements

After identifying the person recorded by the surveillance cameras in the premises of Narita-san Shinsho-ji Temple as Suspect Masahide KANAYAMA, investigators examined the footage tracing him and visually confirmed that he walked around *Nio-mon* (Gate), *Komyo-do* (Hall), *Okuno-in* (Inner Shrine) and *So-mon* (Main Gate); touched poles, and behaved in a suspicious manner.

It was confirmed that he touched affected three poles on the east side of *So-mon* at around 4:06 p.m. on March 25, 2015, which corroborated his criminal conduct in the premises of Narita-san Shinsho-ji Temple.

B. Obtaining photos of *So-mon* (Main Gate)

Among others, investigators noticed that many tourists went to *So-mon* as the main gateway to Narita-san Shinsho-ji Temple and searched for the tourists or visitors who posted photos taken at *So-mon* on the Internet in an effort to get such photos from them.

1. Obtaining photos of *So-mon* taken before incident

Investigators searched for organized tours to look for the tourists visiting Narita-san Shinsho-ji Temple on March 25, 2015, the day when the suspect was captured by the surveillance cameras. As a result, it was found that Ms. Noriko YAGI, 62 years

2

A0516

old, part-timer, address: 2-9-13 Higashi-nakanoyama, Higashi-ku, Niigata City, Niigata Prefecture joined a tour organized by Tabix Japan, Inc. and took photos of *So-mon*.

It was found that a photo investigators got from her was taken at around 2:24 p.m. on March 25, 2015 based on the data recorded on her camera.

The photo was taken before the suspect visited the temple, and any traces of stain were not seen on the poles in the photo. It was therefore determined that the photo was taken before the incident.

2. Obtaining photos of *So-mon* taken after incident

Investigators ran online search and found a website showing some photos taken at *So-mon* of Narita-san Shinsho-ji Temple. The website showed that the photos were taken after 3:30 p.m. The website owner was identified as Mr. Hideyuki OKADA, 46 years old, company employee, address: 2-164 Sakurashin-machi, Yotsukaichi City, Mie Prefecture.

It was found that the photos investigators got from him were taken at around 4:07 p.m. on March 25, 2015 based on the data recorded on his camera. They were taken immediately after the suspect touched the poles on the east side of the *So-mon*, and traces of stain were seen on the poles in the photos It was therefore determined that the photos were taken immediately after the incident.

C. Comparison of the photos obtained

1. Photo taken before the incident

After sharpening the photo mentioned in B.1. for comparison with another photo taken from the same angle, it was confirmed that both photos were consistent with common objects in the same positions. Any traces of stain were not seen in the photo. It was therefore determined that vandalism did not occur at around 2:24 p.m. on March 25, 2015.

2. Photo taken after incident

After sharpening a photo mentioned in B.2. for comparison with another photo taken from the same angle, it was confirmed that both photos were consistent with common traces of stain in the same positions. It was therefore determined that vandalism occurred before 4:07 p.m. on March 25, 2015.

D. Analysis of surveillance camera footage recorded before and after the incident

As described above, a photo before the incident was taken at around 2:24 p.m. on March 25, 2015, and a photo after the incident was taken at around 4:07 p.m. on March 25, 2015. The analysis has also revealed that the suspect touched the poles on the east side of *So-mon* (Main Gate) at around 4:06 p.m. on March 25, 2015.

3

A0517

Further analysis of the surveillance camera footage during the timeframe has revealed that nobody other than the suspect touched the poles of *So-mon* although many people passed by the poles on the east side of *So-mon*. It was therefore determined that nobody other than the suspect touched the poles during the timeframe.

III. Facts established

As mentioned in II.A., II.B., II.C. and II.D. above, it has been confirmed that:

- The person filmed by the surveillance cameras in Narita-san Shinsho-ji Temple is Suspect Masahide KANAYAMA.;
- The surveillance cameras filmed the person touching the poles on the east side of the *So-mon* (Main Gate).;
- The photos were taken before and after the incident for sure.; and
- No one other than the suspect touched the poles during the said timeframe.

Therefore, as described in I. above, his criminal facts were established.

4

A0518

A0519

April 25, 2015

To: Superintendent Hideki CHAYA

  Judicial Police Officer

  Chief of Narita Police Station

From: Inspector Toshijiro TSUBOI

Judicial Police Officer

First Investigation Division, Criminal Investigation

Department, Chiba Prefectural Police

Headquarters

(Dispatched to Narita Police Station for support)

Re: Investigation report on establishing the criminal facts pertaining to the case of vandalizing

historic sites

Regarding the captioned case that occurred in Narita-san Shinsho-ji Temple and Katori

Jingu Shrine on March 25, 2015, I hereby report the criminal facts that have been uncovered

as a result of investigation to date.

I. Uncovered criminal facts

At around 5:02 p.m. on March 25, 2015, in the premises of Katori Jingu Shrine located

at 1697 Katori, Katori City, Chiba Prefecture, the suspect defaced a black pole located in the

west front of the worship hall and another black pole located in the east front of the worship

1

A0520

hall, and also black stairs and a black offertory box located in front of the worship hall, both

under the management of Priest Shoji TAKAHASHI, with an oily liquid (the monetary

damages unknown). In this way, the suspect destroyed the structures owned by another.

II. Process for establishing the facts

A. This is a case of vandalizing historic sites where the suspect defaced poles and stairs in

the Hall of Worship and the Main Hall and many other cultural properties in the premises

of Katori Jingu Shrine with an oily liquid.

B. The images taken by security cameras installed at crime scenes show a man acting in a

suspicious manner between 4:57 p.m. and 5:10 p.m. on March 25, 2015. The

subsequent investigation identified him as the suspect. Still, it could not be determined

that he had been involved in vandalizing all the affected sites because some sites were

not covered by security cameras. Again, the close analysis of security camera images

was conducted, and as a result, it was confirmed that the suspect touched the poles on

the right and left side in the front of the Hall of Worship, swung up his right hand, and

acted like spraying some kind of liquid towards the offertory box in the front of the Hall

of Worship in the premises of Katori Jingu Shrine at around 5:02 p.m. on March 25, 2015.

C. Then, investigators interviewed staff members of Katori Jingu Shrine and asked in details

what they did around the day of the incident and how they found the damages, showing

the security camera images taken at the crime scene. During the interview, the following

facts were found:

- At around 4:48 p.m. on March 25, 2015, when a shrine maiden named Momoka

2

SAKAKI collected offertory from the offertory box in the Hall of Worship, she did not
see any oil-like liquid on the offertory box.

- At around 4:52 p.m. on March 25, 2015, when a priest on night duty named Masayuki
KATORI closed the door on the side of the Hall of Worship, he did not see any oil-like
liquid on the stairs in the Hall of Worship.

- At around 9:36 p.m. on March 25, 2015, when a security guard named Toru
TAKAHASHI patrolled the Hall of Worship area, he found some kind of liquid sprayed
on the offertory box and the stairs nearby.

*false*

- At around 5:13 a.m. on March 26, 2015, when a priest on night duty named Masayuki
KATORI opened the front door of the Hall of Worship, he found oil-like liquid sprayed
over the stairs in the front of the Hall of Worship.

D. Based on the above:

The affected sites were identified as a result of on-the-spot investigation.

Oil ingredients were detected by the crime-scene identification.

Further, security camera footage shows that the suspect committed the crime in the Hall
of Worship at 5:02 p.m. on March 25, 2015. Therefore, as described in I. above, his
criminal acts were established.

3

A0522

# Exhibit 17

### AFFIRMATION OF TOSHIMITSU TAKAESU

I, **TOSHIMITSU TAKAESU**, being duly sworn depose and say:

1.     I am an attorney duly licensed to practice law in Japan. My Japan Federation of Bar Association number is 15423. I am also admitted to practice law as a Foreign Law Consultant in the State of Washington. My Washington State Bar Association number is 23544. I have been a practicing attorney for more than 50 years.

2.     I received my law degree from the Chuo University School of Law in 1957. I also earned an LLM degree from the Tulane University School of Law 1968. For more than 20 years, from 1958-1978, I was a prosecutor in Okinawa and served as the Chief Liaison Prosecutor in the Naha Public Prosecutor's Office. Since 1978, when I left government service, I have maintained a law practice focusing on criminal defense.

3.     I affirm under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following statements are true to the best of my understanding and belief. The statements made herein are of my own personal knowledge unless otherwise indicated.

4.     I make this affirmation regarding the request for extradition filed in the United States District Court for the Southern District of New York in which the Japanese government is seeking the extradition of Dr. Masahide Kanayama. Since June 5, 2015, I have been Dr. Kanayama's attorney representing him in Japan regarding the facts that give rise to Japan's request for Dr. Kanayama's

A0524

extradition. I submit this affirmation to further amplify my prior declaration to this honorable Court and to re-affirm the truth of all that I said in my declaration. I also write to refute certain new allegations made by the representatives of the government of Japan in response to my declaration.

5.    As part of my representation of Dr. Kanayama, I visited the Shinshoji Temple and Katori Shrine on July 11, 2017. I also had several telephone conversations following my July 11th meeting. On July 11, 2017, I met with Mr. Yoichi Kiyosu (General Affairs Manager of the Sinshoji Temple) and Mr. Isamu Terauchi (Property Manager of the Sinshoji Temple). My purpose in meeting with these men was to view the location of the alleged incident and to discuss a possible civil settlement involving the claim of damage to the site.

6.    Specifically, since I represent Dr. Kanayama in Japan only, I met with these gentlemen as part of the normal process in Japan of representing a suspect under investigation by Japanese authorities, particularly where the conduct attributed to the client involved a financial loss. Consistent with my ethical responsibilities as an attorney I met with these men to try to resolve a case between the parties without court intervention.

7.    *At no time did I ever admit or acknowledge in any way to anyone (either those at the Temple or the Shrine) that Dr. Kanayama was involved in these incidents.* As an attorney who practices criminal law in Japan for more than five decades I know better than to do that; more importantly, I would *never* admit that Dr. Kanayama perpetrated this offense because I have no knowledge whatsoever that he did such a thing. To the contrary, I stated

2

specifically that Dr. Kanayama had <u>not</u> committed alleged offense. My purpose was to try to resolve what appeared to me to be a solvable problem on behalf of a client who was looking to remove himself from the legal morass in which he now finds himself. My offer of settlement was declined.

8.    Subsequently, I asked the Temple officials to take me to the gate so that I could see for myself the claimed damage to the three pillars located on the east side of the gate. I was told by one of the gentlemen (I do not recall which one said it but both of them were together and within hearing of each other) that there was no longer any stain – that the stain had disappeared naturally over time. I looked at the spot where they showed me where the stains had been – in particular, on the middle of the three columns on the right-hand side, as one would enter the Shrine from the street – and I could observe that there was no stain. It was the same place where the Japanese police had made a photograph of them pointing to a small (4 cm) mark on the middle pole of the gate into the Shinshoji Temple.

9.    The gentlemen from the Temple also showed me the first and third columns of the gate where the damage was alleged to have occurred and I could see, as with the middle column, that there was no stain. I later returned with a professional photographer, Koji Uchida of Azabu Co., who took photographs of the three columns described above.

10.    I have since reviewed Mr. Uchida's photographs and they depict exactly what I saw: that none of the three columns have on them any oily-substance stain or other similar damage. It is my understanding that these photographs, along

3

with others, have been submitted to the court in New York as evidence that the columns at the gate of the Shinshoji Temple have not been damaged.

11.    Later that same day I met with Mr. Kazuhiro Sagawa of the Katori Shrine. He is the person responsible for oversight of the Shrine. As with the two gentlemen from the Temple, my offer of a civil settlement was declined. However, I did have a lengthy conversation with Mr. Sagawa and I herewith re-affirm all that I said previously in my declaration submitted to your Honor in Dr. Kanayama's primary submission (*see* paragraphs 11-13, at 4-5).

12.    In short, Mr. Sagawa told me that the Shrine had suffered no damage or loss and that all of the stains initially observed on the steps, posts and offering box in front of the Shrine had disappeared naturally. They can no longer be seen because they no longer exist. Specifically, as I stated previously stated, Mr. Sagawa told me that the Shrine did no cleaning or repairs following the discovery of the stains and that they had no intention of doing so in the future. Mr. Sagawa also told me, and I re-affirm here, that the Shrine had suffered no financial loss or a loss of use or earnings as a consequence of the incident.

Duly affirmed this 31st day of December 2017
Narita, Japan

Toshimitsu Takaesu, Esq.

4

A0527

# Exhibit 18

Case 1:23-cv-03469-CM    Document 4-24    Filed 04/28/23    Page 6 of 20

**Kanayama Stain Timeline**

| Date | Description | Source |
|---|---|---|
| 25-Mar-15 | Man splashes oil onto areas at two shrines--the Narita-san Shinjoji. Temple, and the Katori Jingu Shrine. | Gov't Memo Page 3 |
| 25-Apr-15 | Japane Police investigation report completed | Gov't Reply Page 21 Ex 5 |
| 1-Jul-15 | Attorney Takaesu visits shrine and observes no stains visible. | Def Sur Reply Page 8 |
| 11-Jul-17 | Atty Toshimitsu Takaesu and Koji Uchida visit both sites and note stains have completely disappeared. Photos taken | Opposition brief, page 5-6 |
| 24-Oct-17 | Japanese police measures stain on Somon damage and says while less tan previously, still visible. | Gov't Reply Memo Page 5, Supp Ex 7. |
| 31-Oct-17 | Japanese poice followup report filed this date claims stains still visible at both sites, but no photographs | Gov't Reply Page 21, Supp Ex 9 |
| 18-Dec-17 | Defense Attorneys visit both sites; photo and video show stains have disappeared entirely. | Def Sur Reply Page _ |
| 23-Dec-17 | Attorneys Takashi Mochizuki and Takahiro Suzuki visit both sites, no stains, take photos | Def Sur Reply Page _ |
| 30-Dec-17 | Attorney Lawrence Shoenbach visits both sites; no stains; video shows no stains. | Def Sur Reply Page _ |

A0529

# Exhibit 19

12

Date: April 22, 2015

To: Superintendent Hideki CHAYA
    Judicial Police Officer
    Chief of Narita Police Station

              From: Sergeant Takashi MIDORIKAWA (Signature and Seal)
                    Judicial Police Officer
                    Narita Police Station

Re: Investigation report on the photographs taken pertaining to the case of vandalizing historic sites

    Regarding the captioned case that occurred in Narita-san Shinsho-ji Temple and Katori Jingu Shrine on March 25, 2015, I hereby report the result of photographing to clarify the damages in the premises of Narita-san Shinsho-ji Temple.

I.    Date of photographing
    April 22, 2015

II.    Place of photographing
    In the premises of *Dai-honzan* (Sectarian Headquarters), Narita-san Shinsho-ji Temple
    Location: 1 Narita, Narita City, Chiba Prefecture

III.    Photographing officers
    A.    Officer in charge
        The a/m officer
    B.    Photographer
        Police Officer Soma HATAKEYAMA, Judicial Police Officer, Narita Police Station

IV.    Reason for photographing
    Investigators were working hard to clarify the extensive damages that were found in the large premises of the shrine.
    In the course of investigation, investigators interviewed persons concerned, conducted on-the-spot investigation, and analyzed security camera footage. Then, I photographed the affected sites that have been identified as of April 22, 2015.

V.    Photographing the affected sites
    A.    *So-mon* (Main Gate)

1

A0532

(See Photo #1 and "1" on Crime Scene Layout)

    1.  Pole on the east side in the center of *So-mon* (Main Gate), the first one from the south

        (See Photo #2 and ① on Crime Scene Layout)

    2.  Pole on the east side in the center of *So-mon* (Main Gate), the second one from the south

        (See Photo #3 and ② on Crime Scene Layout)

    3.  Pole on the east side in the center of *So-mon*, the third one from the south

        (See Photo #4 and ③ on Crime Scene Layout)

B.  Front of *Benzaiten-do* (Goddess Saraswati Hall)

        (See Photo #5 and "2" on Crime Scene Layout)

    1.  Front door of *Benzaiten-do*

        (See Photo #6 and ④ on Crime Scene Layout)

C.  Front of *Daishi-do* (Hall for the Great Teacher)

        (See Photo #7 and "3" on Crime Scene Layout)

    1.  Door rail, front doors and front porch of *Daishi-do*

        (See Photo #8 and ⑤⑥⑦ on Crime Scene Layout)

D.  *Nio-mon* (God Vajrapani Gate)

        (See Photo #9 and "4" on Crime Scene Layout)

    1.  Fence in front of the Statue of *Naraen Kongo* (Guardian of Buddha) at *Nio-mon*

        (See Photo #10 and ⑧ on Crime Scene Layout)

    2.  Same as the above (Enlargement)

        (See Photo #11 and ⑧ on Crime Scene Layout)

    3.  Central pole on the northeast side of *Nio-mon*

        (See Photo #12 and ⑨ on Crime Scene Layout)

    4.  Same as the above (Enlargement)

        (See Photo #13 and ⑨ on Crime Scene Layout)

    5.  Central pole on the northwest side of *Nio-mon*

        (See Photo #14 and ⑩ on Crime Scene Layout)

    6.  Outer pole on the northwest side of *Nio-mon*

        (See Photo #15 and ⑪ on Crime Scene Layout)

    7.  Same as the above (Enlargement)

        (See Photo #16 and ⑪ on Crime Scene Layout)

E.  *Korin-kaku* (Aureole House)

        (See Photo #17 and "5" on Crime Scene Layout)

    1.  Same as the above

        (See Photo #18 and "5" on Crime Scene Layout)

2

A0533

2. Pole on the north side in front of the inner entrance of *Korin-kaku* (south side)
   (See Photo #19 and ⑫ on Crime Scene Layout)

3. Pole on the north side in front of the inner entrance of *Korin-kaku* (southeast corner)
   (See Photo #20 and ⑬ on Crime Scene Layout)

4. Pole to the north of the lower threshold of the inner entrance of *Korin-kaku*
   (See Photo #21 and ⑭ on Crime Scene Layout)

5. Middle threshold of the inner entrance of *Korin-kaku*
   (See Photo #22 and ⑮ on Crime Scene Layout)

6. South side of the outer pole on the southeast side of *Korin-kaku*
   (See Photo #23 and ⑯ on Crime Scene Layout)

7. North side of the outer pole on the southeast side of *Korin-kaku*
   (See Photo "24 and ⑰ on Crime Scene Layout)

8. Pole in front of the entrance lobby of *Korin-kaku*
   (See Photo #25 and ⑱ on Crime Scene Layout)

9. Pole to the south of the threshold of the great entrance of *Korin-kaku*
   (See Photo #26 and ⑲ on Crime Scene Layout)

10. Pole to the north of the threshold of the great entrance of *Korin-kaku*
    (See Photo #27 and ⑳ on Crime Scene Layout)

11. Pole to the north of the Reception Counter for *O-goma* (Ritual Burning of Wood Sticks) at *Korin-kaku*
    (See Photo #28 and ㉑ on Crime Scene Layout)

12. Outer pole on the northeast side of *Korin-kaku*
    (See Photo #29 and ㉒ on Crime Scene Layout)

F. *Shaka-do* (Shakyamuni Hall)
   (See Photo #30 and **"6"** on Crime Scene Layout)

1. Front doors of *Shaka-do*
   (See Photo #31 and **"6"** on Crime Scene Layout)

2. West side of the front doors of *Shaka-do*
   (See Photo #32 and ㉓ on Crime Scene Layout)

3. East side of the front doors of *Shaka-do*
   (See Photo #33 and ㉔ on Crime Scene Layout)

4. West-side folding door panels (carved with the Twenty-four Filial Exemplars) of *Shaka-do*
   (See Photo #34 and ㉕ on Crime Scene Layout)

5. Same as the above (Left door panels enlarged)
   (See Photo #35 and ㉕ on Crime Scene Layout)

6. Same as the above (Right door panels enlarged)

3

(See Photo #36 and ㉕ on Crime Scene Layout)

7. Pole to the left of the west-side folding door panels (carved with the Twenty-four Filial Exemplars) of *Shaka-do*

    (See Photo #37 and ㉖ on Crime Scene Layout)

8. Pole to the right of the west-side folding door panels (carved with the Twenty-four Filial Exemplars) of *Shaka-do*

    (See Photo #38 and ㉗ on Crime Scene Layout)

9. Pole on the northwest side of *Shaka-do*

    (See Photo #39 and ㉘ on Crime Scene Layout)

10. Same as the above (Enlargement)

    (See Photo #40 and ㉘ on Crime Scene Layout)

11. Pole on the north side of *Shaka-do*

    (See Photo #41 and ㉙ on Crime Scene Layout)

12. Same as the above (Enlargement)

    (See Photo #42 and ㉙ on Crime Scene Layout)

13. Pole to the right of the north-side folding door panels (carved with the Twenty-four Filial Exemplars) of *Shaka-do*

    (See Photo #43 and ㉚ on Crime Scene Layout)

14. Same as the above (Enlargement)

    (See Photo #44 and ㉚ on Crime Scene Layout)

15. One of the right panels of the north-side folding doors (carved with the Twenty-four Filial Exemplars) of *Shaka-do*

    (See Photo #45 and ㉛ on Crime Scene Layout)

16. Same as the above (Enlargement)

    (See Photo #46 and ㉛ on Crime Scene Layout)

17. One of the left panels of the north-side folding doors of *Shaka-do*

    (See Photo #47 and ㉛ on Crime Scene Layout)

18. Same as the above (Enlargement)

    (See Photo #48 and ㉛ on Crime Scene Layout)

19. Pole on the northeast side of *Shaka-do*

    (See Photo #49 and ㉜ on Crime Scene Layout)

20. Same as the above (Enlargement)

    (See Photo #50 and ㉜ on Crime Scene Layout)

21. Pole right to the east-side doors of *Shaka-do*

    (See Photo #51 and ㉝ on Crime Scene Layout)

22. Same as the above (Enlargement)

    (See Photo #52 and ㉝ on Crime Scene Layout)

23. Pole left to the east-side doors of *Shaka-do*

4

A0535

(See Photo #53 and ㉝ on Crime Scene Layout)

24. Same as the above (Enlargement)

(See Photo #54 and ㉝ on Crime Scene Layout)

25. Pole on the southeast side of *Shaka-do*

(See Photo #55 and ㉞ on Crime Scene Layout)

26. Same as the above (Enlargement)

(See Photo #56 and ㉞ on Crime Scene Layout)

G. *Kaizan-do* (Open Mountain Hall)

(See Photo #57 and **"7"** on Crime Scene Layout)

1. Pole on the south side in front of *Kaizan-do*

(See Photo #58 and ㉟ on Crime Scene Layout)

2. Same as the above (Enlargement)

(See Photo #59 and ㉟ on Crime Scene Layout)

3. Pole on the north side in front of *Kaizan-do*

(See Photo #60 and ㊱ on Crime Scene Layout)

4. Same as the above (Enlargement)

(See Photo #61 and ㊱ on Crime Scene Layout)

H. *Sanja* (Triple Shrine)

(See Photo #62 and **"8"** on Crime Scene Layout)

1. Front of the front doors

(See Photo #63 and ㊲ on Crime Scene Layout)

2. Same as the above (Enlargement)

(See Photo #64 and ㊲ on Crime Scene Layout)

I. *Komyo-do* (Enlightenment Hall)

(See Photo #65 and **"9"** on Crime Scene Layout)

1. Outer pole on the southwest side of *Komyo-do*

(See Photo #66 and ㊳ on Crime Scene Layout)

2. Same as the above (Enlargement)

(See Photo #67 and ㊳ on Crime Scene Layout)

3. Pole on the southwest side of *Komyo-do*

(See Photo #68 and ㊴ on Crime Scene Layout)

4. Same as the above (Enlargement)

(See Photo #69 and ㊴ on Crime Scene Layout)

5. Pole on the northwest side of *Komyo-do*

(See Photo #70 and ㊵ on Crime Scene Layout)

6. Same as the above (Enlargement)

(See Photo #71 and ㊵ on Crime Scene Layout)

7. Doors on the north side of *Komyo-do*

5

A0536

(See Photo #72 and ㊵ on Crime Scene Layout)

8. Same as the above (Enlargement)

(See Photo #73 and ㊵ on Crime Scene Layout) .

9. Pole on the northeast side of *Komyo-do*

(See Photo #74 and ㊷ on Crime Scene Layout)

10. Same as the above (Enlargement)

(See Photo #75 and ㊷ on Crime Scene Layout)

11. Pole on the southeast side of *Komyo-do*

(See Photo #76 and ㊸ on Crime Scene Layout)

12. Same as the above (Enlargement)

(See Photo #77 and ㊸ on Crime Scene Layout)

13. Upper part of the pole on the east side in front of *Komyo-do*

(See Photo #78 and ㊹ on Crime Scene Layout)

14. Lower part of the pole on the east side in front of *Komyo-do*

(See Photo #79 and ㊺ on Crime Scene Layout)

J. *Oku-no-in* (Inner Shrine)

(See Photo #80 and **"10"** on Crime Scene Layout)

1. Entrance doors of *Oku-no-in*

(See Photo #81 and ㊻ on Crime Scene Layout)

2. Doors on the southeast side of *Oku-no-in*

(See Photo #82 and ㊼ on Crime Scene Layout)

3. Same as the above (Enlargement)

(See Photo #83 and ㊼ on Crime Scene Layout)

K. Bronze Statue of *Kobo Daishi* (Great Teacher *Kobo*)

(See Photo #84 and **"11"** and ㊽ on Crime Scene Layout)

1. Same as the above (Enlargement)

(See Photo #85 and **"11"** and ㊽ on Crime Scene Layout)

L. *Issai-kyo-do* (All Sutras Repository)

(See Photo #86 and **"12"** on Crime Scene Layout)

1. Same as the above (Enlargement)

(See Photo #87 and **"12"** on Crime Scene Layout)

2. Pole on the right side of the front doors of *Issai-kyo-do*

(See Photo #88 and ㊾ on Crime Scene Layout)

3. Same as the above (Enlargement)

(See Photo #89 and ㊾ on Crime Scene Layout)

4. Pole on the left side of the front doors of *Issai-kyo-do*

(See Photo #90 and ㊿ on Crime Scene Layout)

5. Same as the above (Enlargement)

6

(See Photo #91 and ㊿ on Crime Scene Layout)

6. Doors on the south side of *Issai-kyo-do*

(See Photo #92 and ㊿ on Crime Scene Layout)

7. Same as the above (Enlargement)

(See Photo #93 and ㊿ on Crime Scene Layout)

M. *Hon-do* (Great Main Hall)

(See Photo #94 and **"13"** on Crime Scene Layout)

1. Pole on the southeast side of *Hon-do*

(See Photo #95 and ㊿ on Crime Scene Layout)

2. Same as the above (Enlargement)

(See Photo #96 and ㊿ on Crime Scene Layout)

3. Pole on the southwest side of *Hon-do*

(See Photo #97 and ㊿ on Crime Scene Layout)

4. Same as the above (Enlargement)

(See Photo #98 and ㊿ on Crime Scene Layout)

5. Pole on the west side of *Hon-do*

(See Photo #99 and ㊿ on Crime Scene Layout)

6. Same as the above (Enlargement)

(See Photo #100 and ㊿ on Crime Scene Layout)

7. Pole on the northwest side of *Hon-do*

(See Photo #101 and ㊿ on Crime Scene Layout)

8. Same as the above (Enlargement)

(See Photo #102 and ㊿ on Crime Scene Layout)

9. Lantern on the right side of *Ura-butsu* (Buddha Altar Behind) of *Hon-do*

(See Photo #103 and ㊿ on Crime Scene Layout)

10. Same as the above (Enlargement)

(See Photo #104 and ㊿ on Crime Scene Layout)

11. Pole on the northeast side of *Hon-do*

(See Photo #105 and ㊿ on Crime Scene Layout)

12. Same as the above (Enlargement)

(See Photo #106 and ㊿ on Crime Scene Layout)

13. Pole on the east side of *Hon-do*, the second one from the north

(See Photo #107 and ㊿ on Crime Scene Layout)

14. Same as the above (Enlargement)

(See Photo #108 and ㊿ on Crime Scene Layout)

15. Pole on the east side of *Hon-do*, the third one from the north

(See Photo #109 and ㊿ on Crime Scene Layout)

16. Same as the above (Enlargement)

7

A0538

(See Photo #110 and ⑤⑨ on Crime Scene Layout)

17. Pole on the east side of *Hon-do*, the fourth one from the north

(See Photo #111 and ⑥⑩ on Crime Scene Layout)

18. Same as the above (Enlargement)

(See Photo #112 and ⑥⑩ on Crime Scene Layout)

N. *Koware Fudo-do* (Breakable Fire-God Hall)

(See Photo #113 and **"14"** on Crime Scene Layout)

1. Top of the candle stand

(See Photo #114 and ⑥① on Crime Scene Layout)

O. *Shuho Dojo* (Esoteric Training Hall)

(See Photo #115 and **"15"** on Crime Scene Layout)

1. Same as the above

(See Photo #116 and **"15"** on Crime Scene Layout)

2. Pole on the left side of the front entrance

(See Photo #117 and ⑥② on Crime Scene Layout)

3. Same as the above (Enlargement)

(See Photo #118 and ⑥② on Crime Scene Layout)

4. Pole on the right side of the front entrance

(See Photo #119 and ⑥③ on Crime Scene Layout)

5. Same as the above (Enlargement)

(See Photo #120 and ⑥③ on Crime Scene Layout)

P. *Dai-mon* (Great Gate)

(See Photo #121 and **"16"** on Crime Scene Layout)

1. Pole on the south side of *Dai-mon*

(See Photo #122 and ⑥④ on Crime Scene Layout)

2. Same as the above (Enlargement)

(See Photo #123 and ⑥④ on Crime Scene Layout)

3. Pole on the north side of *Dai-mon*

(See Photo #124 and ⑥⑤ on Crime Scene Layout)

4. Same as the above (Enlargement)

(See Photo #125 and ⑥⑤ on Crime Scene Layout)

VI. Reference

You will find attached to this report at the end the Crime Scene Layout of Narita-san Shinsho-ji Temple and 125 photographs.

Seal

8

A0539

Cross-Reference Table

| Number on Crime Scene Layout | Damaged Portion | Photo No. |
|---|---|---|
| "1" | *So-mon* (Main Gate) | 1 |
| ① | Pole on the east side in the center of *So-mon*, the first one from the south | 2 |
| ② | Pole on the east side in the center of *So-mon*, the second one from the south | 3 |
| ③ | Pole on the east side in the center of *So-mon*, the third one from the south | 4 |
| "2" | *Benzaiten-do* (Goddess Saraswati Hall) | 5 |
| ④ | Front door of *Benzaiten-do* | 6 |
| "3" | *Daishi-do* (Hall for Great Teacher) | 7 |
| ⑤⑥ | Door rail and front doors of *Daishi-do* | 8 |
| ⑦ | Front porch of *Daishi-do* | |
| "4" | *Nio-mon* (God Vajrapani Gate) | 9 |
| ⑧ | Fence in front of the *Naraen Kongo* (Guardian of Buddha) Statue at *Nio-mon* | 10, 11 |
| ⑨ | Central pole on the northeast side of *Nio-mon* | 12, 13 |
| ⑩ | Central pole on the northwest side of *Nio-mon* | 14 |
| ⑪ | Outer pole on the northwest side of *Nio-mon* | 15, 16 |
| "5" | *Korin-kaku* (Aureole House) | 17, 18 |
| ⑫ | Pole on the north side in front of the inner entrance of *Korin-kaku* (south side) | 19 |
| ⑬ | Pole on the north side in front of the inner entrance of *Korin-kaku* (southeast corner) | 20 |
| ⑭ | Pole on the north side at the lower threshold at the inner entrance of *Korin-kaku* | 21 |
| ⑮ | Middle threshold at the inner entrance of *Korin-kaku* | 22 |
| ⑯ | South side of the outer pole on the southeast side of *Korin-kaku* | 23 |
| ⑰ | North side of the outer pole on the southeast side of *Korin-kaku* | 24 |
| ⑱ | Pole in front of the entrance lobby of *Korin-kaku* | 25 |
| ⑲ | Pole to the south of the threshold of the great entrance of *Korin-kaku* | 26 |
| ⑳ | Pole to the north of the threshold of the great entrance of *Korin-kaku* | 27 |

9

A0540

| ㉑ | Pole to the north of Reception Counter for *O-goma* (Ritual Burning of Wood Sticks) at *Korin-kaku* | 28 |
| ㉒ | Outer pole on the northeast side of *Korin-kaku* | 29 |
| "6" | **Shaka-do (Shakyamuni Hall) and its front doors** | 30, 31 |
| ㉓ | West side of the front doors of *Shaka-do* | 32 |
| ㉔ | East side of the front doors of *Shaka-do* | 33 |
| ㉕ | West-side folding door panels (carved with the Twenty-four Filial Exemplars) of *Shaka-do* | 34-36 |
| ㉖ | Pole left to the west-side folding door panels (carved with the Twenty-four Filial Exemplars) of *Shaka-do* | 37 |
| ㉗ | Pole right to the west-side folding door panels (carved with the Twenty-four Filial Exemplars) of *Shaka-do* | 38 |
| ㉘ | Pole on the northwest side of *Shaka-do* | 39, 40 |
| ㉙ | Pole on the north side of *Shaka-do* | 41, 42 |
| ㉚ | Pole right to the north-side folding door panels (carved with the Twenty-four Filial Exemplars) of *Shaka-do* | 43, 44 |
| ㉛ | North-side folding door panels (carved with the Twenty-four Filial Exemplars) of *Shaka-do* | 45-48 |
| ㉜ | Pole on the northeast side of *Shaka-do* | 49, 50 |
| ㉝ | Poles on the east side of *Shaka-do* | 51-54 |
| ㉞ | Pole on the southeast side of *Shaka-do* | 55, 56 |
| "7" | **Kaizan-do (Open Mountain Hall)** | 57 |
| ㉟ | Pole on the south side in front of *Kaizan-do* | 58, 59 |
| ㊱ | Pole on the north side in front of *Kaizan-do* | 60, 61 |
| "8" | **Sanja (Triple Shrine)** | 62 |
| ㊲ | Front of the front doors | 63, 64 |
| "9" | **Komyo-do (Enlightenment Hall)** | 65 |
| ㊳ | Outer pole on the southwest side of *Komyo-do* | 66, 67 |
| ㊴ | Pole on the southwest side of *Komyo-do* | 68, 69 |
| ㊵ | Pole on the northwest side of *Komyo-do* | 70, 71 |
| ㊶ | Doors on the north side of *Komyo-do* | 72, 73 |
| ㊷ | Pole on the northeast side of *Komyo-do* | 74, 75 |
| ㊸ | Pole on the southeast side of *Komyo-do* | 76, 77 |
| ㊹ | Upper part of the pole on the east side in front of *Komyo-do* | 78 |
| ㊺ | Lower part of the pole on the east side in front of *Komyo-do* | 79 |
| "10" | **Oku-no-in (Inner Shrine)** | 80 |

10

| | | |
|---|---|---|
| 46 | Entrance doors of *Oku-no-in* | 81 |
| 47 | Doors on the southeast side of *Oku-no-in* | 82, 83 |
| "11"  48 | Bronze Statue of *Kobo Daishi* (Great Teacher Kobo) | 84, 85 |
| "12" | *Issai-kyo-do* (All Sutras Repository) | 86, 87 |
| 49 | Pole right to the front doors of *Issai-kyo-do* | 88, 89 |
| 50 | Pole left to the front doors of *Issai-kyo-do* | 90, 91 |
| 51 | Doors on the south side of *Issai-kyo-do* | 92, 93 |
| "13" | *Hon-do* (Great Main Hall) | 94 |
| 52 | Pole on the southeast side of *Hon-do* | 95, 96 |
| 53 | Pole on the southwest side of *Hon-do* | 97, 98 |
| 54 | Pole on the west side of *Hon-do* | 99, 100 |
| 55 | Pole on the northwest side of *Hon-do* | 101,102 |
| 56 | Lantern on the right side of *Ura-butsu* (the Buddha Altar Behind) of *Hon-do* | 103,104 |
| 57 | Pole on the northeast side of *Hon-do* | 105,106 |
| 58 | Pole on the east side of *Hon-do*, the second one from the north | 107,108 |
| 59 | Pole on the east side of *Hon-do*, the third one from the north | 109,110 |
| 60 | Pole on the east side of *Hon-do*, the fourth one from the north | 111,112 |
| "14" | *Koware Fudo-do* (Breakable Fire-God Hall) | 113 |
| 61 | Top of the candle stand | 114 |
| "15" | *Shuho Dojo* (Esoteric Training Hall) | 115,116 |
| 62 | Pole on the left side of the front entrance | 117,118 |
| 63 | Pole on the right side of the front entrance | 119,120 |
| "16" | *Dai-mon* (Great Gate) | 121 |
| 64 | Pole on the south side of *Dai-mon* | 122,123 |
| 65 | Pole on the north side of *Dai-mon* | 124,125 |

11

〔成田山新勝寺現場見取図〕

成田山新勝寺現場見取図　Crime Scene Layout of Narita-san Shinsho-ji Temple

総門　*So-mon* (Main Gate)

弁財天堂　*Benzaiten-do* (Goddess Saraswati Hall)

大師堂　*Daishi-do* (Hall for Great Teacher)

仁王門　*Nio-mon* (God Vajrapani Gate)

光輪閣　*Korin-kaku* (Aureole House)

釈迦堂　*Shaka-do* (Shakyamuni Hall)

開山堂　*Kaizan-do* (Open Mountain Hall)

三社　*Sanja* (Triple Shrine)

光明堂　*Komyo-do* (Enlightenment Hall)

奥之院　*Oku-no-in* (Inner Shrine)

弘法大師銅像　Bronze Statue of *Kobo Daishi* (Great Teacher *Kobo*)

一切経堂　*Issai-kyo-do* (All Sutras Repository)

本堂　*Hon-do* (Great Main Hall)

こわれ不動堂　*Koware Fudo-do* (Breakable Fire-God Hall)

修法道場　*Shuho Dojo* (Esoteric Training Hall)

大門　*Dai-mon* (Great Gate)

12

A0543



*So-mon* (Main Gate)



Pole on the east side in the center of *So-mon* (Main Gate), the first one from the south

A0544

3



Pole on the east side in the center of *So-mon* (Main Gate), the second one from the south

4



Pole on the east side in the center of *So-mon*, the third one from the south

5



Front of *Benzaiten-do* (Goddess Saraswati Hall)

6



Front door of *Benzaiten-do*

7



Front of *Daishi-do* (Hall for the Great Teacher)

8



Door rail, front doors and front porch of *Daishi-do*

9



*Nio-mon* (God Vajrapani Gate)

10



Fence in front of the Statue of *Naraen Kongo* (Guardian of Buddha) at *Nio-mon*

A0548

11



Same as the above (Enlargement)

12



Central pole on the northeast side of *Nio-mon*

A0549

13



Same as the above (Enlargement)

14

Central pole on the northwest side of *Nio-mon*

15



Outer pole on the northwest side of *Nio-mon*

16



Same as the above (Enlargement)

17



*Korin-kaku* (Aureole House)

18



Same as the above

A0552

19



Pole on the north side in front of the inner entrance of *Korin-kaku* (south side)

20



Pole on the north side in front of the inner entrance of *Korin-kaku* (southeast corner)

21



Pole to the north of the lower threshold of the inner entrance of *Korin-kaku*

22



Middle threshold of the inner entrance of *Korin-kaku*

23



South side of the outer pole on the southeast side of *Korin-kaku*

24



North side of the outer pole on the southeast side of *Korin-kaku*

25



Pole in front of the entrance lobby of *Korin-kaku*

26



Pole to the south of the threshold of the great entrance of *Korin-kaku*

27



Pole to the north of the threshold of the great entrance of *Korin-kaku*

28



Pole to the north of the Reception Counter for *O-goma* (Ritual Burning of Wood Sticks) at *Korin-kaku*

A0557

29



Outer pole on the northeast side of *Korin-kaku*

30



*Shaka-do* (Shakyamuni Hall)

# Exhibit 20

Date: April 22, 2015

To: Superintendent Hideki CHAYA
   Judicial Police Officer
   Chief of Narita Police Station

From: Sergeant Takashi MIDORIKAWA (Signature and Seal)
   Judicial Police Officer
   Narita Police Station

Re: Investigation report on the photographs taken pertaining to the case of vandalizing historic sites

   Regarding the captioned case that occurred in Narita-san Shinsho-ji Temple and Katori Jingu Shrine on March 25, 2015, I hereby report the result of photographing to clarify the damages in the premises of Narita-san Shinsho-ji Temple.

I.   Date of photographing
     April 22, 2015

II.  Place of photographing
     In the premises of *Dai-honzan* (Sectarian Headquarters), Narita-san Shinsho-ji Temple
     Location: 1 Narita, Narita City, Chiba Prefecture

III. Photographing officers
     A.   Officer in charge
          The a/m officer
     B.   Photographer
          Police Officer Soma HATAKEYAMA, Judicial Police Officer, Narita Police Station

IV.  Reason for photographing
     Investigators were working hard to clarify the extensive damages that were found in the large premises of the shrine.
     In the course of investigation, investigators interviewed persons concerned, conducted on-the-spot investigation, and analyzed security camera footage. Then, I photographed the affected sites that have been identified as of April 22, 2015.

V.   Photographing the affected sites
     A.   *So-mon* (Main Gate)

1

A0560

(See Photo #1 and "1" on Crime Scene Layout)

1.  Pole on the east side in the center of *So-mon* (Main Gate), the first one from the south

    (See Photo #2 and ① on Crime Scene Layout)

2.  Pole on the east side in the center of *So-mon* (Main Gate), the second one from the south

    (See Photo #3 and ② on Crime Scene Layout)

3.  Pole on the east side in the center of *So-mon*, the third one from the south

    (See Photo #4 and ③ on Crime Scene Layout)

B.  Front of *Benzaiten-do* (Goddess Saraswati Hall)

    (See Photo #5 and "2" on Crime Scene Layout)

1.  Front door of *Benzaiten-do*

    (See Photo #6 and ④ on Crime Scene Layout)

C.  Front of *Daishi-do* (Hall for the Great Teacher)

    (See Photo #7 and "3" on Crime Scene Layout)

1.  Door rail, front doors and front porch of *Daishi-do*

    (See Photo #8 and ⑤⑥⑦ on Crime Scene Layout)

D.  *Nio-mon* (God Vajrapani Gate)

    (See Photo #9 and "4" on Crime Scene Layout)

1.  Fence in front of the Statue of *Naraen Kongo* (Guardian of Buddha) at *Nio-mon*

    (See Photo #10 and ⑧ on Crime Scene Layout)

2.  Same as the above (Enlargement)

    (See Photo #11 and ⑧ on Crime Scene Layout)

3.  Central pole on the northeast side of *Nio-mon*

    (See Photo #12 and ⑨ on Crime Scene Layout)

4.  Same as the above (Enlargement)

    (See Photo #13 and ⑨ on Crime Scene Layout)

5.  Central pole on the northwest side of *Nio-mon*

    (See Photo #14 and ⑩ on Crime Scene Layout)

6.  Outer pole on the northwest side of *Nio-mon*

    (See Photo #15 and ⑪ on Crime Scene Layout)

7.  Same as the above (Enlargement)

    (See Photo #16 and ⑪ on Crime Scene Layout)

E.  *Korin-kaku* (Aureole House)

    (See Photo #17 and "5" on Crime Scene Layout)

1.  Same as the above

    (See Photo #18 and "5" on Crime Scene Layout)

2

A0561

2.  Pole on the north side in front of the inner entrance of *Korin-kaku* (south side)
    (See Photo #19 and ⑫ on Crime Scene Layout)

3.  Pole on the north side in front of the inner entrance of *Korin-kaku* (southeast corner)
    (See Photo #20 and ⑬ on Crime Scene Layout)

4.  Pole to the north of the lower threshold of the inner entrance of *Korin-kaku*
    (See Photo #21 and ⑭ on Crime Scene Layout)

5.  Middle threshold of the inner entrance of *Korin-kaku*
    (See Photo #22 and ⑮ on Crime Scene Layout)

6.  South side of the outer pole on the southeast side of *Korin-kaku*
    (See Photo #23 and ⑯ on Crime Scene Layout)

7.  North side of the outer pole on the southeast side of *Korin-kaku*
    (See Photo "24 and ⑰ on Crime Scene Layout)

8.  Pole in front of the entrance lobby of *Korin-kaku*
    (See Photo #25 and ⑱ on Crime Scene Layout)

9.  Pole to the south of the threshold of the great entrance of *Korin-kaku*
    (See Photo #26 and ⑲ on Crime Scene Layout)

10. Pole to the north of the threshold of the great entrance of *Korin-kaku*
    (See Photo #27 and ⑳ on Crime Scene Layout)

11. Pole to the north of the Reception Counter for *O-goma* (Ritual Burning of Wood Sticks) at *Korin-kaku*
    (See Photo #28 and ㉑ on Crime Scene Layout)

12. Outer pole on the northeast side of *Korin-kaku*
    (See Photo #29 and ㉒ on Crime Scene Layout)

F.  *Shaka-do* (Shakyamuni Hall)
    (See Photo #30 and "6" on Crime Scene Layout)

1.  Front doors of *Shaka-do*
    (See Photo #31 and "6" on Crime Scene Layout)

2.  West side of the front doors of *Shaka-do*
    (See Photo #32 and ㉓ on Crime Scene Layout)

3.  East side of the front doors of *Shaka-do*
    (See Photo #33 and ㉔ on Crime Scene Layout)

4.  West-side folding door panels (carved with the Twenty-four Filial Exemplars) of *Shaka-do*
    (See Photo #34 and ㉕ on Crime Scene Layout)

5.  Same as the above (Left door panels enlarged)
    (See Photo #35 and ㉕ on Crime Scene Layout)

6.  Same as the above (Right door panels enlarged)

3

A0562

(See Photo #36 and ㉕ on Crime Scene Layout)

7. Pole to the left of the west-side folding door panels (carved with the Twenty-four Filial Exemplars) of *Shaka-do*

    (See Photo #37 and ㉖ on Crime Scene Layout)

8. Pole to the right of the west-side folding door panels (carved with the Twenty-four Filial Exemplars) of *Shaka-do*

    (See Photo #38 and ㉗ on Crime Scene Layout)

9. Pole on the northwest side of *Shaka-do*

    (See Photo #39 and ㉘ on Crime Scene Layout)

10. Same as the above (Enlargement)

    (See Photo #40 and ㉘ on Crime Scene Layout)

11. Pole on the north side of *Shaka-do*

    (See Photo #41 and ㉙ on Crime Scene Layout)

12. Same as the above (Enlargement)

    (See Photo #42 and ㉙ on Crime Scene Layout)

13. Pole to the right of the north-side folding door panels (carved with the Twenty-four Filial Exemplars) of *Shaka-do*

    (See Photo #43 and ㉚ on Crime Scene Layout)

14. Same as the above (Enlargement)

    (See Photo #44 and ㉚ on Crime Scene Layout)

15. One of the right panels of the north-side folding doors (carved with the Twenty-four Filial Exemplars) of *Shaka-do*

    (See Photo #45 and ㉛ on Crime Scene Layout)

16. Same as the above (Enlargement)

    (See Photo #46 and ㉛ on Crime Scene Layout)

17. One of the left panels of the north-side folding doors of *Shaka-do*

    (See Photo #47 and ㉛ on Crime Scene Layout)

18. Same as the above (Enlargement)

    (See Photo #48 and ㉛ on Crime Scene Layout)

19. Pole on the northeast side of *Shaka-do*

    (See Photo #49 and ㉜ on Crime Scene Layout)

20. Same as the above (Enlargement)

    (See Photo #50 and ㉜ on Crime Scene Layout)

21. Pole right to the east-side doors of *Shaka-do*

    (See Photo #51 and ㉝ on Crime Scene Layout)

22. Same as the above (Enlargement)

    (See Photo #52 and ㉝ on Crime Scene Layout)

23. Pole left to the east-side doors of *Shaka-do*

4

(See Photo #53 and ㉝ on Crime Scene Layout)

24. Same as the above (Enlargement)

(See Photo #54 and ㉝ on Crime Scene Layout)

25. Pole on the southeast side of *Shaka-do*

(See Photo #55 and ㉞ on Crime Scene Layout)

26. Same as the above (Enlargement)

(See Photo #56 and ㉞ on Crime Scene Layout)

G. *Kaizan-do* (Open Mountain Hall)

(See Photo #57 and **"7"** on Crime Scene Layout)

1. Pole on the south side in front of *Kaizan-do*

(See Photo #58 and ㉟ on Crime Scene Layout)

2. Same as the above (Enlargement)

(See Photo #59 and ㉟ on Crime Scene Layout)

3. Pole on the north side in front of *Kaizan-do*

(See Photo #60 and ㊱ on Crime Scene Layout)

4. Same as the above (Enlargement)

(See Photo #61 and ㊱ on Crime Scene Layout)

H. *Sanja* (Triple Shrine)

(See Photo #62 and **"8"** on Crime Scene Layout)

1. Front of the front doors

(See Photo #63 and ㊲ on Crime Scene Layout)

2. Same as the above (Enlargement)

(See Photo #64 and ㊲ on Crime Scene Layout)

I. *Komyo-do* (Enlightenment Hall)

(See Photo #65 and **"9"** on Crime Scene Layout)

1. Outer pole on the southwest side of *Komyo-do*

(See Photo #66 and ㊳ on Crime Scene Layout)

2. Same as the above (Enlargement)

(See Photo #67 and ㊳ on Crime Scene Layout)

3. Pole on the southwest side of *Komyo-do*

(See Photo #68 and ㊴ on Crime Scene Layout)

4. Same as the above (Enlargement)

(See Photo #69 and ㊴ on Crime Scene Layout)

5. Pole on the northwest side of *Komyo-do*

(See Photo #70 and ㊵ on Crime Scene Layout)

6. Same as the above (Enlargement)

(See Photo #71 and ㊵ on Crime Scene Layout)

7. Doors on the north side of *Komyo-do*

5

A0564

(See Photo #72 and ㊶ on Crime Scene Layout)

8. Same as the above (Enlargement)

    (See Photo #73 and ㊶ on Crime Scene Layout)

9. Pole on the northeast side of *Komyo-do*

    (See Photo #74 and ㊷ on Crime Scene Layout)

10. Same as the above (Enlargement)

    (See Photo #75 and ㊷ on Crime Scene Layout)

11. Pole on the southeast side of *Komyo-do*

    (See Photo #76 and ㊸ on Crime Scene Layout)

12. Same as the above (Enlargement)

    (See Photo #77 and ㊸ on Crime Scene Layout)

13. Upper part of the pole on the east side in front of *Komyo-do*

    (See Photo #78 and ㊹ on Crime Scene Layout)

14. Lower part of the pole on the east side in front of *Komyo-do*

    (See Photo #79 and ㊺ on Crime Scene Layout)

J. *Oku-no-in* (Inner Shrine)

    (See Photo #80 and "**10**" on Crime Scene Layout)

1. Entrance doors of *Oku-no-in*

    (See Photo #81 and ㊻ on Crime Scene Layout)

2. Doors on the southeast side of *Oku-no-in*

    (See Photo #82 and ㊼ on Crime Scene Layout)

3. Same as the above (Enlargement)

    (See Photo #83 and ㊼ on Crime Scene Layout)

K. Bronze Statue of *Kobo Daishi* (Great Teacher *Kobo*)

    (See Photo #84 and "**11**" and ㊽ on Crime Scene Layout)

1. Same as the above (Enlargement)

    (See Photo #85 and "**11**" and ㊽ on Crime Scene Layout)

L. *Issai-kyo-do* (All Sutras Repository)

    (See Photo #86 and "**12**" on Crime Scene Layout)

1. Same as the above (Enlargement)

    (See Photo #87 and "**12**" on Crime Scene Layout)

2. Pole on the right side of the front doors of *Issai-kyo-do*

    (See Photo #88 and ㊾ on Crime Scene Layout)

3. Same as the above (Enlargement)

    (See Photo #89 and ㊾ on Crime Scene Layout)

4. Pole on the left side of the front doors of *Issai-kyo-do*

    (See Photo #90 and ㊿ on Crime Scene Layout)

5. Same as the above (Enlargement)

6

(See Photo #91 and ⑩ on Crime Scene Layout)

6. Doors on the south side of *Issai-kyo-do*

(See Photo #92 and ㉛ on Crime Scene Layout)

7. Same as the above (Enlargement)

(See Photo #93 and ㉛ on Crime Scene Layout)

M. *Hon-do* (Great Main Hall)

(See Photo #94 and **"13"** on Crime Scene Layout)

1. Pole on the southeast side of *Hon-do*

(See Photo #95 and ㊼ on Crime Scene Layout)

2. Same as the above (Enlargement)

(See Photo #96 and ㊼ on Crime Scene Layout)

3. Pole on the southwest side of *Hon-do*

(See Photo #97 and ㊽ on Crime Scene Layout)

4. Same as the above (Enlargement)

(See Photo #98 and ㊽ on Crime Scene Layout)

5. Pole on the west side of *Hon-do*

(See Photo #99 and ㊾ on Crime Scene Layout)

6. Same as the above (Enlargement)

(See Photo #100 and ㊾ on Crime Scene Layout)

7. Pole on the northwest side of *Hon-do*

(See Photo #101 and ㊿ on Crime Scene Layout)

8. Same as the above (Enlargement)

(See Photo #102 and ㊿ on Crime Scene Layout)

9. Lantern on the right side of *Ura-butsu* (Buddha Altar Behind) of *Hon-do*

(See Photo #103 and ⑯ on Crime Scene Layout)

10. Same as the above (Enlargement)

(See Photo #104 and ⑯ on Crime Scene Layout)

11. Pole on the northeast side of *Hon-do*

(See Photo #105 and ㊻ on Crime Scene Layout)

12. Same as the above (Enlargement)

(See Photo #106 and ㊻ on Crime Scene Layout)

13. Pole on the east side of *Hon-do*, the second one from the north

(See Photo #107 and ㊿ on Crime Scene Layout)

14. Same as the above (Enlargement)

(See Photo #108 and ㊿ on Crime Scene Layout)

15. Pole on the east side of *Hon-do*, the third one from the north

(See Photo #109 and ㊾ on Crime Scene Layout)

16. Same as the above (Enlargement)

7

A0566

(See Photo #110 and ⑤⑨ on Crime Scene Layout)

17. Pole on the east side of *Hon-do*, the fourth one from the north
(See Photo #111 and ⑥⑩ on Crime Scene Layout)

18. Same as the above (Enlargement)
(See Photo #112 and ⑥⑩ on Crime Scene Layout)

N. *Koware Fudo-do* (Breakable Fire-God Hall)
(See Photo #113 and "**14**" on Crime Scene Layout)

1. Top of the candle stand
(See Photo #114 and ⑥① on Crime Scene Layout)

O. *Shuho Dojo* (Esoteric Training Hall)
(See Photo #115 and "**15**" on Crime Scene Layout)

1. Same as the above
(See Photo #116 and "**15**" on Crime Scene Layout)

2. Pole on the left side of the front entrance
(See Photo #117 and ⑥② on Crime Scene Layout)

3. Same as the above (Enlargement)
(See Photo #118 and ⑥② on Crime Scene Layout)

4. Pole on the right side of the front entrance
(See Photo #119 and ⑥③ on Crime Scene Layout)

5. Same as the above (Enlargement)
(See Photo #120 and ⑥③ on Crime Scene Layout)

P. *Dai-mon* (Great Gate)
(See Photo #121 and "**16**" on Crime Scene Layout)

1. Pole on the south side of *Dai-mon*
(See Photo #122 and ⑥④ on Crime Scene Layout)

2. Same as the above (Enlargement)
(See Photo #123 and ⑥④ on Crime Scene Layout)

3. Pole on the north side of *Dai-mon*
(See Photo #124 and ⑥⑤ on Crime Scene Layout)

4. Same as the above (Enlargement)
(See Photo #125 and ⑥⑤ on Crime Scene Layout)

VI. Reference

You will find attached to this report at the end the Crime Scene Layout of Narita-san Shinsho-ji Temple and 125 photographs.

Seal

8

A0567

Cross-Reference Table

| Number on Crime Scene Layout | Damaged Portion | Photo No. |
|---|---|---|
| "1" | *So-mon* (Main Gate) | 1 |
| ① | Pole on the east side in the center of *So-mon*, the first one from the south | 2 |
| ② | Pole on the east side in the center of *So-mon*, the second one from the south | 3 |
| ③ | Pole on the east side in the center of *So-mon*, the third one from the south | 4 |
| "2" | *Benzaiten-do* (Goddess Saraswati Hall) | 5 |
| ④ | Front door of *Benzaiten-do* | 6 |
| "3" | *Daishi-do* (Hall for Great Teacher) | 7 |
| ⑤⑥ | Door rail and front doors of *Daishi-do* | 8 |
| ⑦ | Front porch of *Daishi-do* | |
| "4" | *Nio-mon* (God Vajrapani Gate) | 9 |
| ⑧ | Fence in front of the *Naraen Kongo* (Guardian of Buddha) Statue at *Nio-mon* | 10, 11 |
| ⑨ | Central pole on the northeast side of *Nio-mon* | 12, 13 |
| ⑩ | Central pole on the northwest side of *Nio-mon* | 14 |
| ⑪ | Outer pole on the northwest side of *Nio-mon* | 15, 16 |
| "5" | *Korin-kaku* (Aureole House) | 17, 18 |
| ⑫ | Pole on the north side in front of the inner entrance of *Korin-kaku* (south side) | 19 |
| ⑬ | Pole on the north side in front of the inner entrance of *Korin-kaku* (southeast corner) | 20 |
| ⑭ | Pole on the north side at the lower threshold at the inner entrance of *Korin-kaku* | 21 |
| ⑮ | Middle threshold at the inner entrance of *Korin-kaku* | 22 |
| ⑯ | South side of the outer pole on the southeast side of *Korin-kaku* | 23 |
| ⑰ | North side of the outer pole on the southeast side of *Korin-kaku* | 24 |
| ⑱ | Pole in front of the entrance lobby of *Korin-kaku* | 25 |
| ⑲ | Pole to the south of the threshold of the great entrance of *Korin-kaku* | 26 |
| ⑳ | Pole to the north of the threshold of the great entrance of *Korin-kaku* | 27 |

9

A0568

| ㉑ | Pole to the north of Reception Counter for *O-goma* (Ritual Burning of Wood Sticks) at *Korin-kaku* | 28 |
| ㉒ | Outer pole on the northeast side of *Korin-kaku* | 29 |
| **"6"** | ***Shaka-do* (Shakyamuni Hall) and its front doors** | 30, 31 |
| ㉓ | West side of the front doors of *Shaka-do* | 32 |
| ㉔ | East side of the front doors of *Shaka-do* | 33 |
| ㉕ | West-side folding door panels (carved with the Twenty-four Filial Exemplars) of *Shaka-do* | 34-36 |
| ㉖ | Pole left to the west-side folding door panels (carved with the Twenty-four Filial Exemplars) of *Shaka-do* | 37 |
| ㉗ | Pole right to the west-side folding door panels (carved with the Twenty-four Filial Exemplars) of *Shaka-do* | 38 |
| ㉘ | Pole on the northwest side of *Shaka-do* | 39, 40 |
| ㉙ | Pole on the north side of *Shaka-do* | 41, 42 |
| ㉚ | Pole right to the north-side folding door panels (carved with the Twenty-four Filial Exemplars) of *Shaka-do* | 43, 44 |
| ㉛ | North-side folding door panels (carved with the Twenty-four Filial Exemplars) of *Shaka-do* | 45-48 |
| ㉜ | Pole on the northeast side of *Shaka-do* | 49, 50 |
| ㉝ | Poles on the east side of *Shaka-do* | 51-54 |
| ㉞ | Pole on the southeast side of *Shaka-do* | 55, 56 |
| **"7"** | ***Kaizan-do* (Open Mountain Hall)** | 57 |
| ㉟ | Pole on the south side in front of *Kaizan-do* | 58, 59 |
| ㊱ | Pole on the north side in front of *Kaizan-do* | 60, 61 |
| **"8"** | ***Sanja* (Triple Shrine)** | 62 |
| ㊲ | Front of the front doors | 63, 64 |
| **"9"** | ***Komyo-do* (Enlightenment Hall)** | 65 |
| ㊳ | Outer pole on the southwest side of *Komyo-do* | 66, 67 |
| ㊴ | Pole on the southwest side of *Komyo-do* | 68, 69 |
| ㊵ | Pole on the northwest side of *Komyo-do* | 70, 71 |
| ㊶ | Doors on the north side of *Komyo-do* | 72, 73 |
| ㊷ | Pole on the northeast side of *Komyo-do* | 74, 75 |
| ㊸ | Pole on the southeast side of *Komyo-do* | 76, 77 |
| ㊹ | Upper part of the pole on the east side in front of *Komyo-do* | 78 |
| ㊺ | Lower part of the pole on the east side in front of *Komyo-do* | 79 |
| **"10"** | ***Oku-no-in* (Inner Shrine)** | 80 |

10

A0569

| | | | |
|---|---|---|---|
| ㊻ | | Entrance doors of *Oku-no-in* | 81 |
| ㊼ | | Doors on the southeast side of *Oku-no-in* | 82, 83 |
| "11" | ㊽ | Bronze Statue of *Kobo Daishi* (Great Teacher Kobo) | 84, 85 |
| "12" | | *Issai-kyo-do* (All Sutras Repository) | 86, 87 |
| ㊾ | | Pole right to the front doors of *Issai-kyo-do* | 88, 89 |
| ㊿ | | Pole left to the front doors of *Issai-kyo-do* | 90, 91 |
| �51 | | Doors on the south side of *Issai-kyo-do* | 92, 93 |
| "13" | | *Hon-do* (Great Main Hall) | 94 |
| �52 | | Pole on the southeast side of *Hon-do* | 95, 96 |
| �53 | | Pole on the southwest side of *Hon-do* | 97, 98 |
| �54 | | Pole on the west side of *Hon-do* | 99, 100 |
| �55 | | Pole on the northwest side of *Hon-do* | 101,102 |
| �56 | | Lantern on the right side of *Ura-butsu* (the Buddha Altar Behind) of *Hon-do* | 103,104 |
| �57 | | Pole on the northeast side of *Hon-do* | 105,106 |
| �58 | | Pole on the east side of *Hon-do*, the second one from the north | 107,108 |
| �59 | | Pole on the east side of *Hon-do*, the third one from the north | 109,110 |
| �60 | | Pole on the east side of *Hon-do*, the fourth one from the north | 111,112 |
| "14" | | *Koware Fudo-do* (Breakable Fire-God Hall) | 113 |
| �61 | | Top of the candle stand | 114 |
| "15" | | *Shuho Dojo* (Esoteric Training Hall) | 115,116 |
| �62 | | Pole on the left side of the front entrance | 117,118 |
| �63 | | Pole on the right side of the front entrance | 119,120 |
| "16" | | *Dai-mon* (Great Gate) | 121 |
| �64 | | Pole on the south side of *Dai-mon* | 122,123 |
| �65 | | Pole on the north side of *Dai-mon* | 124,125 |

11

A0570

（成田山新勝寺現場見取図）

成田山新勝寺現場見取図　Crime Scene Layout of Narita-san Shinsho-ji Temple

総門　*So-mon* (Main Gate)

弁財天堂　*Benzaiten-do* (Goddess Saraswati Hall)

大師堂　*Daishi-do* (Hall for Great Teacher)

仁王門　*Nio-mon* (God Vajrapani Gate)

光輪閣　*Korin-kaku* (Aureole House)

釈迦堂　*Shaka-do* (Shakyamuni Hall)

開山堂　*Kaizan-do* (Open Mountain Hall)

三社　*Sanja* (Triple Shrine)

光明堂　*Komyo-do* (Enlightenment Hall)

奥之院　*Oku-no-in* (Inner Shrine)

弘法大師銅像　Bronze Statue of *Kobo Daishi* (Great Teacher *Kobo*)

一切経堂　*Issai-kyo-do* (All Sutras Repository)

本堂　*Hon-do* (Great Main Hall)

こわれ不動堂　*Koware Fudo-do* (Breakable Fire-God Hall)

修法道場　*Shuho Dojo* (Esoteric Training Hall)

大門　*Dai-mon* (Great Gate)

12

A0571



*So-mon* (Main Gate)



Pole on the east side in the center of *So-mon* (Main Gate), the first one from the south

A0572

3



Pole on the east side in the center of *So-mon* (Main Gate), the second one from the south

4



Pole on the east side in the center of *So-mon*, the third one from the south

A0573

5



Front of *Benzaiten-do* (Goddess Saraswati Hall)

6



Front door of *Benzaiten-do*

A0574

7



Front of *Daishi-do* (Hall for the Great Teacher)

8



Door rail, front doors and front porch of *Daishi-do*

9



*Nio-mon* (God Vajrapani Gate)

10



Fence in front of the Statue of *Naraen Kongo* (Guardian of Buddha) at *Nio-mon*

11



Same as the above (Enlargement)

12



Central pole on the northeast side of *Nio-mon*

13



Same as the above (Enlargement)

14

Central pole on the northwest side of *Nio-mon*

15



Outer pole on the northwest side of *Nio-mon*

16



Same as the above (Enlargement)

A0579

17



*Korin-kaku* (Aureole House)

18



Same as the above

A0580

19



Pole on the north side in front of the inner entrance of *Korin-kaku* (south side)

20



Pole on the north side in front of the inner entrance of *Korin-kaku* (southeast corner)

21



Pole to the north of the lower threshold of the inner entrance of *Korin-kaku*

22



Middle threshold of the inner entrance of *Korin-kaku*

23



South side of the outer pole on the southeast side of *Korin-kaku*

24



North side of the outer pole on the southeast side of *Korin-kaku*

25



Pole in front of the entrance lobby of *Korin-kaku*

26



Pole to the south of the threshold of the great entrance of *Korin-kaku*

27



Pole to the north of the threshold of the great entrance of *Korin-kaku*

28



Pole to the north of the Reception Counter for *O-goma* (Ritual Burning of Wood Sticks) at *Korin-kaku*

29



Outer pole on the northeast side of *Korin-kaku*

30



*Shaka-do* (Shakyamuni Hall)

Case 1:23-cv-03469-CM    Document 4-25    Filed 04/28/23    Page 44 of 44

Cross-Reference Table

| Letter/Number on Layout of Katori Jingu Shrine | Damaged Portion | Photo No. |
|---|---|---|
| Ⓐ | **Romon or Tower Gate** | 1 |
| ① | Vermilion-colored round pole on the southwest side (first one from the south side) | 2-3 |
| ② | Vermilion-colored round pole on the west side (second one from the south side) | 2-4 |
| ③ | Vermilion-colored round pole on the northwest side (third one from the south side) | 5-6 |
| ④ | Vermilion-colored round pole on the southeast side (first one from the south side) | 7-8 |
| ⑤ | Vermilion-colored round pole on the east side (second one from the south side) | 7-9 |
| ⑥ | Vermilion-colored round pole on the northeast side (third one from the south side) | 10-11 |
| ⑦ | *Komainu* or Guardian Dog Statue on the northwest side | 12-13 |
| ⑧ | *Komainu* or Guardian Dog Statue on the northeast side | 14-15 |
| Ⓑ-Ⓗ | **Hall of Worship and *Tamagaki* Fence around the *Honden* or Main Hall** | 16 |
| ⑨ | Black-colored square pole on the east side in front of the Hall of Worship | 17-18 |
| ⑩ | Black-colored stairs and the black-colored offertory box in front of the Hall of Worship | 19-21 |
| ⑪ | Black-colored square pole on the west side in front of the Hall of Worship | 22-23 |
| ⑫ | Black-mirror-finished wooden double door on the west side of the Hall of Worship | 24-26 |
| ⑬ | Wooden black-colored *Tamagaki* Fence at the | 27-29 |

10

A0587

Dated:       March 24, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of March 2025, a copy of the foregoing accompanying Appendix Volume II of VIII was filed via ACMS. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties on the electronic filing receipt, including:

**Tara Marie La Morte, Esq.**
**DOJ-USAO**
**1 St. Andrews Plaza**
**New York, NY 10017**
**212-637-1041**
**Email: tara.lamorte2@usdoj.gov**

*Counsel for Appellee*

David Dudley, Esq.